**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| THE NIELSEN COMPANY (US), LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | C.A. No. _____ |
| v. | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| TVISION INSIGHTS, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## COMPLAINT FOR PATENT INFRINGEMENT

The Nielsen Company (US), LLC ("Nielsen" or "Plaintiff"), for its Complaint against Defendant TVision Insights, Inc. ("TVision" or "Defendant"), alleges as follows:

## NATURE OF THE ACTION

1.      This is an action for patent infringement brought against Defendant for infringement of United States Patent Nos. 9,020,189 ("the '189 Patent") and 8,302,120 ("the '120 Patent") (collectively, "the Asserted Patents").

## PARTIES

2.      Plaintiff The Nielsen Company (US), LLC is organized and existing under the laws of the State of Delaware, with a principal place of business at 85 Broad Street, New York, New York 10004.

3.      According to public records, Defendant TVision Insights, Inc. is organized and existing under the laws of the State of Delaware.

## JURISDICTION AND VENUE

4.      This is an action for patent infringement arising under the Patent Act, 35 U.S.C. §§ 1 *et seq.*  This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1338(a).

5.     This Court has personal jurisdiction over Defendant because Defendant is a Delaware corporation, and on information and belief, regularly transacts business in Delaware. Defendant has a registered agent in Delaware:  The Corporation Trust Company, 1209 Orange Street, Wilmington, DE 19801.

6.     Venue is proper pursuant to 28 U.S.C. § 1400(b) because Defendant resides in this District.

**FACTUAL BACKGROUND**

7.     Founded in 1923 by Arthur C. Nielsen, Nielsen is the media industry's leading data and analytics company.  Nielsen fuels the industry with an accurate understanding of what people watch and listen to.

8.     Measuring across all channels and platforms – from traditional linear television to streaming TV to social media and on-line video/audio platforms – Nielsen helps its clients and partners optimize the value of their marketing investments and growth strategies.  Nielsen offers measurement and analytics in nearly 60 countries.

9.     One of the unique features of Nielsen's product and service offerings is the leveraging of panel measurement technologies.  More specifically, a cornerstone of Nielsen's media data and analytics business has been its investment in media panels and the related technology to measure those panels.  Media panels consist of people allowing Nielsen into their homes to enable first-hand measurement of their media consumption activities on an ongoing basis.  These media panels allow for a true understanding of not just who is consuming media, but when, why, where, and how much – a truth set, which can be used to improve the accuracy of other messy, "dirty," or fragmented Big Data sets from other sources.  Panel measurement can de-duplicate video and audio audiences so Nielsen's customers can know, for example, the difference

between a single binge watcher and a family of devotees gathered in the living room watching their favorite programs.

10.     The importance of panel measurement to Nielsen's products and services explains why Nielsen has spent hundreds of millions of dollars on its panel measurement technologies and capabilities over decades.  Knowing exactly who and how many individuals are watching television or consuming media within a particular Nielsen panel-home at a given time is at the core of Nielsen's data and analytics business.

## THE ASSERTED PATENTS

11.     Nielsen has obtained patent protection for its innovative technologies, including the '189 Patent and the '120 Patent.

### The '189 Patent

12.     The '189 Patent, entitled "Methods and Apparatus to Monitor Environments," was duly and legally issued on April 28, 2015.  A true and correct copy of the '189 Patent is attached hereto as Exhibit A.

13.     Nielsen is the assignee and owner of all right, title, and interest in the '189 Patent. The '189 Patent is valid and enforceable.

14.     The '189 Patent is directed to, among other things, an audience measurement device that improves the accuracy of detection of individuals who are watching particular television content. ('189 Patent, Ex. A, 1:6-8, Claim 9.)  The methods, systems, and apparatuses for detection of individuals disclosed and claimed in the '189 Patent are often used as part of broader audience measurement systems and methods (*i.e.*, systems and methods that determine the number of individuals watching particular content).  (*Id.*, 1:32-35, 1:63-2:1, 2:58-64.)

15.     More specifically, the '189 Patent relates to, among other things, methods, systems, and apparatuses for capturing images of the area in front of the television and analyzing those images to determine the number of people present.  (*Id.*, 1:25-32, 2:1-3.)  Such methods, systems, and apparatuses attempt to recognize objects in those images, such as body parts, using, for example, face detection.  (*Id.*, 2:13-17, 2:36.)  Many such methods, systems, and apparatuses have relied solely on two-dimensional image data to recognize body parts.  (*Id.*, 3:10-12.)  Others have relied solely on three-dimensional image data.  (*Id.*, 3:10-25.)

16.     Before the invention disclosed in the '189 Patent, numerous technical problems were encountered in the above-discussed methods, systems, and apparatuses.  These problems resulted in under- or over-counting of the individuals present in the room, which could be fatal to generating accurate panel measurement data.  For example, faces sometimes went undetected due to partial visibility, poor lighting, or rotation of the head.  (*Id.*, 2:36-40.)  At other times, a picture of a human face hanging on the wall in the area of the television was incorrectly interpreted as an individual watching the television.  (*Id.*, 2:47-50.)

17.     The declaration of Virginia Lee ("Lee Decl."), attached hereto as Exhibit B, is incorporated by reference into this Complaint.

18.     Claim 9 of the '189 Patent recites an audience measurement device.  The claim recites an element ("the Analyzer Element") that includes two data analyzers: one to execute a recognition analysis on three-dimensional data representative of a first object within a threshold distance from a three-dimensional sensor, and another to execute a second recognition analysis on two-dimensional data representative of a second object outside the threshold distance from the three-dimensional sensor.  (Lee Decl., ¶ 15.)  The claim also recites an element ("the Combination

Element") that includes a counter to combine the detection of people by the two analyzers to generate a people count.  (*Id.*)

19.     The Analyzer Element and the Combination Element are inventive and novel.  (*Id.*, ¶ 16.)  As of the priority date of the '189 Patent, these elements were not well-understood, routine, or conventional.  (*Id.*)

20.     In practice, for example, the Analyzer Element may involve the use of three-dimensional data from a three-dimensional sensor such as an infrared ("IR") sensor to detect and count people who are in the area of a television set (*i.e.,* people who are exposed to particular media content being played on the television).  (*Id.*, ¶ 17.)  Such data can represent a skeletal framework of a detected person and can thereby track the person's movements or gestures.  (*Id.*) The capture and processing of three-dimensional data can also provide the ability to distinguish human beings from pictures that contain similar patterns (*e.g.,* a painting hanging on the wall). (*Id.*)

21.     The Analyzer Element employs three-dimensional data when the object (for example, a person) is within a threshold distance from the three-dimensional sensor (for example, an IR sensor).  (*Id.*, ¶ 18.)  When the object/person is outside of that threshold distance from the three-dimensional sensor, the Analyzer Element employs a two-dimensional sensor such as a camera to detect people who are in the area of the television set.  (*Id.*)  Accordingly, the Analyzer Element provides for the detecting and counting of people who are both close to (*i.e.,* within a threshold distance of) and farther away from (*i.e.* outside the threshold distance from) a television set with three-dimensional and two-dimensional sensors, respectively.  (*Id.*)  The Combination Element, in turn, provides for the combination of the results obtained from the three-dimensional and two-dimensional sensors to arrive at an accurate people count.  (*Id.*)

5

22.    The Analyzer Element and the Combination Element were not known in the prior art.  (*Id.*, ¶ 19.)  Before the priority date of the '189 Patent, the use of two-dimensional data analysis by itself was the most common approach.  (*Id.*)  Such two-dimensional analysis was performed using a camera that captured a two-dimensional image.  (*Id.*)  But this led to several problems, which in turn led to inaccuracies in counting people.  (*Id.*)  For example, the use of two-dimensional sensors and data often led to over-counting due to misinterpretation of images such as pictures hanging on the wall as actual human beings present in the room.  (*Id.*)  Other issues, such as poor lighting, also led to inaccuracies in counting via two-dimensional data.  (*Id.*)

23.    Alternatively, before the priority date of the '189 Patent, some systems used three-dimensional data by itself.  (*Id.*, ¶ 20.)  Three-dimensional data analysis provided an improved ability over the two-dimensional approach to recognize and count people in certain circumstances. (*Id.*)  In particular, the three-dimensional approach provided greater accuracy in many instances. (*Id.*)  For example, it could discern people from pictures better than the two-dimensional approach. (*Id.*)  However, it was limited by the distance at which it could perform accurate detection of people.  (*Id.*)

24.    The Analyzer Element, which employs three-dimensional analysis for objects within a threshold distance and two-dimensional analysis for objects that are further away, reflects the recognition, disclosed in the '189 Patent, that three-dimensional data analysis provides benefits over two-dimensional data analysis only when the objects being identified and counted are close to the three-dimensional sensor.  (*Id.*, ¶ 21.)  For objects that are farther away from the three-dimensional sensor, the Analyzer Element employs two-dimensional analysis, which the '189 Patent discloses is better suited to objects that are farther from the sensor.  (*Id.*)  The Combination

Element combines the results of both the three-dimensional and the two-dimensional analyses to arrive at an accurate count of the people present in the area of the television.  (*Id.*)

25.     The Analyzer Element and the Combination Element provide an improvement over the prior art by using three-dimensional analysis in a distance range that is best suited to three-dimensional analysis, using two-dimensional analysis in a distance range that is most suited to two-dimensional analysis, and combining the results of the analyses into a people count.  This has led to much more accurate counting of people than is obtained by using three-dimensional data analysis alone or using two-dimensional data analysis alone.

26.     The Analyzer Element and the Combination Element provide one specific way (an improved way) to generate people counts.  There are other ways, including the prior art approaches discussed above.

**The '120 Patent**

27.     The '120 Patent, entitled "Methods and Apparatus to Monitor Advertisement Exposure," was duly and legally issued on October 30, 2012.  A true and correct copy of the '120 Patent is attached hereto as Exhibit C.

28.     Nielsen is the assignee and owner of all right, title, and interest in the '120 Patent.  The '120 Patent is valid and enforceable.

29.     The '120 Patent is directed to, among other things, correlating presentation of media content on a media content presentation device with activity on a different computing device.  ('120 Patent, Ex. C, Abstract, 1:14-39.)

30.     In the prior art, there were many methods for determining how many individuals were exposed to media content such as advertisements.  (*Id.,* 1:23-25.)  For example, there were systems for monitoring the number of individuals in the same room as a television that was playing

a particular advertisement or other media content.  (*Id.,* 1:25-31.)  However, the prior art was unable to determine associations between the presentation of media content to the individuals and activity on computing devices attributable to the individuals (*e.g.,* the correlation between viewing a particular advertisement and visiting a website for the advertised product).  (*Id.,* 1:32-37.)

31.     Claims 1 and 14 of the '120 patent and their dependent claims (including claims 2, 9, and 15) recite a method and system for monitoring media content.  This media content could be, for example, an advertisement.  (Lee Decl., ¶ 7.)  The method and system include the determination of an association between the presentation of media content on a media content presentation device (such as a television) and activity on a computing device different from (and not in communication with) the media content presentation device.  (*Id.*)  This is accomplished in part by logging activity relating to the computing device via an activity monitor.  (*Id.*)

32.     The determination of an association between the presentation of media content on a media content presentation device and activity on a computing device different from (and not in communication with) the media content presentation device via computing device activity logging ("the Determination Element"), as recited in Claims 1 and 14 (and their dependent claims), is inventive and novel.  (*Id.,* ¶ 8.)  As of the priority date of the '120 Patent, this Determination Element was not well-understood, routine, or conventional.  (*Id.*)

33.     In practice, for example, the Determination Element allows a determination of the effectiveness of an advertisement.  (*Id.,* ¶ 9.)  Given a particular time that an advertisement has been presented on a viewer's television, the Determination Element involves an examination of the activities of the viewer on a computing device near that time.  (*Id.*)  This, in turn, allows conclusions to be drawn regarding the effectiveness of the advertisement.  (*Id.*)  For example, if the viewer visits the website for an advertised product shortly after presentation of the

advertisement, this association between the advertisement's presentation and the computer activity leads to the conclusion that the advertisement was effective in influencing the viewer's activity. (*Id*.)

34.     The Determination Element was not known in the prior art.  (*Id., ¶* 10.)  Before the priority date of the '120 Patent, the association between media content and activity – for example, the association between presentation of an advertisement and the purchasing of the product – was determined by drawing inferences from general sales volumes.  (*Id*.)  For example, if sales of a product generally increased in the days after the airing of a television commercial, an inference was drawn that the commercial was effective in motivating product sales.  (*Id*.)

35.     Since well before the priority date of the '120 Patent, determining the association between presentation of media content and viewer activity has been extremely important.  (*Id.*, ¶ 11.)  Using such associations to measure the effectiveness of the content (*e.g.,* advertisements) has been the holy grail of the industry.  (*Id*.)  As such, advertisers have been willing to spend enormous sums of money in the pursuit of making their advertising more effective.  (*Id*.)  Accordingly, there has long been a demand for improved ways of monitoring content and determining associations between that media content and the activities of users on their computer devices.  (*Id*.)

36.     The prior art method of drawing inferences based on the timing of sales volumes in relationship to the timing of advertising provided some insights regarding the effectiveness of advertising, but the method was not sufficiently precise.  (*Id.*, ¶ 12.)  At times, incorrect conclusions were drawn due to external factors (for example, the state of the economy, environmental conditions, or other factors).  (*Id*.)  Businesses realized this and focused on ways of improving their ability to determine the effectiveness of particular advertising.  (*Id*.)

37.     The Determination Element provided such an improvement.  (*Id.*, ¶ 13.)  By focusing on the computer activity of users, shortly after being exposed to media content, the Determination Element allows much more precise associations between the media content and consumer activity.  (*Id.*)  This is so because the Determination Element reduces or eliminates the effects of external factors that cause errors in the prior art approaches (*e.g.,* observing general sales volumes after the airing of particular advertisements) such as general economic or environmental factors, etc.  (*Id.*)  By focusing on individuals' computer activity, the Determination Element also allows an interested party to gauge the effectiveness of an advertisement in terms of consumer activity other than just completed purchases (*e.g.,* an advertisement can be considered effective if it triggers visits to an advertiser's website even if the visits do not result in purchases).  (*Id.*)

38.     The Determination Element provides one specific way (an improved way) to associate media content with consumer activity.  (*Id.*, ¶ 14.)  There are other ways to associate media content with consumer activity, including the prior art approach discussed above.  (*Id.*)

## THE INFRINGING SYSTEM AND METHOD

39.     Defendant is a data and analytics company that measures how people watch TV. Defendant "started out by measuring attention on linear TV" (*see* Allison Schiff, *TVision Insights 'Ratings Only Tell Part of the Story'*, https://www.adexchanger.com /tv-and-video/tvision-insights-ratings-only-tell-part-of-the-story/ ("AdExchanger Article"), attached hereto as Exhibit D), but has since become the "go-to-choice" for Nielsen's measurement rivals, as reported by AdAge, by providing panel measurement data to them to compete directly with Nielsen's products and service offerings (*see TVision is the go-to-choice for Several Nielsen Rivals*, https://www.tvisioninsights.com/resources/adage-mrc-panel-data ("AdAge Article"), attached hereto as Exhibit E).  Defendant collects data from a panel of TV viewers that opt-in to

be part of the panel.  (*See* https://www.mytvpanel.com/video (at 00:50-03:16).)  Defendant's President and COO, Luke McGuinness, has stated that "[w]e are like Nielsen in that we use a panel methodology."  (*See* AdExchanger Article, Ex. D.)

40.     Defendant's panel includes at least 5,000 homes (approximately 15,000 persons) in the United States.  (*Id.*; *Alison* Weissbrot, *4 Challenges the Industry will Face as it Breaks Away from Nielsen*,  https://www.campaignlive.com/article/4-challenges-industry-will-face-breaks-away-nielsen/1726140?DCMP=EMC-CONTheCampaignFix&bulletin=the-campaign-fix ("CampaignLive Article"), attached hereto as Exhibit F.)  According to TVision CEO Yan Liu and various press accounts, Defendant's panelists are located in and around Boston, Chicago, Dallas, New York, Philadelphia, Atlanta, Seattle, and Los Angeles. (https://www.youtube.com/watch?v=RCtw7NxjalQ (at 00:41); *see also* Sapna Maheshwari, *For Marketers TV Sets are an Invaluable Pair of Eyes*, https://www.nytimes.com/2017/02/25/business/media/tv-viewers-tracking-tools.html, attached hereto as Exhibit G; *see also* Adam Jacobson, *For TV's Ad Future, all Eyes are on Attention Metrics*, https://www.rbr.com/tvision-0926/ ("RBR"), attached hereto as Exhibit H.)

41.     Defendant has taken a "copy Nielsen" approach to its products and services.  For example, Defendant's marketing materials imitate Nielsen's sales literature.  It is necessary to look no further than Defendant's website for evidence of this approach.  (*See* Defendant's web pages, attached hereto as Exhibits I (excerpt) and Exhibit J (excerpt).)  In particular, Defendant's website contains multiple photographs that are the same in concept and design as (or even exact copies of) photographs contained in Nielsen's standard sales slide decks.  A comparison of the photographs on Defendant's website with photographs in Nielsen's slide decks is as follows:

| DEFENDANT'S PHOTOGRAPH | NIELSEN'S PHOTOGRAPH |
|---|---|



42.     Defendant uses a system ("the Infringing System") and employs a method ("the Infringing Method") to accomplish audience measurement and to measure the effectiveness of advertising.

43.     The Infringing System includes a device that Defendant places in each of its panelists' homes ("the Device").  The Infringing Method includes the steps of collecting data using at least the Device and analyzing the collected data using the Device and computer systems.

44.     The data Defendant collects and analyzes from its panel can provide second-by-second, person-level insights into how people watch TV, including insights into TV attribution, co-viewing, reach, frequency, and cross-platform management.  (*See* Yan Liu, *The Future of Media Measurement: The Role of Panels in Big Data*, https://www.tvisioninsights.com/ resources/the-role-of-panels-in-big-data, attached hereto as Exhibit K); *see also Advanced Audience Projections*, https://f.hubspotusercontent00.net/hubfs/3023204/TVision%20Advanced %20Audience%20Projections%20(1).pdf, attached hereto as Exhibit L.)

### Use of Both Two-Dimensional Data and Three-Dimensional Data

45.     Defendant's President and COO has described Defendant's technology as "most critically" including "a camera:"

> Our panelists put our device in their homes next to their TV. It's about the size of an Apple TV and it does three key things. First, we use ACR [automatic content recognition] to determine what someone is watching on the TV.  Is it "The Voice," "Stranger Things," a specific commercial?
>
> Then we detect how the content got to the screen, whether the person is watching through live cable, the Hulu app, a Roku device, the NBCU app on Chromecast, whatever it happens to be. And then, third and most critically, our device has a camera. The technology only processes images – no video – to determine if there is anyone in the room and, if so, who. It recognizes the specific person, associates their demographics and can tell if they're paying attention to the TV or not.

(AdExchanger Article, Ex. D.)  Defendant's President and COO further stated that "all of the data is processed on the device in the panelist's home."  (*Id.*)

46.     More specifically, Defendant's technology includes a webcam that measures eyes-on-screen attention to TV shows and commercials using motion-capture computer vision technology.



(https://www.mytvpanel.com/video (at 01:14).)   In some examples, the webcam includes a Logitech® webcam.  (*See* RBR, Ex. H.)

47.     With its webcam, Defendant's technology captures headshot images of panelists, determines which panelists are in the room, and determines when the panelists' eyes are looking at the TV screen.



(https://www.mytvpanel.com/video (at 01:44).)

48.     Defendant's CRO and Co-Founder Dan Schiffman has stated that Defendant has filed patent applications on the systems and methods it uses. (*see* Ingrid Lunden, *TVision Raises $6.8M to Take on Nielsen With Thermal eye and Emotion Tracking tech*, https://techcrunch.com/2016/10/26/tvision-raises-6-8m-to-take-on-nielsen-with-thermal-eye-and-emotion-tracking-tech/ ("TechCrunch Article," attached hereto as Exhibit M) ("Schiffman [who co-founded the company with CEO Yan Liu] told me that TVision already has applications in for two utility patents, one for its computer vision algorithm and another around its analytics.")  One such patent application is U.S. Patent Application Publication 2018/0007431 ("the '431 Publication") (attached hereto as Exhibit N).  Defendant has implemented concepts disclosed in the '431 Publication in the Infringing System and the Infringing Method.  (*See* TechCrunch Article, Ex. M; '431 Publication, Ex. N, Abstract and Par. 0029, 31, 42-45, 54, 61, 101, 160-162, 169, 170-172.)

49.    As explained above, the Infringing System and the Infringing Method employ a webcam.  But Defendant's infringing technology relies on more than an optical camera.  (*See* TechCrunch Article, Ex. M.)  In addition to using a camera to capture two-dimensional color images, Defendant's infringing technology also uses infrared ("IR") sensors to capture three-dimensional images.  (*See id*; '431 Publication, Ex. N, Par. 0044.)

**Defendant's Measurement of Effectiveness of Advertising**

50.    Defendant has stated that its data can offer cross-platform insights through partnerships with other companies.  (*See* Anthony Ha, *TVision Raises $16M to Measure Viewer Attention on Connected TVs*, https://techcrunch.com/2020/11/02/tvision-funding/?guccounter=1, attached hereto as Exhibit O.)  According to TVision, it had and continues to have such a partnership with Data Plus Math.  (*See TVision Insights Partners with Data Plus Math to Tie TV Attention Data to Outcomes*, https://www.tvisioninsights.com/resources/tvision-insights-partners-data-plus-math-tie-tv-attention-data-outcomes, attached hereto as Exhibit P.)  Defendant has stated that "Data Plus Math looks at the entire customer journey from product awareness to eventual purchase and measures the conversion power of the various elements of the campaign."  (*Id.*)

51.    Defendant's CRO and Co-Founder has stated that "[w]ith TVision's attention data integrated into Data Plus Math's attribution platform, marketers can see the causal relationship between ad engagement to sales," and "[t]his partnership with Data Plus Math ties attention to outcomes while campaigns are in-flight."  (*Id.*)

52.    Defendant explains to potential panelists that "[w]e may also collect information from third-party partners to augment what we know from the System and what you provide to us." (*See Privacy Policy*, https://www.mytvpanel.com/privacy-policy, attached hereto as Exhibit Q.)

53.     Accordingly, Defendant "derive[s] information such as the effectiveness of certain . . . advertisement[s]" by comparing computer activity it gathers (*e.g.,* credit card transactions and Internet history) with identified media content.  ('431 Publication, Ex. N, Par. 0159, 0160, 0161.)

54.     Defendant licenses and offers to license data that Defendant collects and analyzes from its panel.  Defendant has been and is licensing its data to several Nielsen competitors.  (*See* CampaignLive Article, Ex. F.)  The press has made known that Defendant has licensed its data to Comscore, VideoAmp, iSpot, Xandr, and 605.  (*See* AdAge Article, Ex. E.)  AdAge reported that Defendant is "the go-to-choice for several Nielsen rivals."  (*Id.*)

55.     By making, using, offering to sell, and selling the Infringing System and performing the Infringing Method, Defendant is infringing the Asserted Patents as described in detail below.

56.     By this lawsuit, Nielsen seeks to enjoin Defendant from any further unauthorized use of Nielsen's patented technology, and it seeks to recover damages, including lost profits, increased damages, reasonable attorneys' fees, and other such relief as the Court deems just and proper for Defendant's violation of federal law.

**COUNT I**
**INFRINGEMENT OF THE '189 PATENT**

57.     Nielsen repeats and re-alleges paragraphs 1-56 as if fully set forth herein.

58.     Defendant has infringed and continues to infringe, literally or under the doctrine of equivalents, at least Claim 9 of the '189 Patent under 35 U.S.C. § 271(a) by making, using, selling and/or offering to sell in the United States, and/or importing into the United States, the Infringing System.  Defendant's activities are without license or permission from Nielsen.

59.     The Infringing System includes all elements of Claim 9 of the '189 Patent, either literally or equivalently.

60.     Claim 9 of the '189 Patent recites "[a]n audience measurement device."  The Infringing System includes an audience measurement device that Defendant places in its panelists' homes and in other locations that have televisions or other display devices.  ('431 Publication, Ex. N, Par. 0042) ("FIG 1 illustrates a schematic view of a system 100 for assessing viewer engagement in a household, a sports bar, or other space with a display.  The system 100 includes a local device 105 disposed in each household to collect viewer engagement data . . .")

61.     Claim 9 of the '189 Patent also recites "a first data analyzer to execute first recognition analysis on three-dimensional data representative of a first object within a threshold distance from a three-dimensional sensor."  According to the patent application that Defendant acknowledges covers its products and methods, the Infringing System contains this element.  In particular, it includes an infrared (IR) sensor that produces one or more IR depth images.  This IR sensor is a three-dimensional sensor that measures IR light reflected or scattered in three dimensions by objects in the viewing area, and the IR depth images are three-dimensional data representative of objects within a threshold distance of the IR sensor.  ('431 Publication, Ex. N, Par. 0043.)  According to the patent application that Defendant acknowledges covers its products and methods, the Infringing System includes a processor that uses the IR depth images, and program module executable by the processor, to determine how many people are in the viewing area.  (*See id.*)

62.     Claim 9 of the '189 Patent also recites "a second data analyzer to execute a second recognition analysis on two-dimensional data representative of a second object outside the threshold distance from the three-dimensional sensor."  According to the patent application that Defendant acknowledges covers its products and methods, the Infringing System includes this element.  In particular, it includes a camera, which captures color images in two dimensions. ('431

Publication, Ex. N, Par. 0044.)  The color images are two-dimensional data representative of a second object outside the threshold distance from the three-dimensional sensor.  (*Id.*)  According to the patent application that Defendant acknowledges covers its products and methods, the Infringing System includes a processor that uses the color images, and a program module executable by the processor, to estimate how many people are in the viewing area.  (*See id.*)

63.     Claim 9 of the '189 Patent also recites "a counter to combine a first detection of a first person provided by the first data analyzer and a second detection of a second person provided by the second data analyzer to generate a people count for an environment."  According to the patent application that Defendant acknowledges covers its products and methods, the Infringing System contains this element.  In particular, it includes a processor that uses the number of people identified from the two-dimensional color image and the number of people identified from the three-dimensional IR depth image corresponding to the color image to count the number of people in the viewing area.  ('431 Publication, Ex. N, Par. 0044.)

64.     Claim 9 of the '189 Patent also recites "wherein at least one of the first data analyzer, the second analyzer or the counter is implemented via a logic circuit."  According to the patent application that Defendant acknowledges covers its products and methods, the Infringing System contains this element.  In particular, it includes a processor implemented via a logic circuit. ('431 Publication, Ex. N, Par. 0054, 0169.)

65.     Defendant has knowledge of the '189 Patent as of the service date of the Complaint, and Defendant is willfully and deliberately infringing the '189 Patent at least as of the service date of the Complaint.

66.     On information and belief, Defendant also had knowledge of the '189 Patent before the service date of the Complaint, and on information and belief, Defendant has been willfully and

deliberately infringing the '189 Patent since before the service date of the Complaint.  (*See supra* ¶ 41 (demonstrating Defendant's "copy Nielsen" approach to its products and services).)

67.     Through the conduct alleged above, Defendant has caused and will in the absence of an injunction continue to cause Nielsen to suffer damages, which in no event are less than a reasonable royalty, and which include, but are not limited to, lost sales and sales opportunities.

68.     Defendant has also irreparably harmed Nielsen.  Unless and until Defendant is enjoined by this Court from further infringement of the '189 Patent, Nielsen will continue to suffer irreparable injury for which it has no adequate remedy at law.

## COUNT II
## INFRINGEMENT OF THE '120 PATENT

69.     Nielsen repeats and re-alleges paragraphs 1-68 as if fully set forth herein.

70.     Defendant has infringed and continues to infringe, literally or under the doctrine of equivalents, at least Claims 1-2, 9, and 14-15 of the '120 Patent under 35 U.S.C. § 271(a) by making, using, selling and/or offering to sell in the United States, and/or importing into the United States, the Infringing System and performing the Infringing Method.  Defendant's activities are without license or permission from Nielsen.

71.     All elements of Claims 1, 2, and 9 of the '120 Patent are performed by or attributable to the Defendant, either literally or equivalently.

72.     Claim 1 of the '120 Patent recites "A method for monitoring media content." According to the patent application that Defendant acknowledges covers its products and methods, the Infringing Method is a method for monitoring media content.  ('431 Publication, Ex. N, Abstract.)

73.     Claim 1 of the '120 Patent also recites "determining via a meter that a media content segment was presented at a media content presentation device."   According to the patent

application that Defendant acknowledges covers its products and methods, the Infringing Method performs this method step.  In particular, it "samples the soundtrack of the video with a microphone and identifies the videos using the samples of the soundtrack."  (*Id.*, Par. 0029.)  This is accomplished through the comparison of audio fingerprints from the soundtrack to known reference fingerprints.  (*Id.,* Par. 0045.)

74.     Claim 1 of the '120 Patent recites "logging via an activity monitor different than the meter an occurrence of an activity on a computing device different than the content presentation device, wherein the computing device is not in communication with the media content presentation device."  According to the patent application that Defendant acknowledges covers its products and methods, the Infringing Method performs this method step.  In particular, it collects and logs the user's credit card transactions, Internet history, and other computing device-related information. ('431 Publication, Ex. N, Par. 0159, 0160, 0161.)  This collection and logging is performed for a separate computing device that is not in communication with the television or other content presentation device.  (*See id.*)  For example, in some instances, a partner of Defendant (*e.g*., Data Plus Math) detects and logs the user's activity at the direction and control of Defendant.  (*See* TVision, *TVision Insights Partners with Data Plus Math to Tie TV Attention Data to Outcomes*, https://www.tvisioninsights.com/resources/tvision-insights-partners-data-plus-math-tie-tv-attention-data-outcomes, Ex. P.)

75.     Claim 1 of the '120 Patent also recites "determining an association between the occurrence of the activity on the computing device and the presentation of the media content segment at the media content presentation device."  According to the patent application that Defendant acknowledges covers its products and methods, the Infringing Method performs this method step.  In particular, it "derive[s] information such as the effectiveness of certain . . .

advertisement[s]" by examining the computing device-related information (*e.g.,* credit card transactions and Internet history) and the identified media content. ('431 Publication, Ex. N, Par. 0159, 0160, 0161.) For example, in some instances, a partner of Defendant (*e.g.*, Data Plus Math) determines the association at the direction and control of Defendant.

76.     Claim 2 of the '120 Patent recites a method as defined in claim 1, wherein the activity comprises at least one of a accessing a webpage, a software application, or a media storage device. According to the patent application that Defendant acknowledges covers its products and methods, the Infringing Method performs this method step. (*See id.*)

77.     Claim 9 of the '120 Patent recites a method as defined in claim 1, wherein the media content presentation device is at least one of a television or a radio. According to the patent application that Defendant acknowledges covers its products and methods, the Infringing Method performs this method step. (*See id.*)

78.     The Infringing System includes all elements of Claims 14 and 15 of the '120 Patent, either literally or equivalently. In at least some instances, Defendant puts the Infringing System into service and obtains a benefit from it.

79.     Claim 14 of the '120 Patent recites "A system for monitoring media content." According to the patent application that Defendant acknowledges covers its products and methods, the Infringing System is used for monitoring media content. ('431 Publication, Ex. N, Abstract.)

80.     Claim 14 of the '120 Patent also recites "an activity monitor to log an occurrence of an activity on a computing device." According to the patent application that Defendant acknowledges covers its products and methods, the Infringing System includes this element. In particular, it uses an activity monitor to collect and log the user's credit card transactions, Internet history, and other computing device-related information. ('431 Publication, Ex. N, Par. 0159,

0160, 0161.)  This activity monitor logs activity of a separate computing device that is not in communication with the television or other content presentation device.  (*See id.*)

81.   Claim 14 of the '120 Patent also recites "a meter different than the activity monitor to monitor a media content presentation device different than the computing device and to determine that a media content segment was presented at the media content presentation device, wherein the media content presentation device is not in communication with the computing device."  According to the patent application that Defendant acknowledges covers its products and methods, the Infringing System contains this element.  In particular, it has a meter that "samples the soundtrack of the video with a microphone and identifies the videos using the samples of the soundtrack."  ('431 Publication, Ex. N, Par. 0029.)  This is accomplished through the comparison of audio fingerprints from the soundtrack to known reference fingerprints.  (*Id.,* Par. 0045.)  This meter is separate from, and is not in communication with, the activity monitor.  (*Id.*, Par. 0060, 0061.)

82.   Claim 14 of the '120 Patent also recites "a central facility to determine an association between the occurrence of the activity on the computing device and the presentation of the media content segment on the media content presentation device, and to create a report based on the association."  According to the patent application that Defendant acknowledges covers its products and methods, the Infringing System contains this element.  In particular, it has a central facility that "derive[s] information such as the effectiveness of certain . . . advertisement[s]" by examining the computing device-related information (*e.g.,* credit card transactions and Internet history) and the identified media content, and creates corresponding reports.  (*Id.*, Par. 0160, 0161.)

83.   Claim 15 of the '120 Patent recites a system as defined in claim 14, wherein the activity comprises at least one of a accessing a webpage, a software application, or a media storage

device.  According to the patent application that Defendant acknowledges covers its products and methods, the Infringing System contains this element.  (*See id.*)

84.     Defendant has knowledge of the '120 Patent as of the service date of the Complaint, and Defendant is willfully and deliberately infringing the '120 Patent as of the service date of the Complaint.

85.     On information and belief, Defendant also had knowledge of the '120 Patent before the service date of the Complaint, and on information and belief, Defendant has been willfully and deliberately infringing the '120 Patent before the service date of the Complaint.  (*See supra* ¶ 41 (demonstrating Defendant's "copy Nielsen" approach to its products and services).)

86.     Through the conduct alleged above, Defendant has caused and will in the absence of an injunction continue to cause Nielsen to suffer damages, which in no event are less than a reasonable royalty, and which include, but are not limited to, lost sales and sales opportunities.

87.     Defendant has also irreparably harmed Nielsen.  Unless and until Defendant is enjoined by this Court from further infringement of the '120 Patent, Nielsen will continue to suffer irreparable injury for which it has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Nielsen prays for judgment against Defendant as follows:

A.     A judgment that Defendant has infringed the '189 Patent and the '120 Patent;

B.     A judgment that Defendant's infringement of the '189 Patent and the '120 Patent is willful;

C.     An order permanently enjoining Defendant and its officers, directors, agents, servants, employees, affiliates, and all others acting in privity or in concert with them, and their

parents, subsidiaries, divisions, successors, and assigns, from further acts of infringement of the '189 Patent and the '120 Patent;

D.     An award of damages adequate to compensate Nielsen for Defendant's infringement of the '189 Patent and the '120 Patent, including increased damages up to three times the amount found or assessed, together with pre-judgment and post-judgment interest and costs, under 35 U.S.C. §§ 284 and 154(d).

E.     A judgment that this case is exceptional and an award of Nielsen's reasonable attorneys' fees, costs, and expenses under 35 U.S.C. § 285; and

F.     An award of such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury as to all issues so triable.

Respectfully submitted,

POTTER ANDERSON & CORROON LLP

OF COUNSEL:

Paul H. Berghoff
James L. Lovsin
Gavin J. O'Keefe
Gregory M. Huffman
James L. Korenchan
MCDONNELL BOEHNEN HULBERT & BERGHOFF LLP
300 South Wacker Drive
Chicago, IL 60606
Tel:  (312) 913-0001

Dated:  November 10, 2021
7455245 / 52358

By:  */s/ David E. Moore*
     David E. Moore (#3983)
     Bindu A. Palapura (#5370)
     Hercules Plaza, 6th Floor
     1313 N. Market Street
     Wilmington, DE  19801
     Tel:  (302) 984-6000
     dmoore@potteranderson.com
     bpalapura@potteranderson.com

*Attorneys for Plaintiff The Nielsen Company (US), LLC*