# EXHIBIT A



US007783889B2

(12) **United States Patent**
Srinivasan

(10) Patent No.: **US 7,783,889 B2**
(45) Date of Patent: **Aug. 24, 2010**

(54) **METHODS AND APPARATUS FOR GENERATING SIGNATURES**

(75) Inventor: **Venugopal Srinivasan**, Palm Harbor, FL (US)

(73) Assignee: **The Nielsen Company (US), LLC**, Schaumburg, IL (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 199 days.

(21) Appl. No.: **11/676,452**

(22) Filed: **Feb. 19, 2007**

(65) **Prior Publication Data**

US 2007/0274537 A1    Nov. 29, 2007

**Related U.S. Application Data**

(63) Continuation of application No. PCT/US2005/029623, filed on Aug. 18, 2005.

(60) Provisional application No. 60/603,024, filed on Aug. 18, 2004.

(51) **Int. Cl.**
*H04L 9/00*        (2006.01)

(52) **U.S. Cl.** .......................... **713/179**; 713/176; 725/19; 725/20; 380/202; 380/239; 381/94.3

(58) **Field of Classification Search** ................. 713/160, 713/176, 179; 380/202, 206, 207, 239, 253, 380/229; 382/100, 232, 240, 191; 381/94.3; 375/134; 704/268, 273; 725/19, 20
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

4,230,990 A    10/1980  Lert, Jr. et al.
(Continued)

FOREIGN PATENT DOCUMENTS

AU            718227      11/1997
(Continued)

OTHER PUBLICATIONS

United States Patent and Trademark Office, "PCT International Search Report," issued by the International Searching Authority of the United States Patent and Trademark Office on Feb. 6, 2008, in connection with a counterpart international application No. PCT/US2005/029623 (3 pages).

(Continued)

*Primary Examiner*—Nasser Moazzami
*Assistant Examiner*—Shanto M Abedin
(74) *Attorney, Agent, or Firm*—Hanley, Flight and Zimmerman, LLC

(57) **ABSTRACT**

Methods, apparatus, and articles of manufacture for media monitoring are disclosed. In particular, the example methods, apparatus, and articles of manufacture generate digital spectral signatures for use in identifying media information. Initially, a frame of media samples is obtained. A first frequency component having a first spectral power and a second frequency component having a second spectral power are identified by performing a spectral transform operation on the frame of media samples. A descriptor of the first frame of media samples is determined based on a comparison of the first spectral power and the second spectral power. A first signature is then generated based on the descriptor.

**17 Claims, 12 Drawing Sheets**



## US 7,783,889 B2
Page 2

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,450,531 | A | 5/1984 | Kenyon et al. |
| 4,677,466 | A * | 6/1987 | Lert et al. .................... 725/22 |
| 4,697,209 | A * | 9/1987 | Kiewit et al. ................. 725/19 |
| 4,739,398 | A | 4/1988 | Thomas et al. |
| 4,843,562 | A | 6/1989 | Kenyon et al. |
| 4,931,871 | A | 6/1990 | Kramer |
| 4,945,412 | A | 7/1990 | Kramer |
| 4,947,436 | A | 8/1990 | Greaves et al. |
| 5,019,899 | A | 5/1991 | Boles et al. |
| 5,436,653 | A | 7/1995 | Ellis et al. |
| 5,437,050 | A | 7/1995 | Lamb et al. |
| 5,450,490 | A * | 9/1995 | Jensen et al. ................ 380/253 |
| 5,481,294 | A | 1/1996 | Thomas et al. |
| 5,485,518 | A | 1/1996 | Hunter et al. |
| 5,504,518 | A | 4/1996 | Ellis et al. |
| 5,572,246 | A | 11/1996 | Ellis et al. |
| 5,581,658 | A | 12/1996 | O'Hagan et al. |
| 5,612,729 | A | 3/1997 | Ellis et al. |
| 5,621,454 | A | 4/1997 | Ellis et al. |
| 5,809,160 | A | 9/1998 | Powell et al. |
| 5,822,436 | A | 10/1998 | Rhoads |
| 5,826,164 | A | 10/1998 | Weinblatt |
| 5,875,122 | A | 2/1999 | Acharya |
| 5,909,518 | A | 6/1999 | Chui |
| 5,918,223 | A | 6/1999 | Blum et al. |
| 6,061,793 | A * | 5/2000 | Tewfik et al. ............... 713/176 |
| 6,072,888 | A | 6/2000 | Powell et al. |
| 6,122,392 | A | 9/2000 | Rhoads |
| 6,175,627 | B1 | 1/2001 | Petrovic et al. |
| 6,226,387 | B1 * | 5/2001 | Tewfik et al. ............... 382/100 |
| 6,230,176 | B1 | 5/2001 | Mizutani |
| 6,240,062 | B1 | 5/2001 | Kozaki et al. |
| 6,253,182 | B1 * | 6/2001 | Acero ......................... 704/268 |
| 6,266,430 | B1 | 7/2001 | Rhoads |
| 6,272,176 | B1 * | 8/2001 | Srinivasan ................... 375/240 |
| 6,330,335 | B1 | 12/2001 | Rhoads |
| 6,366,937 | B1 | 4/2002 | Shridhar et al. |
| 6,385,330 | B1 | 5/2002 | Powell et al. |
| 6,404,898 | B1 | 6/2002 | Rhoads |
| 6,421,445 | B1 | 7/2002 | Jensen et al. |
| 6,459,803 | B1 | 10/2002 | Powell et al. |
| 6,466,670 | B1 | 10/2002 | Tsuria et al. |
| 6,469,749 | B1 | 10/2002 | Dimitrova et al. |
| 6,496,591 | B1 | 12/2002 | Rhoads |
| 6,504,870 | B2 * | 1/2003 | Srinivasan ................... 375/240 |
| 6,513,161 | B2 * | 1/2003 | Wheeler et al. ............... 725/14 |
| 6,542,620 | B1 | 4/2003 | Rhoads |
| 6,560,349 | B1 | 5/2003 | Rhoads |
| 6,560,350 | B2 | 5/2003 | Rhoads |
| 6,567,780 | B2 | 5/2003 | Rhoads |
| 6,574,594 | B2 | 6/2003 | Pitman et al. |
| 6,597,405 | B1 | 7/2003 | Iggulden |
| 6,604,072 | B2 | 8/2003 | Pitman et al. |
| 6,614,915 | B2 | 9/2003 | Powell et al. |
| 6,633,651 | B1 | 10/2003 | Hirzalla et al. |
| 6,647,129 | B2 | 11/2003 | Rhoads |
| 6,647,130 | B2 | 11/2003 | Rhoads |
| 6,675,383 | B1 | 1/2004 | Wheeler et al. |
| 6,678,392 | B2 | 1/2004 | Powell et al. |
| 6,714,683 | B1 | 3/2004 | Tian et al. |
| 6,757,407 | B2 * | 6/2004 | Bruckstein et al. .......... 382/100 |
| 6,799,274 | B1 * | 9/2004 | Hamlin ....................... 713/176 |

| | | | |
|---|---|---|---|
| 6,839,673 | B1 * | 1/2005 | Choi et al. .................... 704/273 |
| 6,959,386 | B2 | 10/2005 | Rhoads |
| 6,968,337 | B2 | 11/2005 | Wold |
| 6,971,010 | B1 * | 11/2005 | Abdel-Mottaleb .......... 713/176 |
| 7,006,555 | B1 * | 2/2006 | Srinivasan .................. 375/133 |
| 7,073,065 | B2 * | 7/2006 | Stone .......................... 713/176 |
| 7,120,562 | B1 * | 10/2006 | Wilson ........................ 702/189 |
| 7,221,902 | B2 * | 5/2007 | Kopra et al. ............ 455/3.05 |
| 7,269,338 | B2 * | 9/2007 | Janevski ...................... 386/96 |
| 7,284,128 | B2 * | 10/2007 | Sako .......................... 713/176 |
| 7,512,801 | B1 | 3/2009 | Akiyama et al. |
| 7,562,012 | B1 | 7/2009 | Wold et al. |
| 2001/0005823 | A1 | 6/2001 | Fischer et al. |
| 2001/0029580 | A1 | 10/2001 | Moskowitz |
| 2002/0178410 | A1 | 11/2002 | Haitsma et al. |
| 2002/0186768 | A1 | 12/2002 | Dimitrova et al. |
| 2003/0005430 | A1 | 1/2003 | Kolessar |
| 2003/0036910 | A1 * | 2/2003 | Van Der Veen et al. ..... 704/500 |
| 2003/0086341 | A1 | 5/2003 | Wells et al. |
| 2003/0131350 | A1 | 7/2003 | Peiffer et al. |
| 2003/0156827 | A1 * | 8/2003 | Janevski ...................... 386/96 |
| 2003/0223584 | A1 * | 12/2003 | Bradley et al. .............. 380/222 |
| 2004/0122679 | A1 | 6/2004 | Neuhauser et al. |
| 2004/0210922 | A1 | 10/2004 | Peiffer et al. |
| 2005/0257064 | A1 * | 11/2005 | Boutant et al. .............. 713/180 |
| 2006/0107057 | A1 * | 5/2006 | Lewis et al. ................. 713/176 |
| 2006/0184961 | A1 | 8/2006 | Lee et al. |
| 2006/0195861 | A1 * | 8/2006 | Lee ............................... 725/19 |

### FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| AU | 747044 | 9/2000 |
| EP | 0887958 | 12/1998 |
| EP | 0987855 A2 | 3/2000 |
| JP | 3173291 | 7/1991 |
| WO | WO0079709 | 12/2000 |
| WO | WO02065782 | 8/2002 |
| WO | 2005/006768 | 1/2005 |

### OTHER PUBLICATIONS

Graps, Amara, "An Introduction to Wavelets," Institute of Electrical and Electronics Engineers, Inc., Summer 1995, Los Alamitos, USA (18 pages).

Haitsma et al., "Robust Audio Hashing for Content Identification," Philips Research, Eindhoven, NL, http://cite.seer.ist.psu.edu/ haitsma01robust.html, 2001 (8 pages).

Conner, Margery, "Advantages of the Sliding-Mode DFT," www.edn. com, Jan. 9, 2002 (1 page).

International Preliminary Examining Authority, "PCT International Preliminary Examination Report," issued by the United States Patent and Trademark Office on May 6, 2008, in connection with a counterpart international applicaton No. PCT/US2005/029623 (9 pages).

Mexican Institute of Industrial Property issued on Jul. 14, 2009, The result of Substantive Examination (including English Translation) in Mexican patent application No. MX/a/2007/002071, 3 pages with 3 pages English Translation.

Jeffrey D. Taft, PhD., "DSP Design Performance—Breaking barriers in Digital Signal Processing...with new design tools," 2001, [retrieved from http://www.nauticom.net/www.jdtaft/DFT_ increm. htm, accessed on Jan. 19, 2004], 1 page.

Schneider et al., "A Robust Content Based Digital Signature for Image Authentication," Columbia University, 1996, 4 pages.

* cited by examiner



FIG. 1A



FIG. 1B



FIG. 2



FIG. 3



FIG. 4



FIG. 5



FIG. 6



FIG. 7



FIG. 8



FIG. 9



FIG. 10



FIG. 11

Case 1:21-cv-01592-CJB   Document 82-1   Filed 01/25/23   Page 15 of 160 PageID #: 949



FIG. 12

US 7,783,889 B2

1

## METHODS AND APPARATUS FOR GENERATING SIGNATURES

### RELATED APPLICATIONS

This patent is a continuation of International Patent Application Ser. No. PCT/US2005/029623, filed Aug. 18, 2005, which claims priority to U.S. Provisional Application 60/603, 024, filed on Aug. 18, 2004, both of which are hereby incorporated herein by reference in their entireties.

### FIELD OF THE DISCLOSURE

The present disclosure relates generally to media monitoring and, more particularly, to methods and apparatus for generating signatures for use in identifying media information.

### BACKGROUND

Identifying media information and more specifically audio streams (e.g., audio information) using signature-matching techniques is well known. Known signature-matching techniques are often used in television and radio audience metering applications and are implemented using several known methods for generating and matching signatures. For example, in television audience metering applications, signatures are generated at monitoring sites (e.g., monitored households) and reference sites. Monitoring sites typically include locations such as, for example, households where the media consumption of audience members is monitored. For example, at a monitoring site, monitored signatures may be generated based on audio streams associated with a selected channel, radio station, etc. The monitored signatures may then be sent to a central data collection facility for analysis. At a reference site, signatures, typically referred to as reference signatures, are generated based on known programs that are provided within a broadcast region. The reference signatures may be stored at the reference site and/or a central data collection facility and compared with monitored signatures generated at monitoring sites. A monitored signature may be found to match with a reference signature and the known program corresponding to the matching reference signature may be identified as the program that was presented at the monitoring site.

### BRIEF DESCRIPTION OF THE DRAWINGS

FIGS. 1A and 1B illustrate example audio stream identification systems for generating digital spectral signatures and identifying audio streams.

FIG. 2 is a time-domain representation of an example monitored audio stream and a plurality of audio sample frames acquired from the monitored audio stream.

FIG. 3 is a time-domain representation of an example reference audio stream and a plurality of audio sample frames acquired from the example reference audio stream.

FIG. 4 is a flow diagram of an example method for generating digital spectral signatures based on spectral decompositions.

FIG. 5 is a flow diagram of an example method for generating descriptors associated with the example method of FIG. 4.

FIG. 6 is a flow diagram of another example method for generating digital spectral signatures based on spectral decompositions.

FIG. 7 is a flow diagram of an example method for generating descriptors associated with the example method of FIG. 6.

2

FIG. 8 is a flow diagram of an example method for comparing the digital spectral signatures generated using the example methods of FIGS. 4-7.

FIG. 9 is a block diagram of an example signature generation system for generating digital spectral signatures based on audio streams.

FIG. 10 is a block diagram of another example signature generation system for generating digital spectral signatures based on audio streams.

FIG. 11 is a block diagram of an example signature comparison system for comparing digital spectral signatures.

FIG. 12 is a block diagram of an example processor system that may be used to implement the methods and apparatus described herein.

### DETAILED DESCRIPTION

Although the following discloses example systems including, among other components, software executed on hardware, it should be noted that such systems are merely illustrative and should not be considered as limiting. For example, it is contemplated that any or all of these hardware and software components could be embodied exclusively in hardware, exclusively in software, or in any combination of hardware and software. Accordingly, while the following describes example systems, persons of ordinary skill in the art will readily appreciate that the examples provided are not the only way to implement such systems.

The methods and apparatus described herein generally relate to generating digital spectral signatures, which may be used to identify media information. In particular, the disclosed methods and apparatus are described with respect to generating digital spectral signatures based on audio streams (e.g., audio information). However, the methods and apparatus described herein may also be used to generate digital spectral signatures based on any other type of media information such as, for example, video information, web pages, still images, computer data, etc. Further, the media information may be associated with broadcast information (e.g., television information, radio information, etc.), information reproduced from any storage medium (e.g., compact discs (CD), digital versatile discs (DVD), etc.), or any other information that is associated with an audio stream, a video stream, or any other media information for which the digital spectral signatures are generated. In one particular example, the audio streams are identified based on digital spectral signatures that include monitored digital signatures generated at a monitoring site (e.g., a monitored household) and reference digital signatures generated and/or stored at a reference site and/or a central data collection facility.

As described in detail below, the methods and apparatus described herein identify media information including audio streams based on digital spectral signatures. The digital spectral signatures may be formed using digital descriptors that are generated based on the spectral components of an audio stream and that may be analyzed using frequency transforms and/or wavelet transforms.

Unlike known methods in the prior art that use interframe operations (e.g., operations based on sample data within different data sample frames) to generate digital spectral signatures, the methods and apparatus described herein may be implemented using intraframe operations (e.g., operations based on sample data within a single frame). Intraframe operations may include, for example, comparison operations, determining percentage differences between values, etc. that are performed on two or more values (e.g., spectral power values) that are uniquely associated with or derived from a single frame. For example, using the methods and apparatus described herein, a digital spectral signature may be generated by obtaining a frame of media samples, determining

US 7,783,889 B2

3

spectral power values by performing a spectral transform (e.g., a FFT, a wavelet transform, etc.) on the frame of media samples, and performing an intraframe operation (e.g., a comparison) based on two or more spectral power values that are uniquely associated with the frame of media samples.

Frequency components of an audio signal are typically generated by transforming the audio signal data (e.g., an audio stream) from the time domain to the frequency domain using, for example, a Fourier Transform. The Fourier Transform can be used to analyze the frequency components in an audio stream and identify the spectral power of each frequency component. The spectral powers may then be used to generate digital spectral signatures.

Digital spectral signatures may also be generated based on wavelet transforms which transform audio data from the time domain to the wavelet domain. In general, wavelet transforms may be used to decompose blocks or frames of data (e.g., time domain audio samples) into multiple sub-bands, thereby allowing data sets to be analyzed at various scales and/or resolutions. By separating data into multiple sub-bands, a wavelet transform may be used to analyze each time interval of data at a desired scale or resolution.

Monitored signatures may be generated at a monitoring site based on audio streams associated with media information (e.g., a monitored audio stream) that is consumed by an audience. For example, a monitored signature may be generated based on the audio track of a television program presented at a monitoring site. The monitored signature may then be communicated to a central data collection facility for comparison to one or more reference signatures.

Reference signatures are generated at a reference site and/or a central data collection facility based on audio streams associated with known media information. The known media information may include media that is broadcast within a region, media that is reproduced within a household, media that is received via the internet, etc. Each reference signature is stored in a memory with media identification information such as, for example, a song title, a movie title, etc. When a monitored signature is received at the central data collection facility, the monitored signature is compared with one or more reference signatures until a match is found. This match information may then be used to identify the media information (e.g., audio information, audio stream) from which the monitored signature was generated. For example, a look-up table or a database may be referenced to retrieve a media title, a program identity, an episode number, etc. that corresponds to the media information from which the monitored signature was generated.

As described below in connection with FIGS. 2 and 3, more reference signatures are generated at a reference site and/or a central data collection facility for a given audio stream than monitored signatures generated for a given audio stream at a monitoring site. In particular, the reference signatures generated for an audio stream (i.e., a reference audio stream) overlap in time. More specifically, the starting reference time or timestamp of each reference signature is shifted by a relatively small amount of time from the starting reference time or timestamp of a previous reference signature. In this manner, a monitored signature generated at a monitoring site and having a substantially arbitrary reference time may be aligned and/or matched with at least one of the reference signatures generated for a reference audio stream. As a result of the relatively fewer number of monitored signatures generated at the monitoring site, monitored signatures may be generated by processor systems and/or hardware devices having relatively less computing power and/or memory than processor systems and/or hardware devices used to generate reference signatures.

FIGS. 1A and 1B illustrate example audio stream identification systems 100 and 150 for generating digital spectral

4

signatures and identifying audio streams. The example audio stream identification systems 100 and 150 may be implemented as a television broadcast information identification system and a radio broadcast information identification system, respectively. The example audio stream identification system 100 includes a monitoring site 102 (e.g., a monitored household), a reference site 104, and a central data collection facility 106.

Monitoring television broadcast information involves generating monitored signatures at the monitoring site 102 based on the audio data of television broadcast information and communicating the monitored signatures to the central data collection facility 106 via a network 108. Reference signatures may be generated at the reference site 104 and may also be communicated to the central data collection facility 106 via the network 108. The audio content represented by a monitored signature that is generated at the monitoring site 102 may be identified at the central data collection facility 106 by comparing the monitored signature to one or more reference signatures until a match is found. Alternatively, monitored signatures may be communicated from the monitoring site 102 to the reference site 104 and compared one or more reference signatures at the reference site 104. In another example, the reference signatures may be communicated to the monitoring site 102 and compared with the monitored signatures at the monitoring site 102.

The monitoring site 102 may be, for example, a household for which the media consumption of an audience is monitored. In general, the monitoring site 102 may include a plurality of media delivery devices 110, a plurality of media presentation devices 112, and a signature generator 114 that is used to generate monitored signatures associated with media presented at the monitoring site 102.

The plurality of media delivery devices 110 may include, for example, set top box tuners (e.g., cable tuners, satellite tuners, etc.), DVD players, CD players, radios, etc. Some or all of the media delivery devices 110 such as, for example, set top box tuners may be communicatively coupled to one or more broadcast information reception devices 116, which may include a cable, a satellite dish, an antenna, and/or any other suitable device for receiving broadcast information. The media delivery devices 110 may be configured to reproduce media information (e.g., audio information, video information, web pages, still images, etc.) based on, for example, broadcast information and/or stored information. Broadcast information may be obtained from the broadcast information reception devices 116 and stored information may be obtained from any information storage medium (e.g., a DVD, a CD, a tape, etc.). The media delivery devices 110 are communicatively coupled to the media presentation devices 112 and configurable to communicate media information to the media presentation devices 112 for presentation. The media presentation devices 112 may include televisions having a display device and/or a set of speakers by which audience members consume, for example, broadcast television information, music, movies, etc.

The signature generator 114 may be used to generate monitored digital signatures based on audio information as described in greater detail below. In particular, at the monitoring site 102, the signature generator 114 may be configured to generate monitored signatures based on monitored audio streams that are reproduced by the media delivery devices 110 and/or presented by the media presentation devices 112. The signature generator 114 may be communicatively coupled to the media delivery devices 110 and/or the media presentation devices 112 via an audio monitoring interface 118. In this manner, the signature generator 114 may obtain audio streams associated with media information that is reproduced by the media delivery devices 110 and/or presented by the media presentation devices 112. Additionally or alternatively,

US 7,783,889 B2

5                                                                  6

the signature generator **114** may be communicatively coupled to microphones (not shown) that are placed in proximity to the media presentation devices **112** to detect audio streams. The signature generator **114** may also be communicatively coupled to the central data collection facility **106** via the network **108**.

The network **108** may be used to communicate signatures (e.g., digital spectral signatures), control information, and/or configuration information between the monitoring site **102**, the reference site **104**, and the central data collection facility **106**. Any wired or wireless communication system such as, for example, a broadband cable network, a DSL network, a cellular telephone network, a satellite network, and/or any other communication network may be used to implement the network **108**.

As shown in FIG. **1A**, the reference site **104** may include a plurality of broadcast information tuners **120**, a reference signature generator **122**, a transmitter **124**, a database or memory **126**, and broadcast information reception devices **128**. The reference signature generator **122** and the transmitter **124** may be communicatively coupled to the memory **126** to store reference signatures therein and/or to retrieve stored reference signatures therefrom.

The broadcast information tuners **120** may be communicatively coupled to the broadcast information reception devices **128**, which may include a cable, an antenna, a satellite dish, and/or any other suitable device for receiving broadcast information. Each of the broadcast information tuners **120** may be configured to tune to a particular broadcast channel. In general, the number of tuners at the reference site **104** is equal to the number of channels available in a particular broadcast region. In this manner, reference signatures may be generated for all of the media information transmitted over all of the channels in a broadcast region. The audio portion of the tuned media information may be communicated from the broadcast information tuners **120** to the reference signature generator **122**.

The reference signature generator **122** may be configured to obtain the audio portion of all of the media information that is available in a particular broadcast region. The reference signature generator **122** may then generate a plurality of reference signatures (as described in greater detail below) based on the audio information and store the reference signatures in the memory **126**. Although one reference signature generator is shown in FIG. **1**, a plurality of reference signature generators may be used in the reference site **104**. For example, each of the plurality of signature generators may be communicatively coupled to a respective one of the broadcast information tuners **120**.

The transmitter **124** may be communicatively coupled to the memory **126** and configured to retrieve signatures therefrom and communicate the reference signatures to the central data collection facility **106** via the network **108**.

The central data collection facility **106** may be configured to compare monitored signatures received from the monitoring site **102** to reference signatures received from the reference site **104**. In addition, the central data collection facility **106** may be configured to identify monitored audio streams by matching monitored signatures to reference signatures and using the matching information to retrieve television program identification information (e.g., program title, broadcast time, broadcast channel, etc.) from a database. The central data collection facility **106** includes a receiver **130**, a signature analyzer **132**, and a memory **134**, all of which are communicatively coupled as shown.

The receiver **130** may be configured to receive monitored signatures and reference signatures via the network **108**. The receiver **130** is communicatively coupled to the memory **134** and configured to store the monitored signatures and the reference signatures therein.

The signature analyzer **132** may be used to compare reference signatures to monitored signatures. The signature analyzer **132** is communicatively coupled to the memory **134** and configured to retrieve the monitored signatures and the reference signatures from the same. The signature analyzer **132** may be configured to retrieve reference signatures and monitored signatures from the memory **134** and compare the monitored signatures to the reference signatures until a match is found. The memory **134** may be implemented using any machine accessible information storage medium such as, for example, one or more hard drives, one or more optical storage devices, etc.

Although the signature analyzer **132** is located at the central data collection facility **106** in FIG. **1A**, the signature analyzer **132** may instead be located at the reference site **104**. In such a configuration, the monitored signatures may be communicated from the monitoring site **102** to the reference site **104** via the network **108**. Alternatively, the memory **134** may be located at the monitoring site **102** and reference signatures may be added periodically to the memory **134** via the network **108** by transmitter **124**. Additionally, although the signature analyzer **132** is shown as a separate device from the signature generators **114** and **122**, the signature analyzer **132** may be integral with the reference signature generator **122** and/or the signature generator **114**. Still further, although FIG. **1** depicts a single monitoring site (i.e., the monitoring site **102**) and a single reference site (i.e., the reference site **104**), multiple such sites may be coupled via the network **108** to the central data collection facility **106**.

The audio stream identification system **150** of FIG. **1B** may be configured to monitor and identify audio streams associated with radio broadcast information. In general, the audio stream identification system **150** is used to monitor the content that is broadcast by a plurality of radio stations in a particular broadcast region. Unlike the audio stream identification system **100** used to monitor television content consumed by an audience, the audio stream identification system **150** may be used to monitor music, songs, etc. that are broadcast within a broadcast region and the number of times that they are broadcast. This type of media tracking may be used to determine royalty payments, proper use of copyrights, etc. associated with each audio composition. The audio stream identification system **150** includes a monitoring site **152**, a central data collection facility **154**, and the network **108**.

The monitoring site **152** is configured to receive all radio broadcast information that is available in a particular broadcast region and generate monitored signatures based on the radio broadcast information. The monitoring site **152** includes the plurality of broadcast information tuners **120**, the transmitter **124**, the memory **126**, and the broadcast information reception devices **128**, all of which are described above in connection with FIG. **1A**. In addition, the monitoring site **152** includes a signature generator **156**. When used in the audio stream identification system **150**, the broadcast information reception devices **128** are configured to receive radio broadcast information and the broadcast information tuners **120** are configured to tune to the radio broadcast stations. The number of broadcast information tuners **120** at the monitoring site **152** may be equal to the number of radio broadcasting stations in a particular broadcast region.

The signature generator **156** is configured to receive the tuned to audio information from each of the broadcast information tuners **120** and generate monitored signatures for the same. Although one signature generator is shown (i.e., the signature generator **156**), the monitoring site **152** may include multiple signature generators, each of which may be communicatively coupled to one of the broadcast information tuners **120**. The signature generator **156** may store the monitored signatures in the memory **126**. The transmitter **124** may

retrieve the monitored signatures from the memory 126 and communicate them to the central data collection facility 154 via the network 108.

The central data collection facility 154 is configured to receive monitored signatures from the monitoring site 152, generate reference signatures based on reference audio streams, and compare the monitored signatures to the reference signatures. The central data collection facility 154 includes the receiver 130, the signature analyzer 132, and the memory 134, all of which are described in greater detail above in connection with FIG. 1A. In addition, the central data collection facility 154 includes a reference signature generator 158.

The reference signature generator 158 is configured to generate reference signatures based on reference audio streams. The reference audio streams may be stored on any type of machine accessible medium such as, for example, a CD, a DVD, a digital audio tape (DAT), etc. In general, artists and/or record producing companies send their audio works (i.e., music, songs, etc.) to the central data collection facility 154 to be added to a reference library. The reference signature generator 158 may read the audio data from the machine accessible medium and generate a plurality of reference signatures based on each audio work (e.g., the reference audio stream 302 of FIG. 3). The reference signature generator 158 may then store the reference signatures in the memory 134 for subsequent retrieval by the signature analyzer 132. Identification information (e.g., song title, artist name, track number, etc.) associated with each reference audio work may be stored in a database and may be indexed based on the reference signatures. In this manner, the central data collection facility 154 includes a database of reference signatures and identification information corresponding to all known and available song titles.

The receiver 130 is configured to receive monitored signatures from the network 108 and store the monitored signatures in the memory 134. The monitored signatures and the reference signatures are retrieved from the memory 134 by the signature analyzer 132 for use in identifying the monitored audio streams broadcast within a broadcast region. The signature analyzer 132 may identify the monitored audio streams by first matching a monitored signature to a reference signature. The match information and/or the matching reference signature is then used to retrieve identification information (e.g., a song title, a song track, an artist, etc.) from a database stored in the memory 134.

Although one monitoring site (e.g., the monitoring site 152) is shown in FIG. 1B, multiple monitoring sites may be communicatively coupled to the network 108 and configured to generate monitored signatures. In particular, each monitoring site may be located in a respective broadcast region and configured to monitor the content of the broadcast stations within a respective broadcast region.

FIG. 2 is a time-domain representation 200 of an example monitored audio stream 202 and a plurality of audio sample frames 204, 206, 208, and 210 acquired from the monitored audio stream 202. A monitored digital spectral signature is generated at a monitoring site (e.g., the monitoring site 102 of FIG. 1A or the monitoring site 152 of FIG. 1B) based on audio samples acquired from the example monitored audio stream 202. The time-domain representation 200 illustrates the time relationship between the example monitored audio stream 202 and the audio sample frames 204, 206, 208, and 210, which are used to generate monitored signatures.

In one example, an N-bit monitored signature $S_x(t)$ is formed using one or more M-bit descriptors $B_x(t_0)$, $B_x(t_0+1)$, $B_x(t_0+2)$, $B_x(t_0+3)$. For example, a 32-bit monitored signature $S_x(t)$ includes four 8-bit descriptors $B_x(t_0)$, $B_x(t_0+1)$, $B_x(t_0+2)$, $B_x(t_0+3)$, each of which is generated based on a corresponding one of the audio sample frames 204, 206, 208, and

210. More specifically, each of the descriptors is generated using one or more intraframe operations (e.g., comparison operations) based on two or more spectral components that are uniquely associated with a single audio sample frame.

The four descriptors may be generated based on spectral decompositions (e.g., frequency decompositions or wavelet decompositions) of the audio sample frames 204, 206, 208, and 210 as described in detail below in connection with FIGS. 4-7. The spectral decompositions are used to extract features that are uniquely characteristic of the example monitored audio stream 202. In this manner, a reference signature and a monitored signature that are generated based on the same audio stream using the same signature generation method (e.g., the same spectral decomposition-based method) will include similar features, and, thus can be used to reliably identify the monitored audio stream 202 using a matching algorithm. A monitored signature may be generated by sampling the example monitored audio stream 202 to generate the audio sample frames 204, 206, 208, and 210, generating the descriptors $B_x(t_0)$, $B_0(t_0+1)$, $B_x(t_0+2)$, $B_x(t_0+3)$ based on spectral decompositions of the audio sample frames 204, 206, 208, and 210, and concatenating the descriptors.

The audio sample frames 204, 206, 208, and 210 are generated by sampling the example monitored audio stream 202 during four time intervals at a sampling frequency $f_s$. For example, a sampling frequency $f_s$ of 6000 Hz will generate 6000 samples of audio data for each of the audio sample frames 204, 206, 208, and 210 (assuming the sample frames are collected over one second intervals). However, any other suitable sampling frequency $f_s$ may instead be selected. As shown in FIG. 2, the duration of each of the audio sample frames 204, 206, 208, and 210 is one second (e.g., 0 to $t_0$, $t_0$ to $t_0+1$, $t_0+1$ to $t_0+2$, and $t_0+2$ to $t_0+3$). However, the duration may instead be set to any other length of time. The times within the monitored audio stream 202 during which monitored signatures are generated are substantially similar or identical to the times within a reference audio stream during which corresponding reference signatures are generated. By acquiring audio sample frames for monitored signatures and reference signatures at substantially the same times, the features extracted from a monitored audio stream (e.g., the example monitored audio stream 202) and a corresponding reference audio stream (e.g., the example reference audio stream 302 of FIG. 3) are substantially similar or identical. Although the audio sample frames 204, 206, 208, and 210 are shown in FIG. 2 as occurring consecutively in time, the audio sample frames 204, 206, 208, and 210 may occur at any time and in any sequence within the example monitored audio stream 202.

To ensure that the monitored signature is compared with a reference signature that is generated at substantially the same time within respective audio streams, the monitored signatures may be generated relative to a reference time that is used during the signature comparison process to align a monitored signature with a reference signature. More specifically, during the generation of a monitored signature, the example monitored audio stream 202 is sampled starting at a time indicated by a reference time to, which may be selected relative to a time stamp embedded within the example audio stream 202, a system startup time, a daily recurring time (e.g., midnight), and/or any other reference time that may be indicative of the time at which a signature is generated. A signature matching system (e.g., the signature analyzer 132 of FIGS. 1A and 1B) uses the reference time $t_0$ to retrieve one or more reference signatures that correspond to substantially the same time within reference audio streams as indicated by the reference time $t_0$.

Additionally, one or more monitored signatures may be generated using the example monitored audio stream 202 so that multiple signatures are matched to identify the example

US 7,783,889 B2

9

10

monitored audio stream **202**. For example, it is possible that one or more monitored signatures generated using the example monitored audio stream **202** are substantially similar or identical to one or more reference signatures of a reference audio stream (e.g., the example reference audio stream **302** of FIG. **3**) that does not correspond to the example monitored audio stream **202**. In this case, to decrease the possibility of erroneously identifying the wrong reference audio stream, more than one monitored signature is generated for the monitored audio stream **202**. More specifically, the signatures may be generated at multiple times throughout the example monitored audio stream **202**. In addition, a comparison algorithm may be configured to match two or more monitored signatures with corresponding reference signatures to accurately identify the example monitored audio stream **202**.

FIG. **3** is a time-domain representation **300** of an example reference audio stream **302** and a plurality of audio sample frames **304**, **306**, **308**, and **310** that may be acquired from the example reference audio stream **302**. The time-domain representation **300** shows two one second time intervals (e.g., 0 to $t_0$ and $t_0$ to $t_0+1$) and the plurality of audio sample frames **304**, **306**, **308**, and **310** that are collected during the time intervals and that are subsequently used to generate a plurality of reference signatures that are staggered in time (i.e., time shifted relative to one another). The example reference audio stream **302** is sampled at a sampling frequency $f_s$ to collect the audio sample frames **304**, **306**, **308**, and **310**, which are used to generate M-bit reference signatures $B_{Rn}$(t). One or more of the descriptors $B_{Rn}$(t) may then be concatenated to form an N-bit reference signature $S_{Rn}$(t). Typically, the number of descriptors in a reference signature is equal to the number of descriptors in a monitored signature. Additionally, each of the M-bit descriptors $B_{Rn}$(t) includes the same number of bits as a corresponding M-bit descriptor $B_s$(t) associated with the example monitored audio stream **202** (FIG. **2**) and, thus, each N-bit reference signature $S_{Rn}$(t) includes the same number of bits as a corresponding N-bit monitored signature $S_s$(t).

Multiple reference signatures are generated for the example reference audio stream **302** in a manner that causes the reference signatures to be time-shifted relative to each other and to overlap in time with one another. More specifically, the start time at which a first audio sample frame (e.g., the audio sample frame **304**) of a first reference signature is collected is offset, or shifted, by an amount of time

$$\frac{1}{T_s}$$

from the start time at which a first audio sample frame (e.g., the audio sample frame **308**) of a second reference signature is collected. The value $T_S$ is associated with a number of equal segments ("sample segments") into which each time interval (e.g., $t_0$ to $t_0+1$) is divided. For example, if the number of sample segments $T_S$ in a time interval of one second is set equal to thirty, the collection of a new data set will begin every

$$\frac{1}{30} \cdot th$$

of a second. In addition, if the sampling frequency $f_s$ is set equal to 6000 Hz, each sample segment will include 200 samples.

Each audio sample frame is used to generate a single signature. More specifically, an audio sample frame is collected using a predetermined number of sample segments (e.g., the

sample segments **312a-312e**), which are concatenated to form the audio sample frame (e.g., the audio sample frame **304**). To achieve overlap among consecutively generated signatures, each signature is formed using an audio sample frame that partially overlaps with an audio sample frame used to form the previously generated signature. More specifically, two audio sample frames that overlap include a common set of sample segments. For example, the audio sample frames **304** and **308** include a common set of sample segments comprising the sample segments **312b-312e**. The audio sample frame **308** may be formed by extracting a common plurality of media samples or the common set of sample segments **312b-312e** from the audio sample frame **304** and appending a recently acquired sample segment (e.g., the sample segment **312f**) to the common set of sample segments **312b-312e**. In addition, two audio sample frames that overlap also contain sample segments that are exclusive to one or the other of the audio sample frames (i.e., audio sample frames that overlap also contain sample segments that occur in one or the other of the audio sample frames but do not occur in both frames).

To further illustrate the generation of reference signatures that are time shifted and overlapped, each reference signature is formed by four reference descriptors

$$B_{Rn}\left(t_0 + \frac{k}{T_s}\right), B_{Rn}\left(t_0 + \frac{k}{T_s} + 1\right), B_{Rn}\left(t_0 \frac{k}{T_s} + 2\right), B_{Rn}\left(t_0 + \frac{k}{T_s} + 3\right).$$

The four reference descriptors are separated by one-second time intervals and are shifted by

$$\frac{k}{T_s}$$

seconds with respect to the reference time $T_0$, where $0 \leqq k < T_S$. For example, the audio sample frames **304** and **306** (generated at

$$t_0 + \frac{0}{T_s} \text{ and } t_0 + \frac{0}{T_s} + 1\right),$$

respectively, in combination with two other audio sample frames generated at

$$t_0 + \frac{0}{T_s} + 2 \text{ and } t_0 + \frac{0}{T_s} + 3$$

(not shown), are used to generate four descriptors that form a first reference signature. Additionally, the audio sample frames **308** and **310** (generated at

$$\left(t_0 + \frac{1}{T_s}\right) \text{and} \left(t_0 + \frac{1}{T_s} + 1\right)\right),$$

respectively, are used with two other audio sample frames generated at

US 7,783,889 B2

11

$$\left(t_0 + \frac{1}{T_s} + 2\right) \text{and} \left(t_0 + \frac{1}{T_s} + 3\right)$$

(not shown) to generate four descriptors that form a second reference signature that is time shifted relative to the first reference signature by

$$\frac{1}{T_s}$$

seconds. As described below in connection with FIG. 5, each of the reference descriptors is generated using one or more operations (e.g., comparison operations) based on two or more spectral components that are both associated with the same audio sample frame. These operations are referred to as intraframe operations because they are performed using data exclusive to a single audio frame and are not dependent on sample data collected over other audio frames.

During an example sample acquisition process, the sample segments $312a$-$312e$ are collected and are used to form the first audio sample frame 304, which is subsequently used to determine a descriptor. This descriptor is then used to form part of a first reference signature. Then, a new sample segment $312f$ is collected and a second audio sample frame 308 is formed using sample segments $312b$-$312f$. The second audio sample frame 308 is then used to determine a reference descriptor which is used to form part of a second reference signature. Thus, the first and second audio sample frames 304 and 308 include a common set of sample segments $312b$-$312e$ and each of the first and second audio sample frames additionally include a sample segment not included in the other (i.e., the first audio sample frame 304 includes sample segment $312a$ and the second audio sample frame 308 includes sample segment $312f$). In this manner, the first and second reference signatures are generated using data collected at points in the audio stream that are staggered or shifted in time by

$$\frac{1}{T_s}$$

seconds and are generated using data that overlaps. In addition, the amount by which the first and second signatures are shifted can be adjusted by changing the value of $T_s$ thereby permitting the resolution of the signatures to vary as desired. Specifically, if a set of signatures that represents an audio stream with a greater resolution is desired, $T_s$ can be increased accordingly. Likewise, if less resolution is desired, $T_s$ can be decreased. As will be appreciated by one having ordinary skill in the art, the value of $T_s$ may affect the quantity of signatures that can be generated for a given audio stream. For example, if the number of sample segments used to form a signature remains constant, a larger value of $T_s$ will result in forming more audio sample frames than a smaller value of $T_s$. Therefore, the amount of memory available to store the signature data may be a factor in determining the desired value of $T_s$.

As described above, in order to identify the title of a song or the title of a program associated with a particular audio stream, a set of monitored signatures generated for a monitored audio stream are compared to a database of reference

12

signatures associated with a plurality of reference audio streams. In one example system, a signature generator (e.g., the signature generator 114 of FIG. 1A) may be configured to monitor the audio emitted by a specific television (e.g., one of the presentation devices 112 of FIG. 1A) located in the home of a specific panelist. Signatures are generated for the audio emitted by the television in the manner described above. In addition, the time at which the audio corresponding to each signature was emitted is recorded and stored as a reference time $t_0$ with the corresponding monitored signature in a memory device. A timing device (e.g., the timing device 903 of FIGS. 9 and 10) located at the monitoring site may be used to trigger the collection of the audio data for the subsequent generation of monitored signatures and to provide the corresponding data collection times (e.g., reference times $t_0$, timestamps, etc.) to the memory for storage with the corresponding signature. To enable the subsequent identification of the emitted audio, a reference site (e.g., the reference site 104 of FIG. 1A) located within the same broadcast region as a monitoring site (e.g., the monitoring site 102 of FIG. 1A) is configured to generate reference signatures corresponding to the audio broadcast on all television broadcast channels at all times of the day. A timing device (e.g., the timing device 903 of FIGS. 9 and 10) located at the reference site may be used to trigger the collection of the audio data at a set of equally spaced intervals corresponding to the time period

$$\frac{1}{T_s}$$

for the subsequent generation of the reference signatures and to provide a corresponding set of data collection times to a reference memory (e.g., the memory 126 of FIG. 1A) for storage. Thus, each reference signature is stored in a memory device located at the reference site along with timestamp data indicating the time at which the underlying audio data was collected. In one example, the timing devices (e.g., the timing device 903 of FIG. 9) located at the monitoring site and the reference site are synchronized such that the timestamps can be used to align the reference signatures with the monitored signatures to facilitate the signature matching process. Likewise, because a plurality of monitoring sites are likely to be located in the same broadcast region as a single reference site, in the same example, each of the timing devices 903 located in each such monitoring site may be synchronized with the timing device 903 located in the single reference site. However, due to the staggered arrangement of the reference signatures described above in connection with FIG. 3, the timing devices 903 at the monitoring site and the reference site do not have to be synchronized.

To compensate for offsets between the timing devices located at the monitoring sites and the reference site, the value of $T_s$ may be adjusted. The value of $T_s$ is generally selected to incrementally time shift a reference signature from a previous reference signature so that a monitored signature generated at an arbitrary reference time is highly likely to align with one of the staggered or time-shifted reference signatures. More specifically, increasing the value of $T_s$ causes the number of sample segments (e.g., the sample segments $312a$-$312f$) to increase and the offset or time shift from one reference signature to the next reference signature to decrease. This, in turn, increases the likelihood that the times at which reference signatures are generated for a given audio stream correspond to substantially similar or identical reference times at which monitored signatures are generated for the same audio stream. Signatures generated at the same times for the same program are expected to be identical or at least similar enough

13

to cause a match to be detected. Thus, increasing the value of $T_z$ increases the likelihood of a match between a set of reference signatures and a set of monitored signatures corresponding to the same audio program. Additionally, assuming the timing devices located at the reference site and the monitoring site are synchronized with sufficient precision, a monitored signature generated for data collected at a time T need only be compared to each reference signature associated with the same timestamp T instead of all reference signatures generated during the same twenty-four hour period. This reduction in comparisons reduces the processing time required to find a match. Similarly, assuming there is a known error, E, between the timing devices located at a monitoring site and a reference site, each monitored signature generated at the monitoring site at a time T need only be compared to all reference signatures generated from data collected within a window of the time spanning from T−E to T+E.

In another example system (e.g., the example audio identification system **150** of FIG. **1B**), a set of monitored signatures are generated for a monitored audio stream and then compared to a database of reference signatures associated with a set of reference audio streams that, ideally, represent the universe of currently available audio streams. For example, as described above, in connection with FIG. **1B**, reference signatures corresponding to reference audio streams may be stored in a database that is stored in, for example, the memory **134**. For each reference signature that is matched to a monitored signature, the matching information and/or the reference signature may be used to retrieve identification information (e.g., song title, song track, artist, etc.) from the database. The identification information is then used to identify the monitored audio stream. In one example, reference times $t_0$ or timestamps associated with each monitored signature may be used to identify the time (of day) at which the monitored audio streams were broadcast.

FIG. **4** is a flow diagram of an example method for generating digital spectral signatures based on spectral decompositions. In particular, the example method of FIG. **4** may be used to generate digital spectral signatures (e.g., reference signatures and/or monitored signatures) based on frequency decomposition methods using a sliding Fast Fourier transform (FFT). As is known by one having ordinary skill in the art, an FFT may be used to convert a time domain signal (e.g., the example audio streams **202** and **302** of FIGS. **2** and **3**) into a frequency domain representation of the same signal which may then be used to analyze the frequency components of the converted signal.

As will be appreciated by one having ordinary skill in the art, a sliding FFT provides advantages over a conventional non-sliding FFT for generating the digital spectral signatures. Unlike a conventional non-sliding FFT, a sliding FFT can be used to incrementally compute an FFT. For example, one example approach to processing the audio streams **202** and **302** involves generating FFT data for each audio sample frame independent of any data associated with previous audio sample frames. In contrast, a sliding FFT involves generating FFT data for an audio sample frame by updating the FFT data generated in connection with a previous audio sample frame. Updating the previous frame's FFT data is less computationally expensive than generating FFT data anew for each frame causing the sliding FFT technique to be more efficient than the non-sliding conventional FFT approach. Additionally, the number of samples forming each audio sample frame (e.g., the audio sample frames **204**, **206**, **208**, and **210** of FIG. **2** or **304**, **306**, **308**, and **310** of FIG. **3**) need not be a power of two, as is required of the non-sliding FFT approach. Thus, when using a sliding FFT, the digital spectral signatures can be generated using audio sample frames of any arbitrary size (i.e., any number of samples) that are acquired using any sampling frequency $f_s$.

14

Now turning in detail to the example method of FIG. **4**, initially the example method involves obtaining an audio stream (block **402**) (e.g., the example monitored audio stream **202** of FIG. **2** or the example reference audio stream **302** of FIG. **3**). A reference time to described above in connection with FIGS. **2** and **3** is determined (block **404**) to indicate the time within an audio stream at which a signature is generated. An initial audio sample set is then obtained (block **406**). The audio samples may be obtained by sampling an analog audio stream at a sampling frequency $f_s$ and performing an analog-to-digital conversion. Alternatively, the audio samples may be obtained by extracting or acquiring samples from a digital audio stream at a sampling frequency $f_s$. The initial audio sample set may be a complete audio sample frame (e.g., one of the audio sample frames **204**, **206**, **208**, and **210** of FIG. **2** or **304**, **306**, **308**, and **310** of FIG. **3**) or a portion thereof. An initial FFT operation is performed on the initial audio sample set to establish an initial frequency spectrum (block **408**). The method of performing a FFT is well known in the art and, thus, is not discussed in detail herein.

After the initial frequency spectrum is determined (block **408**), a next set of audio samples is obtained (block **410**). The sliding FFT may then be used to update the initial frequency spectrum (generated at block **408**) based on two most recently collected samples $v_{N_S-2}$ and $v_{N_S-1}$ according to Equation 1 below.

$$
\begin{aligned}
a_1[J] \times \exp(\varphi_1[J]) = \qquad\qquad\qquad\qquad\text{Equation 1}\\
a_0[J] \times \exp(\varphi_0[J]) \times \exp\!\left(-\frac{i2\pi J(2)}{N_S}\right) + \\
\left(v_{N_{S}-2} \times \exp\!\left(\frac{i2\pi J(N_S - 2)}{N_S}\right)\right) + \\
\left(v_{N_{S}-1} \times \exp\!\left(\frac{i2\pi J(N_S - 1)}{6000}\right)\right) - \\
\left(v_0 \times \exp\!\left(-\frac{i2\pi J(2)}{N_S}\right)\right) - \left(v_1 \times \exp\!\left(-\frac{i2\pi J}{N_S}\right)\right)
\end{aligned}
$$

Equation 1 may be used to update the frequency spectrum of an audio sample frame having a sample quantity $N_S$. The spectral amplitude $a_0[J]$ and phase value $\phi_0[J]$ form the existing frequency spectrum $a_0[J] \times \exp(\phi_0[J])$, which includes the frequencies indexed by the frequency index J. When the two most recently collected audio samples $v_{N_S-2}$ and $v_{N_S-1}$ are obtained, the existing frequency spectrum $a_0[J] \times \exp(\phi_0[J])$ may be updated to determine a new frequency spectrum $a_1[J] \times \exp(\phi_1[J])$. The two most recently collected audio samples $v_{N_S-2}$ and $v_{N_S-1}$ are inserted into the audio sample frame to replace the two earliest collected samples $v_0$ and $v_1$.

As shown in Equation 1, the updated frequency spectrum $a_1[J] \times \exp(\phi_1[J])$ is determined using one or more multiplication operations, addition operations, and subtraction operations based on complex exponents, the two earliest collected samples $v_0$ and $v_1$, and the two most recently collected samples $v_{N_S-2}$ and $v_{N_S-1}$. Initially, the existing frequency spectrum $a_0[J] \times \exp(\phi_0[J])$ is multiplied by a first complex exponential value

$$
\exp\!\left(-\frac{i2\pi J(2)}{N_S}\right).
$$

The product of the multiplication is added to a product determined by multiplying the first most recently collected audio sample $v_{N_S-2}$ by a second complex exponential value

US 7,783,889 B2

15                                                        16

$$\exp\left(\frac{i2\pi J(N_S - 2)}{N_S}\right).$$

The result is then added to a product determined by multiplying the second most recently collected audio sample $v_{N_s-1}$ by a third complex exponential value

$$\exp\left(\frac{i2\pi J(N_S - 1)}{N_S}\right).$$

The first earliest collected audio sample $v_0$ is then multiplied by the first complex exponential value

$$\exp\left(-\frac{i2\pi J(2)}{N_S}\right)$$

and subtracted from the previous addition result. The second earliest collected audio sample $v_1$ is then multiplied by a fourth complex exponential value

$$\exp\left(-\frac{i2\pi J}{N_S}\right)$$

and subtracted from the previous subtraction result.

It is well known in the art that instabilities such as, for example, oscillation or data overflow can be substantially minimized when implementing a sliding FFT by multiplying most recently collected audio samples (e.g., the most recently collected audio samples $v_{Ns-2}$ and $v_{N_s-1}$) by a first stability factor $sf_1$ and earliest collected audio samples (e.g., the earliest collected audio samples $v_0$ and $v_1$) by a second stability factor $sf_2$. The first stability factor $sf_1$ may be set equal to a value as close as possible to one. In the case of an audio sample frame having 6000 samples, the first stability factor $sf_1$ may be set equal to 0.99995. The second stability factor $sf_2$ may be set equal to $(sf_1)^{p-1}$, where the value p is equal to the number of sample shifts required to process an audio sample frame using the sliding FFT. For example, a two-sample shift is required to update an audio sample frame based on the two most recently collected audio samples $v_{N_s-2}$ and $v_{N_s-1}$. In the case of an audio sample frame having 6000 samples, the value p may be set equal to 3000.

After the sliding FFT is determined or calculated at block 412, it is determined if a complete audio sample frame (e.g., one of the audio sample frames 204, 206, 208, and 210 of FIG. 2 or one of the audio sample frames 304, 306, 308, and 310 of FIG. 3) has been obtained (block 414). At the monitoring sites 102 (FIG. 1A) and 152 (FIG. 1B), a complete audio sample frame is obtained when a plurality of most recently collected $N_S$ samples is obtained. For example, if an audio sample frame includes 6000 samples, a complete audio sample frame is obtained after 6000 new samples are obtained. At the reference site 104 (FIG. 1A) or the central data collection facility 154 (FIG. 1B), a complete audio sample frame is obtained when a most recently collected audio sample segment (e.g., one of the sample segments 312a-312f of FIG. 3) is obtained and a current audio sample frame is formed as described in greater detail above in connection with FIG. 3. If it is determined at block 414 that a complete audio sample frame has not been obtained, control is passed back to block 410. However, if it is

determined at block 414 that a complete audio sample frame has been obtained, a descriptor is generated (block 416). An example method for generating descriptors based on frequency components is described in greater detail below in connection with FIG. 5.

It is then determined if a complete descriptor set has been obtained (block 418). A descriptor set includes a predetermined number of descriptors that are used to form a signature. For example, if a 32-bit signature is formed by 8-bit descriptors, then a descriptor set includes four descriptors. If it is determined at block 418 that a complete descriptor set has not been obtained, control is passed back to block 410. However, if it is determined at block 418, that a complete descriptor set has been obtained, a digital spectral signature is generated by concatenating the descriptors of the descriptor set (block 420). After the digital spectral signature is generated (block 420), it is determined if another signature is to be generated (block 422). If another signature is to be generated, control is passed back to block 404.

FIG. 5 is a flow diagram of an example method for generating descriptors associated with the example method of FIG. 4. In particular, the example method of FIG. 5 may be used to implement block 416 of FIG. 4. An M-bit descriptor is generated by selecting M pairs of frequency components $f_{lb}$ that are uniquely associated with an audio sample frame and determining each bit of the descriptor based on intraframe comparisons of the spectral powers $P_{lb}$ of the frequency components $f_{lb}$. The frequency components $f_{lb}$ and the spectral powers $P_{lb}$ are indexed by a frequency component index l and a bit index b, where $0 \leqq l < f\ index_{max}$ and $0 \leqq b < M$.

The example method initially selects a first pair of frequency components $f_{00}$ and $f_{10}$ (block 502). Although consecutive frequency components are selected (i.e., $f_{0b}$ and $f_{1b}$, $f_{2b}$, and $f_{3b}$, etc.) in the example method, the frequency components may be selected from any location in the frequency spectrum of an audio sample frame (e.g., one of the audio sample frames 204, 206, 208, and 210 of FIG. 2 or one of the audio sample frames 304, 306, 308, and 310 of FIG. 3). However, the frequency component indexes l used to select pairs of frequency components for generating a monitored signature are the same frequency component indexes l used to select pairs of frequency components for generating a corresponding reference signature.

After the first pair of frequency components $f_{00}$ and $f_{10}$ is selected, the spectral powers $P_{00}$ and $P_{10}$ corresponding to the selected frequency components are determined (block 504). One of ordinary skill in the art will readily appreciate that the spectral power for each frequency component can be obtained based on the results of the sliding FFT performed at block 412 of FIG. 4.

A descriptor bit is determined based on the frequency components $f_{00}$ and $f_{10}$ by comparing the first spectral power $P_{00}$ with the second spectral power $P_{10}$ (block 506). If the first spectral power is greater than the second spectral power (i.e., $P_{00} > P_{10}$), the descriptor bit is set equal to one. If, instead, the first spectral power is less than or equal to the second spectral power (i.e., $P_{00} \leqq P_{10}$), the descriptor bit is set equal to zero.

It is then determined if another descriptor bit is to be determined (block 508). If another descriptor bit is to be determined, another pair of frequency components is selected (e.g., $f_{21}$ and $f_{31}$) (block 510) and control is passed back to block 504. If, instead, another descriptor bit is not to be determined, the example method of FIG. 5 may be stopped.

FIG. 6 is a flow diagram of another example method for generating digital spectral signatures based on spectral decompositions. In particular, the example method of FIG. 6 may be used to generate digital spectral signatures (e.g., reference signatures and monitored signatures) based on wavelet decompositions of audio sample frames (e.g., the audio sample frames 204, 206, 208, and 210 of FIG. 2 or 304,

US 7,783,889 B2

17

**306**, **308**, and **310** of FIG. **3**) using wavelet transforms. As described above, wavelet transforms may be employed to analyze data using different scales and/or resolutions by separating blocks or frames of data (e.g., the audio sample frames **204**, **206**, **208**, **210**, **304**, **306**, **308**, and **310**) into multiple sub-bands.

Initially, the example method obtains an audio stream (block **602**) (e.g., the example monitored audio stream **202** of FIG. **2** or the example reference audio stream **302** of FIG. **3**). A reference time to described above in connection with FIGS. **2** and **3** is determined (block **604**) to indicate the time within an audio stream at which a signature is generated. An audio sample frame is then obtained (block **606**). The audio sample frame may be obtained by sampling an analog audio stream at a sampling frequency $f_s$ and performing an analog-to-digital conversion. Alternatively, the audio sample frame may be obtained by extracting or acquiring samples from a digital audio stream at a sampling frequency $f_s$. Based on the Nyquist Theorem, aliasing is avoided by sampling the audio samples at frequencies ranging from zero to

$$\frac{f_s}{2}.$$

A descriptor is then determined (block **608**) based on wavelet decomposition performed using a wavelet transform. An example method for generating descriptors based on one or more wavelet decompositions is described in greater detail below in connection with FIG. **7**.

After the descriptor is generated, it is determined if a complete descriptor set has been obtained (block **610**). If a complete descriptor set has not been obtained, a next audio sample frame is obtained (block **612**) and control is passed back to block **608**. However, if a complete descriptor set has been obtained, a digital spectral signature is generated (block **614**) by concatenating the descriptors of the descriptor set. After the digital spectral signature is generated, it is determined if another signature is to be generated (block **616**). If another signature is to be generated, control is passed back to block **604**. Otherwise, the example method is stopped.

FIG. **7** is a flow diagram of an example method for generating descriptors associated with the example method of FIG. **6**. In particular, the example method of FIG. **7** may be used to implement block **608** of FIG. **6**. An M-bit descriptor is generated by performing an M-level wavelet decomposition on an audio sample frame (e.g., one of the audio sample frames **204**, **206**, **208**, and **210** of FIG. **2** or one of the audio sample frames **304**, **306**, **308**, and **310** of FIG. **3**). For each level wavelet decomposition, the energy of the audio signal for each sub-band is determined and descriptors are generated based on comparisons of the sub-band energies. For each descriptor, the M-level wavelet decomposition is implemented as an intraframe operation that is performed on spectral energies that are uniquely associated with an audio sample frame. Additionally, the M-level wavelet decomposition may be implemented using any wavelet transform. For purposes of clarity, the example method of FIG. **7** is described in terms of the well-known Daubechies wavelet transform.

Initially, the example method performs a first-level wavelet decomposition (block **702**) by applying the Daubechies wavelet transform to an audio sample frame. The first application of the Daubechies wavelet transform results in a low-frequency sub-band block of filtered values $L_0$ and a high-frequency sub-band block of filtered values $H_0$, each of which includes

18

$$\frac{N_s}{2}$$

filtered values.

Turning in greater detail to the Daubechies wavelet transform implementation, the Daubechies coefficients $c_0$, $c_1$, $c_2$, and $c_3$ are used to generate an $N_s \times N_s$ transformation matrix in which the coefficients are arranged as shown below.

$$
\begin{bmatrix}
c_0 & c_1 & c_2 & c_3 & & & & & \\
c_3 & -c_2 & c_1 & -c_0 & & & & & \\
& & c_0 & c_1 & c_2 & c_3 & & & \\
& & c_3 & -c_2 & c_1 & -c_0 & & & \\
& & & & & & & & \\
& & & & & & c_0 & c_1 & c_2 & c_3 \\
& & & & & & c_3 & -c_2 & c_1 & -c_0 \\
c_2 & c_3 & & & & & & & c_0 & c_1
\end{bmatrix}
$$

The coefficients are ordered in the transformation matrix, as shown above, using two dominant patterns. The odd rows include the first pattern, which is an ordering of the coefficients that functions as a smoothing filter (e.g., similar to a moving filter). The even rows include the second pattern, which is an ordering of the coefficients that functions to bring out the details of data (e.g., the audio sample frame). The transformation matrix is first applied to the entire audio sample frame (e.g., all of the $N_s$ samples) to generate filtered values that include low-frequency sub-band filtered values alternated with high-frequency sub-band filtered values. The values are de-interleaved to generate the two sub-band blocks $L_0$ and $H_0$, each of which includes

$$\frac{N_s}{2}$$

samples. The low-frequency sub-band block $L_0$ includes filtered values that are associated with sub-band frequencies ranging from zero to

$$\frac{f_s}{4}.$$

The high-frequency sub-band block $H_0$ includes filtered values that are associated with sub-band frequencies ranging from

$$\frac{f_s}{4} \text{ to } \frac{f_s}{2}.$$

An

$$\frac{N_s}{2} \times \frac{N_s}{2}$$

transformation matrix of the Daubechies coefficients is then applied to the low-frequency sub-band block $L_0$ to generate

US 7,783,889 B2

**19**

two additional sub-band blocks $L_1$ and $H_1$. For each transformation, the number of filtered values in each sub-band block is halved. Additionally, for each transformation, a descriptor is generated based on a high-frequency sub-band block (e.g., $H_0, H_1, H_2$, etc.). Further details related to the implementation of wavelet transforms are well known in the art and are not described herein.

After the first-level wavelet transform is applied, the high-frequency sub-band block $H_0$ is parsed by separating the filtered values into a first half and a second half (block 704). Next, at a block 706, a first energy value $E_0$ is determined by squaring and summing the filtered values of the first half of the high-frequency sub-band block $H_0$ and a second energy value $E_1$ is also determined (block 706) by squaring and summing the filtered values of the second half of the high-frequency sub-band block $H_0$.

A descriptor bit is determined by comparing the first energy value $E_0$ with the second energy value $E_1$ (block 708). For example, if the first energy value $E_0$ is greater than the second energy value $E_1$ (i.e., $E_0 > E_1$), the first descriptor bit is set equal to one. If the first energy value $E_0$ is less than or equal to the second energy value $E_1$ (i.e., $E_0 \leq E_1$), the first descriptor bit is set equal to zero. It is then determined if another descriptor bit is to be determined (block 710). If another descriptor bit is to be determined, a next-level wavelet decomposition is performed (block 712). For example, as described above, if a second-level wavelet decomposition is performed, an

$$\frac{N_S}{2} \times \frac{N_S}{2}$$

transformation matrix is applied to the filtered values of the low-frequency sub-band block $L_0$ to determine filtered sub-band blocks $L_1$ and $H_1$. If it is determined at block 710 that another descriptor bit is not to be determined, the example method of FIG. 7 may be stopped.

FIG. 8 is a flow diagram of an example method for comparing the digital spectral signatures (e.g., monitored signatures and reference signatures) generated using the example methods of FIGS. 4-7. In particular, the example method may be used to compare a monitored signature with a reference signature, both of which are generated based on a sliding FFT or a wavelet transform. In general, the example method of FIG. 8 may be used to match a monitored signature with a reference signature by comparing the monitored signature with a plurality of reference signatures. Identification information (e.g., channel, program title, episode number, etc.) associated with a matching reference signature may then be retrieved from, for example, a database and used to generate media ratings information. The comparisons may be performed by comparing any number of bits from a monitored signature with the same number of bits from a reference signature such as, for example, a bit-by-bit comparison, a byte-by-byte comparison, a word-by-word comparison, etc. Due to the large number of reference signatures available for comparison, a Hamming distance may be used for the comparisons to eliminate mismatches rapidly, thereby significantly decreasing the time required to compare a monitored signature with the reference signatures.

As is known to one of ordinary skill in the art, a Hamming distance between two values may be identified by determining how many bits, numbers, characters, etc. need to be changed to make the two values equal. For example, a first binary value of 0110 and a second binary value of 0101 have

**20**

a Hamming distance of two because bit location zero and bit location one need to be changed to make the first binary value equal to the second binary value.

Now turning in detail to the example method of FIG. 8, the example method involves first obtaining a monitored signature (block 802). A reference time to for the monitored signature is then obtained (block 804). A first reference signature corresponding to a time within a reference audio stream indicated by the reference time to is obtained from, for example, the memory 134 of FIGS. 1A and 1B (block 806). The first descriptor of the monitored signature and the first descriptor of the reference signature are then obtained (block 808).

The first descriptor of the monitored signature is compared to the first descriptor of the reference signature to determine if the descriptors match (block 810). If a match is detected, it is determined if all of the descriptors of the monitored signature and the reference signature have been compared (block 812). If it is determined at block 812 that all of the descriptors have not been compared, the next descriptors are obtained from the monitored signature and the reference signature (block 816) and control is passed back to block 810. If it is determined at block 812 that all of the descriptors have been compared, the monitored audio stream is identified based on the matching reference signature (block 814). Alternatively, the example method may be implemented so that multiple monitored signatures of a single audio stream need to be matched to multiple signatures of a reference audio stream prior to identifying the monitored audio stream.

If it is determined at block 810 that the descriptors do not match, then it is determined if all of the reference signatures has been compared (block 818). If all of the reference signatures have not been compared, the next reference signature is obtained (block 820) and control is passed to block 808. However, if it is determined at block 818 that all of the reference signatures have been compared, the media, channel, radio station, etc. associated with the monitored audio stream may be unidentifiable and the example method is stopped. A flag may be set to indicate that the monitored audio stream is unidentifiable.

Although the example method of FIG. 8 is described as comparing one reference signature at a time, the example method can be adapted to compare multiple reference signatures with one monitored signature in parallel (i.e., at the same time). For example, the operation of block 806 may be configured to obtain a plurality of reference signatures at one time, each of which corresponds to a different reference audio stream. The operation of block 808 may be configured to obtain the first descriptor of each of the plurality of reference signatures retrieved at block 806. The descriptors of each of the reference signatures may be compared with the each descriptor of the monitored signature until a match is found or until the plurality of reference signatures obtained at block 806 is eliminated, after which time another plurality of reference signatures may be obtained at block 820.

One of ordinary skill in the art can readily appreciate that applying the Hamming distance to the comparison process may significantly reduce the time required to match all of the available reference signatures. For example, after the first descriptor of each of a plurality of reference signatures are compared to the first descriptor of a monitored signature, the first descriptor of each of the reference signatures is associated with a Hamming distance. Only reference signatures having first descriptors associated with a Hamming distance less than a predetermined Hamming distance threshold are further compared with the monitored signature based on the next descriptor of each of the reference signatures and the monitored signature. Reference signatures having descriptors

US 7,783,889 B2

21

associated with a Hamming distance greater than a predetermined threshold are discarded. The number of reference signatures to be compared based on the next descriptors is reduced from the number of reference signatures compared to the monitored signature based on the first descriptor. In this manner, with each iteration of the comparison process, the number of reference signatures that remain to be compared in subsequent iterations of the signature comparison process quickly diminishes until it is determined that all of the descriptors of a single reference signature are associated with a Hamming distance below the predetermined Hamming distance threshold.

In instances where all of the descriptors of more than one reference signature are associated with a Hamming distance below the predetermined Hamming distance threshold, more than one monitored signature may need to be matched with respective reference signatures of the possible matching reference audio streams. It will be relatively unlikely that all of the monitored signatures generated based on the monitored audio stream will match all of the reference signatures of more than one reference audio stream, and, thus erroneously matching more than one reference audio stream to the monitored audio stream can be prevented.

The example methods described above in connection with FIGS. 4-8 may be implemented by hardware, software, and/ or any combination thereof. More specifically, the example methods may be executed in hardware defined by the block diagrams of FIGS. 9-11. The example methods may also be implemented by software executed on a processor system such as, for example, the processor system 1210 of FIG. 12.

FIG. 9 is a block diagram of an example signature generation system 900 for generating digital spectral signatures. In particular, the example signature generation system 900 may be used to generate monitored signatures and/or reference signatures based on a sliding FFT as described above in connection with the example methods of FIGS. 4 and 5. For example, the example signature generation system 900 may be used to implement the signature generators 114 and 122 of FIG. 1A or the signature generators 156 and 158 of FIG. 1B. Additionally, the example signature generation system 900 may be used to implement the example methods of FIGS. 4 and 5.

As shown in FIG. 9, the example signature generation system 900 includes a sample generator 902, a timing device 903, a reference time generator 904, a sliding FFT module 906, a frequency identifier 908, a spectral power value identifier 910, a comparator 912, a descriptor generator 914, a concatenator 916, and a data communication interface 918, all of which may be communicatively coupled as shown. The example signature generation system 900 may be configured to obtain an example audio stream 920, acquire a plurality of audio samples from the example audio stream 920, and generate digital spectral signatures based on the audio samples.

The sample generator 902 may be configured to obtain the example audio stream 920, which may be any analog or digital audio stream. If the example audio stream 920 is an analog audio stream, the sample generator 902 may be implemented using an analog-to-digital converter. If the example audio stream 920 is a digital audio stream, the sample generator 902 may be implemented using a digital signal processor. Additionally, the sample generator 902 may be configured to acquire and/or extract audio samples at any desired sampling frequency $f_s$ and notify the reference time generator 904 when an audio sample acquisition process begins. The sample generator 902 communicates samples to the sliding FFT module 906. The sample generator 902 may also be configured to notify the frequency identifier 908 when an

22

audio sample frame (e.g., one of the audio sample frames 204, 206, 208, and 210 of FIG. 2 or 304, 306, 308, and 310 of FIG. 3) or a sample segment (e.g., one of the sample segments 312a-f of FIG. 3) has been generated.

The timing device 903 may be configured to generate time data and/or timestamp information and may be implemented by a clock, a timer, a counter, and/or any other suitable device. The timing device 903 may be communicatively coupled to the reference time generator 904 and may be configured to communicate time data and/or timestamps to the reference time generator 904. The timing device 903 may also be communicatively coupled to the sample generator 902 and may assert a start signal or interrupt to instruct the sample generator 902 to begin collecting or acquiring audio sample data. In one example, the timing device 903 may be implemented by a real-time clock having a 24-hour period that tracks time at a resolution of milliseconds. In this case, the timing device 903 may be configured to reset to zero at midnight and track time in milliseconds with respect to midnight.

The reference time generator 904 may initialize a reference time to when a notification is received from the sample generator 902. As described above in connection with FIGS. 2 and 3, the reference time $t_0$ may be used to indicate the time within an audio stream at which a signature is generated. In particular, the reference time generator 904 may be configured to read time data and/or a timestamp value from the timing device 903 when notified of the beginning of a sample acquisition process by the sample generator 902. The reference time generator 904 may then store the timestamp value as the reference time.

The sliding FFT module 906 may be configured to perform a sliding FFT using the audio samples obtained from the sample generator 902. As described above in connection with FIG. 4, a sliding FFT may update frequency spectrum data each time two samples (e.g., the two most recently acquired samples $v_{N_s-2}$ and $v_{N_s-1}$) are obtained from the sample generator 902.

The frequency identifier 908 may be configured to identify one or more frequency pairs from frequency spectrum data in response to a notification from the sample generator 902 that a new audio sample frame or a new sample segment has been generated. For example, if the example signature generation system 900 is configured to generate monitored signatures, the frequency identifier 908 identifies frequency pairs from the frequency spectrum data in response to a new audio sample frame notification. Alternatively, if the example signature generation system 900 is configured to generate reference signatures, an audio sample frame of data is formed with each new sample segment as described above in connection with FIG. 3. Therefore, the frequency identifier 908 identifies frequency pairs from the frequency spectrum data in response to a new sample segment notification. The frequency identifier 908 may then be configured to communicate indexes identifying the frequency components of the frequency pairs to the spectral power value identifier 910.

The spectral power value identifier 910 may be configured to obtain the indexes associated with the frequency components of the frequency pairs from the frequency identifier 908. The spectral power value identifier 910 may then determine or identify the spectral power of each frequency component of the frequency pairs by retrieving the spectral power value for each frequency component from the frequency spectrum data generated by the sliding FFT module 906. The spectral power values may then be communicated to the comparator 912.

As described above in connection with FIG. 5, the comparator 912 and the descriptor generator 914 may work coop-

**23**

eratively to generate M-bit descriptors. The comparator **912** may obtain the spectral power values and compare the spectral power values for each frequency pair. The descriptor generator **914** may be configured to obtain comparison results from the comparator **912** and generate the descriptor bits of an M-bit descriptor based on the comparison results.

The concatenator **916** may obtain descriptor values from the descriptor generator **914**. When a complete set of descriptors is obtained, the concatenator **916** may concatenate the descriptors **916** to form a digital spectral signature. The data communication interface **918** may obtain the digital spectral signatures from the concatenator **916** and the reference time to corresponding to the digital spectral signature and communicate the same to a memory and/or a reference site. For example, if the example signature generation system **900** is configured to generate monitored signatures at the monitoring site **102** (FIG. 1A), the monitored signatures may be communicated to the central data collection facility (FIG. 1A) via the network **108** (FIG. 1A). Alternatively, if the example signature generation system **900** is configured to generate reference signatures, the reference signatures may be communicated to the central data collection facility **154** (FIG. 1B) and/or stored in the memory **134** (FIG. 1B).

FIG. **10** is a block diagram of another example signature generation system **1000** for generating digital signatures based on audio streams. In particular, the example signature generation system **1000** may be used to generate monitored signatures and/or reference signatures based on wavelet transforms as described above in connection with the example methods of FIGS. **6** and **7**. For example, the example signature generation system **1000** may be used to implement the signature generators **114** and **122** of FIG. 1A and generate monitored signatures. Additionally or alternatively, the example signature generation system **1000** may be used to implement the signature generators **156** and **158** of FIG. 1B. In addition, the example signature generation system **1000** may be used to implement the example methods of FIGS. **6** and **7**.

The example signature generation system **1000** includes the sample generator **902**, the timing device **903**, the reference time generator **904**, the comparator **912**, the descriptor generator **914**, the concatenator **916**, and the data communication interface **918** of the example signature generation system **900** described above in connection with FIG. **9**. Additionally, the example signature generation system **1000** includes a wavelet transform module **1002**, a sub-band block identifier **1004**, and an energy value generator **1006**, all of which may be communicatively coupled as shown.

The wavelet transform module **1002** may be configured to apply wavelet transforms to audio samples obtained from the sample generator **902**. For example, the wavelet transform module **1002** may obtain an audio sample frame (e.g., one of the audio sample frames **204**, **206**, **208**, and **210** of FIG. **2** or **304**, **306**, **308**, and **310** of FIG. **3**) from the sample generator **902** and perform an M-level wavelet decomposition on the audio samples to generate filtered data values using, for example, the Daubechies wavelet transform as described in connection with FIGS. **6** and **7**. The filtered data values may then be communicated to the sub-band block identifier **1004**.

The sub-band block identifier **1004** may be configured to obtain the filtered data values from the wavelet transform module **1002** and generate a low-frequency sub-band block $L_x$ and a high-frequency sub-band block $H_x$. As described in greater detail above in connection with FIG. **7**, the sub-band blocks $L_x$ and $H_x$ may be identified by de-interleaving the filtered data values. The low-frequency sub-band block may then be communicated to the wavelet transform module **1002**

**24**

to perform another wavelet decomposition and the high-frequency sub-band filtered block may be communicated to the energy value generator **1006**.

The energy value generator **1006** may be configured to generate energy values $E_x$ based on the high-frequency sub-band block. The energy value generator **1006** may be configured to parse or separate the high-frequency sub-band block into a first half of filtered data values and a second half of filtered data values as described in greater detail above in connection with FIG. **7**. The energy value generator **1006** may then generate a first energy value $E_0$ by squaring and summing the first half of filtered data values. A second energy value $E_1$ may be generated by squaring and summing the second half of filtered data values.

The comparator **912** and the descriptor generator **914** may be configured to generate descriptors based on energy values. For example, the comparator **912** may obtain energy values from the energy value generator **1006** and compare a first energy to a second energy value. The descriptor generator **914** may obtain comparison results from the comparator **912** and generate the bits of an M-bit descriptor based on the comparison results.

The concatenator **916** may obtain descriptors from the descriptor generator **914** and generate digital spectral signatures by concatenating a plurality of descriptors as described above in connection with FIG. **9**. The data communication interface **918** may then store or transmit signatures obtained from the concatenator **916** with corresponding reference times obtained from the reference time generator **904**.

FIG. **11** is a block diagram of an example signature comparison system **1100** for comparing digital spectral signatures. In particular, the example signature comparison system **1100** may be used to compare monitored signatures with reference signatures. For example, the example signature comparison system **1100** may be used to implement the signature analyzer **132** of FIG. **1**. To compare monitored signatures with reference signatures. Additionally, the example signature comparison system **1100** may be used to implement the example method of FIG. **8**.

The example signature comparison system **1100** includes a monitored signature receiver **1102**, a reference signature receiver **1104**, a comparator **1106**, a Hamming distance filter **1108**, a media identifier **1110**, and a media identification look-up table interface **1112**, all of which may be communicatively coupled as shown.

The monitored signature receiver **1102** may be configured to obtain monitored signatures via the network **106** (FIG. 1) and communicate the monitored signatures to the comparator **1106**. The reference signature receiver **1104** may be configured to obtain reference signatures from the memory **134** (FIGS. 1A and 1B) and communicate the reference signatures to the comparator **1106**.

The comparator **1106** and the Hamming distance filter **1108** may be configured to compare reference signatures to monitored signatures using Hamming distances. In particular, the comparator **1106** may be configured to compare descriptors of monitored signatures with descriptors from a plurality of reference signatures and to generate Hamming distance values for each comparison. The Hamming distance filter **1108** may then obtain the Hamming distance values from the comparator **1106** and filter out non-matching reference signatures based on the Hamming distance values as described above in connection with FIG. **8**.

After a matching reference signature is found, the media identifier **1110** may obtain the matching reference signature and in cooperation with the media identification look-up table interface **1112** may identify the media information associated

US 7,783,889 B2

25

with an unidentified audio stream (e.g., the example monitored audio stream 202 of FIG. 2). For example, the media identification look-up table interface 1112 may be communicatively coupled to a media identification look-up table or a database that is used to cross-reference media identification information (e.g., movie title, show title, song title, artist name, episode number, etc.) based on reference signatures. In this manner, the media identifier 1110 may retrieve media identification information from the media identification database based on the matching reference signatures.

FIG. 12 is a block diagram of an example processor system 1210 that may be used to implement the apparatus and methods described herein. As shown in FIG. 12, the processor system 1210 includes a processor 1212 that is coupled to an interconnection bus or network 1214. The processor 1212 includes a register set or register space 1216, which is depicted in FIG. 12 as being entirely on-chip, but which could alternatively be located entirely or partially off-chip and directly coupled to the processor 1212 via dedicated electrical connections and/or via the interconnection network or bus 1214. The processor 1212 may be any suitable processor, processing unit or microprocessor. Although not shown in FIG. 12, the system 1210 may be a multi-processor system and, thus, may include one or more additional processors that are identical or similar to the processor 1212 and that are communicatively coupled to the interconnection bus or network 1214.

The processor 1212 of FIG. 12 is coupled to a chipset 1218, which includes a memory controller 1220 and an input/output (I/O) controller 1222. As is well known, a chipset typically provides I/O and memory management functions as well as a plurality of general purpose and/or special purpose registers, timers, etc. that are accessible or used by one or more processors coupled to the chipset. The memory controller 1220 performs functions that enable the processor 1212 (or processors if there are multiple processors) to access a system memory 1224 and a mass storage memory 1225.

The system memory 1224 may include any desired type of volatile and/or non-volatile memory such as, for example, static random access memory (SRAM), dynamic random access memory (DRAM), flash memory, read-only memory (ROM), etc. The mass storage memory 1225 may include any desired type of mass storage device including hard disk drives, optical drives, tape storage devices, etc.

The I/O controller 1222 performs functions that enable the processor 1212 to communicate with peripheral input/output (I/O) devices 1226 and 1228 via an I/O bus 1230. The I/O devices 1226 and 1228 may be any desired type of I/O device such as, for example, a keyboard, a video display or monitor, a mouse, etc. While the memory controller 1220 and the I/O controller 1222 are depicted in FIG. 12 as separate functional blocks within the chipset 1218, the functions performed by these blocks may be integrated within a single semiconductor circuit or may be implemented using two or more separate integrated circuits.

The methods described herein may be implemented using instructions stored on a computer readable medium that are executed by the processor 1212. The computer readable medium may include any desired combination of solid state, magnetic and/or optical media implemented using any desired combination of mass storage devices (e.g., disk drive), removable storage devices (e.g., floppy disks, memory cards or sticks, etc.) and/or integrated memory devices (e.g., random access memory, flash memory, etc.).

Although certain methods, apparatus, and articles of manufacture have been described herein, the scope of coverage of this patent is not limited thereto. To the contrary, this patent

26

covers all methods, apparatus, and articles of manufacture fairly falling within the scope of the appended claims either literally or under the doctrine of equivalents.

What is claimed is:

1. A method for generating signatures implemented using an apparatus comprising a processor, the method comprising:
   obtaining a first frame of media samples;
   identifying a first frequency component having a first spectral power and a second frequency component having a second spectral power by performing a spectral transform operation on the first frame of media samples;
   determining a first descriptor of the first frame of media samples based on a comparison of the first spectral power and the second spectral power;
   generating a first signature based on the first descriptor;
   identifying a second frame of media samples by extracting a common plurality of media samples from the first frame of media samples and appending another plurality of media samples to the common plurality of media samples;
   identifying a third spectral power associated with a third frequency component and a fourth spectral power associated with a fourth frequency component, wherein the third frequency component and the fourth frequency component are associated with performing the spectral transform operation on the second frame of media samples;
   determining a second descriptor based on a comparison of the third spectral power and the fourth spectral power; and
   generating a second signature based on the second descriptor.

2. A method as defined in claim 1, further comprising identifying media information based on the first signature.

3. A method as defined in claim 2, wherein a Hamming distance is used to identify the media information based on the first signature.

4. A method as defined in claim 1, wherein the media information is associated with at least one of audio information or video information.

5. A method as defined in claim 1, wherein the first descriptor is associated with only the first frame of media samples.

6. A method as defined in claim 1, wherein the second descriptor is of the second frame of media samples.

7. A method as defined in claim 1, wherein the spectral transform operation is a sliding Fast Fourier Transform.

8. An apparatus for generating signatures, comprising:
   a processor system including a memory; and
   instructions stored in the memory that enable the processor system to:
   obtain a first and second frames of media samples, the first and second frames of media samples consecutively located in an audio stream, a portion of the first frame of media samples overlapping with a portion of the second frame of media samples;
   identify a first frequency component having a first spectral power and a second frequency component having a second spectral power by performing a spectral transform operation on the first frame of media samples;
   identify a third spectral power and a fourth spectral power; determine a first descriptor of the first frame of media samples based on a comparison of the first spectral power and the second spectral power;
   determine a second descriptor of the second frame of media samples based on a comparison of the third spectral power and the fourth spectral power; and

US 7,783,889 B2

27

generate a first signature based on the first descriptor and
a second signature based on the second descriptor.

**9**. An apparatus as defined in claim **8**, wherein the instructions stored in the memory enable the processor system to identify media information based on the first signature.

**10**. An apparatus as defined in claim **9**, wherein a Hamming distance is used to identify the media information based on the first signature.

**11**. An apparatus as defined in claim **8**, wherein the first descriptor is associated with only the first frame of media samples.

**12**. An apparatus as defined in claim **8**, wherein the instructions stored in the memory enable the processor system to:

obtain a first plurality of media samples; and

identify the second frame of media samples by extracting a common plurality of media samples from the first frame of media samples and appending the first plurality of media samples to the common plurality of media samples, the common plurality of media samples including the overlapping portions of the first and second frames of media samples.

**13**. An apparatus as defined in claim **8**, wherein the third spectral power is associated with a third frequency component and the fourth spectral power is associated with a fourth frequency component, and wherein the third frequency component and the fourth frequency component are associated with performing the spectral transform operation on the second frame of media samples.

**14**. A tangible machine accessible medium having instructions stored thereon that, when executed, cause a machine to:

obtain a first frame first and second frames of media samples, the first and second frames of media samples consecutively located in an audio stream, a portion of the first frame of media samples overlapping with a portion of the second frame of media samples;

28

identify a first frequency component having a first spectral power and a second frequency component having a second spectral power by performing a spectral transform operation on the first frame of media samples;

identify a third spectral power and a fourth spectral power;

determine a first descriptor of the first frame of media samples based on a comparison of the first spectral power and the second spectral power;

determine a second descriptor of the second frame of media samples based on a comparison of the third spectral power and the fourth spectral power; and

generate a first signature based on the first descriptor and a second signature based on the second descriptor.

**15**. A tangible machine accessible medium as defined in claim **14**, wherein the first descriptor is associated with only the first frame of media samples.

**16**. A tangible machine accessible medium as defined in claim **14** having instructions stored thereon that, when executed, cause the machine to:

obtain a first plurality of media samples; and

identify the second frame of media samples by extracting a common plurality of media samples from the first frame of media samples and appending the first plurality of media samples to the common plurality of media samples, the common plurality of media samples including the overlapping portions of the first and second frames of media samples.

**17**. A tangible machine accessible medium as defined in claim **14**, wherein third spectral power is associated with a third frequency component and the fourth spectral power is associated with a fourth frequency component, and wherein the third frequency component and the fourth frequency component are associated with performing the spectral transform operation on the second frame of media samples.

\*   \*   \*   \*   \*

# EXHIBIT B

US009020189B2

(12) **United States Patent**　　　(10) **Patent No.:**　　**US 9,020,189 B2**

Lee et al.　　　　　　　　　　　(45) **Date of Patent:**　　**Apr. 28, 2015**

(54) **METHODS AND APPARATUS TO MONITOR ENVIRONMENTS**

(71) Applicants:**Morris Lee**, Palm Harbor, FL (US); **Alex Terrazas**, Santa Cruz, CA (US)

(72) Inventors: **Morris Lee**, Palm Harbor, FL (US); **Alex Terrazas**, Santa Cruz, CA (US)

(73) Assignee: **The Nielsen Company (US), LLC**, Schaumburg, IL (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 45 days.

(21) Appl. No.: **13/708,698**

(22) Filed: **Dec. 7, 2012**

(65) **Prior Publication Data**

US 2014/0161305 A1　　Jun. 12, 2014

(51) **Int. Cl.**
　　*G06K 9/00*　　　　(2006.01)
　　*G06K 9/20*　　　　(2006.01)
(52) **U.S. Cl.**
　　CPC ........ *G06K 9/00362* (2013.01); *G06K 9/00771* (2013.01); *G06K 9/2036* (2013.01)
(58) **Field of Classification Search**
　　None
　　See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 5,973,732 | A * | 10/1999 | Guthrie | 348/169 |
| 6,674,877 | B1 * | 1/2004 | Jojic et al. | 382/103 |

| | | | | |
|---|---|---|---|---|
| 6,697,104 | B1 * | 2/2004 | Yakobi et al. | 348/143 |
| 6,771,818 | B1 * | 8/2004 | Krumm et al. | 382/225 |
| 7,330,566 | B2 | 2/2008 | Cutler | |
| 7,965,866 | B2 * | 6/2011 | Wang et al. | 382/103 |
| 8,159,507 | B2 | 4/2012 | Nishibori | |
| 8,233,721 | B2 | 7/2012 | Wagg | |
| 8,295,542 | B2 | 10/2012 | Albertson et al. | |
| 2005/0229200 | A1 | 10/2005 | Kirkland et al. | |
| 2005/0249382 | A1 * | 11/2005 | Schwab et al. | 382/115 |
| 2011/0286633 | A1 * | 11/2011 | Wang et al. | 382/103 |
| 2014/0254880 | A1 | 9/2014 | Srinivasan et al. | |
| 2014/0282644 | A1 | 9/2014 | Terrazas | |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| WO | 2009133429 | 11/2009 |

* cited by examiner

*Primary Examiner* — Tsung-Yin Tsai

(74) *Attorney, Agent, or Firm* — Hanley, Flight & Zimmerman, LLC

(57) **ABSTRACT**

Methods and apparatus to monitor environments are disclosed. An example method includes analyzing a plurality of three-dimensional data points having respective depth values representative of distances between a sensor and respective objects of an environment; when a first set of the three-dimensional data points has a first depth value less than a threshold, executing a first type of recognition analysis on a first area of the environment corresponding to the first set of the three-dimensional data points; and when a second set of the three-dimensional data points has a second depth value greater than the threshold, executing a second type of recognition analysis different than the first type of recognition analysis on a second area of the environment corresponding to the second set of the three-dimensional data points.

**21 Claims, 8 Drawing Sheets**





FIG. 1



**FIG. 1A**



FIG. 2A

FIG. 2



**FIG. 3**



**FIG. 4**



500
INITIALIZE PEOPLE COUNTER
502
CAPTURE 3-D DATA POINTS FOR ENVIRONMENT
504
IDENTIFY DATA POINTS HAVING A DEPTH VALUE WITHIN A THRESHOLD DISTANCE FROM 3D SENSOR
506
EXECUTE 3D-BASED RECOGNITION ANALYS(ES) ON DATA POINTS HAVING A DEPTH VALUE WITHIN THE THRESHOLD DISTANCE
508
ANY OBJECT(S) RECOGNIZED AS A PERSON?
NO
YES
510
STORE INFORMATION RELATED TO RECOGNIZED PERSON(S) IN FRAME DATABASE
512
DETERMINE IF 2-D ANALYSIS HAS BEEN TRIGGERED
514
2-D RECOGNITION ANALYSIS TRIGGERED?
NO
YES
516
WHAT TYPE OF 2D-BASED RECOGNITION ANALYSIS WAS TRIGGERED?
TARGETED
FULL SCAN
518
OBTAIN LOCATION INFORMATION OF DETECTED OBJECT(S) AND DEFINE LIMIT BOUNDARIES
520
EXECUTE FOCUSED 2D RECOGNITION ANALYSIS BASED ON LOCATION(S)
524
EXECUTE 2D RECOGNITION ANALYSIS ON TWO-DIMENSIONAL DATA FOR ENTIRE ENVIRONMENT
522
STORE INFORMATION RELATED TO RECOGNIZED PERSON(S) IN FRAME DATABASE

FIG. 5



600
HAS INTERVAL FOR 2D ANALYSIS ELAPSED?
NO
YES
602
TRIGGER 2D-BASED RECOGNITION ANALYSIS
604
HAS PERSON TRAVELLED FROM WITHIN THRESHOLD DISTANCE FROM SENSOR TO OUTSIDE THRESHOLD DISTANCE FROM SENSOR?
NO
YES
606
TRIGGER TARGETED 2D RECOGNITION ANALYSIS ON LOCATION OF PERSON THAT TRAVELLED OUTSIDE THRESHOLD DISTANCE
608
DID 2D-BASED RECOGNITION ANALYSIS OF IMMEDIATELY PREVIOUS FRAME(S) RESULT IN RECOGNITION OF AN OBJECT AT A FIRST LOCATION AS A PERSON?
NO
YES
610
TRIGGER TARGETED 2D RECOGNITION ANALYSIS ON LOCATION OF PREVIOUSLY IDENTIFIED PERSON
612
DETERMINE THAT 2D ANALYSIS HAS NOT BEEN TRIGGERED
614
RETURN

FIG. 6



FIG. 7

US 9,020,189 B2

**1**

## METHODS AND APPARATUS TO MONITOR ENVIRONMENTS

### FIELD OF THE DISCLOSURE

This disclosure relates generally to audience measurement and, more particularly, to methods and apparatus to monitor environments.

### BACKGROUND

Audience measurement of media (e.g., broadcast television and/or radio, stored audio and/or video content played back from a memory such as a digital video recorder or a digital video disc, a webpage, audio and/or video media presented (e.g., streamed) via the Internet, a video game, etc.) often involves collection of media identifying data (e.g., signature(s), fingerprint(s), code(s), tuned channel identification information, time of exposure information, etc.) and people data (e.g., user identifiers, demographic data associated with audience members, etc.). The media identifying data and the people data can be combined to generate, for example, media exposure data indicative of amount(s) and/or type(s) of people that were exposed to specific piece(s) of media.

In some audience measurement systems, the people data is collected by capturing a series of images of a media exposure environment (e.g., a television room, a family room, a living room, a bar, a restaurant, etc.) and analyzing the images to determine, for example, an identity of one or more persons present in the media exposure environment, an amount of people present in the media exposure environment during one or more times and/or periods of time, etc. The collected people data can be correlated with media detected as being presented in the media exposure environment to provide exposure data (e.g., ratings data) for that media.

### BRIEF DESCRIPTION OF THE DRAWINGS

FIG. **1** is an illustration of an example media exposure environment including an example audience measurement device disclosed herein.

FIG. **1A** is another illustration of the example media exposure environment of FIG. **1**.

FIG. **2** is a block diagram of an example implementation of the example audience measurement device of FIG. **1**.

FIG. **2A** is a block diagram of an example implementation of the example image capturing device of FIG. **1**.

FIG. **3** is a block diagram of an example implementation of the example people counter of FIGS. **1** and/or **2**.

FIG. **4** is an illustration of an example face rectangle tracked by the example people counter of FIGS. **1**, **2** and/or **3**.

FIGS. **5** and **6** are flowcharts representative of example machine readable instructions that may be executed to implement the example audience measurement device of FIGS. **1**, **2** and/or **3**.

FIG. **7** is a block diagram of an example processing system capable of executing the example machine readable instructions of FIGS. **5** and/or **6** to implement the example audience measurement device of FIGS. **1**, **2** and/or **3**.

### DETAILED DESCRIPTION

There are known applications, systems, and devices (e.g., surveillance systems, consumer behavior monitors deployed in shopping centers, audience measurement devices, etc.) that benefit from the ability to accurately count a number of people in a particular space or environment at a particular

**2**

time. Such known systems typically capture images of the monitored environment and analyze the images to determine how many people are present at certain times.

To count people in a media exposure environment, some known audience measurement systems attempt to recognize objects as humans and/or to recognize an identity of a detected person in image data representative of the media exposure environment. As used herein, recognition systems include one or more devices, one or more applications, one or more algorithms, etc. tasked with recognizing and/or detecting one or more aspects of image data representative of an environment and/or occupants of the environment. In some known systems, recognition systems include devices, applications, algorithms, etc. tasked with determining that a portion of image data represents a particular type of object such as, for example, a body part (e.g., an arm, a hand, a leg, a head, a torso, etc.). In some known systems, recognition systems include devices, applications, algorithms, etc. tasked with determining that an object, such as a face, belongs to a certain individual. That is, in some known systems, recognition systems include identification systems that, for example, verify and/or detect an identity of a known person. In some known examples, recognition systems include devices, applications, algorithms, etc. tasked with identifying a gesture (e.g., a hand movement, a body motion, etc.) performed by a detected person.

In some traditional systems, the audience measurement system maintains a tally for each frame of image data to reflect an amount of people in the environment at a time corresponding to a respective frame. Recognition of an object as a human in a frame of image data causes these traditional audience measurement devices to increment the tally associated with that frame. Some such systems do not attempt to identify the person, but instead maintain a tally of persons and/or prompt the audience to self identify when a change in the count occurs. In examples when face detection is employed, faces of people may be undetected or unrecognized due to, for example, partial visibility, lighting conditions, obscuring of the face due to eating or drinking, or a rotation of a head relative to a camera capturing the frames, etc. Additionally, faces of people in the media exposure environment may go undetected or unrecognized in such systems due to field of view limitations associated with an image sensor. In other words, the image sensor tasked with captured images of the media exposure environment may not have a wide enough field of view to capture certain faces of people that are being exposed to media. Additionally, a non-human object, such as a picture of a human face hanging on a wall, is sometimes mistaken for a human face in such known systems, thereby improperly inflating the tally for the corresponding frame.

These and other limitations and/or inaccuracies of known systems can lead to an inaccurate tally of people for individual frames. An inaccurate tally of people in a frame can negatively affect the accuracy of media exposure data generated using the tally. For example, an audience measurement system counting the people in a room may also be collecting media identifying information to identify media being presented (e.g., aurally and/or visually) in the room. With the identification of the media and the amount of people in the room at a given date and time, the audience measurement system can indicate how many people were exposed to the specific media and/or associate the demographics of the people with the specific exposure to determine audience characteristics for the specific media. An audience measurement entity (e.g., The Nielsen Company (US), LLC) can calculate ratings for a piece of media detected in an environment by correlating the piece of media with presence information

US 9,020,189 B2

**3**

detected in the environment at times corresponding to a detection of the piece of media. If face(s) are not detected or recognized as faces, the exposure data for the identified media may be under counted (e.g., the media is credited with less viewers/listeners than had actually been exposed to the media). Alternatively, if false positives are detected, the exposure data for the identified media may be overstated (e.g., the media is credited with more viewers/listeners than had actually been exposed to the media).

Recent developments in the capture and processing of three-dimensional data have improved recognition systems that previously relied solely on two-dimensional image data. That is, systems tasked with, for example, recognizing objects as people, determining an identity of a person, and/or identifying a gesture being made by a person have benefited from three-dimensional imaging technology that has improved the accuracy, efficiency, and capabilities of such systems. For example, some three-dimensional data processing involves generating a skeletal framework representative of a detected person. The skeletal framework is especially useful in tracking movements of a person and/or identifying gestures made by the person. Further, capture and processing of three-dimensional data can provide a more accurate identification of an object as a body part (e.g., an arm, a hand, a head, a leg, etc.) than two-dimensional data. Further, capture and processing of three-dimensional data can provide a more accurate identification of a known person than two dimensional data. Further, capture and processing of three-dimensional data improves an ability to distinguish actual human faces from face-like patterns, such as painting, pictures, fabrics including face depictions, etc.

Examples disclosed herein recognize that the advantages provided by using three-dimensional data to recognize objects as people and/or identify people are less significant (relative to the use of two-dimensional data) when depth values of the three-dimensional data are beyond a certain distance (which may vary depending on a particular sensor used to capture the three-dimensional data and/or a particular processing technique). In other words, examples disclosed herein recognize that three-dimensional data and the processing thereof improve recognition of objects to a first degree when the objects are within a threshold distance from the three-dimensional sensor and to a second, less significant degree when the objects are outside the threshold distance from the three-dimensional sensor. Accordingly, a greater distance between the three-dimensional sensor and the analyzed object leads to less accurate conclusions from analyses generated by three-dimensional based (3D-based) recognition systems.

For example, a 3D-based recognition analysis tasked with recognizing objects as human body parts (e.g., arms, legs, heads, hands, etc.) may have a first accuracy rating (e.g., a percentage of true positives, a percentage of false positives, a percentage of false negatives, and/or a percentage of true negatives) for recognition of objects located between one (1) foot and six (6) feet away from a three-dimensional sensor, a second accuracy rating for recognition of objects located between six (6) feet and ten (10) feet away from the three-dimensional sensor, and a third accuracy rating for recognition of objects located ten (10) feet or greater from the three-dimensional sensor. In such instances, the first accuracy rating is greater than the second accuracy rating, and the second accuracy rating is greater than the third accuracy rating. Examples disclosed herein recognize that in some instances, the second and/or third accuracy rating may be less than a fourth accuracy rating associated with a two-dimensional based (2D-

**4**

based) recognition analysis. That is, examples disclosed herein recognize that in certain instances (e.g., when a subject object is greater than a threshold distance away from a sensor) a 2D-based recognition analysis may be better suited (e.g., may provide more accurate results) for object recognition than a 3D-based recognition analyses. The advantages of 2D-based recognition analyses over the 3D-based recognition analyses are especially significant for relatively thin objects (e.g., arms, hands, etc.) at relatively far distances from the corresponding sensor.

Further, examples disclosed herein recognize that 2D-based recognition analyses are often more costly in terms of computational resources than 3D-based recognition analyses. In particular, some 2D-based recognition analyses often involve complex processing techniques that consume more resources (e.g., processing cycles, memory, etc.) than 3D-based recognition analyses. For example, while many 2D-based recognition analyses involve large amounts of comparisons of large amounts of image data (e.g., pixel intensities) to determine which portions of the image data (if any) correspond to a person, many 3D-based recognition analyses are able to reference collection(s) of shape libraries to determine whether depth information corresponds to a person. Thus, the additional dimension used for the 3D-based analyses enable more efficient recognition of objects.

Example methods, apparatus, and/or articles of manufacture disclosed herein utilize three-dimensional recognition analysis and two-dimensional analysis to more accurately and more efficiently recognize objects in an environment than previous recognition systems. In particular, example methods, apparatus, and/or articles of manufacture disclosed herein capture three-dimensional data of the environment via a three-dimensional sensor and determine whether the environment includes an object within a threshold distance from the three-dimensional sensor. The threshold distance used by examples disclosed herein corresponds to, for example, a distance at which the accuracy rating (e.g., a percentage) of the 3D-based recognition analysis falls below a threshold accuracy. For object(s) detected within the threshold distance from the three-dimensional sensor, example methods, apparatus and/or articles of manufacture disclosed herein execute a 3D-based recognition analysis to determine, for example, whether the object(s) are people and/or body part(s) of people. Thus, examples disclosed herein execute the 3D-based recognition analysis on objects for which the threshold accuracy can be achieved. For each one of the object(s) determined to correspond to a person via the 3D-based recognition analysis, example methods, apparatus, and/or articles of manufacture disclosed herein increment a people tally associated with the environment (e.g., for a particular frame corresponding to the captured three-dimensional data). Thus, the people tally generated by examples disclosed herein for objects located within the threshold distance have an accuracy aligned with the high accuracy provided by the 3D-based recognition analysis.

For portions of the environment having depth information in the captured three-dimensional data greater than the threshold distance, example methods, apparatus, and/or articles of manufacture disclosed herein execute a 2D-based recognition analyses on captured two-dimensional data (e.g., via a two-dimensional image sensor) to determine whether any people are present in the environment at distances greater than the threshold distance associated with the 3D-based recognition analysis. Put another way, examples disclosed herein execute the 2D-based recognition analysis for objects located at distances at which the accuracy of the 3D-based recognition analyses falls below the threshold accuracy. As

US 9,020,189 B2

5

6

described in greater detail below, example methods, apparatus, and/or articles of manufacture disclosed herein trigger execution of the 2D-based recognition analysis in response to one or more example detections and/or events. For example, some examples disclosed herein trigger the 2D-based recognition analysis in connection with the capture of each frame of captured image data. Additionally or alternatively, some examples disclosed herein trigger the 2D-based recognition analysis in response to a predefined time interval elapsing (e.g., according to a schedule). Additionally or alternatively, some examples disclosed herein trigger the 2D-based recognition analysis in response to the 3D-based recognition analysis determining that a person has moved from within the threshold distance from the sensor to a distance outside the threshold distance. Some such examples disclosed herein use the location of the person that has moved beyond the threshold distance (as recorded via the 3D-based recognition analysis) to focus the 2D-based recognition analysis on a particular area of the environment, thereby avoiding the need to scan the entire environment in connection with the 2D-based recognition analysis, which is a computational expensive procedure. In some examples disclosed herein, the 2D-based analysis is only performed in areas beyond the area in which 3D-based analyses have an acceptable level of accuracy. Some disclosed examples use a combination of any two or more of the above triggers (e.g., time based and three-dimensional recognition determination) to trigger the 2D-based analysis.

FIG. 1 is an illustration of an example media exposure environment 100 including an information presentation device 102, an example image capturing device 104, and a meter 106 for collecting audience measurement data. In the illustrated example of FIG. 1, the information presentation device 102 is a television and the media exposure environment 100 is a room of a household (e.g., a room in a home of a panelist such as the home of a "Nielsen family") that has been statistically selected to develop television ratings data for population(s)/demographic(s) of interest. In the illustrated example, one or more persons of the household have registered with an audience measurement entity (e.g., by agreeing to be a panelist) and have provided demographic information to the audience measurement entity to enable associating demographics with viewing activities (e.g., media exposure).

In some examples, the audience measurement entity provides the image capturing device 104 to the household. In some examples, the image capturing device 104 is a component of a media presentation device purchased by the household such as, for example, a camera of a video game system 108 (e.g., Microsoft® Kinect®) and/or piece(s) of equipment associated with a video game system (e.g., a Kinect® sensor). In such examples, the image capturing device 104 may be repurposed and/or data collected by the image capturing device 104 may be repurposed for audience measurement.

In the illustrated example of FIG. 1, the image capturing device 104 is placed above the information presentation device 102 at a position for capturing image data of the environment 100. In some examples, the image capturing device 104 is positioned beneath or to a side of the information presentation device 102 (e.g., a television or other display). In some examples, the image capturing device 104 is integrated with the video game system 108. For example, the image capturing device 104 may collect image data (e.g., three-dimensional data and/or two-dimensional data) using one or more sensors for use with the video game system 108 and/or may also collect such image data for use by the meter 106. In some examples, the image capturing device 104 employs a first type of image sensor (e.g., a two-dimensional sensor) to obtain image data of a first type (e.g., two-dimensional data) and collects a second type of image data (e.g., three-dimensional data) from a second type of image sensor (e.g., a three-dimensional sensor). In some examples, only one type of sensor is provided by the video game system 108 and a second sensor is added by the audience measurement system.

In the example of FIG. 1, the meter 106 is a software meter provided for collecting and/or analyzing the data from the image capturing device 104 and other media identification data collected as explained below. In the illustrated example, the meter 106 is installed in the video game system 108 (e.g., by being downloaded to the same from a network, by being installed at the time of manufacture, by being installed via a port (e.g., a universal serial bus (USB) from a jump drive provided by the audience measurement company, by being installed from a storage disc (e.g., an optical disc such as a BluRay disc, Digital Versatile Disc (DVD) or CD (compact Disk), or by some other installation approach). Executing the meter 106 on the panelist's equipment is advantageous in that it reduces the costs of installation by relieving the audience measurement entity of the need to supply hardware to the monitored household). In other examples, rather than installing the software meter 106 on the panelist's consumer electronics, the meter 106 is a dedicated audience measurement unit provided by the audience measurement entity. In such examples, the meter 106 may include its own housing, processor, memory and software to perform the desired audience measurement functions. In such examples, the meter 106 is adapted to communicate with the image capturing device 104 via a wired or wireless connection. In some such examples, the communications are effected via the panelist's consumer electronics (e.g., via a video game console). In other example, the image capturing device 104 is dedicated to audience measurement and, thus, no direct interaction with the consumer electronics owned by the panelist is involved.

Although the example audience measurement system of FIG. 1 is illustrated in a panelist home, the system can be implemented in additional and/or alternative types of environments such as, for example, a room in a non-statistically selected household (e.g., a non-panelist site), a theater, a restaurant, a tavern, a retail location, an arena, etc. For example, the environment may not be associated with a panelist of an audience measurement study, but instead may simply be an environment associated with a purchased XBOX® and/or Kinect® system. In some examples, the example audience measurement system of FIG. 1 is implemented, at least in part, in connection with additional and/or alternative types of media presentation devices such as, for example, a radio, a computer, a tablet, a cellular telephone, and/or any other communication device able to present media to one or more individuals.

In the example shown in FIG. 1, first and second persons 109 and 110 are present in the environment 100. In the illustrated example, the first person 109 is located in a near range set of distances 112 defined by a location of a three-dimensional sensor of the image capturing device 104 in the example of FIG. 1, and a first threshold distance 114 extending away from the imaging capturing device 104 along the z-axis shown in FIG. 1. The example environment 100 of FIG. 1 also includes a mid-range set of distances 116 defined by a second threshold distance 118 extending away from the image capturing device 104 along the z-axis and beginning at the end of the first threshold distance 114. The example environment 100 of FIG. 1 also includes a far range set of dis-

US 9,020,189 B2

7                                                        8

tances **120** that includes distances greater than the second threshold distance **118** away from the image capturing device **104**.

FIG. **1A** illustrates the example media exposure environment **100** of FIG. **1** from a different perspective. In particular, the example image capturing device **104** captures data across a field of view illustrated in FIG. **1A**. As shown in FIG. **1A**, a first detection area **122** is defined by the first threshold **114** and the field of view to include the near range set of distances **112**. Further, a second detection area **124** is defined by the first threshold **114**, the second threshold **118**, and the field of view to include the mid-range set of distances **116**. Further, a third detection area **126** is defined by the second threshold **118** and the field of view to include the far range set of distances **120**. As described in detail below in connection with FIG. **2**, the example meter **106** of FIG. **1** applies different types of recognition analyses to determine whether objects correspond to people depending on, for example, in which one of the detection areas **122-126** or distance ranges **112**, **116** and **120** of the environment **100** the objects are located.

FIG. **2** illustrates an example implementation of the meter **106** of FIG. **1**. FIG. **2A** illustrates an example implementation of the image capturing device **104** of FIG. **1**. The example meter **106** of FIG. **2** includes an audience detector **200** to develop audience composition information regarding, for example, presence of people in the example environment **100** of FIG. **1**. The example meter **106** of FIG. **2** also includes a media detector **202** to collect information regarding, for example, media presented in the environment **100** of FIG. **1**. An example implementation of the media detector **202** is discussed further below. The example image capturing device **104** of FIG. **2A** includes a three-dimensional sensor **204** capable of capturing three-dimensional data representative of the environment **100** and a two-dimensional sensor **206** capable of capturing two-dimensional data representative of the environment **100**. While the example image capturing device **104** of FIG. **2A** includes the three-dimensional sensor **204** and the two-dimensional sensor **206**, the example meter **106** may additionally or alternatively receive three-dimensional data and/or two-dimensional data representative of the environment **100** from a different source. For example, the image capturing device **104** may include the two-dimensional sensor **206** and may receive three-dimensional data representative of the environment **100** from a three-dimensional sensor implemented by a different component in communication with the example meter **106** such as, for example, a video game system (e.g., Microsoft® Kinect®) owned by the panelist. In some examples, the image capturing device **104** is implemented by a Kinect® sensor which includes both the two-dimensional sensor **206** and the three-dimensional sensor **204**.

The example three-dimensional sensor **204** of FIG. **2A** projects an array or grid of dots (e.g., via one or more electromagnetic radiation beams) onto objects of the environment **100**. The dots of the array projected by the example three-dimensional sensor **204** have respective x-axis coordinates and y-axis coordinates and/or some derivation thereof. The example three-dimensional sensor **204** of FIG. **2A** uses feedback received in connection with the dot array to calculate depth values associated with different dots projected onto the environment **100**. Thus, the example three-dimensional sensor **204** generates a plurality of data points. Each such data point has a first component representative of an x-axis position in the environment **100**, a second component representative of a y-axis position in the environment **100**, and a third component representative of a z-axis position in the environment **100**. As used herein, the x-axis position of an object is

referred to as a horizontal position, the y-axis position of the object is referred to as a vertical position, and the z-axis position of the object is referred to as a depth position relative to the image capturing device **104**. In the illustrated example, the array projected onto the environment **100** is an infrared array. The example image capturing device **104** of FIG. **2A** may utilize additional or alternative type(s) of three-dimensional sensor(s) to capture three-dimensional data representative of the environment **100** such as, for example, image capturing devices employing structured lighting, time-of-flight of light, and/or stereo cameras.

The example three-dimensional sensor **204** of FIG. **2A** is implemented by a laser that projects a plurality grid points onto the environment **100**. The example two-dimensional sensor **206** of FIG. **2A** is implemented by a sensor and/or camera that captures two-dimensional image data representative of the environment **100**. In some examples, the two-dimensional sensor **206** includes an infrared imager, a complimentary metal-oxide semiconductor (CMOS) camera, and/or a charge coupled device (CCD) camera.

In some examples, the sensors three-dimensional sensor **204** and/or the two-dimensional sensor **206** only capture data when the information presentation device **102** is in an "on" state and/or when the media detector **202** determines that media is being presented in the environment **100** of FIG. **1**.

The example audience detector **200** of FIG. **2** includes a people analyzer **208**, a time stamper **210** and a memory **212**. In the illustrated example of FIG. **2**, the data generated by the example three-dimensional sensor **204** and/or the example two-dimensional sensor **206** is conveyed to the example people analyzer **208**. The example people analyzer **208** of FIG. **2** calculates a people count corresponding to different time periods (e.g., one minute intervals, thirty second intervals, etc.) for the example environment **100** of FIG. **1**. The manner in which the example people analyzer **208** of FIG. **2** generates the people counts is described in detail below in connection with FIGS. **3-6**.

The example people analyzer **208** of FIG. **2** outputs, for example, calculated people counts or tallies to the example time stamper **210**. The time stamper **210** of the illustrated example includes a clock and a calendar. The example time stamper **210** associates a time period (e.g., 1:00 a.m. Central Standard Time (CST) to 1:01 a.m. CST) and date (e.g., Jan. 1, 2012) with each calculated people count by, for example, appending the period of time and date information to an end of the people data. In some examples, the time stamper **210** applies a single time and date rather than a period of time. A data package (e.g., the people count, the time stamp, the image data, etc.) is stored in the memory **212**.

The example memory **212** of FIG. **2** may include a volatile memory (e.g., Synchronous Dynamic Random Access Memory (SDRAM), Dynamic Random Access Memory (DRAM), RAMBUS Dynamic Random Access Memory (RDRAM, etc.) and/or a non-volatile memory (e.g., flash memory). The example memory **212** of FIG. **2** may also include one or more mass storage devices such as, for example, hard drive disk(s), compact disk drive(s), digital versatile disk drive(s), etc. When the example meter **106** is integrated into, for example, the video game system **108** of FIG. **1**, the meter **106** may utilize memory of the video game system **108** to store information such as, for example, the people counts, the image data, etc.

The example time stamper **210** of FIG. **2** also receives data from the example media detector **202**. The example media detector **202** of FIG. **2** detects presentation(s) of media in the media exposure environment **100** and/or collects identification information associated with the detected presentation(s).

US 9,020,189 B2

9                                      10

For example, the media detector 202, which may be in wired and/or wireless communication with the information presentation device 102 (e.g., a television), the video game system 108, an STB associated with the information presentation device 102, and/or any other component of FIG. 1, can identify a presentation time and/or a source of a presentation. The presentation time and the source identification data may be utilized to identify the program by, for example, cross-referencing a program guide configured, for example, as a look up table. In such instances, the source identification data is, for example, the identity of a channel (e.g., obtained by monitoring a tuner of an STB or a digital selection made via a remote control signal) currently being presented on the information presentation device 102.

Additionally or alternatively, the example media detector 202 can identify the presentation by detecting codes and/or watermarks embedded with or otherwise conveyed (e.g., broadcast) with media being presented via an STB and/or the information presentation device 102. As used herein, a code is an identifier that is transmitted with the media for the purpose of identifying and/or for tuning to (e.g., via a packet identifier (PID) header and/or other data used to tune or select packets in a multiplexed stream of packets) the corresponding media. Codes may be carried in the audio, in the video, in metadata, in a vertical blanking interval, in a program guide, in content data, or in any other portion of the media and/or the signal carrying the media. In the illustrated example, the media detector 202 extracts the code(s) from the media. In other examples, the media detector may collect samples of the media and export the samples to a remote site for detection of the code(s).

Additionally or alternatively, the media detector 202 can collect a signature representative of a portion of the media. As used herein, a signature is a representation of some characteristic of the signal carrying or representing one or more aspects of the media (e.g., a frequency spectrum of an audio signal). Signatures may be thought of as fingerprints of the media. Collected signature(s) can be compared against a collection of reference signatures of known media (e.g., content and/or advertisements) to identify tuned media. In some examples, the signature(s) are generated by the media detector 202. Additionally or alternatively, the media detector 202 collects samples of the media and exports the samples to a remote site for generation of the signature(s). In the example of FIG. 2, irrespective of the manner in which the media of the presentation is identified (e.g., based on tuning data, metadata, codes, watermarks, and/or signatures), the media identification information is time stamped by the time stamper 210 and stored in the memory 212.

In the illustrated example of FIG. 2, an output device 214 periodically and/or aperiodically exports the audience identification information and/or the media identification information from the memory 212 to a data collection facility 216 via a network (e.g., a local-area network, a wide-area network, a metropolitan-area network, the Internet, a digital subscriber line (DSL) network, a cable network, a power line network, a wireless communication network, a wireless mobile phone network, a Wi-Fi network, etc.). In some examples, the example meter 106 utilizes the communication capabilities (e.g., network connections) of the video game system 108 to convey information to, for example, the data collection facility 216. In the illustrated example of FIG. 2, the data collection facility 216 is managed and/or owned by an audience measurement entity (e.g., The Nielsen Company (US), LLC). The audience measurement entity associated with the example data collection facility 216 of FIG. 2 utilizes the people tallies generated by the people analyzer 208 in

conjunction with the media identifying data collected by the media detector 202 to generate exposure information. The information from many panelist locations may be collected and analyzed to generate ratings representative of media exposure by one or more populations of interest.

While example manners of implementing the image capturing device 104 and the meter 106 of FIG. 1 have been illustrated in FIGS. 2 and 2A, one or more of the elements, processes and/or devices illustrated in FIGS. 2 and/or 2A may be combined, divided, re-arranged, omitted, eliminated and/or implemented in any other way. Further, the example audience detector 200, the example media detector 202, the example three-dimensional sensor 204, the example two-dimensional sensor 206, the example people analyzer 208, the example time stamper 210, the example output device 214, and/or, more generally, the example meter 106 of FIG. 2 and/or the example image capturing device 104 may be implemented by hardware, software, firmware and/or any combination of hardware, software and/or firmware. Thus, for example, any of the example audience detector 200, the example media detector 202, the example three-dimensional sensor 204, the example two-dimensional sensor 206, the example people analyzer 208, the example time stamper 210, the example output device 214, and/or, more generally, the example meter 106 of FIG. 2 and/or the example image capturing device 104 of FIG. 2A could be implemented by one or more circuit(s), programmable processor(s), application specific integrated circuit(s) (ASIC(s)), programmable logic device(s) (PLD(s)) and/or field programmable logic device(s) (FPLD(s)), etc. When any of the system or apparatus claims of this patent are read to cover a purely software and/or firmware implementation, at least one of the example audience detector 200, the example media detector 202, the example three-dimensional sensor 204, the example two-dimensional sensor 206, the example people analyzer 208, the example time stamper 210, the example output device 214, and/or, more generally, the example meter 106 of FIG. 2 and/or the example image capturing device 104 of FIG. 2A are hereby expressly defined to include a tangible computer readable storage medium such as a storage device or storage disc storing the software and/or firmware. Further still, the example meter 106 of FIG. 2 and/or the example image capturing device 104 may include one or more elements, processes and/or devices in addition to, or instead of, those illustrated in FIGS. 2 and/or 2A, and/or may include more than one of any or all of the illustrated elements, processes and devices.

FIG. 3 illustrates an example implementation of the example people analyzer 208 of FIG. 2. The example people analyzer 208 of FIG. 2 generates a people count or tally representative of a number of people in the media exposure environment 100 of FIG. 1 for frame(s) of captured image data. The rate at which the example people analyzer 208 of FIG. 3 generates people counts is configurable. In the illustrated example of FIG. 3, the example people analyzer 208 instructs the example three-dimensional sensor 204 of FIG. 2A to capture three-dimensional data representative of the environment 100 every five seconds. However, the example people analyzer 208 can capture and/or analyze data at any suitable rate. As described in detail below, the example people analyzer 208 of FIG. 3 utilizes a three-dimensional data analyzer 300 and a two-dimensional data analyzer 302 to detect people in the environment 100. The example people analyzer 208 of FIG. 3 also includes a body tracker 304 to store information generated by the data analyzers 300 and 302 and information related thereto. Further, as described in detail below, the example body tracker 304 of FIG. 3 enables the

US 9,020,189 B2

11

two-dimensional data analyzer **302** to focus a corresponding analysis on areas of interest in the environment **100**, rather than analyzing the entirety of the environment **100**.

The example three-dimensional data analyzer **300** of FIG. **3** receives frames of three-dimensional data and executes one or more 3D-based recognition analyses on objects appearing in the environment **100** within one or more threshold distances from the three-dimensional sensor **204**. As described above, the received three-dimensional data includes data points each having a horizontal component, a vertical component, and a depth component. The example three-dimensional data analyzer **300** includes a depth filter **306** to analyze the depth component of the data points. The example depth filter **306** of FIG. **3** determines whether objects of the environment **100** corresponding to the data points fall within the first detection area **122** (e.g., at one of the near range set of distances **112**), the second detection area **124** (e.g., at one of the mid-range set of distances **116**), or the third detection area **126** (e.g., at one of the far range set of distances **120**) of FIG. **1**A. In particular, the example depth filter **306** determines whether the depth components of the respective data points are (1) less than the first threshold distance **114**, (2) greater than the first threshold distance **114** but less than the second threshold distance **118**, or (3) greater than the second threshold distance **118**.

In the illustrated example, the depth filter **306** of FIG. **3** designates the data points corresponding to objects of the environment **100** located in the first detection area **122** for further 3D-based recognition analysis via the example three-dimensional data analyzer **300**. Although the example depth filter **306** of FIG. **3** designates the data points found in the first detection area **122** for 3D-based recognition analysis, such data points may be additionally or alternatively be designated for 2D-based recognition analysis. Further, in some examples, the first detection area **122** includes a subset of distances from the image capturing device **104** for which three-dimensional data processing is undesirable due to, for example, limitations on capture of three-dimensional data and/or processing thereof. Such a subset of distances may include, for example, distances within one (1) foot or within one and a half (1.5) feet from the image capturing device **104**. In such instances, the example depth filter **306** designates the data points in the subset of distances for 2D-based recognition. Alternatively, the example depth filter **306** of FIG. **3** may designate any data point detected within the first detection area **122** for further 3D-based recognition analysis.

For data points located in the second detection area **124**, the example depth filter **306** of FIG. **3** designates the data for further analysis via the example three-dimensional analyzer **300** and for analysis via the two-dimensional data analyzer **302**. That is, in the illustrated example of FIG. **3**, the data points falling in the mid-range set of distances **116** are subject to a 2D-based recognition analysis in addition to a 3D-based recognition analysis.

The example depth filter **306** of FIG. **3** filters the data points corresponding to objects of the environment **100** located in the third detection area **126** (e.g., at one of the far range set of distances **120**) from further analysis via the example three-dimensional data analyzer **300**. In the illustrated example of FIG. **3**, the accuracy of the three-dimensional data analyzer **300** is below a threshold (e.g., an accuracy percentage) for objects located in the third detection area **126**. Thus, the data points associated with third detection area **126** are not further analyzed by the example three-dimensional data analyzer **300**. As a result, people counts having an accuracy less than a threshold are avoided. That is, the example three-dimensional data analyzer **300** only generates people counts greater than

12

or equal to the relatively high accuracy rating corresponding to 3D-based recognition of near objects. Alternatively, the example three-dimensional data analyzer **300** may analyze the data points corresponding to the far range **120** and the example depth filter **306** can prevent the results of such analysis from contributing or affecting the people counts generated by the example three-dimensional data analyzer **300**. For example, the depth filter **306** may discard analysis results for data points found in the far range **120** by preventing a write to memory associated with such analysis results or by writing such results to a separate variable (e.g., an untrustworthy tally) to be used, for example, for diagnostic purposes.

In some examples, the three-dimensional sensor **204** supports additional or alternative ranges and/or the example depth filter **306** designates the data points for further analysis in additional or alternative manners. For example, the environment **100** may only include a near range (e.g., a combination of the first and second detection areas **122**, **124** in FIG. **1**A) and a far range (e.g., the third detection area **126** in FIG. **1**A). In such instances, the example depth filter **306** of FIG. **3** only designates data points corresponding to objects located in the near range for further analysis via the example three-dimensional data analyzer **300**.

The example body recognizer **308** of FIG. **3** receives the data points determined to be suitable for further processing via the three-dimensional data analyzer **300** by the example depth filter **306**. The example body recognizer **308** of FIG. **3** implements one or more 3D-based recognition analyses capable of identifying a set of data points as corresponding to a body and/or a body part of a person. For example, the body recognizer **308** of FIG. **3** implements a first 3D-based recognition analysis to determine whether a set of three-dimensional data points corresponds to a human head, a second 3D-based recognition analysis to determine whether a set of three-dimensional data points corresponds to a human arm, a third 3D-based recognition analysis to determine whether a set of three-dimensional data points corresponds to a human torso, etc. The recognition analys(es) implemented by the example body recognizer **308** of FIG. **3** are based on, for example, three-dimensional shapes known to correspond to the corresponding body part(s) and/or a training algorithm that improves over time based on learned information.

When the example body recognizer **308** of FIG. **3** recognizes a set of data points as corresponding to a person, the example body recognizer **308** conveys an indication of such a recognition to a body counter **316** of the example body tracker **304**. The example body counter **316** of FIG. **3** maintains counts for respective frames of image data representative of the environment **100** of FIG. **1**. The counts generated and maintained by the example body counter **316** are stored in association with the corresponding frames in a frame database **318** of the example body tracker **304**. In some examples, the frames of image data are also stored in the example frame database for purposes of, for example, record keeping and/or subsequent verification procedures.

In the illustrated example of FIG. **3**, the body recognizer **308** also conveys a coordinate of the detected body to a crossover detector **320** of the example three-dimensional data analyzer **300**. The coordinate of the detected body is indicative of a location in the environment **100** of the body and/or body part detected by the body recognizer **308**. FIG. **4** illustrates an example person **400** detected by the example body recognizer **308** and an example coordinate **402** conveyed to the example crossover detector **320**. The example of FIG. **4** corresponds to an instance of the body recognizer **308** detecting a head of the person **400** and, thus, the coordinate **402** corresponds to a center of the detected head. However, when

the example body recognizer **308** of FIG. **3** recognizes a different body part, the coordinate conveyed to the crossover detector **320** is the coordinate that corresponds to that body part. The example coordinate **402** of FIG. **4** includes a horizontal component (x-axis) and a vertical component (y-axis) corresponding to a two-dimensional location of the detected person **400** in the environment **100**.

The example crossover detector **320** maintains records of the coordinates received in connection with chronologically captured frames and uses the same to detect a person travelling from the first detection area **122** (e.g., at one of the near range set of distances **112**) to the second detection area **124** (e.g., at one of the mid-range set of distances **116**) and/or from the second detection area **124** to the third detection area **126** (e.g., at one of the far range set of distances **120**) of the environment **100**. That is, the example crossover detector **320** identifies instances of a person crossing over from a first range designated for a 3D-based recognition analysis to a second range designated for a 2D-based recognition analysis (in addition to or in lieu of a 3D-based recognition analysis). For example, the crossover detector **320** of FIG. **3** may determine that a change in depth value of a three-dimensional data point at the provided coordinate from a first frame to a second frame crosses over one of the threshold distances **114** and **118** of FIG. **1**. As described in detail below in connection with the two-dimensional data analyzer **302**, the example crossover detector **320** of FIG. **3** provides the location (e.g., x-y coordinate) of a person crossing over to a farther range such that a 2D-based recognition analysis can be focused on the corresponding area of the environment **100**, thereby reducing the amount of processing of two-dimensional data by avoiding the need for the 2D-based recognition analysis to scan the entirety of the environment **100**.

When the example body recognizer **308** of FIG. **3** determines that a body is present in the environment **100**, the type of detected body part and the location thereof is conveyed to the skeletal frame generator **310**. The example skeletal frame generator **310** of FIG. **3** analyzes the three-dimensional data points to generate a representation of a current shape of the detected body. For example, the skeletal framework generator **310** of FIG. **3** generates a plurality of centerline points corresponding to detected body parts and the relation of the detected body parts to other body parts of the detected person. In some examples, the skeletal framework generator **310** determines a posture of the person. For example, the skeletal framework generator **310** may determine that the detected body is standing, sitting, lying down, etc.

Further, when the example body recognizer **308** of FIG. **3** determines that a body is present in the environment **100**, the body recognizer **308** and/or the skeletal framework generator **310** conveys information to the face recognizer **312**. In the illustrated example, the face recognizer **312** attempts to identify the detected body as belonging to one of a plurality of known people, such as a family of the household, frequent visitors of the household, etc. The example face recognizer **312** employs any suitable facial recognition technique and/or procedure based on three-dimensional data points. When the example face recognizer **312** identifies the detected body as corresponding to a known person, the example face recognizer **312** conveys the detected identity of the person (e.g., an identifier) to the example body tracker **304**. In the illustrated example of FIG. **3**, the identity of the detected body is stored in the frame database **318** in association with the appropriate frame of data and/or timestamp.

Further, when the example body recognizer **308** of FIG. **3** determines that a body is present in the environment **100**, the type of detected body part, the location of the detected body

part, and/or data generated by the example skeletal framework generator **310** is conveyed to the gesture recognizer **314**. The example gesture recognizer **314** uses data associated with a single frame and/or data related to several consecutive frames to determine whether the detected body is making a known gesture (e.g., a gesture corresponding to one or more of a collection of predefined gestures). For example, the detected person may be in the act of making a gesture towards the information presentation device **102** in connection with the video game system **108** of FIG. **1**. Such gestures include, for example, hand motions, body motions, finger configuration, etc. In such instances, the example gesture recognizer **314** compares the three-dimensional data points to data known to correspond to certain gestures. In some examples, information generated by the example gesture recognizer **314** is conveyed to the example body tracker **304** for storage in, for example, the frame database **318** in association with a timestamp.

Thus, the example three-dimensional data analyzer **300** of FIG. **3** performs one or more 3D-based recognition analyses on data points determined to correspond to objects located within one or more threshold distances from the example three-dimensional sensor **204** of FIG. **2**A. In the illustrated example of FIG. **3**, the three-dimensional data analyzer **300** performs the 3D-based recognition analys(es) for ones of the data points captured by the three-dimensional sensor **204** having a depth value falling in the first or second detection areas **122** and **124** of FIG. **1**A (e.g., in the near range **112** or the mid-range **116**).

For ones of the data points having a depth value falling in the second detection area **124** or the third detection area of FIG. **1**, the example two-dimensional data analyzer **302** of FIG. **3** initiates one or more 2D-based recognition analyses. Further, as described above, the two-dimensional data analyzer **302** may initiate a 2D-based recognition analysis for data points located at a subset of distances in the near range of distances **112** (e.g., data points within one (1) foot of the image capturing device **104**, for which one or more 3D-based analysis are impractical (e.g., depending on the capabilities of the three-dimensional sensor **204**).

In the illustrated example of FIG. **3**, the two-dimensional data analyzer **302** includes a body recognizer **322** to implement one or more 2D-based recognition analyses on two-dimensional data captured by, for example, the two-dimensional sensor **206** of FIG. **2**A. Like the example body recognizer **308** of the three-dimensional data analyzer **300** of FIG. **3**, the example body recognizer **322** of the two-dimensional data analyzer **302** attempts to recognize objects present in the environment **100** as people. For example, the body recognizer **322** of FIG. **3** utilizes a plurality of comparison techniques and/or algorithms to detect shape(s) corresponding to body part(s) such as, for example, an arm, a leg, a hand, a head, etc. As described above, the example body recognizer **308** of the three-dimensional data analyzer **300** of FIG. **3** is more accurate and efficient than the example body recognizer **322** of the two-dimensional data analyzer **302** of FIG. **3** when the body recognizer **308** of the three-dimensional data analyzer **300** is analyzing data points having a depth value less than a threshold distance. However, the example body recognizer **322** of the two-dimensional data analyzer **302** is more accurate than the body recognizer **308** of the three-dimensional data analyzer **300** when the body recognizer **308** of the three-dimensional data analyzer **300** is analyzing data points having a depth value greater than the threshold distance. Accordingly, the example people analyzer **208** of FIG. **3**

US 9,020,189 B2

15

16

utilizes the more accurate of the two body recognizers **308** and **322** depending on, for example, a depth value of an object to be analyzed.

When the example body recognizer **322** of FIG. **3** detects a body of a person in a particular frame of two-dimensional data, an indication of the recognition is conveyed to the example body counter **316** and/or the example frame database **318**. In the illustrated example of FIG. **3**, the example body counter **316** combines the body detections provided by the body recognizer **308** of the three-dimensional data analyzer **300** and the body detections provided by the body recognizer **322** of the two-dimensional data analyzer **302** corresponding to a common frame or frames to generate body counts for the respective frames. In some examples, the body counter **316** also executes one or more filters and/or check functions to avoid counting the same person more than once. Further, the example body recognizer **322** calculates and/or stores a location of the detected person in, for example, the frame database **318** in connection with a timestamp. In some examples, the location of the detected sent by the example body recognizer **322** is an x-y coordinate similar to the example coordinate **402** of FIG. **4**.

In addition to or in lieu of the example body recognizer **322**, the example two-dimensional data analyzer **302** of FIG. **3** includes a face recognizer **324** to obtain an identity of a person by analyzing two-dimensional data captured by, for example, the two-dimensional sensor **206**. The example face recognizer **324** of FIG. **3** utilizes any suitable technique(s) and/or algorithm(s) to perform one or more identity recognition analyses. The example two-dimensional data analyzer **302** of FIG. **3** can implement additional or alternative recognition analys(es) that are based on two-dimensional data.

In some examples, the 2D-based recognition analys(es) performed by the example two-dimensional data analyzer **302** are initiated for each frame of data. However, in the illustrated example of FIG. **3**, the two-dimensional data analyzer **302** includes an analysis trigger **326** to determine whether one or more of the 2D-based recognition analyses (e.g., the analysis performed by the body recognizer **322** and/or the analysis performed by the face recognizer **324**) are to be performed on a certain frame of data and/or what type of 2D-based recognition analysis is to be performed. In particular, the example analysis trigger **326** of FIG. **3** triggers 2D-based recognition analyses in different circumstances and/or in response to different events. For example, the analysis trigger **326** of FIG. **3** triggers a 2D-based recognition analysis in response to arrival of a scheduled time (e.g., elapsing of a predefined time interval, occurrences of an absolute time, such as five minutes after an event, etc.). Additionally or alternatively, the example analysis trigger **326** of FIG. **3** may trigger a 2D-based recognition analysis in response to the crossover detector **320** determining that a person has travelled away from the three-dimensional sensor **204** into, for example, the mid-range **116** and/or the far range **120** of FIG. **1**. Additionally or alternatively, the example analysis trigger **326** of FIG. **3** may trigger a 2D-based recognition analysis for a first frame in response to a 2D-based recognition of a second frame prior to the first frame resulting in detection of person. The example analysis trigger **326** of FIG. **3** may employ additional or alternative events, schedules, etc. for triggering one or more 2D-based recognition analysis.

Moreover, the example analysis trigger **326** of FIG. **3** initiates different types of 2D-based recognition analyses based on one or more factors and/or conditions. For example, the analysis trigger **326** of FIG. **3** sometimes triggers a full scan of the captured two-dimensional data (e.g., via the two-dimensional sensor **206**). Additionally or alternatively, the

example analysis trigger **326** of FIG. **3** triggers a scan of the captured two-dimensional data (e.g., via the two-dimensional sensor **206**) corresponding to area(s) of the environment **100** having depth values greater than a threshold distance. Such area(s) of the environment **100** correspond to, for example, the far range **120** and/or the mid-range **116**. Additionally or alternatively, the example analysis trigger **326** of FIG. **3** triggers a focused analysis that targets a subset of the captured two-dimensional data corresponding to a previously detected person.

The type of 2D-based recognition analysis triggered by the example analysis trigger **326** depends on, for example, which type of event or circumstance triggered the 2D-based recognition. For example, when the 2D-based recognition analysis is triggered in response to expiration of a first period of time or interval of a schedule elapsing, the example analysis trigger **326** of FIG. **3** selects a full scan of the two-dimensional data (e.g., via the face recognizer **324**, via the body recognizer **322**, etc.) that analyzes the entire environment **100** captured by the two-dimensional sensor **206**. Additionally, when the 2D-based recognition is triggered in response to a expiration of a second period of time or interval of the schedule elapsing, the example analysis trigger **326** of FIG. **3** selects a scan of areas of the environment **100** having a depth value (e.g., according to the three-dimensional data points) greater than a threshold distance. In some examples, when the 2D-based recognition analysis is triggered in response to a detection of a person crossing over into the third detection area **126** and/or the second detection area **124**, the example analysis trigger **326** of FIG. **3** selects a targeted scan (e.g., via the face recognizer **324**, via the body recognizer **322**, etc.) of the two-dimensional data focused on a particular area of the environment **100** corresponding to the detected person. In some examples, when the 2D-based recognition analysis is triggered for a first frame in response to a detection of a person in a second, prior frame via a 2D-based recognition analysis, the example analysis trigger **326** of FIG. **3** selects a targeted scan of the two-dimensional data focused on a particular area of the environment **100** corresponding to the previously detected person. The example analysis trigger **326** of FIG. **3** may employ and/or select additional or alternative types of 2D-based recognition analyses.

To implement the focused type of 2D-based recognition analysis that is limited to a particular area of the environment **100**, the example two-dimensional data analyzer **302** of FIG. **3** includes an analysis limiter **328**. The example analysis limiter **328** of FIG. **3** obtains location information associated with previously detected people to focus the 2D-based recognition analysis executed by the two-dimensional data analyzer **302** to certain area(s) of the environment **100**. For example, the analysis limiter **328** of FIG. **3** obtains a coordinate provided by the example crossover detector **320** that corresponds to a person crossing over into the second detection area **124** and/or the third detection area **126** of FIG. **1A**. In some instances, the coordinate used by the example analysis limiter **328** corresponds to the example coordinate **402** of FIG. **4**. As described above, a person recognized while located in the first detection area **122** (e.g., by the example body recognizer **308** of the three-dimensional data analyzer **300**) may be determined to have travelled outside the first detection area **122** (e.g., into the mid-range set of distances **116** and/or the far range set of distances **120**) and, thus, a 2D-based recognition analysis is selected by the people analyzer **208** to analyze such data (e.g., because the 2D-based recognition analysis is more accurate in detecting the person in subsequent frames than 3D-based recognition analysis for object located at certain depths of the environment). In such

US 9,020,189 B2

17

instances, the example analysis limiter **328** focuses the 2D-based recognition analysis in a certain area (e.g., the area where the person is expected to be) to avoid having to execute the 2D-based recognition analysis on the entire environment **100**, which is computationally expensive. Alternatively, when the triggered 2D-based recognition analysis corresponds to a person detected via a previous execution of the 2D-based face recognizer **324** in a prior frame, the location obtained by the example analysis limiter **328** of FIG. **3** is a coordinate generated by the example body recognizer **322**. That is, when the example face recognizer **324** of FIG. **3** (and/or body recognizer **322** of FIG. **3**) detects a person in a first frame, the face recognizer **324** records the location of the person (e.g., an x-y coordinate such as the coordinate **402** of FIG. **4**). In such instances, the example analysis trigger **326** may trigger the face recognizer **324** to execute a 2D-based recognition analysis for a second, subsequent frame. If so, the example analysis limiter **328** of FIG. **3** uses the location recorded in connection with the first frame to focus the 2D-based recognition analysis on a corresponding part of the second frame. The example analysis limiter **328** of FIG. **3** focuses recognition analyses by, for example, defining boundaries around the obtained location (e.g., coordinate) and using the boundaries to limit the 2D-based recognition analysis within the boundaries. Put another way, the example analysis limiter **328** of FIG. **3** selects a portion or subset of the two-dimensional data captured by the two-dimensional sensor **206** for the 2D-based recognition analysis performed by, for example, the face recognizer **324**.

The example analysis limiter **328** generates different types of boundaries that form different shapes around a focal point (e.g., the obtained coordinate in which analysis is to be performed). The shape created by the boundaries of the example analysis limiter **328** of FIG. **3** depends on, for example, which body part was detected by the body recognizer **322** in the previous frame. For example, when the body recognizer **322** has determined that an object in the environment **100** is likely a human head (and, thus, the focal coordinate is the center of the detected head), the example analysis limiter **328** of FIG. **3** defines boundaries that form a rectangle surrounding the obtained location point. Alternatively, when the body recognizer **322** has determined that an object in the environment **100** is likely a torso (and, thus, the focal coordinate is the center of the torso), the example analysis limiter **328** of FIG. **3** defines boundaries that form an oval surrounding the focal location point. The example analysis limiter **328** of FIG. **3** may use additional or alternative types of boundaries and/or shapes to focus the 2D-based recognition analysis performed by the example two-dimensional data analyzer **302** of FIG. **3** on specific area(s).

While the example people analyzer **208** of FIGS. **2** and/or **3** is described in the context of an audience measurement device system and the generation of exposure data for media, the example methods, articles of manufacture, and apparatus disclosed herein can be applied to additional or alternative environments, contexts, systems, measurements, applications, programs, problems, etc. That is, the example methods, articles of manufacture, and apparatus disclosed herein can be used in any application wherein detecting to determine how many people are located in a space or location would be beneficial (e.g., in security applications).

While example manners of implementing the people analyzer **208** of FIG. **2** have been illustrated in FIG. **3**, one or more of the elements, processes and/or devices illustrated in FIG. **3** may be combined, divided, re-arranged, omitted, eliminated and/or implemented in any other way. Further, the example three-dimensional analyzer **300**, the example two-

18

dimensional analyzer **302**, the example body tracker **304**, the example depth filter **306**, the example body recognizer **308**, the example skeletal frame generator **310**, the example face recognizer **312**, the example gesture recognizer **314**, the example body counter **316**, the example crossover detector **320**, the example body recognizer **322**, the example face recognizer **324**, the example analysis trigger **326**, the example analysis limiter **328**, and/or, more generally, the example people analyzer **208** of FIG. **3** may be implemented by hardware, software, firmware and/or any combination of hardware, software and/or firmware. Thus, for example, any of the example three-dimensional analyzer **300**, the example two-dimensional analyzer **302**, the example body tracker **304**, the example depth filter **306**, the example body recognizer **308**, the example skeletal frame generator **310**, the example face recognizer **312**, the example gesture recognizer **314**, the example body counter **316**, the example crossover detector **320**, the example body recognizer **322**, the example face recognizer **324**, the example analysis trigger **326**, the example analysis limiter **328**, and/or, more generally, the example people analyzer **208** of FIG. **3** could be implemented by one or more circuit(s), programmable processor(s), application specific integrated circuit(s) (ASIC(s)), programmable logic device(s) (PLD(s)) and/or field programmable logic device(s) (FPLD(s)), etc. When any of the system or apparatus claims of this patent are read to cover a purely software and/or firmware implementation, at least one of the example three-dimensional analyzer **300**, the example two-dimensional analyzer **302**, the example body tracker **304**, the example depth filter **306**, the example body recognizer **308**, the example skeletal frame generator **310**, the example face recognizer **312**, the example gesture recognizer **314**, the example body counter **316**, the example crossover detector **320**, the example body recognizer **322**, the example face recognizer **324**, the example analysis trigger **326**, the example analysis limiter **328**, and/or, more generally, the example people analyzer **208** of FIG. **3** are hereby expressly defined to include a tangible computer readable storage medium such as a storage device or storage disc storing the software and/or firmware. Further still, the example people analyzer **208** may include one or more elements, processes and/or devices in addition to, or instead of, those illustrated in FIG. **3**, and/or may include more than one of any or all of the illustrated elements, processes and devices.

FIGS. **5** and **6** are flowcharts representative of example machine readable instructions for implementing the example people analyzer **208** of FIGS. **2** and/or **3**. In the example flowcharts of FIGS. **5** and **6**, the machine readable instructions comprise program(s) for execution by a processor such as the processor **712** shown in the example processing platform **700** discussed below in connection with FIG. **7**. The program(s) may be embodied in software stored on a tangible computer readable storage medium such as a CD-ROM, a floppy disk, a hard drive, a digital versatile disk (DVD), a Blu-ray disk, or a memory associated with the processor **712**, but the entire program and/or parts thereof could alternatively be executed by a device other than the processor **712** and/or embodied in firmware or dedicated hardware. Further, although the example program(s) is described with reference to the flowcharts illustrated in FIGS. **5** and **6**, many other methods of implementing the example people analyzer **208** may alternatively be used. For example, the order of execution of the blocks may be changed, and/or some of the blocks described may be changed, eliminated, or combined.

As mentioned above, the example processes of FIGS. **5** and **6** may be implemented using coded instructions (e.g., computer readable instructions) stored on a tangible computer

19
20

readable storage medium such as a hard disk drive, a flash memory, a read-only memory (ROM), a compact disk (CD), a digital versatile disk (DVD), a cache, a random-access memory (RAM) and/or any other storage media in which information is stored for any duration (e.g., for extended time periods, permanently, brief instances, for temporarily buffering, and/or for caching of the information). As used herein, the term tangible computer readable storage medium is expressly defined to include any type of computer readable storage and to exclude propagating signals. Additionally or alternatively, the example processes of FIGS. 5 and 6 may be implemented using coded instructions (e.g., computer readable instructions) stored on a non-transitory computer readable medium such as a hard disk drive, a flash memory, a read-only memory, a compact disk, a digital versatile disk, a cache, a random-access memory and/or any other storage media in which information is stored for any duration (e.g., for extended time periods, permanently, brief instances, for temporarily buffering, and/or for caching of the information). As used herein, the term non-transitory computer readable medium is expressly defined to include any type of computer readable medium and to exclude propagating signals. As used herein, when the phrase "at least" is used as the transition term in a preamble of a claim, it is open-ended in the same manner as the term "comprising" is open ended. Thus, a claim using "at least" as the transition term in its preamble may include elements in addition to those expressly recited in the claim.

FIG. 5 begins with an initiation of the example people analyzer 208 of FIG. 3 (block 500). The initiation of the people analyzer 208 coincides with, for example, activation of the information presentation device 102 and/or the video game system 108 of FIG. 1. To begin analyzing the environment 100 of FIG. 1, the three-dimensional sensor 204 of FIG. 2A captures three-dimensional data representative of the environment 100 and the objects present in the environment 100 at a first time (block 502). The example three-dimensional sensor captures a plurality of three-dimensional data points having a horizontal component, a vertical component, and a depth value component. The example depth filter 306 of FIG. 3 analyzes the data points to determine whether the respective depth values are within one or more threshold distances from the three-dimensional sensor 204 (block 504). The threshold distance(s) correspond to, for example, the first and second threshold distances 114 and 118 of FIG. 1. For those of the data points having a depth value, for example, between the threshold distances 114 and 118, the example three-dimensional data analyzer 300 performs one or more 3D-based recognition analyses to detect people present in the environment 100 (block 506). For example, the example body recognizer 308 of FIG. 3 executes a plurality of 3D-based recognition analyses to detect different body parts of a person, such as a head, an arm, a leg, etc. Additionally or alternatively, the example skeletal framework generator 310 of FIG. 3 generates a mapping of a detected body. Additionally or alternatively, the example face recognizer 312 of FIG. 3 identifies any known people present in the environment 100. Additionally or alternatively, the example gesture recognizer 314 of FIG. 3 determines whether the detected people are making one or more known gestures (e.g., in connection with the video game system 108 and/or as feedback to the meter 106 in response to media currently being presented by the information presentation device 102). As described above, the data points identified within the first threshold distance 114 from the sensor 104 may additionally or alternatively be subject to 3D-based recognition analysis.

If the example body recognizer 308 of FIG. 3 determines that one or more objects in the environment 100 correspond to

people (block 508), the related information is stored in the example body tracker 304 of FIG. 3 (block 510). For example, the body recognizer 308 of FIG. 3 conveys an indication of a detected person to the example body counter 316. The example body counter 316 maintains records of body counts for different frames and/or periods of time such that people counts can be generated (e.g., for purposes of generating ratings information for media detected in the environment 100). In the illustrated example, the body recognizer 308 also records the location information (e.g., an x-y coordinate) of any detected people and/or conveys the location information to the example crossover detector 320.

The example analysis trigger 326 of FIG. 3 determines whether a 2D-based recognition analysis is to be triggered (block 512). FIG. 6 illustrates an example implementation of block 512 of FIG. 5. In the example of FIG. 6, the analysis trigger 326 determines whether a predefined interval or period of time has elapsed according to, for example, a user configurable schedule (block 600). If the predefined interval has elapsed in the example of FIG. 6 (block 600), the example analysis trigger 326 initiates the face recognizer 324 to perform a full scan of the environment 100 or a scan of portions of the environment 100 having a depth value (e.g., according to the corresponding three-dimensional data points) greater than the threshold distance (e.g., the second threshold distance 118 of FIG. 1) (block 602).

Alternatively, when the predefined interval has not elapsed (block 600), the example analysis trigger 326 determines whether a person has travelled from within the threshold distance to outside the threshold distance (block 604). In the illustrated example, the analysis trigger 326 references the crossover detector 320 of FIG. 3, which may convey an indication of such a detection to the analysis trigger 326, to determine whether such a transition from one of the ranges 112, 116 and 120 of FIG. 1 to another one of the ranges in a direction away from the three-dimensional sensor 204. If a person is detected travelling outside the threshold distance, the example analysis trigger 326 of FIG. 3 triggers a targeted 2D-based recognition analysis on a location of the environment 100 corresponding to the detected person (block 606). For example, the analysis trigger 326 may cause the face recognizer 324 of FIG. 3 to inspect a rectangle defined around a coordinate of the detected person to obtain an identity of the person.

In the illustrated example of FIG. 6, the analysis trigger 326 also determines whether one or more previous 2D-based recognition analysis (e.g., performed by the example body recognizer 322) of one or more immediately previous frames (e.g., one or more frames directly prior to a current frame in a chronological sequence) resulted in a detection of a person in the environment 100 (block 608). The number of previous frames that a person detection can trigger a subsequent 2D-based recognition analysis is configurable and can be any suitable number of frames (e.g., five frames, ten frames, etc.) and/or a corresponding period of time (e.g., ten seconds, fifteen seconds, etc.). As described above, such detections are recorded in the example body tracker 304 of FIG. 3 along with related information, such as a location of the detected person (s) in the environment 100. In the example of FIG. 6, when a person was detected in a previous frame (block 608), the example analysis trigger 326 of FIG. 3 triggers a targeted 2D-based recognition analysis for the location corresponding to the previously detected person (block 610).

Alternatively, the example of FIG. 6 may lead to a determination that a 2D-based recognition analysis has not been triggered (block 612). Control then returns to FIG. 5. If a 2D-based recognition analysis has not been triggered (block

US 9,020,189 B2

21

514), control returns to block 502. Otherwise, if a 2D-based recognition analysis has been triggered (block 514), the example analysis trigger 326 determines what type of 2D-based recognition analysis has been triggered (block 516). When the triggered 2D-based recognition is a targeted analysis (block 516), the example analysis limiter 328 of FIG. 3 obtains the corresponding location in the environment 100 around which the analysis is to be focused (block 518). Further, the example analysis limiter 328 of FIG. 3 defines boundaries to limit the analysis to a certain portion or subset of the two-dimensional data captured by the two-dimensional sensor 206 (block 518). The focused 2D-based recognition analysis is then executed by, for example, the body recognizer 322 and/or the face recognizer 324 within the defined limit boundaries (block 520). Results of the recognition analysis are stored in the example body tracker 304 of FIG. 3 (block 522).

When the type of 2D-based recognition analysis that was triggered is a full scan of the environment 100 (block 516), the example two-dimensional data analyzer 302 executes the corresponding one or more 2D-based analyses (e.g., via the face recognizer 324 and/or the body recognizer 322) (block 524). The results of the analys(es) are stored in the example body tracker 304 of FIG. 3 (block 522). Control then returns to block 502.

FIG. 7 is a block diagram of an example processor platform 700 capable of executing the instructions of FIGS. 5 and 6 to implement the example audience measurement device of FIGS. 1, 2 and/or 3. The processor platform 700 can be, for example, a personal computer, an Internet appliance, a DVD player, a CD player, a digital video recorder, a Blu-ray player, a gaming console, a personal video recorder, a set top box, or any other type of computing device.

The processor platform 700 of the instant example includes a processor 712. For example, the processor 712 can be implemented by one or more microprocessors or controllers from any desired family or manufacturer.

The processor 712 includes a local memory 713 (e.g., a cache) and is in communication with a main memory including a volatile memory 714 and a non-volatile memory 716 via a bus 718. The volatile memory 714 may be implemented by Synchronous Dynamic Random Access Memory (SDRAM), Dynamic Random Access Memory (DRAM), RAMBUS Dynamic Random Access Memory (RDRAM) and/or any other type of random access memory device. The non-volatile memory 716 may be implemented by flash memory and/or any other desired type of memory device. Access to the main memory 714 and the non-volatile memory 716 is controlled by a memory controller.

The example processor platform 700 of FIG. 7 also includes an interface circuit 720. The interface circuit 720 may be implemented by any type of interface standard, such as an Ethernet interface, a universal serial bus (USB), and/or a PCI express interface.

In the example of FIG. 7, one or more input devices 722 are connected to the interface circuit 720. The input device(s) 722 permit a user to enter data and commands into the processor 712. The input device(s) can be implemented by, for example, a keyboard, a mouse, a touchscreen, a track-pad, a trackball, isopoint and/or a voice recognition system.

In the example of FIG. 7, one or more output devices 724 are also connected to the interface circuit 720. The output devices 724 can be implemented, for example, by display devices (e.g., a liquid crystal display, a cathode ray tube display (CRT), a printer and/or speakers). The interface circuit 720, thus, typically includes a graphics driver card.

22

The interface circuit 720 also includes a communication device such as a modem or network interface card to facilitate exchange of data with external computers via a network 726 (e.g., an Ethernet connection, a digital subscriber line (DSL), a telephone line, coaxial cable, a cellular telephone system, etc.).

The processor platform 700 also includes one or more mass storage devices 728 for storing software and data. Examples of such mass storage devices 728 include floppy disk drives, hard drive disks, compact disk drives and digital versatile disk (DVD) drives. The mass storage device 728 may implement the frame database 318 of FIG. 3.

Coded instructions 732 of FIGS. 5 and/or 6 may be stored in the mass storage device 728, in the volatile memory 714, in the non-volatile memory 716, and/or on a removable storage medium such as a CD or DVD.

In some example implementations, the example meter 106 of FIGS. 1, 2 and/or 3 is implemented in connection with an XBOX® gaming system. In some examples, the one or more sensors associated with the example image capturing device 104 of FIGS. 1 and/or 2A are implemented with KINECT® sensors (e.g., to capture images of an environment to count people). In some examples, some or all of the machine readable instructions of FIGS. 5 and/or 6 can be downloaded (e.g., via the Internet) to and stored on an XBOX® gaming console that implements the example meter 106 of FIGS. 1, 2 and/or 3. In some examples, the machine readable instructions of FIGS. 5 and/or 6 are downloaded prior to the retail point of sale and only activated upon receiving consent from a purchaser.

Although certain example apparatus, methods, and articles of manufacture have been disclosed herein, the scope of coverage of this patent is not limited thereto. On the contrary, this patent covers all apparatus, methods, and articles of manufacture fairly falling within the scope of the claims of this patent.

What is claimed is:

1. A tangible machine readable storage medium comprising instructions that, when executed, cause a machine to at least:

execute, in connection with a first frame of data, a three-dimensional recognition analysis on an object detected in an environment within a threshold distance from a sensor;

store a location of the object; and

in response to detecting that the first object has moved outside the threshold distance from the sensor in connection with a second frame subsequent to the first frame:

execute a two-dimensional recognition analysis on the object in the second frame; and

use the stored location of the object as a focal point for the two-dimensional analysis.

2. A storage medium as defined in claim 1, wherein the instructions, when executed, cause the machine to use the stored location of the object as the focal point for the two-dimensional recognition analysis by limiting the two-dimensional recognition analysis to a portion of the second frame associated with the stored location of the object in the first frame.

3. A storage medium as defined in claim 1, wherein the instructions, when executed, cause the machine to use the stored location of the object as the focal point for the two-dimensional recognition analysis by limiting the two-dimensional recognition analysis to a portion of the second frame corresponding to a shape and surrounding the stored location of the object in the frame.

23

**4**. A storage medium as defined in claim **1**, wherein the instructions, when executed, cause the machine to store the location of the object by recording a two-dimensional coordinate in association with the first frame.

**5**. A storage medium as defined in claim **1**, wherein the instructions, when executed, cause the machine to analyze captured three-dimensional data of the environment to determine whether the object is within the threshold distance from the sensor.

**6**. A storage medium as defined in claim **1**, wherein the instructions, when executed, cause the machine to execute the two-dimensional recognition analysis in response to occurrence of a time event.

**7**. A storage medium as defined in claim **1**, wherein the three-dimensional and the two-dimensional recognition analyses determine whether the respective objects of the environment correspond to people.

**8**. A storage medium as defined in claim **7**, wherein the instructions, when executed, cause the machine to calculate a people count using results of at least one of the three-dimensional or the two-dimensional recognition analyses.

**9**. An audience measurement device, comprising:

a first data analyzer to execute a first recognition analysis on three-dimensional data representative of a first object within a threshold distance from a three-dimensional sensor;

a second data analyzer to execute a second recognition analysis on two-dimensional data representative of a second object outside the threshold distance from the three-dimensional sensor; and

a counter to combine a first detection of a first person provided by the first data analyzer and a second detection of a second person provided by the second data analyzer to generate a people count for an environment, wherein at least one of the first data analyzer, the second data analyzer or the counter is implemented via a logic circuit.

**10**. An apparatus as defined in claim **9**, further comprising a crossover detector to detect the first person travelling from within the threshold distance to outside the threshold distance, the crossover detector to record a location of the first person when the first person travelled outside the threshold distance.

**11**. An apparatus as defined in claim **10**, further comprising a limiter to focus the second recognition analysis on the location of the first person.

**12**. An apparatus as defined in claim **11**, wherein the limiter is to define a boundary within the two-dimensional data in

24

which to perform the second recognition analysis to areas adjacent to the location of the first person.

**13**. An apparatus as defined in claim **12**, wherein a shape of the boundary to be defined by the limiter depends on a type of body part detected by the first data analyzer.

**14**. A method comprising:

executing, via a processor, in connection with a first frame of data, a three-dimensional recognition analysis on an object detected in an environment within a threshold distance from a sensor;

storing a location of the object; and

in response to detecting that the first object has moved outside the threshold distance from the sensor in a second frame subsequent to the first frame:

executing, via the processor, a two-dimensional recognition analysis on the object in the second frame; and

using the stored location of the object as a focal point for the two-dimensional recognition analysis.

**15**. A method as defined in claim **14**, wherein the using of the stored location of the object as the focal point for the two-dimensional recognition analysis comprises limiting the two-dimensional recognition analysis to a portion of the second frame associated with the stored location of the object in the first frame.

**16**. A method as defined in claim **14**, wherein the using of the stored location of the object as the focal point for the two-dimensional recognition analysis comprises limiting the two-dimensional recognition analysis to a portion of the second frame corresponding to a shape and surrounding the stored location of the object in the frame.

**17**. A method as defined in claim **14**, wherein the storing of the location of the object comprises recording a two-dimensional coordinate in association with the first frame.

**18**. A method as defined in claim **14**, further comprising analyzing captured three-dimensional data of the environment to determine whether the object is within the threshold distance from the sensor.

**19**. A method as defined in claim **14**, wherein the executing of the two-dimensional recognition analysis is in response to occurrence of a time event.

**20**. A method as defined in claim **14**, wherein the three-dimensional and the two-dimensional recognition analyses determine whether the respective objects environment correspond to people.

**21**. A method as defined in claim **20**, further comprising calculating a people count using results of at least one of the three-dimensional or the two-dimensional recognition analyses.

\* \* \* \* \*

# EXHIBIT C

UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 11/676,452 | 02/19/2007 | Venugopal Srinivasan | 20004/97-US | 8207 |

81905        7590        12/30/2008
Hanley, Flight & Zimmerman, LLC
150 S. Wacker Dr. Suite 2100
Chicago, IL 60606

| EXAMINER |
|---|
| ABEDIN, SHANTO |

| ART UNIT | PAPER NUMBER |
|---|---|
| 2436 | |

| MAIL DATE | DELIVERY MODE |
|---|---|
| 12/30/2008 | PAPER |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

PTOL-90A  (Rev. 04/07)

NLSN_TVISION0000589

| *Office Action Summary* | Application No. | Applicant(s) |
|---|---|---|
| | 11/676,452 | SRINIVASAN, VENUGOPAL |
| | Examiner | Art Unit | |
| | SHANTO M. ABEDIN | 2436 | |

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address --*

**Period for Reply**

A SHORTENED STATUTORY PERIOD FOR REPLY IS SET TO EXPIRE <u>03</u> MONTH(S) OR THIRTY (30) DAYS, WHICHEVER IS LONGER, FROM THE MAILING DATE OF THIS COMMUNICATION.
- Extensions of time may be available under the provisions of 37 CFR 1.136(a). In no event, however, may a reply be timely filed after SIX (6) MONTHS from the mailing date of this communication.
- If NO period for reply is specified above, the maximum statutory period will apply and will expire SIX (6) MONTHS from the mailing date of this communication.
- Failure to reply within the set or extended period for reply will, by statute, cause the application to become ABANDONED (35 U.S.C. § 133). Any reply received by the Office later than three months after the mailing date of this communication, even if timely filed, may reduce any earned patent term adjustment. See 37 CFR 1.704(b).

**Status**

1) ☒ Responsive to communication(s) filed on <u>19 February 2007</u>.
2a) ☐ This action is **FINAL**. 2b) ☒ This action is non-final.
3) ☐ Since this application is in condition for allowance except for formal matters, prosecution as to the merits is closed in accordance with the practice under *Ex parte Quayle*, 1935 C.D. 11, 453 O.G. 213.

**Disposition of Claims**

4) ☒ Claim(s) <u>1-9,11-14,16-18,23 and 27-29</u> is/are pending in the application.
    4a) Of the above claim(s) _____ is/are withdrawn from consideration.
5) ☐ Claim(s) _____ is/are allowed.
6) ☒ Claim(s) <u>1-9,11-14,16-18,23 and 27-29</u> is/are rejected.
7) ☐ Claim(s) _____ is/are objected to.
8) ☐ Claim(s) _____ are subject to restriction and/or election requirement.

**Application Papers**

9) ☐ The specification is objected to by the Examiner.
10) ☒ The drawing(s) filed on <u>19 February 2007</u> is/are: a) ☒ accepted or b) ☐ objected to by the Examiner.
    Applicant may not request that any objection to the drawing(s) be held in abeyance. See 37 CFR 1.85(a).
    Replacement drawing sheet(s) including the correction is required if the drawing(s) is objected to. See 37 CFR 1.121(d).
11) ☐ The oath or declaration is objected to by the Examiner. Note the attached Office Action or form PTO-152.

**Priority under 35 U.S.C. § 119**

12) ☐ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).
    a) ☐ All   b) ☐ Some * c) ☐ None of:
        1. ☐ Certified copies of the priority documents have been received.
        2. ☐ Certified copies of the priority documents have been received in Application No. _____.
        3. ☐ Copies of the certified copies of the priority documents have been received in this National Stage application from the International Bureau (PCT Rule 17.2(a)).
    * See the attached detailed Office action for a list of the certified copies not received.

**Attachment(s)**

1) ☒ Notice of References Cited (PTO-892)
2) ☐ Notice of Draftsperson's Patent Drawing Review (PTO-948)
3) ☒ Information Disclosure Statement(s) (PTO/SB/08)
    Paper No(s)/Mail Date <u>07/26/2007;05/20/2008;08/20/2008</u>.

4) ☐ Interview Summary (PTO-413)
    Paper No(s)/Mail Date. _____ .
5) ☐ Notice of Informal Patent Application
6) ☐ Other: _____ .

NLSN_TVISION0000590

NLSN_TVISION0000591

Application/Control Number: 11/676,452                                      Page 2

Art Unit: 2436

### DETAILED ACTION

1.    This office action is in response to the communication filed on 02/19/2007.

2.    Claims 1-9, 11-14, 16-18, 23 and 27-29 are pending in the application.

3.    Claims 1-9, 11-14, 16-18, 23 and 27-29 have been rejected.

### Claim Rejections - 35 USC § 103

The following is a quotation of 35 U.S.C. 103(a) which forms the basis for all obviousness

rejections set forth in this Office action:

(a) A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains.  Patentability shall not be negatived by the manner in which the invention was made.

4.    Claims 1-9, 11-14, 16-18, 23 and 27-29  are rejected under 35 U.S.C. 102(e ) as

anticipated by  Tewfik et al (US 6061793) or, in the alternative, under 35 U.S.C. 103(a) as

obvious over  Kopra et al (US 7221902 B2)

*Regarding claims 1, 12 and 23,*  Tewfik et al teaches a  method/ apparatus/ machine

accessible medium having instructions stored thereon,  for generating signatures, comprising:

obtaining a first frame of media samples (Col 5, starts at line 7; sampling);

identifying a first frequency component having a first spectral power and a second

frequency component having a second spectral power by performing a spectral transform

operation on the first frame of media samples (Col 5, lines 15-25; Col 6, starts at line 42; Col 9,

line 45- Col 10, line 65; computing plurality of spectral/ spread-spectrum, frequency subbands

for FFT, or DCT transformation);

Application/Control Number: 11/676,452                                           Page 3
Art Unit: 2436

   determining a first descriptor of the first frame of media samples based on a

comparison of the first spectral power and the second spectral power (Col 5, lines 15-25; Col 6,

starts at line 42; Col 9, lines 45-65; determining spread spectrums, or  higher frequency bands,

or coefficients/ Fi's for DCT transformation;   spread spectrums, or frequency bands, or DCT

coefficients are interpreted as descriptors); and

   generating a first signature based on the first descriptor (Col  5, line 10- Col 6, line 65;

Col 9, starts at line 47; generating  perceptual watermark/ signature using frequency domain

masking, or DCT transformation).

   Alternatively, if the position of inherency (  regarding the descriptor  ) is not found to

be supportable, the examiner holds the position that it would have been obvious to a person

with ordinary skill in the art to modify Tewfik et al  's method by adding/ substituting  Kopra

et al' s  teachings of  determining a first descriptor of the first frame of media samples based on

a comparison of the first spectral power and the second spectral power  ( Col 9, line 25- Col

10, line 55; generating signatures based on spectral/ frequency descriptors  )

Kopra et al and Tewfik et al   are analogous art because they are from the same field of

endeavor of generating signature/ watermark for digital media. At the time of invention, it

would have been  obvious to a person with ordinary skill in the art to combine/ substitute the

teaching of Kopra et al  with Tewfik et al   to design a method  further comprising  the steps of

determining a first descriptor of the first frame of media samples based on a comparison of the

first spectral power and the second spectral power  , and generating a first signature based on

the first descriptor in order  to  provide an alternative media signature generation mechanism

utilizing descriptors.

Application/Control Number: 11/676,452                                    Page 4
Art Unit: 2436

*Regarding claim 2,* <u>Tewfik et al</u>  teaches a method further comprising identifying

media information based on the first signature (Col  5, line 10- Col 6, line 65; Col 9, starts at

line 47; generating  perceptual watermark/ signature using frequency domain masking, or DCT

transformation; media blocks and associated signatures).

*Regarding claim 3,* <u>Tewfik et al</u>  teaches a method wherein a Hamming distance is

used to identify the media information based on the first signature (Col 8, starts at line 60;

hanning window interpreted to utilize the hammimg distance).

The examiner further takes official notice that  use of Hamming distance is used to

identify the media information based on the first signature is well known in the art (please see

US 20030036910, US 20030156827, US 7120562), therefore, it would have been obvious to a

person of ordinary skill in art to design the method  wherein Hamming distance is used to

identify the media information based on the first signature  in order to  provide a robust

signature computation, and protection mechanism.

*Regarding claim 4,* <u>Tewfik et al</u>  teaches a method wherein the media information is

associated with at least one of audio information and video information (Col 5, starts at line 7;

Col 8, starts at line 40; sampling; data blocks).

*Regarding claim 5,* <u>Tewfik et al</u>  teaches a method wherein the first descriptor is

associated with only the first frame of media samples (Col 5, starts at line 7;  Col 9, starts at

NLSN_TVISION0000594

Application/Control Number: 11/676,452                                        Page 5
Art Unit: 2436

line 45; spread spectrums, or frequency bands, or DCT coefficients associated with the data

blocks, samples). Furthermore, <u>Kopra et al</u>  discloses wherein the first descriptor is associated

with only the first frame of media samples (Col 9, line 25- Col 10, line 55; spectral/ frequency

decriptors for media samples )


  ***Regarding claim 6,*** <u>Kopra et al</u>  teaches a method further comprising:

  obtaining a first plurality of media samples (abstract; Col 9, starts at line 10; media

samples); and

  identifying a second frame of media samples by extracting a common plurality of

media samples from the first frame of media samples and appending the first plurality of media

samples to the common plurality of media samples (Col 9, line 64- Col 10, line 55; Col 12,

starts at line 12; extracting features from media samples; determining descriptors for the

samples/ media blocks).


  ***Regarding claim 7,*** <u>Tewfik et al</u>  teaches a method  further comprising:

  identifying a third spectral power associated with a third frequency component and a

fourth spectral power associated with a fourth frequency component, wherein the third

frequency component and the fourth frequency component are associated with performing the

spectral transform operation on the second frame of media samples (Col 6, line 30-  Col 7, line

30; Col 9, starts at line 48;  computing   signal/ signature/ watermark coefficients in plurality of

frequencies, spread spectrum using FFT, DCT operations).

NLSN_TVISION0000595

Application/Control Number: 11/676,452                                          Page 6
Art Unit: 2436

Tewfik et al fails to teach expressly determining a second descriptor based on a comparison of the third spectral power and the fourth spectral power; and generating a second signature based on the second descriptor.

However, Kopra et al teaches determining a second descriptor based on a comparison of the third spectral power and the fourth spectral power ( Col 9, line 32- Col 10, line 55; determining plurality of spectral/ frequency descriptors ); and generating a second signature based on the second descriptor (Col 9, line 32- Col 10, line 55; generating media sample signature based on the plurality of descriptors ).

**Regarding claim 8,** Kopra et al teaches a method wherein the second descriptor is of the second frame of media samples (Col 9, line 32- Col 10, line 55; plurality of descriptors associated with the media samples).

**Regarding claim 9,** Tewfik et al teaches a method wherein the spectral transform operation is a sliding Fast Fourier Transform (Col 5, starts at line 10; FFT operations).

**Regarding claim 11,** Tewfik et al teaches a method wherein the first signature is at least one of a reference signature and a monitored signature (Col 9, line 25- Col 10, line 55; generating frequency signatures based on spectral/ frequency descriptors, and coding error signature/ watermark ).

NLSN_TVISION0000596

Application/Control Number: 11/676,452                                                     Page 7
Art Unit: 2436

   ***Regarding claims 13-14, 16-18 and 27-29,*** they recite the limitations of claims 1-3, 6-

7, 12 and 23, therefore, they are rejected applying as above applied rejecting claims 1-3, 6-7,

12 and  23.


### *Conclusion*

5.      Examiner's note: Examiner has cited particular columns and line numbers in the references as applied to
the claims above for the convenience of the applicant. Although the specified citations are representative of the
teachings in the art and are applied to the specific limitations within the individual claim, other passages and
figures may be applied as well. It is respectfully requested from the applicant, in preparing the responses, to fully
consider the references in entirety as potentially teaching all or part of the claimed invention as well as the context
of the passage as taught by the prior art or disclosed by the Examiner. Finally, for any future amendments to
claims, the applicant is respectfully requested to incorporate the paragraph numbers from the specification upon
which the support for such amendments were obtained.


6.      A shortened statutory period for reply to this final action is set to expire THREE

MONTHS from the mailing date of this action.  In the event a first reply is filed within TWO

MONTHS of the mailing date of this final action and the advisory action is not mailed until

after the end of the THREE-MONTH shortened statutory period, then the shortened statutory

period will expire on the date the advisory action is mailed, and any extension fee pursuant to

37 CFR 1.136(a) will be calculated from the mailing date of the advisory action.  In no event,

however, will the statutory period for reply expire later than SIX MONTHS from the date of

this final action.

        Any inquiry concerning this communication or earlier communications from the

examiner should be directed to Shanto M  Z Abedin whose telephone number is 571-272-3551.

The examiner can normally be reached on M-F from 10:30 AM to 7:30 PM. If attempts to

reach the examiner by telephone are unsuccessful, the examiner's supervisor, Moazzami

Nasser, can be reached on 571-272-4195. The fax phone number for the organization where

NLSN_TVISION0000597

Application/Control Number: 11/676,452                                            Page 8
Art Unit: 2436

this application or proceeding is assigned is 703-872-9306.  The RightFax number for faxing

directly to the examiner is 571-273-3551.

Information regarding the status of an application may be obtained from the Patent

Application Information Retrieval (PAIR) system.  Status information for published

applications may be obtained from either Private PAIR or Public PAIR.  For more information

about the PAIR system, see http://pair-direct.uspto.gov. Should you have questions on access

to the Private PAIR system, contact the Electronic Business Center (EBC) at 866-217-9197

(toll-free).

Shanto M  Z Abedin

Examiner,  AU 2436

/Nasser G Moazzami/

Supervisory Patent Examiner, Art Unit 2436

| *Notice of References Cited* | Application/Control No.<br>11/676,452 | Applicant(s)/Patent Under<br>Reexamination<br>SRINIVASAN, VENUGOPAL | |
| --- | --- | --- | --- |
| | Examiner<br>SHANTO M. ABEDIN | Art Unit<br>2436 | Page 1 of 1 |

### U.S. PATENT DOCUMENTS

| * | | Document Number<br>Country Code-Number-Kind Code | Date<br>MM-YYYY | Name | Classification |
| --- | --- | --- | --- | --- | --- |
| * | A | US-7,006,555 | 02-2006 | Srinivasan, Venugopal | 375/133 |
| * | B | US-6,061,793 | 05-2000 | Tewfik et al. | 713/176 |
| * | C | US-6,226,387 | 05-2001 | Tewfik et al. | 382/100 |
| * | D | US-6,839,673 B1 | 01-2005 | Choi et al. | 704/273 |
| * | E | US-7,221,902 | 05-2007 | Kopra et al. | 455/3.05 |
| * | F | US-6,799,274 | 09-2004 | Hamlin, Christopher L. | 713/176 |
| * | G | US-7,284,128 | 10-2007 | Sako, Yoichiro | 713/176 |
| * | H | US-7,073,065 B2 | 07-2006 | Stone, Jonathan James | 713/176 |
| * | I | US-2003/0156827 | 08-2003 | Janevski, Angel | 386/96 |
| * | J | US-2003/0036910 | 02-2003 | Van Der Veen et al. | 704/500 |
| * | K | US-7,120,562 | 10-2006 | Wilson, Amela Kreho | 702/189 |
| * | L | US-6,757,407 B2 | 06-2004 | Bruckstein et al. | 382/100 |
| * | M | US-6,971,010 | 11-2005 | Abdel-Mottaleb, Mohamed | 713/176 |

### FOREIGN PATENT DOCUMENTS

| * | | Document Number<br>Country Code-Number-Kind Code | Date<br>MM-YYYY | Country | Name | Classification |
| --- | --- | --- | --- | --- | --- | --- |
| | N | | | | | |
| | O | | | | | |
| | P | | | | | |
| | Q | | | | | |
| | R | | | | | |
| | S | | | | | |
| | T | | | | | |

### NON-PATENT DOCUMENTS

| * | | Include as applicable: Author, Title Date, Publisher, Edition or Volume, Pertinent Pages |
| --- | --- | --- |
| | U | |
| | V | |
| | W | |
| | X | |

*A copy of this reference is not being furnished with this Office action. (See MPEP § 707.05(a).)
Dates in MM-YYYY format are publication dates. Classifications may be US or foreign.

NLSN_TVISION0000599

<div style="text-align:right">

PATENT
Attorney Docket No. 20004/97-US

</div>

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | | | | |
|---|---|---|---|---|
| Applicant | : | Venugopal Srinivasan | ) | I hereby certify that this document is |
| | | | ) | being deposited electronically with the |
| U.S. Serial No. | : | 11/676,452 | ) | United States Patent and Trademark |
| | | | ) | Office on this date: |
| Filed | : | February 19, 2007 | ) | |
| | | | ) | |
| Title | : | METHODS AND | ) | **March 27, 2009** |
| | | APPARATUS FOR | ) | |
| | | GENERATING | ) | |
| | | SIGNATURES | ) | |
| | | | ) | |
| | | | ) | |
| | | | ) | **/Felipe Hernandez/** |
| Art Unit | : | 2436 | ) | Felipe Hernandez |
| | | | ) | Registration No.: 61,971 |
| Examiner | : | Shanto Abedin | ) | Attorney for Applicant |

<div style="text-align:center">

**RESPONSE TO THE NON-FINAL OFFICE ACTION**
**DATED DECEMBER 30, 2008**

</div>

Mail Stop Amendment
Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

Dear Sir:

In response to the non-final official action dated December 30, 2008, please enter the following amendments and consider the accompanying remarks:

**Amendments to the Claims** begin on page 2 of this paper.

**Remarks** begin on page 8 of this paper.

NLSN_TVISION0000622

**Amendments to the Claims:**

1.      (Original) A method for generating signatures, comprising:

obtaining a first frame of media samples;

identifying a first frequency component having a first spectral power and a second frequency component having a second spectral power by performing a spectral transform operation on the first frame of media samples;

determining a first descriptor of the first frame of media samples based on a comparison of the first spectral power and the second spectral power; and

generating a first signature based on the first descriptor.


2.      (Original) A method as defined in claim 1, further comprising identifying media information based on the first signature.


3.      (Original) A method as defined in claim 2, wherein a Hamming distance is used to identify the media information based on the first signature.


4.      (Currently Amended) A method as defined in claim 2, wherein the media information is associated with at least one of audio information ~~and~~ or video information.


5.      (Original) A method as defined in claim 1, wherein the first descriptor is associated with only the first frame of media samples.


Page 2 of 13

NLSN_TVISION0000623

6.      (Original) A method as defined in claim 1, further comprising:

obtaining a first plurality of media samples; and

identifying a second frame of media samples by extracting a common

plurality of media samples from the first frame of media samples and appending the

first plurality of media samples to the common plurality of media samples.


7.      (Original) A method as defined in claim 6, further comprising:

identifying a third spectral power associated with a third frequency

component and a fourth spectral power associated with a fourth frequency component,

wherein the third frequency component and the fourth frequency component are

associated with performing the spectral transform operation on the second frame of media

samples;

determining a second descriptor based on a comparison of the third

spectral power and the fourth spectral power; and

generating a second signature based on the second descriptor.


8.      (Original) A method as defined in claim 7, wherein the second descriptor

is of the second frame of media samples.


9.      (Original) A method as defined in claim 1, wherein the spectral transform

operation is a sliding Fast Fourier Transform.


10.     (Cancelled)

NLSN_TVISION0000624

11.      (Currently Amended) A method as defined in claim 1, wherein the first signature is at least one of a reference signature ~~and~~ or a monitored signature.

12.      (Original) An apparatus for generating signatures, comprising:

a processor system including a memory; and

instructions stored in the memory that enable the processor system to:

obtain a first frame of media samples;

identify a first frequency component having a first spectral power and a second frequency component having a second spectral power by performing a spectral transform operation on the first frame of media samples;

determine a first descriptor of the first frame of media samples based on a comparison of the first spectral power and the second spectral power; and

generate a first signature based on the first descriptor.

13.      (Original) An apparatus as defined in claim 12, wherein the instructions stored in the memory enable the processor system to identify media information based on the first signature.

NLSN_TVISION0000625

14.     (Original) An apparatus as defined in claim 13, wherein a Hamming

distance is used to identify the media information based on the first signature.

15.     (Cancelled)

16.     (Original) An apparatus as defined in claim 12, wherein the first descriptor

is associated with only the first frame of media samples.

17.     (Original) An apparatus as defined in claim 12, wherein the instructions

stored in the memory enable the processor system to:

        obtain a first plurality of media samples; and

        identify a second frame of media samples by extracting a common

plurality of media samples from the first frame of media samples and appending

the first plurality of media samples to the common plurality of media samples.

NLSN_TVISION0000626

U.S. Serial No. 11/676,452                                                    PATENT
Response to Office Action dated December 30, 2008              Attorney Docket No. 20004/97-US

18.    (Original) An apparatus as defined in claim 17, wherein the instructions stored in the memory enable the processor system to:

identify a third spectral power associated with a third frequency component and a fourth spectral power associated with a fourth frequency component, wherein the third frequency component and the fourth frequency component are associated with performing the spectral transform operation on the second frame of media samples;

determine a second descriptor based on a comparison of the third spectral power and the fourth spectral power; and

generate a second signature based on the second descriptor.


19-22  (Cancelled)


23.    (Original) A machine accessible medium having instructions stored thereon that, when executed, cause a machine to:

obtain a first frame of media samples;

identify a first frequency component having a first spectral power and a second frequency component having a second spectral power by performing a spectral transform operation on the first frame of media samples;

determine a first descriptor of the first frame of media samples based on a comparison of the first spectral power and the second spectral power; and

generate a first signature based on the first descriptor.

NLSN_TVISION0000627

24-26 (Cancelled)

27.     (Original) A machine accessible medium as defined in claim 23, wherein the first descriptor is associated with only the first frame of media samples.

28.     (Original) A machine accessible medium as defined in claim 23 having instructions stored thereon that, when executed, cause the machine to:

obtain a first plurality of media samples; and

identify a second frame of media samples by extracting a common plurality of media samples from the first frame of media samples and appending the first plurality of media samples to the common plurality of media samples.

29.     (Original) A machine accessible medium as defined in claim 28 having instructions stored thereon that, when executed, cause the machine to:

identify a third spectral power associated with a third frequency component and a fourth spectral power of a fourth frequency component, wherein the third frequency component and the fourth frequency component are associated with performing the spectral transform operation on the second frame of media samples;

determine a second descriptor based on a comparison of the third spectral power and the fourth spectral power; and

generate a second signature based on the second descriptor.

30-117 (Cancelled)

NLSN_TVISION0000628

## REMARKS

The Applicant has carefully considered the non-final official action dated December 30, 2008, and the references cited therein.  By way of this response, the Applicant has amended claims 4 and 11.  No new matter has been added.  In view of the following remarks, the Applicant respectfully traverses the rejections and submits that this application is in condition for allowance.  Reconsideration of this application is respectfully requested.

### I.      Independent Claim 1

The Applicant respectfully submits that independent claim 1 is allowable over Tewfik et al. (US 6,061,793) and Kopra et al. (US 7,221,902).  Independent claim 1 recites identifying a first frequency component having a first spectral power and a second frequency component having a second spectral power and determining a first descriptor of a first frame of media samples based on a comparison of the first spectral power and the second spectral power.  Neither Tewfik et al. nor Kopra et al. alone or in combination teach or suggest the claimed method.

Tewfik et al. describe calculating a complex spectrum of an input signal by constructing a 1024 point Hann window, performing an FFT on the window, and calculating a polar transformation of the window.  *Tewfik et al.*, 5:20-23.  In addition, Tewfik et al. describe performing a discrete cosine transform (DCT) on a block B$i$ of sound data to form a DCT block F$_i$ and using the DCT block F$i$ to generate a masked block B$i$.  *Id.*, 6:42-59.  Tewfik et al. also describe adding watermarking information to frequency bands by watermarking a sound according to a perceptual mask and a temporal mask.  *Id.*, 9:45-10-11.  However, none of the above, which were cited in the official

NLSN_TVISION0000629

action, teach or suggest identifying a first frequency component having a first spectral

power and a second frequency component having a second spectral power.  That is,

although Tewfik et al. describe working in the frequency domain, Tewfik et al. do not

teach or suggest identifying any particular frequency components having respective

spectral powers, much less determining a first descriptor of a first frame of media

samples based on a comparison of the first spectral power and the second spectral power.

Other than stating generally "computing plurality of spectral/ spread-spectrum, frequency

subbands for FFT, or DCT transformation," the official action is devoid of any specific

and particular evidence, reasoning, or guidance to support the position that Tewfik et al.

teach or suggest identifying a first frequency component having a first spectral power and

a second frequency component having a second spectral power and determining a first

descriptor of a first frame of media samples based on a comparison of the first spectral

power and the second spectral power as recited in claim 1.

In addition, the Applicant respectfully submits that it is not inherent that Tewfik et

al. determine a first descriptor as recited in claim 1.  It is well established law that an

inherency rejection requires that missing descriptive matter is <u>necessarily</u> present in a

prior art reference, and probabilities or possibilities are not sufficient.

> To establish inherency, the extrinsic evidence 'must make clear that the missing descriptive matter is necessarily present in the thing described in the reference, and that it would be so recognized by persons of ordinary skill. Inherency, however, may not be established by probabilities or possibilities. The mere fact that a certain thing may result from a given set of circumstances is not sufficient.'"

*In re Robertson*, 169 F.3d 743, 745, 49 USPQ2d 1949, 1950-51 (Fed. Cir. 1999)

(citing *Continental Can Co. v. Monsanto Co.*, 948 F.2d 1264, 1268, 20 U.S.P.Q.2d 1746,

NLSN_TVISION0000630

1749 (Fed.Cir.1991)); *see also MPEP* § 2112 (IV).  Here, the official action merely

points out that that Tewfik et al. describe processes performed in the frequency domain.

However, performing processes in the frequency domain does not necessitate identifying

a first frequency component having a first spectral power and a second frequency

component having a second spectral power and determining a first descriptor of a first

frame of media samples based on a comparison of the first spectral power and the second

spectral power as recited in claim 1.

Kopra et al. do not overcome the above-noted deficiencies of Tewfik et al.  The

Examiner suggests that Kopra et al. teach determining a first descriptor of a first frame of

media samples based on a comparison of a first spectral power and a second spectral

power.  On the contrary, Kopra et al. do not teach or suggest this language, much less

identifying a first frequency component having a first spectral power and a second

frequency component having a second spectral power and determining a first descriptor

of a first frame of media samples based on a comparison of the first spectral power and

the second spectral power as recited in claim 1.

Kopra et al. describe different types of descriptors for describing audio samples.

*Kopra et al.*, 9:25-10:55.  Kopra et al. also describe how the different types of descriptors

can be used or what they represent.  *Id.*  However, none of the techniques for generating

the descriptors as described by Kopra et al. constitute identifying a first frequency

component having a first spectral power and a second frequency component having a

second spectral power and determining a first descriptor of a first frame of media samples

based on a comparison of the first spectral power and the second spectral power as

recited in claim 1.  No evidence is provided in the official action to the contrary.  Instead,

NLSN_TVISION0000631

the official action merely cites a portion of Kopra et al. and states "generating signatures based on spectral/ frequency descriptors." Thus, the official action is devoid of any specific and particular evidence, reasoning, or guidance to support the position that Kopra et al. teach or suggest determining a first descriptor of a first frame of media samples based on a comparison of a first spectral power and a second spectral power.

In view of the foregoing, the Applicant respectfully submits that neither Tewfik et al. nor Kopra et al. alone or in combination teach or suggest the method of claim 1. Accordingly, the Applicant respectfully submits that independent claim 1 and all claims dependent thereon are in condition for allowance.

## II. Independent Claim 12

The Applicant respectfully submits that independent claim 12 is also allowable over Tewfik et al. and Kopra et al. Independent claim 12 recites identifying a first frequency component having a first spectral power and a second frequency component having a second spectral power by performing a spectral transform operation on the first frame of media samples and determining a first descriptor of the first frame of media samples based on a comparison of the first spectral power and the second spectral power. The Applicant respectfully submits that neither Tewfik et al. nor Kopra et al. alone or in combination teach or suggest the claimed apparatus for at least the reasons discussed above in connection with independent claim 1. Accordingly, the Applicant respectfully submits that independent claim 12 and all claims dependent thereon are in condition for allowance.

NLSN_TVISION0000632

### III.    Independent Claim 23

The Applicant respectfully submits that independent claim 23 is also allowable over Tewfik et al. and Kopra et al.  Independent claim 23 recites identifying a first frequency component having a first spectral power and a second frequency component having a second spectral power by performing a spectral transform operation on the first frame of media samples and determining a first descriptor of the first frame of media samples based on a comparison of the first spectral power and the second spectral power. The Applicant respectfully submits that neither Tewfik et al. nor Kopra et al. alone or in combination teach or suggest the claimed machine accessible medium for at least the reasons discussed above in connection with independent claim 1.  Accordingly, the Applicant respectfully submits that independent claim 23 and all claims dependent thereon are in condition for allowance.

### IV.    Conclusion

In view of the foregoing, the Applicant respectfully submits that this application is in condition for allowance and requests reconsideration thereof and an early favorable action on the merits.  If there are any remaining matters that the Examiner would like to discuss, the Examiner is invited to contact the undersigned representative at the telephone number set forth below.

The Commissioner is hereby authorized to refund any overpayment and charge any deficiency in the amount paid in connection with this paper or any additional fees which may be required during the pendency of this application under 37 CFR 1.16 or 1.17 to Deposit Account No. 50-2455.

NLSN_TVISION0000633

**U.S. Serial No. 11/676,452**                                                **PATENT**
Response to Office Action dated December 30, 2008                **Attorney Docket No. 20004/97-US**

   In addition, if a petition for an extension of time under 37 CFR 1.136(a) is

necessary to maintain the pendency of this case and is not otherwise requested in this

case, the Applicant requests that the Commissioner consider this paper to be a petition for

an appropriate extension of time and hereby authorize the Commissioner to charge the

fee as set forth in 37 CFR 1.17(a) corresponding to the needed extension of time to the

above deposit account.


      Respectfully submitted,

      HANLEY, FLIGHT & ZIMMERMAN, LLC
      (customer number **81905**)
      150 South Wacker Drive, Suite 2100
      Chicago, Illinois 60606
      (312) 580-1020

    By:  /Felipe Hernandez/
      Felipe Hernandez
      Registration No. 61,971
**March 27, 2009**   Attorney for Applicant

NLSN_TVISION0000634

UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 11/676,452 | 02/19/2007 | Venugopal Srinivasan | 20004/97-US | 8207 |

81905        7590        06/08/2009
Hanley, Flight & Zimmerman, LLC
150 S. Wacker Dr. Suite 2100
Chicago, IL 60606

| EXAMINER |
|---|
| ABEDIN, SHANTO |

| ART UNIT | PAPER NUMBER |
|---|---|
| 2436 | |

| MAIL DATE | DELIVERY MODE |
|---|---|
| 06/08/2009 | PAPER |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

PTOL-90A  (Rev. 04/07)

NLSN_TVISION0000658

| *Office Action Summary* | Application No. | Applicant(s) |
|---|---|---|
| | 11/676,452 | SRINIVASAN, VENUGOPAL |
| | Examiner | Art Unit | |
| | SHANTO M. ABEDIN | 2436 | |

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address --*

**Period for Reply**

A SHORTENED STATUTORY PERIOD FOR REPLY IS SET TO EXPIRE <u>03</u> MONTH(S) OR THIRTY (30) DAYS, WHICHEVER IS LONGER, FROM THE MAILING DATE OF THIS COMMUNICATION.
- Extensions of time may be available under the provisions of 37 CFR 1.136(a). In no event, however, may a reply be timely filed after SIX (6) MONTHS from the mailing date of this communication.
- If NO period for reply is specified above, the maximum statutory period will apply and will expire SIX (6) MONTHS from the mailing date of this communication.
- Failure to reply within the set or extended period for reply will, by statute, cause the application to become ABANDONED (35 U.S.C. § 133). Any reply received by the Office later than three months after the mailing date of this communication, even if timely filed, may reduce any earned patent term adjustment. See 37 CFR 1.704(b).

**Status**

1)☒ Responsive to communication(s) filed on <u>27 March 2009</u>.

2a)☐ This action is **FINAL**.   2b)☒ This action is non-final.

3)☐ Since this application is in condition for allowance except for formal matters, prosecution as to the merits is closed in accordance with the practice under *Ex parte Quayle*, 1935 C.D. 11, 453 O.G. 213.

**Disposition of Claims**

4)☒ Claim(s) <u>1-9,11-14,16-18,23 and 27-29</u> is/are pending in the application.

    4a) Of the above claim(s) _____ is/are withdrawn from consideration.

5)☐ Claim(s) _____ is/are allowed.

6)☒ Claim(s) <u>1-9,11-14,16-18,23 and 27-29</u> is/are rejected.

7)☐ Claim(s) _____ is/are objected to.

8)☐ Claim(s) _____ are subject to restriction and/or election requirement.

**Application Papers**

9)☐ The specification is objected to by the Examiner.

10)☒ The drawing(s) filed on <u>19 February 2007</u> is/are:  a)☒ accepted or b)☐ objected to by the Examiner.

    Applicant may not request that any objection to the drawing(s) be held in abeyance. See 37 CFR 1.85(a).

    Replacement drawing sheet(s) including the correction is required if the drawing(s) is objected to. See 37 CFR 1.121(d).

11)☐ The oath or declaration is objected to by the Examiner. Note the attached Office Action or form PTO-152.

**Priority under 35 U.S.C. § 119**

12)☐ Acknowledgement is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).

    a)☐ All   b)☐ Some * c)☐ None of:

      1.☐ Certified copies of the priority documents have been received.

      2.☐ Certified copies of the priority documents have been received in Application No. _____.

      3.☐ Copies of the certified copies of the priority documents have been received in this National Stage application from the International Bureau (PCT Rule 17.2(a)).

    * See the attached detailed Office action for a list of the certified copies not received.

**Attachment(s)**

1)☒ Notice of References Cited (PTO-892)

2)☐ Notice of Draftsperson's Patent Drawing Review (PTO-948)

3)☐ Information Disclosure Statement(s) (PTO/SB/08) Paper No(s)/Mail Date _____.

4)☐ Interview Summary (PTO-413) Paper No(s)/Mail Date. _____ .

5)☐ Notice of Informal Patent Application

6)☐ Other: _____ .

NLSN_TVISION0000659

Application/Control Number: 11/676,452                                    Page 2

Art Unit: 2436

## *DETAILED ACTION*

1.      This office action is in response to the communication filed on 03/27/2009.

2.      Claims 1-9, 11-14, 16-18, 23 and 27-29 are pending in the application.

3.      Claims 1-9, 11-14, 16-18, 23 and 27-29 have been rejected.

4.      The examiner notes, upon further examination, new grounds of rejection are found, and

presented in this office action.


## *Response to Arguments*

5.      The applicant's arguments regarding the previous 35 USC 102 (e) / 103 (a) type

rejections have been fully considered, however, moot in view of new grounds of rejection

presented in this office action.


## *Double Patenting*

The nonstatutory double patenting rejection is based on a judicially created doctrine grounded in public policy (a policy reflected in the statute) so as to prevent the unjustified or improper timewise extension of the "right to exclude" granted by a patent and to prevent possible harassment by multiple assignees.  See *In re Goodman*, 11 F.3d 1046, 29 USPQ2d 2010 (Fed. Cir. 1993); *In re Longi*, 759 F.2d 887, 225 USPQ 645 (Fed. Cir. 1985); *In re Van Ornum*, 686 F.2d 937, 214 USPQ 761 (CCPA 1982); *In re Vogel*, 422 F.2d 438, 164 USPQ 619 (CCPA 1970); and *In re Thorington*, 418 F.2d 528, 163 USPQ 644 (CCPA 1969).
         A timely filed terminal disclaimer in compliance with 37 CFR 1.321(c) may be used to overcome an actual or provisional rejection based on a nonstatutory double patenting ground provided the conflicting application or patent is shown to be commonly owned with this application.  See 37 CFR 1.130(b). Effective January 1, 1994, a registered attorney or agent of record may sign a terminal disclaimer.  A terminal disclaimer signed by the assignee must fully comply with 37 CFR 3.73(b).

6.      Claims  1-9, 11-14, 16-18, 23 and 27-29  are rejected under the judicially created

doctrine of obviousness type double patenting as being unpatentable over claims 1-24 and

39-43 of the commonly owned Patent US 7,006,555 B1.

        In particular claims 1, 6-8, 12, 17-18, 23 and 28-29 of the instant application  are

unpatentable over claims 1-5, 7-11, 15-17 and 20-24 of the commonly owned Patent US

NLSN_TVISION0000660

7,006,555 B1, and claims 2-5, 9, 11, 13-14, 16 and 27 are unpatentable over claims 1-24

and 39-43 of the commonly owned Patent US 7,006,555 B1.

Although the conflicting claims are not identical, they are not patentably distinct

from each other because the claim limitations/ features of the instant application exist in the

above mentioned claim set of the commonly owned Patent US 7,006,555 B1 in different or

similar  names, or at least would have been obvious over the claim set of the commonly

owned Patent US 7,006,555 B1.  Differences between the conflicting claim set of the instant

application, and that of the commonly owned US Patent are that claim set of  the instant

application recites  generating  signature based on the descriptors, whereas the claim set of

the commonly owned US Patent only recites  generating coded block of information based

on the offset values, or spectral power.

However, at the time of invention, it would have been obvious to a person of

ordinary skill in art to  modify the generation of the encoded information using the offset or

spectral information  with the generation of signature from the descriptors  in order to

provide the claimed invention with the alternatively named features.

This is a double patenting rejection.


### *Claim Rejections - 35 USC § 103*

The following is a quotation of 35 U.S.C. 103(a) which forms the basis for all obviousness

rejections set forth in this Office action:

(a) A patent may not be obtained though the invention is not identically disclosed or described as set forth in
section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that
the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary
skill in the art to which said subject matter pertains.  Patentability shall not be negatived by the manner in which the
invention was made.

Application/Control Number: 11/676,452                                      Page 4
Art Unit: 2436

7.     Claims 1-6, 9, 11-14, 16-17, 23 and 27-28  are rejected under 35 U.S.C. 103(a) as

obvious over Srinivasan (US 6272176 B1; hereinafter Srinivasan'176) in view of   Kopra et al

(US 7221902 B2)


***Regarding claims 1, 12 and 23,***  Srinivasan'176 teaches a  method/ apparatus/ machine

accessible medium having instructions stored thereon,  for generating signatures, comprising:

obtaining a first frame of media samples ( Fig 7A; Fig 8.102; Col 6, starts at line 46;

media samples/ blocks);

identifying a first frequency component having a first spectral power and a second

frequency component having a second spectral power by performing a spectral transform

operation on the first frame of media samples ( Fig 3; Col 2, starts at line 50; Col 16, starts at

line 7; first/ second frequency component and associated respective spectral powers/

amplitudes );

determining a first descriptor of the first frame of media samples based on a

comparison of the first spectral power and the second spectral power (Col 2, starts at line 56;

first/ second offset value and associated respective spectral power; 'offset' is interpreted as

descriptor  ); and

generating a first signature based on the first descriptor (Col  3, starts at line 19; Col

23, starts at line 53; generating/ adding encoded message, or coded output, or binary code bit

based on the offset/ spectral amplitude or power; an encoded message, or coded output, or

binary code bit is interpreted as signature ).

Alternatively, if the position of inherency (  regarding the descriptor  ) is not found to

be supportable, the examiner holds the position that it would have been obvious to a person

NLSN_TVISION0000662

with ordinary skill in the art to modify Srinivasan'176 's method by adding/ substituting

Kopra et al' s  teachings of  determining a first descriptor of the first frame of media samples

based on a comparison of the first spectral power and the second spectral power   ( Col 9, line

25- Col 10, line 55; generating signatures based on spectral/ frequency descriptors  )

　　Kopra et al and Srinivasan'176  are analogous art because they are from the same field

of endeavor of generating signature/ watermark/ coded message for digital media. At the time

of invention, it would have been  obvious to a person with ordinary skill in the art to combine/

substitute the teaching of Kopra et al  with  Srinivasan'176  to design a method  further

comprising  the steps of  determining and utilizing  a first/ second  descriptor in order  to

provide an alternative media signature generation mechanism utilizing media specific

information.

　　***Regarding claim 2,*** Srinivasan'176   teaches a method further comprising identifying

media information based on the first signature (  Col  3, starts at line 19; Col  23, starts at line

53; generating  first/ second encoded message, or binary code bit  based on the offset/ spectral

amplitude or power).

　　***Regarding claim 3,*** Srinivasan'176   teaches a method wherein a Hamming distance is

used to identify the media information based on the first signature (  Col  3, starts at line 19;

Col 13, lines 1-40; Hamming distance ).

　　The examiner further takes official notice that  use of Hamming distance is used to

identify the media information based on the first signature is well known in the art (please see

NLSN_TVISION0000663

Application/Control Number: 11/676,452      Page 6
Art Unit: 2436

US 20030036910, US 20030156827, US 7120562), therefore, it would have been obvious to a person of ordinary skill in art to design the method wherein Hamming distance is used to identify the media information based on the first signature in order to provide a robust signature computation, and protection mechanism.

    ***Regarding claim 4,*** <u>Srinivasan'176</u> teaches a method wherein the media information is associated with at least one of audio information and video information ( Fig 9; Col 6, starts at line 20; audio or video data sampling).

    ***Regarding claim 5,*** <u>Srinivasan'176</u> teaches a method wherein the first descriptor is associated with only the first frame of media samples (Col 2, starts at line 56; Col 22, starts at line 20; first/ second offset value and associated with the media samples, or blocks; 'offset' is interpreted as descriptor ). Furthermore, <u>Kopra et al</u> discloses wherein the first descriptor is associated with only the first frame of media samples (Col 9, line 25- Col 10, line 55; spectral/ frequency decriptors for media samples )

    ***Regarding claim 6,*** <u>Srinivasan'176</u> teaches obtaining a first plurality of media samples ( Fig 7A; Fig 8.102; Col 6, starts at line 46; media samples/ blocks); and identifying a second frame of media samples by extracting a common plurality of media samples from the first frame of media samples and appending the first plurality of media samples to the common plurality of media samples ( Col 19, lines 12-23; Col 16, starts at line 7; swapping/ inserting encode data bit for each specific media samples).

NLSN_TVISION0000664

Application/Control Number: 11/676,452                                                    Page 7
Art Unit: 2436

Furthermore, <u>Kopra et al</u>  teaches a method further comprising:  obtaining a first

plurality of media samples (abstract; Col 9, starts at line 10; media samples); and  identifying a

second frame of media samples by extracting a common plurality of media samples from the

first frame of media samples and appending the first plurality of media samples to the common

plurality of media samples (Col 9, line 64- Col 10, line 55; Col 12, starts at line 12; extracting

features from media samples; determining descriptors for the samples/ media blocks).

**Regarding claim 9,** <u>Srinivasan'176</u>  teaches a method  wherein the spectral transform

operation is a sliding Fast Fourier Transform (  Fig 2.44; Col 9, starts at line 46; Fourier

Transform).

**Regarding claim 11,** <u>Srinivasan'176</u>  teaches a method wherein the first signature is at

least one of a reference signature and a monitored signature (  Col 3, starts at line 56;

generating encoded output, or coded binary bits according to the reference, or predetermined

values).

**Regarding claims 13-14, 16-17 and 27-28,** they recite the limitations of claims 1-3, 6,

12 and 23, therefore, they are rejected applying as above applied rejecting claims 1-3, 6, 12 and

23.

### <u>Conclusion</u>

8.        Examiner's note: Examiner has cited particular columns and line numbers in the references as applied to
the claims above for the convenience of the applicant. Although the specified citations are representative of the
teachings in the art and are applied to the specific limitations within the individual claim, other passages and

Application/Control Number: 11/676,452                                    Page 8
Art Unit: 2436

figures may be applied as well. It is respectfully requested from the applicant, in preparing the responses, to fully
consider the references in entirety as potentially teaching all or part of the claimed invention as well as the context
of the passage as taught by the prior art or disclosed by the Examiner. Finally, for any future amendments to
claims, the applicant is respectfully requested to incorporate the paragraph numbers from the specification upon
which the support for such amendments were obtained.

9.      A shortened statutory period for reply to this final action is set to expire THREE

MONTHS from the mailing date of this action.  In the event a first reply is filed within TWO

MONTHS of the mailing date of this final action and the advisory action is not mailed until

after the end of the THREE-MONTH shortened statutory period, then the shortened statutory

period will expire on the date the advisory action is mailed, and any extension fee pursuant to

37 CFR 1.136(a) will be calculated from the mailing date of the advisory action.  In no event,

however, will the statutory period for reply expire later than SIX MONTHS from the date of

this final action.

        Any inquiry concerning this communication or earlier communications from the

examiner should be directed to Shanto M  Z Abedin whose telephone number is 571-272-3551.

The examiner can normally be reached on M-F from 10:30 AM to 7:30 PM. If attempts to

reach the examiner by telephone are unsuccessful, the examiner's supervisor, Moazzami

Nasser, can be reached on 571-272-4195. The fax phone number for the organization where

this application or proceeding is assigned is 703-872-9306.  The RightFax number for faxing

directly to the examiner is 571-273-3551.

        Information regarding the status of an application may be obtained from the Patent

Application Information Retrieval (PAIR) system.  Status information for published

applications may be obtained from either Private PAIR or Public PAIR.  For more information

about the PAIR system, see http://pair-direct.uspto.gov. Should you have questions on access

NLSN_TVISION0000666

Application/Control Number: 11/676,452                                    Page 9

Art Unit: 2436

to the Private PAIR system, contact the Electronic Business Center (EBC) at 866-217-9197

(toll-free).

Shanto M  Z Abedin

Examiner,  AU 2436

/Nasser G Moazzami/

Supervisory Patent Examiner, Art Unit 2436

NLSN_TVISION0000667

PATENT
Attorney Docket No. 20004/97-US

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | | | | |
|---|---|---|---|---|
| Applicant | : | Venugopal Srinivasan | ) | I hereby certify that this document is |
| | | | ) | being deposited electronically with the |
| U.S. Serial No. | : | 11/676,452 | ) | United States Patent and Trademark |
| | | | ) | Office on this date: |
| Filed | : | February 19, 2007 | ) | |
| | | | ) | |
| Title | : | METHODS AND | ) | **September 25, 2009** |
| | | APPARATUS FOR | ) | |
| | | GENERATING | ) | |
| | | SIGNATURES | ) | |
| | | | ) | |
| | | | ) | |
| | | | ) | **/Felipe Hernandez/** |
| Art Unit | : | 2436 | ) | Felipe Hernandez |
| | | | ) | Registration No.: 61,971 |
| Examiner | : | Shanto Abedin | ) | Attorney for Applicant |

## RESPONSE TO THE NON-FINAL OFFICE ACTION
## DATED JUNE 8, 2009

Mail Stop Amendment
Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

Dear Sir:

In response to the non-final official action dated June 8, 2009, please enter the following amendments and consider the accompanying remarks:

**Amendments to the Claims** are reflected in the listing of claims which begins on page 2 of this paper.

**Remarks** begin on page 9 of this paper.

NLSN_TVISION0000671

**U.S. Serial No. 11/676,452**                                           **PATENT**
Response to Office Action dated June 8, 2009                     **Attorney Docket No. 20004/97-US**

**Amendments to the Claims:**

This listing of claims will replace all prior versions, and listings, of claims in the application:

**Listing of Claims:**

1.      (Currently Amended) A method for generating signatures, comprising:

obtaining a first frame of media samples;

identifying a first frequency component having a first spectral power and a second frequency component having a second spectral power by performing a spectral transform operation on the first frame of media samples;

determining a first descriptor of the first frame of media samples based on a comparison of the first spectral power and the second spectral power; [[and]]

generating a first signature based on the first ~~descriptor~~ descriptor;

identifying a second frame of media samples by extracting a common plurality of media samples from the first frame of media samples and appending another plurality of media samples to the common plurality of media samples;

identifying a third spectral power associated with a third frequency component and a fourth spectral power associated with a fourth frequency component, wherein the third frequency component and the fourth frequency component are associated with performing the spectral transform operation on the second frame of media samples;

determining a second descriptor based on a comparison of the third spectral power and the fourth spectral power; and

generating a second signature based on the second descriptor.

Page 2 of 14

NLSN_TVISION0000672

2.      (Original) A method as defined in claim 1, further comprising identifying media information based on the first signature.

3.      (Original) A method as defined in claim 2, wherein a Hamming distance is used to identify the media information based on the first signature.

4.      (Previously Presented) A method as defined in claim 2, wherein the media information is associated with at least one of audio information or video information.

5.      (Original) A method as defined in claim 1, wherein the first descriptor is associated with only the first frame of media samples.

6.      (Cancelled)

7.      (Cancelled)

8.      (Currently Amended) A method as defined in ~~claim 7~~ <u>claim 1</u>, wherein the second descriptor is of the second frame of media samples.

9.      (Original) A method as defined in claim 1, wherein the spectral transform operation is a sliding Fast Fourier Transform.

NLSN_TVISION0000673

U.S. Serial No. 11/676,452                                                                PATENT
Response to Office Action dated June 8, 2009                    Attorney Docket No. 20004/97-US

10.      (Cancelled)

11.      (Cancelled)

12.      (Currently Amended) An apparatus for generating signatures, comprising:

a processor system including a memory; and

instructions stored in the memory that enable the processor system to:

obtain ~~a first frame~~ first and second frames of media samples, the first and second frames of media samples consecutively located in an audio stream, a portion of the first frame of media samples overlapping with a portion of the second frame of media samples;

identify a first frequency component having a first spectral power and a second frequency component having a second spectral power by performing a spectral transform operation on the first frame of media samples;

determine a first descriptor of the first frame of media samples based on a comparison of the first spectral power and the second spectral power; [[and]]

determine a second descriptor of the second frame of media samples; and

generate a first signature based on the first descriptor and a second signature based on the second descriptor.

Page 4 of 14

NLSN_TVISION0000674

13.      (Original) An apparatus as defined in claim 12, wherein the instructions stored in the memory enable the processor system to identify media information based on the first signature.

14.      (Original) An apparatus as defined in claim 13, wherein a Hamming distance is used to identify the media information based on the first signature.

15.      (Cancelled)

16.      (Original) An apparatus as defined in claim 12, wherein the first descriptor is associated with only the first frame of media samples.

17.      (Currently Amended) An apparatus as defined in claim 12, wherein the instructions stored in the memory enable the processor system to:

obtain a first plurality of media samples; and

identify [[a]] the second frame of media samples by extracting a common plurality of media samples from the first frame of media samples and appending the first plurality of media samples to the common plurality of media samples, the common plurality of media samples including the overlapping portions of the first and second frames of media samples.

NLSN_TVISION0000675

**U.S. Serial No. 11/676,452**                                             **PATENT**
Response to Office Action dated June 8, 2009          **Attorney Docket No. 20004/97-US**

18.     (Currently Amended) An apparatus as defined in claim 17, wherein the

instructions stored in the memory enable the processor system to:

identify a third spectral power associated with a third frequency

component and a fourth spectral power associated with a fourth frequency

component, wherein the third frequency component and the fourth frequency

component are associated with performing the spectral transform operation on the

second frame of media samples;

determine [[a]] the second descriptor based on a comparison of the third

spectral power and the fourth spectral power; and

generate [[a]] the second signature based on the second descriptor.


19-22   (Cancelled)

NLSN_TVISION0000676

U.S. Serial No. 11/676,452                                                    PATENT
Response to Office Action dated June 8, 2009              Attorney Docket No. 20004/97-US

23.     (Currently Amended) A tangible machine accessible medium having instructions stored thereon that, when executed, cause a machine to:

obtain a first frame first and second frames of media samples, the first and second frames of media samples consecutively located in an audio stream, a portion of the first frame of media samples overlapping with a portion of the second frame of media samples;

identify a first frequency component having a first spectral power and a second frequency component having a second spectral power by performing a spectral transform operation on the first frame of media samples;

determine a first descriptor of the first frame of media samples based on a comparison of the first spectral power and the second spectral power; [[and]]

determine a second descriptor of the second frame of media samples; and

generate a first signature based on the first descriptor and a second signature based on the second descriptor.


24-26 (Cancelled)


27.     (Currently Amended) A tangible machine accessible medium as defined in claim 23, wherein the first descriptor is associated with only the first frame of media samples.

NLSN_TVISION0000677

28.     (Currently Amended) A tangible machine accessible medium as defined in claim 23 having instructions stored thereon that, when executed, cause the machine to:

obtain a first plurality of media samples; and

identify [[a]] the second frame of media samples by extracting a common plurality of media samples from the first frame of media samples and appending the first plurality of media samples to the common plurality of media samples, the common plurality of media samples including the overlapping portions of the first and second frames of media samples.

29.     (Currently Amended) A tangible machine accessible medium as defined in claim 28 having instructions stored thereon that, when executed, cause the machine to:

identify a third spectral power associated with a third frequency component and a fourth spectral power of a fourth frequency component, wherein the third frequency component and the fourth frequency component are associated with performing the spectral transform operation on the second frame of media samples;

determine [[a]] the second descriptor based on a comparison of the third spectral power and the fourth spectral power; and

generate [[a]] the second signature based on the second descriptor.

30-117 (Cancelled)

NLSN_TVISION0000678

## REMARKS

The Applicant has carefully considered the non-final official action dated June 8, 2009. In the official action, claims 1-9, 11-14, 16-18, 23, and 27-29 were rejected under obviousness-type double patenting. Additionally, claims 1-6, 9, 11-14, 16, 17, 23, 27, and 28 were rejected under 35 USC § 103(a) as unpatentable over Srinivasan (US 6,272,176) in view of Kopra et al. (US 7,221,902).

By way of this response, the Applicant has amended claims 1, 8, 12, 17, 18, 23, and 27-29. No new matter has been added. In addition, the Applicant has cancelled claims 6, 7, and 11 without prejudice to their further prosecution. In view of the foregoing amendments and the following remarks, the Applicant respectfully traverses the rejections and submits that this application is in condition for allowance. Reconsideration of this application is respectfully requested.

### I.      Examiner Interview Summary

As an initial matter, the undersigned would like to thank Examiner Abedin for the courtesies extended during a telephonic interview conducted on September 23, 2009. During the telephonic interview, dependent claims 6, 7, 8, 18, and 29 were discussed. Examiner Abedin confirmed that dependent claims 7, 8, 18, and 29 were not rejected over any prior art. In addition, Examiner Abedin indicated that he would consider amended claim 1 including language from dependent claims 6 and 7.

### II.     The Obviousness-Type Double Patenting Rejections

In the official action, claims 1, 6-8, 12, 17, 18, 23, 28, and 29 were rejected under obviousness-type double patenting as unpatentable over claims 1-5, 7-11, 15-17, and 20-24 of U.S. patent 7,006,555 (the '555 patent). The Applicant respectfully submits that

NLSN_TVISION0000679

pending claims 1, 8, 12, 17, 18, 23, 28, and 29 of the instant application are not obvious over claims 1-5, 7-11, 15-17, and 20-24 of the '555 patent.  In particular, each of claims 1-5, 7-11 and 15 of the '555 patent involves modulating a characteristic of an audio signal to form a first encoded block of information.  In addition, each of claims 16, 17, and 20-24 of the '555 patent involves encoding each of the blocks of audio information by modulating a characteristic of the audio.  None of the pending claims 1, 8, 12, 17, 18, 23, 28, and 29 of the instant application involve modulating a characteristic of an audio signal to form an encoded block of information.

Also in the official action, claims 2-5, 9, 11, 13, 14, 16, and 27 of the instant application were rejected under obviousness-type double patenting as unpatentable over claims 1-24 and 39-43 of the '555 patent.  Each of independent claims 1-5, 7-11 and 15 of the '555 patent involves modulating a characteristic of an audio signal to form a first encoded block of information.  Each of independent claims 16, 17, and 20-24 of the '555 patent involves encoding each of the blocks of audio information by modulating a characteristic of the audio.  Independent claim 39 of the '555 patent involves modulating a signal at one or more of a plurality of frequencies.  None of the pending claims 2-5, 9, 11, 13, 14, 16, and 27 of the instant application involve modulating a signal at one or more of a plurality of frequencies nor do they involve modulating a characteristic of an audio signal to form an encoded block of audio information.

In view of the foregoing, the Applicant respectfully submits that none of the pending claims 1, 8, 12, 17, 18, 23, 28, and 29 are obvious in view of the noted claims of the '555 patent and respectfully requests withdrawal of the obviousness-type double patenting rejections.

Page 10 of 14

NLSN_TVISION0000680

U.S. Serial No. 11/676,452                                                    PATENT
Response to Office Action dated June 8, 2009                 Attorney Docket No. 20004/97-US

### III.    Independent Claim 1

The Applicant respectfully submits that independent claim 1 is in condition for allowance.  Independent claim 1 is directed to a method that involves identifying a second frame of media samples by extracting a common plurality of media samples from a first frame of media samples and appending another plurality of media samples to the common plurality of media samples, determining a second descriptor, and generating a second signature based on the second descriptor.  The combination of Srinivasan and Kopra et al. does not teach or suggest such a method.  Accordingly, the Applicant respectfully submits that independent claim 1 and all claims dependent thereon are in condition for allowance.

### IV.    Independent Claim 12

The Applicant respectfully submits that independent claim 12 is in condition for allowance.  Independent claim 12 is directed to an apparatus having instructions stored on a memory that enable a processor system to obtain first and second frames of media samples, the first and second frames of media samples consecutively located in an audio stream, a portion of the first frame of media samples overlapping with a portion of the second frame of media samples, determine a first descriptor of the first frame of media samples and a second descriptor of the second frame of media samples, and generate a first signature based on the first descriptor and a second signature based on the second descriptor.  The combination of Srinivasan and Kopra et al. does not teach or suggest such a method.

Srinivasan teaches code overwrite techniques which involve testing data bits in a data area and inserting a new bit only in those blocks that do not have the desired bit

NLSN_TVISION0000681

value. *Srinivasan*, 19:19-21.  However, such overwriting of selective bits does not constitute obtaining first and second frames of media samples, the first and second frames of media samples consecutively located in an audio stream, a portion of the first frame of media samples overlapping with a portion of the second frame of media samples, determining a first descriptor of the first frame of media samples and a second descriptor of the second frame of media samples, and generating a first signature based on the first descriptor and a second signature based on the second descriptor as recited in claim 12.

Accordingly, in view of the foregoing, the Applicant respectfully submits that independent claim 12 and all claims dependent thereon are in condition for allowance.

## V.      Independent Claim 23

The Applicant respectfully submits that independent claim 23 is in condition for allowance.  Independent claim 23 is directed to a tangible machine accessible medium having instructions stored thereon that, when executed, cause a machine to obtain first and second frames of media samples, the first and second frames of media samples consecutively located in an audio stream, a portion of the first frame of media samples overlapping with a portion of the second frame of media samples, determine a first descriptor of the first frame of media samples and a second descriptor of the second frame of media samples, and generate a first signature based on the first descriptor and a second signature based on the second descriptor.  The combination of Srinivasan and Kopra et al. does not teach or suggest such a tangible machine accessible medium. Accordingly, the Applicant respectfully submits that independent claim 23 and all claims dependent thereon are in condition for allowance.

NLSN_TVISION0000682

**VI.       Conclusion**

In view of the foregoing, the Applicant respectfully submits that this application is in condition for allowance and requests reconsideration thereof and an early favorable action on the merits.  If there are any remaining matters that the Examiner would like to discuss, the Examiner is invited to contact the undersigned representative at the telephone number set forth below.

In general, the Office action makes various statements regarding the pending claims and the cited references that are now moot in light of the above.  Thus, the Applicant will not address such statements at the present time.  However, the Applicant expressly reserves the right to challenge such statements in the future should the need arise (e.g., if such statement should become relevant by appearing in a rejection of any current or future claim).

The Commissioner is hereby authorized to refund any overpayment and charge any deficiency in the amount paid in connection with this paper or any additional fees which may be required during the pendency of this application under 37 CFR 1.16 or 1.17 to Deposit Account No. 50-2455.

In addition, if a petition for an extension of time under 37 CFR 1.136(a) is necessary to maintain the pendency of this case and is not otherwise requested in this case, the Applicant requests that the Commissioner consider this paper to be a petition for an appropriate extension of time and hereby authorize the Commissioner to charge the fee as set forth in 37 CFR 1.17(a) corresponding to the needed extension of time to the above deposit account.

NLSN_TVISION0000683

**U.S. Serial No. 11/676,452**                                    **PATENT**
Response to Office Action dated June 8, 2009            **Attorney Docket No. 20004/97-US**


                            Respectfully submitted,

                            HANLEY, FLIGHT & ZIMMERMAN, LLC
                            (customer number **81905**)
                            150 South Wacker Drive, Suite 2100
                            Chicago, Illinois 60606
                            (312) 580-1020

              By:     **/Felipe Hernandez/**
                            Felipe Hernandez
                            Registration No. 61,971
**September 25, 2009**         Attorney for Applicant

NLSN_TVISION0000684



UNITED STATES PATENT AND TRADEMARK OFFICE

**UNITED STATES DEPARTMENT OF COMMERCE**
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

# NOTICE OF ALLOWANCE AND FEE(S) DUE

| 81905 | 7590 | 12/09/2009 |

Hanley, Flight & Zimmerman, LLC
150 S. Wacker Dr. Suite 2100
Chicago, IL 60606

| EXAMINER |
| --- |
| ABEDIN, SHANTO |

| ART UNIT | PAPER NUMBER |
| --- | --- |
| 2436 | |

DATE MAILED: 12/09/2009

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
| --- | --- | --- | --- | --- |
| 11/676,452 | 02/19/2007 | Venugopal Srinivasan | 20004/97-US | 8207 |

TITLE OF INVENTION: METHODS AND APPARATUS FOR GENERATING SIGNATURES

| APPLN. TYPE | SMALL ENTITY | ISSUE FEE DUE | PUBLICATION FEE DUE | PREV. PAID ISSUE FEE | TOTAL FEE(S) DUE | DATE DUE |
| --- | --- | --- | --- | --- | --- | --- |
| nonprovisional | NO | $1510 | $300 | $0 | $1810 | 03/09/2010 |

**THE APPLICATION IDENTIFIED ABOVE HAS BEEN EXAMINED AND IS ALLOWED FOR ISSUANCE AS A PATENT.
PROSECUTION ON THE MERITS IS CLOSED. THIS NOTICE OF ALLOWANCE IS NOT A GRANT OF PATENT RIGHTS.
THIS APPLICATION IS SUBJECT TO WITHDRAWAL FROM ISSUE AT THE INITIATIVE OF THE OFFICE OR UPON
PETITION BY THE APPLICANT. SEE 37 CFR 1.313 AND MPEP 1308.**

**THE ISSUE FEE AND PUBLICATION FEE (IF REQUIRED) MUST BE PAID WITHIN THREE MONTHS FROM THE
MAILING DATE OF THIS NOTICE OR THIS APPLICATION SHALL BE REGARDED AS ABANDONED. THIS
STATUTORY PERIOD CANNOT BE EXTENDED. SEE 35 U.S.C. 151. THE ISSUE FEE DUE INDICATED ABOVE DOES
NOT REFLECT A CREDIT FOR ANY PREVIOUSLY PAID ISSUE FEE IN THIS APPLICATION. IF AN ISSUE FEE HAS
PREVIOUSLY BEEN PAID IN THIS APPLICATION (AS SHOWN ABOVE), THE RETURN OF PART B OF THIS FORM
WILL BE CONSIDERED A REQUEST TO REAPPLY THE PREVIOUSLY PAID ISSUE FEE TOWARD THE ISSUE FEE NOW
DUE.**

**HOW TO REPLY TO THIS NOTICE:**

I. Review the SMALL ENTITY status shown above.

If the SMALL ENTITY is shown as YES, verify your current
SMALL ENTITY status:

A. If the status is the same, pay the TOTAL FEE(S) DUE shown
above.

B. If the status above is to be removed, check box 5b on Part B -
Fee(s) Transmittal and pay the PUBLICATION FEE (if required)
and twice the amount of the ISSUE FEE shown above, or

If the SMALL ENTITY is shown as NO:

A. Pay TOTAL FEE(S) DUE shown above, or

B. If applicant claimed SMALL ENTITY status before, or is now
claiming SMALL ENTITY status, check box 5a on Part B - Fee(s)
Transmittal and pay the PUBLICATION FEE (if required) and 1/2
the ISSUE FEE shown above.

II. PART B - FEE(S) TRANSMITTAL, or its equivalent, must be completed and returned to the United States Patent and Trademark Office
(USPTO) with your ISSUE FEE and PUBLICATION FEE (if required). If you are charging the fee(s) to your deposit account, section "4b"
of Part B - Fee(s) Transmittal should be completed and an extra copy of the form should be submitted. If an equivalent of Part B is filed, a
request to reapply a previously paid issue fee must be clearly made, and delays in processing may occur due to the difficulty in recognizing
the paper as an equivalent of Part B.

III. All communications regarding this application must give the application number. Please direct all communications prior to issuance to
Mail Stop ISSUE FEE unless advised to the contrary.

**IMPORTANT REMINDER: Utility patents issuing on applications filed on or after Dec. 12, 1980 may require payment of
maintenance fees. It is patentee's responsibility to ensure timely payment of maintenance fees when due.**

PTOL-85 (Rev. 08/07) Approved for use through 08/31/2010.

NLSN_TVISION0000712

**PART B - FEE(S) TRANSMITTAL**

**Complete and send this form, together with applicable fee(s), to:** <u>Mail</u>   Mail Stop ISSUE FEE
Commissioner for Patents
P.O. Box 1450
Alexandria, Virginia 22313-1450

or <u>Fax</u>   (571)-273-2885

INSTRUCTIONS: This form should be used for transmitting the ISSUE FEE and PUBLICATION FEE (if required). Blocks 1 through 5 should be completed where appropriate. All further correspondence including the Patent, advance orders and notification of maintenance fees will be mailed to the current correspondence address as indicated unless corrected below or directed otherwise in Block 1, by (a) specifying a new correspondence address; and/or (b) indicating a separate "FEE ADDRESS" for maintenance fee notifications.

CURRENT CORRESPONDENCE ADDRESS (Note: Use Block 1 for any change of address)

81905        7590        12/09/2009

Hanley, Flight & Zimmerman, LLC
150 S. Wacker Dr. Suite 2100
Chicago, IL 60606

Note: A certificate of mailing can only be used for domestic mailings of the Fee(s) Transmittal. This certificate cannot be used for any other accompanying papers. Each additional paper, such as an assignment or formal drawing, must have its own certificate of mailing or transmission.

**Certificate of Mailing or Transmission**
I hereby certify that this Fee(s) Transmittal is being deposited with the United States Postal Service with sufficient postage for first class mail in an envelope addressed to the Mail Stop ISSUE FEE address above, or being facsimile transmitted to the USPTO (571) 273-2885, on the date indicated below.

_____ (Depositor's name)

_____ (Signature)

_____ (Date)

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 11/676,452 | 02/19/2007 | Venugopal Srinivasan | 20004/97-US | 8207 |

TITLE OF INVENTION: METHODS AND APPARATUS FOR GENERATING SIGNATURES

| APPLN. TYPE | SMALL ENTITY | ISSUE FEE DUE | PUBLICATION FEE DUE | PREV. PAID ISSUE FEE | TOTAL FEE(S) DUE | DATE DUE |
|---|---|---|---|---|---|---|
| nonprovisional | NO | $1510 | $300 | $0 | $1810 | 03/09/2010 |

| EXAMINER | ART UNIT | CLASS-SUBCLASS |
|---|---|---|
| ABEDIN, SHANTO | 2436 | 380-202000 |

1. Change of correspondence address or indication of "Fee Address" (37 CFR 1.363).

☐ Change of correspondence address (or Change of Correspondence Address form PTO/SB/122) attached.

☐ "Fee Address" indication (or "Fee Address" Indication form PTO/SB/47; Rev 03-02 or more recent) attached. **Use of a Customer Number is required.**

2. For printing on the patent front page, list

(1) the names of up to 3 registered patent attorneys or agents OR, alternatively,

(2) the name of a single firm (having as a member a registered attorney or agent) and the names of up to 2 registered patent attorneys or agents. If no name is listed, no name will be printed.

1 _____

2 _____

3 _____

3. ASSIGNEE NAME AND RESIDENCE DATA TO BE PRINTED ON THE PATENT (print or type)

PLEASE NOTE: Unless an assignee is identified below, no assignee data will appear on the patent. If an assignee is identified below, the document has been filed for recordation as set forth in 37 CFR 3.11. Completion of this form is NOT a substitute for filing an assignment.

(A) NAME OF ASSIGNEE        (B) RESIDENCE: (CITY and STATE OR COUNTRY)

Please check the appropriate assignee category or categories (will not be printed on the patent) :   ☐ Individual   ☐ Corporation or other private group entity   ☐ Government

4a. The following fee(s) are submitted:

☐ Issue Fee
☐ Publication Fee (No small entity discount permitted)
☐ Advance Order - # of Copies _____

4b. Payment of Fee(s): **(Please first reapply any previously paid issue fee shown above)**

☐ A check is enclosed.
☐ Payment by credit card. Form PTO-2038 is attached.
☐ The Director is hereby authorized to charge the required fee(s), any deficiency, or credit any overpayment, to Deposit Account Number _____ (enclose an extra copy of this form).

5. **Change in Entity Status** (from status indicated above)

☐ a. Applicant claims SMALL ENTITY status. See 37 CFR 1.27.   ☐ b. Applicant is no longer claiming SMALL ENTITY status. See 37 CFR 1.27(g)(2).

NOTE: The Issue Fee and Publication Fee (if required) will not be accepted from anyone other than the applicant; a registered attorney or agent; or the assignee or other party in interest as shown by the records of the United States Patent and Trademark Office.

Authorized Signature _____        Date _____

Typed or printed name _____        Registration No. _____

This collection of information is required by 37 CFR 1.311. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 12 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, Virginia 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, Virginia 22313-1450.

Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

PTOL-85  (Rev. 08/07) Approved for use through 08/31/2010.        OMB 0651-0033        U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE

 UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 11/676,452 | 02/19/2007 | Venugopal Srinivasan | 20004/97-US | 8207 |

81905          7590          12/09/2009

Hanley, Flight & Zimmerman, LLC
150 S. Wacker Dr. Suite 2100
Chicago, IL 60606

| EXAMINER |
|---|
| ABEDIN, SHANTO |

| ART UNIT | PAPER NUMBER |
|---|---|
| 2436 | |

DATE MAILED: 12/09/2009

## Determination of Patent Term Adjustment under 35 U.S.C. 154 (b)
(application filed on or after May 29, 2000)

The Patent Term Adjustment to date is 213 day(s). If the issue fee is paid on the date that is three months after the mailing date of this notice and the patent issues on the Tuesday before the date that is 28 weeks (six and a half months) after the mailing date of this notice, the Patent Term Adjustment will be 213 day(s).

If a Continued Prosecution Application (CPA) was filed in the above-identified application, the filing date that determines Patent Term Adjustment is the filing date of the most recent CPA.

Applicant will be able to obtain more detailed information by accessing the Patent Application Information Retrieval (PAIR) WEB site (http://pair.uspto.gov).

Any questions regarding the Patent Term Extension or Adjustment determination should be directed to the Office of Patent Legal Administration at (571)-272-7702.  Questions relating to issue and publication fee payments should be directed to the Customer Service Center of the Office of Patent Publication at 1-(888)-786-0101   or (571)-272-4200.

PTOL-85  (Rev. 08/07) Approved for use through 08/31/2010.

NLSN_TVISION0000714

| *Notice of Allowability* | Application No. | Applicant(s) |
|---|---|---|
| | 11/676,452 | SRINIVASAN, VENUGOPAL |
| | Examiner | Art Unit |
| | SHANTO M. ABEDIN | 2436 |

**-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address--**

All claims being allowable, PROSECUTION ON THE MERITS IS (OR REMAINS) CLOSED in this application. If not included herewith (or previously mailed), a Notice of Allowance (PTOL-85) or other appropriate communication will be mailed in due course. **THIS NOTICE OF ALLOWABILITY IS NOT A GRANT OF PATENT RIGHTS.** This application is subject to withdrawal from issue at the initiative of the Office or upon petition by the applicant. See 37 CFR 1.313 and MPEP 1308.

1. ☒ This communication is responsive to *the filing of 09/25/2009*.

2. ☒ The allowed claim(s) is/are *1-5, 8-9, 12-14, 16-18, 23 and 27-29*.

3. ☐ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).

    a) ☐ All    b) ☐ Some*    c) ☐ None    of the:

        1. ☐ Certified copies of the priority documents have been received.

        2. ☐ Certified copies of the priority documents have been received in Application No. _____ .

        3. ☐ Copies of the certified copies of the priority documents have been received in this national stage application from the International Bureau (PCT Rule 17.2(a)).

    * Certified copies not received: _____ .

Applicant has THREE MONTHS FROM THE "MAILING DATE" of this communication to file a reply complying with the requirements noted below. Failure to timely comply will result in ABANDONMENT of this application. **THIS THREE-MONTH PERIOD IS NOT EXTENDABLE.**

4. ☐ A SUBSTITUTE OATH OR DECLARATION must be submitted. Note the attached EXAMINER'S AMENDMENT or NOTICE OF INFORMAL PATENT APPLICATION (PTO-152) which gives reason(s) why the oath or declaration is deficient.

5. ☐ CORRECTED DRAWINGS ( as "replacement sheets") must be submitted.

    (a) ☐ including changes required by the Notice of Draftsperson's Patent Drawing Review ( PTO-948) attached

        1) ☐ hereto or 2) ☐ to Paper No./Mail No. _____ .

    (b) ☐ including changes required by the attached Examiner's Amendment / Comment or in the Office action of Paper No./Mail Date _____ .

    **Identifying indicia such as the application number (see 37 CFR 1.84(c)) should be written on the drawings in the front (not the back) of each sheet. Replacement sheet(s) should be labeled as such in the header according to 37 CFR 1.121(d).**

6. ☐ DEPOSIT OF and/or INFORMATION about the deposit of BIOLOGICAL MATERIAL must be submitted. Note the attached Examiner's comment regarding REQUIREMENT FOR THE DEPOSIT OF BIOLOGICAL MATERIAL.

**Attachment(s)**

1. ☒ Notice of References Cited (PTO-892)

2. ☐ Notice of Draftsperson's Patent Drawing Review (PTO-948)

3. ☒ Information Disclosure Statements (PTO/SB/08), Paper No./Mail Date 10/05/2009; 10/20/2009

4. ☐ Examiner's Comment Regarding Requirement for Deposit of Biological Material

5. ☐ Notice of Informal Patent Application

6. ☐ Interview Summary (PTO-413), Paper No./Mail Date _____ .

7. ☒ Examiner's Amendment/Comment

8. ☒ Examiner's Statement of Reasons for Allowance

9. ☐ Other _____ .

/SHANTO M ABEDIN/
Examiner, Art Unit 2436

PTOL-37 (Rev. 08-06)          Notice of Allowability          Part of Paper No./Mail Date 20091202

NLSN_TVISION0000715

Application/Control Number: 11/676,452                                    Page 2
Art Unit: 2436

### DETAILED ACTION

1.      This office action is in response to the communication filed on 09/25/2009.

2.      The prior office actions are incorporated herein by reference. In particular, the observations

with respect to claim language, and response to previously presented arguments.

3.      Claims 1-5, 8-9, 12-14, 16-18, 23 and 27-29 are pending in the application.

4.      Claims  1-5, 8-9, 12-14, 16-18, 23 and 27-29 are allowed.


### RESPONSE TO ARGUMENTS

5.      The applicant's arguments regarding obviousness type double patenting type rejections are fully

considered, and found persuasive. The previous obviousness type double patenting type rejections of

claims 1, 6-8, 12, 17-18, 23 and 28-29 are withdrawn.

6.      The applicant's arguments regarding 35 USC 103(a) type rejections are fully considered, and

found persuasive. The previous 35 USC 103(a) type rejections are withdrawn based on the applicant's

arguments, and the amendments made to the claims.


### EXAMINER'S AMENDMENT

7.      An examiner's amendment to the record appears below. Should the changes and/ or additions

be unacceptable to the applicant, an amendment may be filed as provided by 37 CFR 1.312. To ensure

consideration of such an amendment, it MUST be submitted no later than the payment of the issue fee.

Authorization for this examiner's amendment was given in a telephone interview with the applicant's

representative Mr.  Felipe Hernandez on  December 2, 2009.

 **Claims 1, 12, 18, 23 and 29  have been amended as follows:**

Application/Control Number: 11/676,452                                    Page 3
Art Unit: 2436

*Claim 1. (Currently Amended)*  A method for generating signatures [[, ]] <u>implemented using an apparatus comprising a processor, the method</u> comprising:

obtaining a first frame of media samples;

identifying a first frequency component having a first spectral power and a second frequency component having a second spectral power by performing a spectral transform operation on the first frame of media samples;

determining a first descriptor of the first frame of media samples based on a comparison of the first spectral power and the second spectral power;

generating a first signature based on the first descriptor;

identifying a second frame of media samples by extracting a common plurality of media samples from the first frame of media samples and appending another plurality of media samples to the common plurality of media samples;

identifying a third spectral power associated with a third frequency component and a fourth spectral power associated with a fourth frequency component, wherein the third frequency component and the fourth frequency component are associated with performing the spectral transform operation on the second frame of media samples;

determining a second descriptor based on a comparison of the third spectral power and the fourth spectral power; and

generating a second signature based on the second descriptor.

NLSN_TVISION0000717

*Claim  12.  (Currently Amended)*  An apparatus for generating signatures, comprising:

a processor system including a memory; and

instructions stored in the memory that enable the processor system to:

obtain a first and second frames of media samples, the first and second frames of media samples consecutively located in an audio stream, a portion of the first frame of media samples overlapping with a portion of the second frame of media samples;

identify a first frequency component having a first spectral power and a second frequency component having a second spectral power by performing a spectral transform operation on the first frame of media samples;

identify a third spectral power and a fourth spectral power;

determine a first descriptor of the first frame of media samples based on a comparison of the first spectral power and the second spectral power;

determine a second descriptor of the second frame of media samples based on a comparison of the third spectral power and the fourth spectral power ; and

generate a first signature based on the first descriptor and a second signature based on the second descriptor.

*Claim  18.  (Currently Amended)*  An apparatus as defined in ~~claim 17~~ claim 12, wherein the third spectral power is associated with a third frequency component and the fourth spectral power is associated with a fourth frequency component, and wherein the third frequency component and the

fourth frequency component are associated with performing the spectral transform operation on the second frame of media samples. ~~instructions stored in the memory enable the processor system to:~~

~~identify a third spectral power associated with a third frequency component and a fourth spectral power associated with a fourth frequency component, wherein the third frequency component and the fourth frequency component are associated with performing the spectral transform operation on the second frame of media samples;~~

~~determine the second descriptor based on a comparison of the third spectral power and the fourth spectral power; and~~

~~the second signature based on the second descriptor.~~

**Claim 23.   (Currently Amended)** A tangible machine accessible medium having instructions stored thereon that, when executed, cause a machine to:

obtain a ~~first frame~~ first and second frames of media samples, the first and second frames of media samples consecutively located in an audio stream, a portion of the first frame of media samples overlapping with a portion of the second frame of media samples;

identify a first frequency component having a first spectral power and a second frequency component having a second spectral power by performing a spectral transform operation on the first frame of media samples;

identify a third spectral power and a fourth spectral power;

determine a first descriptor of the first frame of media samples based on a comparison of the first spectral power and the second spectral power;

determine a second descriptor of the second frame of media samples based on a comparison of the third spectral power and the fourth spectral power; and

generate a first signature based on the first descriptor and a second signature based on the second descriptor.

***Claim 29. (Currently Amended)*** A tangible machine accessible medium as defined in ~~claim 28~~ claim 23, wherein third spectral power is associated with a third frequency component and the fourth spectral power is associated with a fourth frequency component, and wherein the third frequency component and the fourth frequency component are associated with performing the spectral transform operation on the second frame of media samples. ~~having instructions stored thereon that, when executed, cause the machine to:~~

~~identify a third spectral power associated with a third frequency component and a fourth spectral power of a fourth frequency component, wherein the third frequency component and the fourth frequency component are associated with performing the spectral transform operation on the second frame of media samples;~~

~~determine the second descriptor based on a comparison of the third spectral power and the fourth spectral power; and~~

~~generate the second signature based on the second descriptor.~~

Application/Control Number: 11/676,452                                        Page 7
Art Unit: 2436

### *EXAMINER'S REASONS FOR ALLOWANCE*

8.      The following is an examiner's statement of reasons for allowances:

Independent claim 1 is patentable over the cited prior arts because they do not anticipate nor fairly and reasonably teach independently or in combination a method comprising besides other limitations:  determining a first descriptor of the first frame of media samples based on a comparison of the first spectral power and the second spectral power; identifying a second flame of media samples by extracting a common plurality of media samples from the first flame of media samples and appending another plurality of media samples to the common plurality of media samples; and generating a first signature based on the first descriptor; and identifying a third spectral power associated with a third frequency component and a fourth spectral power associated with a fourth frequency component, wherein the third frequency component and the fourth frequency component are associated with performing the spectral transform operation on the second frame of media samples; and determining a second descriptor based on a comparison of the third spectral power and the fourth spectral power; and generating a second signature based on the second descriptor.

In particular, regarding independent claim 1, patentability exists, at least in part, with the recitation of identifying a second flame of media samples by extracting a common plurality of media samples from the first flame of media samples and appending another plurality of media samples; and generating a first signature based on the first descriptor; and determining a second descriptor based on a comparison of the third spectral power and the fourth spectral power; and generating a second signature based on the second descriptor.  The closest prior art US 6,272,176 B1 (Srinivasan)  discloses spectral transform or modulation operation, and generating coded data from the spectral power,  and US 7, 221,902  (Kopra et al) discloses audio signature comprising descriptors. However, the cited prior

NLSN_TVISION0000721

Application/Control Number: 11/676,452                                          Page 8
Art Unit: 2436

arts do not anticipate nor fairly and reasonably teach independently or in combination a method comprising performing spectral transform operation on the media samples; and identifying a second flame of media samples by extracting a common plurality of media samples from the first flame of media samples and appending another plurality of media samples; and generating a first signature based on the first descriptor; and determining a second descriptor based on a comparison of the third spectral power and the fourth spectral power; and generating a second signature based on the second descriptor.

Independent claims 12 and 23 are patentable over the cited prior arts because they do not anticipate nor fairly and reasonably teach independently or in combination a method comprising besides other limitations: obtain a first and second frames of media samples, a portion of the first frame of media samples overlapping with a portion of the second frame of media samples; and identify a first frequency component having a first spectral power and a second frequency component having a second spectral power by performing a spectral transform operation on the first frame of media samples; and identify a third spectral power and a fourth spectral power; and determine a first descriptor of the first frame of media samples based on a comparison of the first spectral power and the second spectral power; and determine a second descriptor of the second frame of media samples based on a comparison of the third spectral power and the fourth spectral power ; and generate a second signature based on the second descriptor.

In particular, regarding independent claims 23 and 29, patentability exists, at least in part, with the recitation of obtain a first and second frames of media samples, a portion of the first frame of media samples overlapping with a portion of the second frame of media samples; and identify a third spectral power and a fourth spectral power; and determine a first descriptor of the first frame of media samples

NLSN_TVISION0000722

Application/Control Number: 11/676,452                                                    Page 9
Art Unit: 2436

based on a comparison of the first spectral power and the second spectral power;  and determine a second descriptor of the second frame of media samples based on a comparison of the third spectral power and the fourth spectral power ; and generate a first signature based on the first descriptor and a second signature based on the second descriptor. The closest prior art US 6,272,176 B1 (Srinivasan) discloses spectral transform or modulation operation, and generating coded data from the spectral power,  and US 7, 221,902  (Kopra et al) discloses audio signature comprising descriptors. However, the cited prior arts do not anticipate nor fairly and reasonably teach independently or in combination a method comprising obtain a first and second frames of media samples, a portion of the first frame of media samples overlapping with a portion of the second frame of media samples; and identify a third spectral power and a fourth spectral power; and determine a first descriptor of the first frame of media samples based on a comparison of the first spectral power and the second spectral power;  and determine a second descriptor of the second frame of media samples based on a comparison of the third spectral power and the fourth spectral power ; and generate  a second signature based on the second descriptor.

Dependent claims are allowed because of their dependency on the allowable independent claims.

### *CONCLUSION*

9.      Claims 1-5, 8-9, 12-14, 16-18, 23 and 27-29  are patentable.

10.     Any comments considered necessary by applicant must be submitted no later than the payment of the issue fee and, to avoid processing delays should be clearly labeled "Comments on Statement of Reasons for Allowance."

NLSN_TVISION0000723

Application/Control Number: 11/676,452                          Page 10
Art Unit: 2436

11.     Any inquiry concerning this communication or earlier communications from the examiner

should be directed to Shanto M  Abedin whose telephone number is 571-272-3551.  The examiner can

normally be reached on M-F from 10:30 AM to 7:00 PM. If attempts to reach the examiner by

telephone are unsuccessful, the examiner's supervisor, Moazzami Nasser, can be reached on 571-272-

4195.  The fax phone number for the organization where this application or proceeding is assigned is

703-872-9306.

        Information regarding the status of an application may be obtained from the Patent Application

Information Retrieval (PAIR) system.  Status information for published applications may be obtained

from either Private PAIR or Public PAIR.  Status information for unpublished applications is available

through Private PAIR only.  For more information about the PAIR system, see http://pair-

direct.uspto.gov. Should you have questions on access to the Private PAIR system, contact the

Electronic Business Center (EBC) at 866-217-9197 (toll-free).


Shanto  M  Z Abedin

Examiner, A.U. 2436

/Eleni A Shiferaw/

Primary Examiner, Art Unit 2436

NLSN_TVISION0000724

Application/Control Number: 11/676,452                                  Page 11
Art Unit: 2436

NLSN_TVISION0000725

| Notice of References Cited | Application/Control No. 11/676,452 | Applicant(s)/Patent Under Reexamination SRINIVASAN, VENUGOPAL | |
|---|---|---|---|
| | Examiner SHANTO M. ABEDIN | Art Unit 2436 | Page 1 of 1 |

**U.S. PATENT DOCUMENTS**

| * | | Document Number Country Code-Number-Kind Code | Date MM-YYYY | Name | Classification |
|---|---|---|---|---|---|
| * | A | US-7,006,555 | 02-2006 | Srinivasan, Venugopal | 375/133 |
| * | B | US-6,272,176 B1 | 08-2001 | Srinivasan, Venugopal | 375/240 |
| * | C | US-7,221,902 B2 | 05-2007 | Kopra et al. | 455/3.05 |
| * | D | US-6,971,010 B1 | 11-2005 | Abdel-Mottaleb, Mohamed | 713/176 |
| * | E | US-6,061,793 | 05-2000 | Tewfik et al. | 713/176 |
| * | F | US-2005/0257064 A1 | 11-2005 | Boutant et al. | 713/180 |
| | G | US- | | | |
| | H | US- | | | |
| | I | US- | | | |
| | J | US- | | | |
| | K | US- | | | |
| | L | US- | | | |
| | M | US- | | | |

**FOREIGN PATENT DOCUMENTS**

| * | | Document Number Country Code-Number-Kind Code | Date MM-YYYY | Country | Name | Classification |
|---|---|---|---|---|---|---|
| | N | | | | | |
| | O | | | | | |
| | P | | | | | |
| | Q | | | | | |
| | R | | | | | |
| | S | | | | | |
| | T | | | | | |

**NON-PATENT DOCUMENTS**

| * | | Include as applicable: Author, Title Date, Publisher, Edition or Volume, Pertinent Pages) |
|---|---|---|
| | U | |
| | V | |
| | W | |
| | X | |

*A copy of this reference is not being furnished with this Office action. (See MPEP § 707.05(a).)
Dates in MM-YYYY format are publication dates. Classifications may be US or foreign.

U.S. Patent and Trademark Office
PTO-892 (Rev. 01-2001)                    **Notice of References Cited**          Part of Paper No. 20091202

NLSN_TVISION0000726

# EXHIBIT D

US006061793A

# United States Patent [19]

## Tewfik et al.

[11] **Patent Number:** **6,061,793**

[45] **Date of Patent:** **May 9, 2000**

[54] **METHOD AND APPARATUS FOR EMBEDDING DATA, INCLUDING WATERMARKS, IN HUMAN PERCEPTIBLE SOUNDS**

[75] Inventors: **Ahmed H. Tewfik**, Edina; **Mitchell D. Swanson**, Minneapolis; **Bin Zhu**, St. Paul, all of Minn.; **Laurence Boney**, Rambouillet, France

[73] Assignee: **Regents of the University of Minnesota**, Minneapolis, Minn.

[21] Appl. No.: **08/918,891**

[22] Filed: **Aug. 27, 1997**

**Related U.S. Application Data**

[60] Provisional application No. 60/024,979, Aug. 30, 1996, and provisional application No. 60/050,587, Jun. 24, 1997.

[51] Int. Cl.$^7$ .................................... H04N 7/167

[52] **U.S. Cl.** ...................... **713/176**; 713/179; 380/206; 380/207; 380/237; 380/238

[58] **Field of Search** .................................. 360/18, 24, 27, 360/49; 348/461, 462; 381/124; 380/200, 206, 207, 237–238; 705/54; 704/216–218, 226–228, 500, 501, 503, 504; 369/4, 5; 386/95, 96, 104; 713/176

[56] **References Cited**

**U.S. PATENT DOCUMENTS**

| | | |
|---|---|---|
| 3,395,204 | 7/1968 | Earle .......................................... 99/169 |
| 4,313,197 | 1/1982 | Maxemchuk ............................ 370/111 |
| 4,425,661 | 1/1984 | Moses et al. ................................ 375/1 |
| 4,495,620 | 1/1985 | Steele et al. .......................... 370/118 |
| 4,969,041 | 11/1990 | O'Grady et al. ...................... 358/142 |
| 5,010,405 | 4/1991 | Schreiber et al. ..................... 358/141 |
| 5,060,262 | 10/1991 | Bevins, Jr. et al. .................... 380/19 |
| 5,285,498 | 2/1994 | Johnston ................................... 381/2 |
| 5,315,098 | 5/1994 | Tow ........................................ 235/494 |
| 5,319,735 | 6/1994 | Preuss et al. ........................ 395/2.14 |
| 5,325,290 | 6/1994 | Cauffman et al. ..................... 364/401 |
| 5,379,345 | 1/1995 | Greenberg ................................ 380/23 |
| 5,386,240 | 1/1995 | Hori ......................................... 348/473 |
| 5,404,377 | 4/1995 | Moses ..................................... 375/200 |
| 5,450,490 | 9/1995 | Jensen et al. .............................. 380/6 |

(List continued on next page.)

**FOREIGN PATENT DOCUMENTS**

| | | | |
|---|---|---|---|
| 581317A2 | 2/1994 | European Pat. Off. ......... G07D 7/00 |
| 0 635 798 A1 | 1/1995 | European Pat. Off. ........ G06F 17/30 |
| 635798A1 | 1/1995 | European Pat. Off. ........ G06F 17/30 |
| 0 657 831 A1 | 6/1995 | European Pat. Off. ........ G06F 17/30 |
| 657831A1 | 6/1995 | European Pat. Off. ........ G06F 17/30 |
| 7-160731 | 6/1995 | Japan ................................ G06F 17/30 |

**OTHER PUBLICATIONS**

Zhu, S.C., et al., "Region Competition: Unifying Snakes, Region Growing, Energy/Bayes/MDL for Multi–band Image Segmentation", *Proceedings of the Fifth International Conference on Computer Vision*, Massachusetts Institute of Technology, Cambridge, MA, 416–423, (Jun. 20–23, 1995).

(List continued on next page.)

*Primary Examiner*—Tod R. Swann
*Assistant Examiner*—Paul E. Callahan
*Attorney, Agent, or Firm*—Schwegan, Lundberg, Woessner & Kluth P.A.

[57] **ABSTRACT**

A technique for hiding of data, including watermarks, in human-perceptible sounds, that is, audio host data, is disclosed. In one embodiment a method comprises three steps. In the first step, data to be embedded is inputted. In the case of a watermark, this data is a unique signature, and may be a pseudo-noise (PN) code. In the case of hidden data to be embedded in the host data, this data is the hidden data itself, or the hidden data as spread against the frequency spectrum by a pseudo-noise (PN) code. In the second step, the inputted data is embedded within the host data, in accordance with a perceptual mask of the host data. The perceptual mask determines the optimal locations within the host data to insert the inputted data. In the case of sounds, these optimal locations are determined by reference to the human auditory system. In the third step, the host data, with the embedded data, is further masked by a non-frequency mask. In the case of audio data, the non-frequency mask is a temporal mask.

**30 Claims, 5 Drawing Sheets**



**6,061,793**

Page 2

## U.S. PATENT DOCUMENTS

| 5,461,426 | 10/1995 | Limberg et al. | 348/475 |
| 5,465,269 | 11/1995 | Schaffner et al. | 375/200 |
| 5,465,308 | 11/1995 | Hutcheson et al. | 382/159 |
| 5,473,631 | 12/1995 | Moses | 375/202 |
| 5,515,296 | 5/1996 | Agarwal | 364/514 R |
| 5,530,759 | 6/1996 | Braudaway et al. | 380/54 |
| 5,579,471 | 11/1996 | Barber et al. | 395/326 |
| 5,583,941 | 12/1996 | Yoshida et al. | 380/51 |
| 5,606,609 | 2/1997 | Houser et al. | 380/4 |
| 5,613,004 | 3/1997 | Cooperman et al. | 380/28 |
| 5,646,997 | 7/1997 | Barton | 380/23 |
| 5,687,236 | 11/1997 | Moskowitz et al. | 380/28 |
| 5,710,719 | 1/1998 | Houle | 364/514 R |
| 5,710,916 | 1/1998 | Barbaraet et al. | 395/609 |
| 5,809,139 | 9/1998 | Girod et al. | 380/5 |
| 5,848,155 | 12/1998 | Cox | 380/4 |
| 5,850,481 | 12/1998 | Rhoads | 382/232 |
| 5,859,920 | 1/1999 | Daly et al. | 382/115 |

## OTHER PUBLICATIONS

Aizawa, K., "Model–Based Image Coding", *Proceedings of the SPIE, Visual Communications and Image Processing '94,* vol. 2308, Chicago, IL, 1035–1049 (Sep. 25–29, 1994).

Baritaud, T., et al., "On the Security of the Permuted Kernel Indentification Scheme", *Proceedings of the 12th Annual International Cryptology Conference,* Advances in Cryptology—CRYPTO '92, Brickell, E.F., (ed.), Santa Barbara, CA, 305–311 (Aug. 16–20, 1992).

Bender, W., et al., "Techniques for Data Hiding", *IBM Systems Journal,* 35, 313–336 (1996).

Bender, W., et al., "Techniques for Data Hiding", *SPIE,* 2420, 164–173 (1995).

Boland, F.M., et al., "Watermarking Digital Images for Copyright Protection", *IEE International Conference on Image Processing an Its Applications,* Edinburgh, Scotland, 326–330 (Jul. 4–6, 1995).

Boney, L., et al., "Digital Watermarks for Audio Signals", *Proceedings of the 1996 IEEE International Conference on Multimedia Computing and Systems,* MULTIMEDIA '96, Hiroshima, Japan, 473–480 (Jun. 1996).

Bors, A.G., et al., "Image Watermarking Using DCT Domain Constraints", *Proceedings of the 1996 IEEE International Conference on Image Processing,* vol. III, Lausanne, Switzerland, 231–234 (Sep. 16–19, 1996).

Bouman, C., et al., "Multiple Resolution Segmentation of Textured Images", *IEEE Transactions on Pattern Analysis and Machine Intelligence,* 13, 99–113 (Feb. 1991).

Cawkell, A.E., "Picture–Queries and Picture Databases", *The Journal of Information Science,* 19, 409–423 (1993).

Chalom, E., et al., "Segmentation of an Image Sequence Using Multi–Dimensional Image Attributes", *Proceedings of the 1996 IEEE International Conference on Image Processing,* vol. II, Lausanne, Switzerland, 525–528 (Sep. 16–19, 1996).

Chan, W.–Y., et al., "Generalized Product Code Vector Quantization: A Family of Efficient Techniques for Signal Compression", *Digital Signal Processing,* 4, 95–126 (1994).

Chang, S.–F., "Compressed–Domain Techniques for Image/ Video Indexing and Manipulation", *Proceedings of the 1995 IEEE International Conference on Image Processing,* vol. 1, Washington, D.C., 314–317 (Oct. 23–26, 1995).

Chang, S.–F., et al., "Transform Coding of Arbitrarily–Shaped Image Segments", *Proceedings of the ACM, Multimedia 93,* Anaheim, CA, 83–90 (Aug. 1–6, 1993).

Chitprasert, B., et al., "Human Visual Weighted Progressive Image Transmission", *IEEE Transactions on Communications,* 38, 1040–1044 (Jul. 1990).

Corset, I., et al., "MPEG–4: Very Low Bit Rate Coding for Multimedia Applications", *Proceedings of the SPIE, Visual Communications and Image Processing '94,* vol. 2308, Chicago, IL, 1065–1073 (Sep. 25–29, 1994).

Cox, I.J., et al., "Secure Spread Spectrum Watermarking for Images, Audio and Video", *Proceedings of the 1996 IEEE International Conference on Image Processing,* vol. III, Lausanne, Switzerland, 243–246 (Sep. 16–19, 1996).

Craver, S., et al., "Can Invisible Watermarks Resolve Rightful Ownership?", *IBM Research Technical Report, RC 20509, IBM CyberJournal,* 23 p. (Jul. 25, 1996).

Daubechies, I., et al., "Orthonormal Bases of Compactly Supported Wavelets", *Communications on Pure and Applied Mathematics,* XLI, 909–996 (Oct. 1988).

Faloutsos, C., et al., "Signature Files: An Access Method for Documents and Its Analytical Performance Evaluation", *ACM Transactions on Office Information Systems,* 2, 267–288 (Oct. 1984).

Flickner, M., et al., "Query by Image and Video Content: The QBIC System", *Computer,* 28, 23–32 (Sep. 1995).

Gary, J.E., et al., "Shape Similarity–Based Retrieval in Image Database Systems", *Proceedings of the SPIE, Image Storage and Retrieval Systems,* vol. 1662, San Jose, CA, 2–8 (Feb. 13–14, 1992).

Girod, B., "The Information Theoretical Significance of Spatial and Temporal Masking in Video Signals", *Proceedings of the SPIE, Human Vision, Visual Processing and Digital Display,* vol. 1077, 178–187 (1989).

Gruber, J., "Smart Paper", *Wired,* 2, 46 (Dec. 1994).

Gudivada, V.N., et al., "Content–Based Image Retrieval Systems", *Computer,* 28, 18–22 (Sep. 1995).

Hartung, F., et al., "Digital Watermarking of Raw and Compressed Video", *SPIE,* 2952, 205–213 (Oct. 1996).

Hirata, K., et al., "Rough Sketch–Based Image Information Retrieval", *NEC Research & Development,* 34, 463–473 (Apr. 1993).

Hirotsugu, K., "An Image Digital Signature System with ZKIP for the Graph Isomorphism", *Proceedings of the 1996 IEEE International Conference on Image Processing,* vol. III, Lausanne, Switzerland, 247–250 (Sep. 16–19, 1996).

Hsu, C.–T., et al., "Hidden Signatures in Images", *Proceedings of the 1996 IEEE International Conference on Image Processing,* vol. III, Lausanne, Switzerland, 223–226 (Sep. 16–19, 1996).

Huang, Z., et al., "Affine–Invariant B–Spline Moments for Curve Matching", *IEEE Transactions on Image Processing,* 5, 1473–1480 (Oct. 1996).

Huffman, D.A., "A Method for the Construction of Minimum–Redundancy Codes", *Proceedings of the IRE,* 40, 1098–1101 (1952).

Jacobs, C.E., et al., "Fast Multiresolution Image Querying", *Proceedings of the ACM, SIGGRAPH Conference on Computer Graphics,* Los Angeles, CA, 277–286 (1995).

Jayant, N., et al., "Signal Compression Based on Models of Human Perception", *Proceedings of the IEEE,* 81, 1385–1422 (Oct. 1993).

Johnson, J.D., et al., "Wideband Coding—Perceptual Considerations for Speech and Music", In: *Advances in Speech Signal Processing,* Furui, S., et al., (eds.), Dekker, New York, p. 109–140 (1992).

Le Gall, D., "MPEG: A Video Compression Standard for Multimedia Applications", *Communications of the ACM,* 34, 46–58 (Apr. 1991).

Legge, G.E., et al., "Contrast Masking in Human Vision", *The Journal of the Optical Society of America,* 70, 1458–1471 (Dec. 1980).

Lin, H.–C., et al., "Color Image Retrieval Based on Hidden Markov Models", *Proceedings of the 1995 IEEE International Conference on Image Processing,* vol. 1, Washington, D.C., 342–345 (1995).

Macq, B.M., et al., "Cryptology for Digital TV Broadcasting", *Proceedings of the IEEE,* 83, 944–957 (Jun. 1995).

Manjunath, B.S., et al., "Browsing Large Satellite and Aerial Photographs", *Proceedings of the 1996 IEEE International Conference on Image Processing,* vol. II, Lausanne, Switzerland, 765–768 (Sep. 16–19, 1996).

Matsui, K., et al., "Video–Steganography: How to Secretly Embed a Signature in a Picture", *IMA Intellectual Property Project Proceedings,* vol. 1, 187–206 (Jan. 1994).

Nam, J., et al., "Combined Audio and Visual Streams Analysis for Video Sequence Segmentation", Proceedings of the 1997 IEEE International Conference on Acoustics, Speech and Signal Processing, vol. IV, Munich, Germany, 2665–2668 (Apr. 21–24, 1997).

Niblack, W., et al., "The QBIC Project: Querying Images by Content Using Color, Texture and Shape", *Proceedings of the SPIE, Storage and Retrieval for Image and Video Databases,* vol. 1908, 173–187 (1993).

Nill, N.B., "A Visual Model Weighted Cosine Transform for Image Compression and Quality Assessment", *IEEE Transactions on Communications,* COM–33, 551–557 (Jun. 1985).

Noll, P., "Wideband Speech and Audio Coding", *IEEE Communications Magazine,* 31, 34–44 (Nov. 1993).

O Raunaidh, J.J.K., et al., "Phase Watermarking of Digital Images", *Proceedings of the 1996 IEEE International Conference on Image Processing,* vol. III, Lausanne, Switzerland, 239–242 (Sep. 16–19, 1996).

Pitas, I., "A Method for Signature Casting on Digital Images", *Proceedings of the 1996 IEEE International Conference on Image Processing,* vol. III, Lausanne, Switzerland, 215–218 (Sep. 16–19, 1996).

Rioul, O., et al., "Wavelets and Signal Processing", *IEEE Signal Processing Magazine,* 8, 14–38 (Oct. 1991).

Rivest, R.L., "Cryptography", In: *Handbook of Theoretical Computer Sciences,* vol. A, Van Leeuwen, J., (ed.), p. 717–755 (1990).

Rivest, R.L., et al., "A Method for Obtaining Digital Signatures and Public–Key Cryptosystems", *Communications of the ACM,* 21, 120–126 (Feb. 1978).

Smith, J.P., "Authentication of Digital Medical Images with Digital Signature Technology", *Radiology,* 194, 771–774 (Mar. 1995).

Smith, J.R., et al., "Modulation and Information Hiding in Images", *Information Hiding,* Proceedings of the First Int. Workshop, Anderson, R., (ed.), Cambridge, U.K., 207–226 (May 30–Jun. 1, 1996).

Srihari, R.K., "Combining Text and Image Information in Content–Based Retrieval", *Proceedings of the 1995 IEEE International Conference on Image Processing,* Washington, D.C., 326–328 (Oct. 23–26, 1995).

Strang, G., "Wavelets and Dilation Equations: A Brief Introduction", *SIAM Review,* 31, 614–627 (Dec. 1989).

Swain, M.J., et al., "Color Indexing", *International Journal of Computer Vision,* 7, 11–32 (1991).

Tanaka, K., et al., "Embedding Secret Information into a Dithered Multi–Level Image", *1990 IEEE Military Communications Conference,* vol. 1, "Milcom 90: A New Era," Monterey, CA, 216–220 (Sep. 30–Oct. 3, 1990).

van Schyndel, R.G., et al., "A Digital Watermark", *Proceedings of the IEEE, ICIP–94,* vol. II, Austin, TX, 86–90 (Nov. 13–16, 1994).

Voyatzis, G., et al., "Applications of Toral Automorphisms in Image Watermarking", *Proceedings of the 1996 IEEE International Conference on Image Processing,* vol. II, Lausanne, Switzerland, 237–240 (Sep. 16–19, 1996).

Wallace, G.K., "The JPEG Still Picture Compression Standard", *Communications of the ACM,* 34, 30–44 (Apr. 1991).

Witten, I.H., et al., "Arithmetic Coding for Data Compression", *Communications of the ACM,* 30, 520–540 (Jun. 1987).

Wolfgang, R.B., et al., "A Watermark for Digital Images", *Proceedings of the 1996 IEEE International Conference on Image Processing,* vol. III, Lausanne, Switzerland, 219–222 (Sep. 16–19, 1996).

Wunsch, P., et al., "Wavelet Descriptors for Multiresolution Recognition of Handprinted Characters", *Pattern Recognition,* 28, 1237–1249 (Aug. 1995).

Zhu, B., et al., "Image Coding with Mixed Representations and Visual Masking", *Proceedings of the 1995 IEEE International Conference on Acoustics, Speech and Signal Processing,* vol. 4, Detroit, MI, 2327–2330 (May 9–12, 1995).

Zhu, B., et al., "Low Bit Rate Near–Transparent Image Coding", *Proceedings of the SPIE, International Conference on Wavelet Applications for Dual Use,* vol. 2491, Orlando, FL, 173–184 (1995).

Ziv, J., et al., "A Universal Algorithm for Sequential Data Compression", *IEEE Transactions on Information Theory,* IT–23, 337–343 (May 1977).



**FIG. 1**



# FIG. 2



FIG. 3



FIG. 4(a)



FIG. 4(b)

6,061,793

**1**

# METHOD AND APPARATUS FOR EMBEDDING DATA, INCLUDING WATERMARKS, IN HUMAN PERCEPTIBLE SOUNDS

## RELATED DOCUMENTS

This application claims the benefit of U.S. Provisional Application Ser. No. 60/024,979, filed Aug. 30, 1996, which is hereby incorporated by reference. U.S. Provisional Application Ser. No. 60/050,587, filed Jun. 24, 1997, the benefit of which is also claimed, is also hereby incorporated by reference. Co-filed applications entitled "Method and Apparatus for Embedding Data, Including Watermarks, in Human Perceptible Images," application Ser. No. 08/918,122 filed Aug. 27, 1997 "Method and Apparatus for Video Watermarking," application Ser. No. 08/918,125 filed Aug. 27, 1997 "Method and Apparatus for Scene-Based Video Watermarking," application Ser. No. 08/921,931 filed Aug. 27, 1997 and "Digital Watermarking to Resolve Multiple claims of Ownership" application Ser. No. 08/918,126 filed Aug. 27, 1997 are also hereby incorporated by reference.

## STATEMENT REGARDING GOVERNMENT RIGHTS

The present invention was made with government support by AFOSR under grant AF/F49620-94-1-0461, NSF under grant NSF/INT-9406954 ARPA GRANT No. AF/F46920-93-1-0558. The Government has certain rights in this invention.

## FIELD OF THE INVENTION

This invention relates generally to techniques for embedding data such as watermarks, signatures and captions in digital data, and more particularly to embedding such data in human perceptible sounds.

## BACKGROUND OF THE INVENTION

Advances in information systems and networked databases continue to spur rapid growth in digital media, e.g., audio, image and video. This is due, in part, to highly efficient manipulation, reproduction, and access afforded by digital media. Data hiding is the process of encoding extra information in digital data, such as video, images or sounds, by making small modifications to the data. Hiding information in sounds or images may be used to supplement an image or sound with additional information, or verify the integrity of the image or sound. The hidden information itself may be text, audio or image data or hyperlinks. For example, text captions may be used to label faces and buildings in an image. A short audio clip may associate a train whistle with an image of a locomotive. A hyperlink may join an image region to another document or data source.

The embedded data typically remains with the image when it is stored or transmitted. The embedded data may be meant to be extracted by an end user, or hidden to the end user. In the former instance, for example, a consumer may extract the embedded data and use it to satisfy an information need. In the latter instance, the embedded data may be a watermark. Watermarking is a technique used to label digital media by hiding copyright or other information into the underlying data. Unlike encryption, for example, which is used to restrict access to data, watermarking is employed to provide solid proof of authorship. Like data hiding generally, the watermark remains with the media. However,

**2**

unlike data hiding generally, with watermarking the user cannot access the embedded information (i.e., the watermark).

Data hiding in general, and watermarking in particular, typically must satisfy the following requirements to be useful: they must be inaudible, and they must be robust. Although other criteria may be important (such as statistical inaudibility, the support for multiple data embeddings and self-clocking), the inaudibility and the robustness of the resulting data are most important. The first requirement is that the hidden data remain inaudible in the case where the host data is sound data. Otherwise, the quality of the sound may degrade.

The second requirement, robustness, relates to the survivability of the hidden data in light of the manipulation of the media in which it is embedded. Typically, sound data are subject to signal processing operations such as filtering, resampling, compression, noise, cropping, audio-to-digital and subsequent digital-to-audio conversion, etc. Because the host data will invariably be subject to such manipulation, the embedded data must be robust. That is, the embedded data must able to survive after the host data has been subjected to signal processing operations.

Several data hiding techniques are found in the prior art. Some hiding schemes employ spread spectrum techniques. This is typically applied to audio signals. In direct sequence spread spectrum coding, the signature is modulated by both a PN-sequence and the audio signal using bi-phase shift keying. It is then added to the original signal as an additive random noise. However, these schemes fail to meet optimally at least one of the above-identified requirements.

Thus, there is a need for a data hiding and watermarking technique that is inaudible in the case of audio data and has the maximum robustness to ensure that the embedded data survives both legitimate and illegitimate data manipulation.

## SUMMARY OF THE INVENTION

The present invention provides for the hiding of data, including watermarks, in human-perceptible sounds, that is, audio host data. The present invention employs perceptual masking models to determine the optimal locations within host data to insert the hidden data or watermark. In one embodiment of the invention, a method comprises three steps. In the first step, data to be embedded is inputted. In the case of a watermark, this data is a unique signature, and may be a pseudo-noise (PN) code generated by the invention. In the case of hidden data to be embedded in the host data, this data is the hidden data itself, or the hidden data as spread against the frequency spectrum by a pseudo-noise (PN) code.

In the second step, the inputted data is embedded within the host data, in accordance with a perceptual mask of the host data. The perceptual mask determines the optimal locations within the host data to insert the inputted data. In the case of sounds, these optimal locations are determined by reference to the human auditory system. Any model mimicking either the human auditory system can be used under the present invention.

Finally, in the third step, the host data, with the embedded data, is further masked by a non-frequency mask, to ensure that the embedded data is indeed inaudible within the host data. In the case of audio data, the non-frequency mask is a temporal mask. Still other and further aspects, advantages and embodiments of the present invention will become apparent in the following description and by reference to the accompanying drawings.

6,061,793

**3**

### BRIEF DESCRIPTION OF THE DRAWINGS

FIG. **1** is a flow chart of a method according to the present invention;

FIG. **2** is a diagram of a typical computer to be used with the present invention;

FIG. **3** is a flow chart of a method effectuating data hiding within a sound using perceptual frequency masking and temporal masking according to the present invention;

FIG. **4**(*a*) is a block diagram of one embodiment of the invention in which a watermark for audio sound host data is generated; and,

FIG. **4**(*b*) is a block diagram of a method effectuating watermark generation for audio data according to the present invention.

### DETAILED DESCRIPTION OF THE DRAWINGS
General Overview of the Present Invention

The present invention provides for the hiding of data, including watermarks, in human perceptible sounds. That is, the present invention provides for the hiding of data within host data, or watermarking host data. The host data is audio data. Referring to FIG. **1**, a method according to one embodiment of the invention is shown. In step **10**, data is inputted. In the case of watermarking, this data is a signature, or watermark, that acts as a unique identifier for the host data, and which may be generated by the invention. In the case of embedding hidden data within the host data, this data is either the hidden data itself, or the hidden data as spread against a signature according to spread-spectrum techniques that are well known in the art. Spreading the signal provides for robustness of data. Without spreading the signal, the embedded hidden data amasses towards the low end of the frequency spectrum; a filter applied to the entire data set that removes low frequencies may also remove the embedded hidden data. Spreading the signal spreads the data over the entire frequency range. Note that in the case of watermarking the host data, the signature inherently is spread across the frequency spectrum without explicit spread-spectrum processing.

In one embodiment of the invention, the signature is a pseudo-noise (PN) sequence. These are used as codewords for the watermarks because of their noise-like characteristics, resistance to interference, and their good auto-correlation properties. PN-sequences are periodic noise-like binary sequences generated by length m linear shift registers. The maximum period of a PN-sequence is $2^m-1$. When the period is exactly $2^m-1$, the PN-sequence is called an m-sequence. In one embodiment, m-sequences are used to provide an easy way to generate a unique code for an author's identification. Furthermore, the period N auto-correlation function has peaks equal to 1 at 0, N, 2N, etc., and is approximately equal to 1/N, elsewhere. Because of these periodic peaks, an m-sequence is self-clocking. This allows synchronization with the embedded watermark during the detection process. It is also important if the signal is cropped and re-sampled.

In step **12**, the data inputted in step **10** is embedded within the host data as dictated by a perceptual mask. A perceptual masking model is used to determine the optimal locations within the host data in which to insert the hidden data or watermark. The perceptual mask is specific to the host data being audio data. The mask provides for the data inputted by step **10** to be embedded with the host data, at places typically imperceptible to the human ear. That is, the perceptual mask exploits masking properties of the human auditory system. The perceptual masking of step **12** is conducted in the frequency domain.

**4**

Perceptual auditory masking is the effect by which a faint but audible sound becomes inaudible in the presence of another louder audible sound that acts as a masker. If two signals which occur simultaneously are close together in frequency, the stronger masking signal will make the weaker masked signal inaudible. The masking threshold of a master signal depends on the frequency, sound pressure level (SPL), and tone-like or noise-like characteristics of both the masker signal and the masked signal. For example, it is easier for a broadband noise to mask a tonal, than for a tonal signal to mask out a broadband noise. Moreover, higher frequencies are more easily masked.

Audio signals consist of telephone quality speech, wide-band speech, and wideband audio. The frequency range for these types of audio signals are 300–3400 Hz for telephone speech signals, 50–7000 Hz for wideband speech range, and 20–20000 Hz for high quality wideband audio. The human ear acts as a frequency analyzer and can detect sounds with frequencies which vary from 10 Hz to 20000 Hz. The human auditory system can be modeled by a set of 26 bandpass filters with bandwidths that increase with increasing frequency. The 26 bands are known as the critical bands. The critical bands are defined around a center frequency in which the noise bandwidth is increased until there is just a noticeable difference in the tone at the center frequency. Thus, if a faint tone lies in the critical band of a louder tone, the faint tone will not be perceptible.

Frequency masking models have already been defined for the perceptual coding of audio signals. In one embodiment, the masking model used is MPEG Audio Psychoacoustic Model 1, as is disclosed in "Information Technology—Coding of moving pictures and associated audio for digital storage media at up to about 1.5 Mbit/s" tech. rep. ISO/IEC 11172(1993). The psychoacoustic model presented in the report provides a masking model for layers 1–3 in the MPEG standard. The calculation of the psychoacoustic model has to be adapted to the corresponding MPEG layer. In general, the input audio stream is filtered into multiple subbands. The model calculates a signal to mask ratio for each subband using the following steps:

1) Calculation of the FFT for time to frequency conversion.

2) Determination of the sound pressure level in each subband.

3) Determination of the threshold in quiet (absolute threshold).

4) Finding of the tonal (more sinusoidal-like) and non-tonal (more noise-like) components of the audio signal.

5) Decimation of the maskers, to obtain only the relevant maskers.

6) Calculation of the individual masking thresholds.

7) Determination of the global masking threshold.

8) Determination of the minimum masking threshold in each subband.

9) Calculation of the signal-to-mask ratio in each subband.

The steps above are further described in section D.1 in Annex D of the technical report.

The report also defines a Psychoacoustic Model 2. Psychoacoustic Model 2 is an independent psychoacoustic model that can be adjusted and adapted to any ISO/IEC 11172-3 layer.

There are three inputs used in Psychoacoustic model 2. They area:

a) The shift length for the threshold calculation process, iblen, where 384<iblen,640. This iblen must remain

6,061,793

5

constant over any particular application of the threshold calculation process.

b) The newest iblen samples of the signal, with the samples delayed (either in the filter bank or psychoacoustic calculation) such that the window of the psychoacoustic calculation is centered in the time-window of application.

c) The sampling rate. There are sets of tables provided for the standard sampling rates. Sampling rate, like iblen must necessarily remain constant over one implementation of the threshold calculation process.

There is one output from Psychoacoustic Model 2, a set of Signal-to-Masking Ratios, $SMR_n$. The steps in calculating the $SMR_n$ are listed below. As those of skill in the art will appreciate, each step typically uses a result from the previous step to determine a result. The steps are:

a) Reconstruct 1024 samples of the input signal, using concatenations of the iblen input samples.

b) Calculate the complex spectrum of the input signal by constructing a 1024 point Hann window, performing a FFT on the window and by calculating a polar transformation of the window. The polar transformation has a magnitude and phase component.

c) Calculate a predicted magnitude and phase components using previous block data.

d) Calculate an unpredictability measure.

e) Calculate the energy and unpredictability in the threshold calculation partitions.

f) Convolve the partitioned energy and unpredictability with a spreading function.

g) Calculate a tonality index using the normalized results from step 6.

h) Calculate the Signal to Noise Ratio in each partition.

i) Calculate the power ratio.

j) Calculate the actual energy threshold.

k) Spread the threshold energy of FFT lines

l) Calculate a final energy threshold of audibility.

m) Perform pre-echo control if using MPEG Layer III

n) Calculate the Signal to Mask (SMR) ratios.

Further details regarding each of the steps described above can be found in section D.2 of Annex D of the technical report.

In step 14, the host data, including the embedded hidden data or watermark, is further subject to a non-frequency mask. Because the perceptual mask in step 12 is a frequency domain mask, a further mask is necessary to ensure that the embedded data remains inaudible in auditory host data. In the case of auditory host data, the non-frequency mask is a temporal mask.

With respect to auditory data, temporal masking refers to both pre- and post-masking. Pre-masking effects render weaker signals inaudible before the stronger mask is turned on, and post-masking effects render weaker signals inaudible after the stronger masker is turned off. Pre-masking occurs from 5–20 msec before the masker is turned on while post-masking occurs from 50–200 msec after the masker is turned off. Such temporal masking is necessary because the perceptual frequency masking does not provide good time localization. In particular, pre-echoes (audible distortion) will be created. In one embodiment of the invention, the embedded data is weighted in the time domain with the relative energy of the signal. The time domain weighting operation attenuates the energy of the computed embedded data. Those skilled in the art, however, will appreciate that

6

any other type of temporal masking can also be used. Temporal masking models are well known in the art.

As have been described, steps 10, 12 and 14 of FIG. 1 provide a general overview of the present invention. Because, however, the invention varies particularly as to whether hidden data is being embedded into the host data, or whether a watermark is being embedded into the host data, the specifics of the implementation of the invention as to watermarking and hidden data embedding are now provided.

Hardware Implementation of the Invention

The present invention is not limited as to the type of computer on which it runs. However, a typical example of such a computer is shown in FIG. 2. Computer 16 is a desktop computer, and may be of any type, including a PC-compatible computer, an Apple Macintosh computer, a UNIX-compatible computer, etc. Computer 16 usually includes keyboard 18, display device 20 and pointing device 22. Display device 20 can be any of a number of different devices, including a cathode-ray tube (CRT), etc. Pointing device 22 as shown in FIG. 2 is a mouse, but the invention is not so limited. Not shown is that computer 16 typically also comprises a random-access memory (RAM), a read-only memory (ROM), a central-processing unit (CPU), a fixed storage device such as a hard disk drive, and a removable storage device such as a floppy disk drive. The computer program to implement the present invention is typically written in a language such as C, although the present invention is not so limited.

Data Hiding Within an Audio Host Data

The embodiment shown in FIG. 3 illustrates the data hiding aspect of the present invention as it relates to host data that is an audio. Referring now to FIG. 3, a block diagram of one embodiment of the invention, in which hidden data is embedded into a sound by using a perceptual mask, is shown. As shown in the diagram, blocks $B_i$ of the sound data (host data) are selected to embed the data $b_i$ which are first spread by signature $S_i$. The set of all data b is hidden one bit at a time in particular block B of the sound data. The notation $b_i$ refers to the I bit of hidden data b, while the notation $B_i$ refers to the I block of host data B. Similarly, the notation $S_i$ refers to the I bit of signature S.

In step 24, data $b_i$ is spread by signature $S_i$. Data $b_i$ can be any type of data: caption information regarding the audio; sound data regarding the audio; etc. Signature $S_i$ can by any type of signature—for example, a pseudo-noise (PN) code as has been already described. Note that step 24 is not required under the present invention. Data b does not have to be spread in order for the invention to function correctly; without spreading against a signature S, those skilled in the art will understand that there is then an implicit "spreading" against a signature S having all 1 bits. However, spreading of the data B is preferable for robustness. In step 26, a discrete cosine transform (DCT) is applied to each block $B_i$ to form a DCT block $F_i$. That is, $F_i$ is the frequency domain equivalent of block $B_i$. Transforming the host data into the frequency domain is necessary in order to properly apply the perceptual mask according to the present invention.

In step 28, the perceptual mask is applied to each block $F_i$ to generate a masked block $M_i$ corresponding to $F_i$. The perceptual mask according to the present invention takes into account the human auditory system so that the hidden data is embedded within the host data in a manner that makes the hidden data inaudible within the host data. The invention is not limited to any particular perceptual mask; however, as has already been described in conjunction with the general overview of the invention, one particular perceptual mask for auditory data has been used. Therefore,

6,061,793

7

reference to the discussion provided earlier should be made in order for further understanding thereto.

In step 30, a bit $b_i$ is hidden in block $F_i$ by modifying the DCT coefficients according to the equation

$$F_i'(j,k) = ([F_i(j,k)/M_i(j,k)] + (\%)b_i S_i(j,k)) M_i(j,k),$$

where [•] denotes the rounding operation. In step 32, the original blocks $B_i$ are replaced by the inverse DCT's of the modified blocks $F_i'$. Finally, in step 34, temporal masking is applied to the data. The invention is not limited to any particular temporal mask. One particular temporal mask for host data that is a sound has already been described in conjunction with the general overview of the invention, and reference should be made to that discussion for further understanding thereto. Temporal masking ensures that the embedded data is indeed hidden (i.e., inaudible) within the host data as examined by the human ear.

As has been described, the method shown in FIG. 3 provides for data embedding with sound according to a perceptual auditory mask and a temporal mask. The method of FIG. 3 also provides for robust data embedding. Spreading the hidden data in step 24 ensures that a filter cutting off the low frequencies of the data will not corrupt the data. Furthermore, the method provides for inaudible data embedding, in that the mask of step 28 is perceptual such that the data is then embedded in step 30 in places within the sound which are imperceptible to the human ear. The temporal mask in step 34 complements the perceptual mask, and further ensures that the embedded hidden data is inaudible.

Those skilled in the art will recognize that the method shown in FIG. 3 is largely reversible such that extraction of the embedded data from sounds having embedded data is possible. Given a sound with (possibly modified) embedded hidden data blocks $F_i''$, the data bit $b_i$ may be recovered by forming the difference

$$\hat{b}_i = \sum_{j,k} M_i'(j,k) \mathrm{sgn}\left( \frac{F_i''(j,k)}{M_i'(j,k)} - \left[ \frac{F_i''(j,k)}{M_i'(j,k)} \right] \right)$$

where $M_i'$ is the frequency mask estimated by the receiver times the signature $S_i$, i.e., $M_i' = M_i^{est} * S_i$, and $\mathrm{sgn}(\bullet)$ is the sign value. The bit decision for block $B_i$ is weighted by the mask $M_i'$. The bit error rate (BER) of this scheme is zero when no distortion is present in the received sound. A simple expression for the upper bound of the BER when zero mean Gaussian noise with variance $\sigma^2$ is added to the signal can be derived. Without loss of generality, assume that $b_i=1$. A decision error occurs for coefficient $F''(j,k)$ whenever the magnitude of a noise sample $|w(j,k)|$ falls in one of the intervals

$$\left[ \frac{(4n+1)M(j,k)}{4}, \frac{(4n+3)M(j,k)}{4} \right] = I_n$$

for $n=0, 1, 2, \ldots$. Using the complementary error function er fc(•), the probability of error for coefficient $F''(j,k)$ may be written as

$$P_e(F''(j,k), \sigma) = 2 \sum_{n=0}^{\infty} erfc\left( \frac{I_n}{\sigma} \right).$$

For $\sigma$ fixed, $P_e(F''(j,k),\sigma)$ decreases as $M(j,k)$ increases. Therefore, the receiver places more weight on coefficients

8

with large masking values. The overall probability of error for bit $b_i$ is a weighted combination of the $P_e(F''(j,k),\sigma)$ in block $B_i$.

Watermark Generation for Sound Host Data

The embodiment shown in FIG. 4 illustrate the watermark generation aspect of the present invention as it relates to host data that is a sound. Referring now to FIG. 4(a), a block diagram of one embodiment of the invention, in which a watermark for audio sound host data is generated, is shown. The basic watermarking process starts with a PN-sequence 35. Maximum 35. Maximum length PN-sequences are used because they provide an easy way to generate a unique code for an author's identification. Like random binary sequences, PN sequences have 0's and 1's that occur with equal probabilities. The autocorrelation function (ACF) of such a PN-sequence has period N and is binary valued. Because of the periodicity of the ACF, the PN sequence is self-clocking. This allows the author of the host data to synchronize with the embedded watermark during the detection process. This is important if the signal is cropped and resampled.

To actually generate the watermark, a masking threshold of the signal is first calculated using the MPEG Audio Psychoacoustic Model 1, as previously described. In step 36, the audio data is segmented into blocks, specifically audio segments of 512 samples each. Each audio segment (block) is weighted with a Hanning window. Consecutive blocks overlap by fifty percent. In step 38, a fast Fourier transform (FFT) is used to convert the segments to the frequency domain, and in step 40, the masking threshold is approximated with a 10th order all-pole filter, M(w), using a least squares criterion, which is part of the MPEG Audio Psychoacoustic Model 1. Note that this is the perceptual masking of the watermark, as represented by PN-sequence 35, in the frequency domain. Thus, the PN-sequence is filtered with the approximate masking filter, M(w), in order to ensure that the spectrum of the watermark is below the masking threshold (i.e., so that it cannot be heard or perceived by the human ear).

Since the spectral content of the audio signal changes with time, watermarks added to different blocks will be in general different even if they are generated from the same starting PN-sequence. However, it is preferable to use different PN-sequences for different blocks to make the statistical detection by an unauthorized user of the watermark more difficult. Note also that using long PN-sequences or embedding long cryptographic digital signatures also helps in this respect.

Frequency domain shaping is not enough to guarantee that the watermark will be inaudible. Frequency domain masking computations are based on Fourier analysis. A fixed length FFT does not provide good time localization. In particular, a watermark computed using frequency domain masking will spread in time over the entire analysis block. If the signal energy is concentrated in a time interval that is shorter than the analysis block length, the watermark is not masked outside of that subinterval. This then leads to audible distortion, e.g., pre-echoes. To address this problem, the watermark is weighted in the time domain with the relative energy of the signal.

Thus, in step 42, the resulting masked watermark is scaled by scale factor 44, and then in step 46 is scaled by the audio signal as each segment thereof has been weighted with a Hanning window in step 36 and as has then been extracted by an extract envelope in step 48. The resulting scaled masked watermark is in step 50 added to the audio signal as each segment thereof has been weighted with a Hanning window in step 36. In step 52, the resulting signal undergoes quantization.

6,061,793

**9**

The time domain weighting operating attenuates the energy of the computed watermark. In particular, watermarks obtained as has been described have amplitudes that are typically smaller than the quantization step size. Therefore, the watermark would be lost during the quantization process. Note that detection performance is directly proportional to the energy of the watermark. It has been found that it is possible to prevent watermark loss during quantization in step 52 and improve detection performance by amplifying the watermark by 40 dB before weighting it in the domain with the relative energy of the signal. It has been found experimentally that this amplification does not affect the audibility of the watermark because of the attenuation effect of the time domain weighting operating.

Referring now to FIG. 4(b), a block diagram of a method effectuating watermark generation for audio data according to the present invention is shown. It has been found that because most of the energy of an audio watermark lies in low frequencies, an optimal way to detect the low frequency watermarking information is to generate a low-frequency watermark as the difference between a low bit rate coded/decoded watermarked signal and the coded/decoded original signal at the same bit rate. Watermarking itself is accomplishing using the watermarking scheme described in conjunction with FIG. 4(a). The low bit rate chosen to implement this operation is the minimal bit rate for which near-transparent audio coding is known to be possible for signals sampled at the rate of the original signal. This scheme is more effective than other schemes that may attempt to add the watermark on a lowpass filtered version of the signal because the coding/decoding operation is not a liner operation and does not permute with the watermarking operation.

Thus, in steps 54 and 56, the audio signal undergoes coding and decoding at low bit rates. In step 58, a watermark is generated as has been described in conjunction with FIG. 4(a), which is then also coded and decoded in step 60. In step 62, the audio signal is, the coded and decoded audio signal is subtracted from the audio signal itself, a watermark for the resulting difference (error) then being generated in step 64 as has been described in conjunction with FIG. 4(a). The resulting difference is then subtracted from the watermark in step 66. Similarly, in step 68 the watermark generated in step 58 and coded and decoded in step 60 has subtracted from it the audio signal as coded and decoded in step 56. The signals resulting from steps 66 and 68 are added together in step 70, to which the audio signal itself is added in step 72 to generate the audio signal including a watermark.

Note that the signal output from step 68 is shown as wbr in FIG. 4(b), where notation br refers to the bit rate of the coder/decoder. Furthermore, for optimal watermark detection performance at higher bit rates, watermarking information is needed to be added in the higher frequency bands. This is done by producing the watermark werr for the coding error, which is the signal resulting from step 66. The coding error is the difference between the original audio signal and its low bit rate coded version. The watermark werr is computed using the watermarking scheme described in conjunction with FIG. 4(a). The final watermark output in step 70 is thus the sum of the low-frequency watermark and the coding error watermark.

As has been described, the methods shown in FIG. 4(a) and FIG. 4(b) provide for watermarking a sound according to a perceptual mask (frequency domain) and a temporal mask (i.e., time-domain weighting). The watermark embedded within the sound host data according to these method should be extractable even if common signal processing operations are applied to the host data. This is particularly

**10**

true in the case of deliberate unauthorized attempts to remove the watermark. For example, a pirate may attempt to add noise, filter, code, re-scale, etc., an image in an attempt to destroy the watermark. The embedded watermark, however, is noise-like and its location over multiple blocks of the data is unknown. Therefore, the pirate has insufficient knowledge to directly remove the watermark. Furthermore, a different signature is preferably used for each block to further reduce unauthorized watermark removal by cross-correlation. Therefore, any destruction attempts are done blindly.

To detect whether a watermark is within a host sound data, the author of the data has access of the original signal S (that is, the original host data), and the signature. Detection of the watermark is accomplished via hypothesis testing:

$$H_0: X=R-S=N \qquad\qquad \text{(No watermark)}$$

$$H_1: X=R-S=W'+N \qquad\qquad \text{(Watermark)}$$

where R is the potentially pirated signal, W' is the potentially modified watermark, and N is noise. The correct hypothesis is obtained by applying a correlating detector on X with W and comparing with a threshold. In some cases, a generalized likelihood ratio test must be applied.

Although specific embodiments have been illustrated and described herein, it will be appreciated by those of ordinary skill in the art that any arrangement which is calculated to achieve the same purpose may be substituted for the specific embodiments shown. This application is intended to cover any adaptations or variations of the present invention. Therefore, it is manifestly intended that this invention be limited only by the following claims and equivalents thereof.

I claim:

1. A computerized method for embedding data into host data representing human-perceptible sounds comprising:

   inputting the data;

   embedding the data into the host data in accordance with a perceptual mask conducted in the frequency domain; and,

   further wherein the embedded data is embedded in accordance with a perceptual mask conducted in the temporal domain.

2. The computerized method of claim 1, wherein the data embedded into the host data comprises data representing a watermark acting as a unique identifier for the host data.

3. The computerized method of claim 2, wherein the watermark comprises a pseudo-noise (PN) sequence.

4. The computerized method of claim 1, wherein the data embedded into the host data comprises data spread against data representing a signature according to a spread-spectrum technique.

5. The computerized method of claim 4, wherein the signature comprises a pseudo-noise (PN) sequence.

6. A computerized system for hiding hidden data having a plurality of bits within a host data representing human-perceptible sounds comprising:

   a processor;

   a computer-readable medium;

   computer-executable instructions executed by the processor from the computer-readable medium comprising:

   segmenting the host data into a plurality of blocks;

   applying a discrete cosine transform (DCT) to each block of the host data to generate a frequency block corresponding to the block of host data;

   applying a perceptual mask to each frequency block;

**11**

embedding each bit of the hidden data into a corresponding frequency block; and,

applying an inverse DCT to each frequency block to generate the host data having the hidden data embedded therein.

**7**. The computerized system of claim **6**, wherein the instructions further comprise spreading each bit of the hidden data by a signature after selecting a plurality of blocks of the host data.

**8**. The computerized system of claim **6**, wherein the instructions further comprise applying a temporal mask to the host data having the hidden data embedded therein.

**9**. A computer-readable medium having a computer program stored thereon to cause a suitably equipped computer to perform the method comprising:

segmenting host data representing human-perceptible sounds into a plurality of blocks;

spreading each of a plurality of bits of hidden data by a signature;

applying a discrete cosine transform (DCT) to each block of the host data to generate a frequency block corresponding to the block of host data;

applying a perceptual mask to each frequency block;

embedding each bit of the hidden data, as spread by the signature, into a corresponding frequency block;

applying an inverse DCT to each frequency block to generate the host data having the hidden data embedded therein; and,

applying a temporal mask to the host data having the hidden data embedded therein.

**10**. The computer-readable medium of claim **9**, wherein the medium is a floppy disk.

**11**. A computerized method for generating a watermark to embed into host data representing human-perceptible sounds comprising:

generating a watermark sequence;

calculating a masking threshold;

frequency-domain shaping the watermark sequence utilizing the masking threshold; and,

time-domain weighting the watermark sequence after the watermark sequence has been frequency-domain shaped.

**12**. The computerized method of claim **11**, wherein the watermark sequence comprises a PN-sequence.

**13**. The computerized method of claim **11**, wherein the masking threshold is calculated using the MPEG Audio Psychoacoustic Model 1 or 2.

**14**. A computerized system for embedding a watermark into host data representing human-perceptible sounds comprising:

a processor;

a computer-readable medium;

a computer-executable instructions executed by the processor from the computer-readable medium comprising:

low-bit rate coding and decoding the host data;

generating a first interim watermark on the signal comprising of the host signal minus the low-bit rate coded and decoded host signal;

generating a second interim watermark comprising of the difference between the low-bit rate coded and decoded host signal minus the watermarked and low-bit rate coded and decoded host signal;

adding the first interim watermark to the second interim watermark to obtain the watermark; and

**12**

adding the watermark to the host data.

**15**. The computerized system of claim **14**, wherein at least one of the first interim watermark and the second interim watermark is generated by performing a method comprising:

generating a watermark sequence;

calculating a masking threshold;

frequency-domain shaping the watermark sequence utilizing the masking threshold; and,

time-domain weighting the watermark sequence after the watermark sequence has been frequency-domain shaped.

**16**. A computer-readable medium having a computer program stored thereon to cause a suitably equipped computer to perform the method comprising:

low-bit rate coding and decoding host data representing a human-perceptible sound;

generating a first interim watermark on the signal comprising of the host signal minus the low-bit rate coded and decoded host signal;

generating a second interim watermark comprising of the difference between the low-bit rate coded and decoded host signal minus the watermarked and low-bit rate coded and decoded host signal;

adding the first interim watermark to the second interim watermark to obtain the watermark; and

adding the watermark to the host data.

**17**. The computer-readable medium of claim **16**, wherein the computer-readable medium is a floppy disk.

**18**. The method according to claim **1** wherein the perceptual mask conducted in the temporal domain occurs prior to the perceptual mask conducted in the frequency domain.

**19**. The method according to claim **1** wherein the data to be embedded is adjusted according to the frequency masking thresholds and not the temporal masking thresholds.

**20**. The method according to claim **1** wherein the data to be embedded is adjusted according to the temporal masking thresholds and not the frequency masking thresholds.

**21**. The method according to claim **1** wherein the perceptual mask in the frequency domain is computed based on perceptual characteristics of the host data frequency content.

**22**. The method according to claim **1** wherein the perceptual mask in the temporal domain is computed based on perceptual characteristics of the host data temporal content.

**23**. The method according to claim **1** wherein the embedding function consists of a nonlinear rounding operation which adjusts frequency and/or temporal samples of the host audio data by rounding the audio data according to a quantization threshold based on the corresponding frequency and/or temporal mask;

setting rounded value to a preset value to represent the embedded data bit; and

reconstructing the audio by reversing the quantization operation.

**24**. The method according to claim **6** where the discrete cosine transform (DCT), a specific frequency transform, is replaced by a general frequency transform.

**25**. The method according to claim **16** wherein the perceptual mask conducted in the temporal domain occurs prior to the perceptual mask conducted in the frequency domain.

**26**. The method according to claim **16** wherein the data to be embedded is adjusted according to the frequency masking thresholds and not the temporal masking thresholds.

**27**. The method according to claim **16** wherein the data to be embedded is adjusted according to the temporal masking thresholds and not the frequency masking thresholds.

6,061,793

13

**28**. The method according to claim **16** wherein the perceptual mask in the frequency domain is computed based on perceptual charactertistics of the host data frequency content.

**29**. The method according to claim **16** wherein the perceptual mask in the temporal domain is computed based on perceptual characteristics of the host data temporal content.

**30**. The method according to claim **16** wherein the embedding function consists of a nonlinear rounding operation which adjusts frequency and/or temporal samples of the host

14

audio data by rounding the audio data according to a quantization threshold based on the corresponding frequency and/or temporal mask;

setting rounded value to a preset value to represent the embedded data bit; and

reconstructing the audio by reversing the quantization operation.

\*   \*   \*   \*   \*

# EXHIBIT E

US008489884B2

(12) **United States Patent**
Srinivasan

(10) Patent No.: **US 8,489,884 B2**
(45) Date of Patent: **Jul. 16, 2013**

(54) **METHODS AND APPARATUS FOR GENERATING SIGNATURES**

(75) Inventor: **Venugopal Srinivasan**, Palm Harbor, FL (US)

(73) Assignee: **The Nielsen Company (US), LLC**, Schaumburg, IL (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 47 days.

(21) Appl. No.: **12/822,777**

(22) Filed: **Jun. 24, 2010**

(65) **Prior Publication Data**

US 2010/0262642 A1     Oct. 14, 2010

**Related U.S. Application Data**

(63) Continuation of application No. 11/676,452, filed on Feb. 19, 2007, which is a continuation of application No. PCT/US2005/029623, filed on Aug. 18, 2005.

(60) Provisional application No. 60/603,024, filed on Aug. 18, 2004.

(51) **Int. Cl.**
*H04L 9/00*     (2006.01)
*G06F 17/14*     (2006.01)

(52) **U.S. Cl.**
USPC ............... **713/176**; 713/179; 725/19; 725/20; 380/239; 381/94.3; 382/119; 382/309

(58) **Field of Classification Search**
USPC ............ 713/176, 179; 380/202, 239; 725/19, 725/20; 708/400; 381/94.3; 382/119, 309
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,230,990 A | 10/1980 | Lert, Jr. et al. | |
| 4,450,531 A | 5/1984 | Kenyon et al. | |
| 4,677,466 A | 6/1987 | Lert et al. | |
| 4,697,209 A | 9/1987 | Kiewit et al. | |
| 4,739,398 A | 4/1988 | Thomas et al. | |
| 4,843,562 A | 6/1989 | Kenyon et al. | |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| AU | 718227 | 11/1997 |
| AU | 747044 | 9/2000 |

(Continued)

OTHER PUBLICATIONS

Qibin Sun et al, A robust and secure media signature scheme for JPEG images, pp. 296-299, IEEE 2002.*

(Continued)

*Primary Examiner* — David Garcia Cervetti
*Assistant Examiner* — Shanto M Abedin
(74) *Attorney, Agent, or Firm* — Hanley, Flight & Zimmerman, LLC

(57)     **ABSTRACT**

Methods, apparatus, and articles of manufacture for media monitoring are disclosed. In particular, the example methods, apparatus, and articles of manufacture generate signatures. Initially, a first plurality of filtered values are identified by performing a wavelet transform on a first frame of media samples. A first energy value is determined based on a first portion of the first plurality of filtered values, and a second energy value is determined based on a second portion of the first plurality of filtered values. A first descriptor of the first frame of media samples is determined based on a comparison of the first energy value and the second energy value. A first signature is generated based on the first descriptor.

**19 Claims, 12 Drawing Sheets**



**US 8,489,884 B2**

Page 2

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,931,871 A | 6/1990 | Kramer | |
| 4,945,412 A | 7/1990 | Kramer | |
| 4,947,436 A | 8/1990 | Greaves et al. | |
| 5,019,899 A | 5/1991 | Boles et al. | |
| 5,436,653 A | 7/1995 | Ellis et al. | |
| 5,437,050 A | 7/1995 | Lamb et al. | |
| 5,450,490 A | 9/1995 | Jensen et al. | |
| 5,481,294 A | 1/1996 | Thomas et al. | |
| 5,485,518 A | 1/1996 | Hunter et al. | |
| 5,504,518 A | 4/1996 | Ellis et al. | |
| 5,572,246 A | 11/1996 | Ellis et al. | |
| 5,581,658 A | 12/1996 | O'Hagan et al. | |
| 5,612,729 A | 3/1997 | Ellis et al. | |
| 5,621,454 A | 4/1997 | Ellis et al. | |
| 5,809,160 A | 9/1998 | Powell et al. | |
| 5,822,436 A | 10/1998 | Rhoads | |
| 5,826,164 A | 10/1998 | Weinblatt | |
| 5,875,122 A | 2/1999 | Acharya | |
| 5,909,518 A | 6/1999 | Chui | |
| 5,918,223 A | 6/1999 | Blum et al. | |
| 6,061,793 A | 5/2000 | Tewfik et al. | |
| 6,072,888 A | 6/2000 | Powell et al. | |
| 6,122,392 A | 9/2000 | Rhoads | |
| 6,175,627 B1 | 1/2001 | Petrovic et al. | |
| 6,226,387 B1 * | 5/2001 | Tewfik et al. | 382/100 |
| 6,230,176 B1 | 5/2001 | Mizutani | |
| 6,240,062 B1 | 5/2001 | Kozaki et al. | |
| 6,253,182 B1 | 6/2001 | Acero | |
| 6,266,430 B1 | 7/2001 | Rhoads | |
| 6,272,176 B1 * | 8/2001 | Srinivasan | 375/240 |
| 6,330,335 B1 | 12/2001 | Rhoads | |
| 6,366,937 B1 | 4/2002 | Shridhar et al. | |
| 6,385,330 B1 | 5/2002 | Powell et al. | |
| 6,404,898 B1 | 6/2002 | Rhoads | |
| 6,421,445 B1 | 7/2002 | Jensen et al. | |
| 6,459,803 B1 | 10/2002 | Powell et al. | |
| 6,466,670 B1 | 10/2002 | Tsuria et al. | |
| 6,469,749 B1 | 10/2002 | Dimitrova et al. | |
| 6,477,269 B1 * | 11/2002 | Brechner | 382/165 |
| 6,496,591 B1 | 12/2002 | Rhoads | |
| 6,504,870 B2 | 1/2003 | Srinivasan | |
| 6,513,161 B2 | 1/2003 | Wheeler et al. | |
| 6,542,620 B1 | 4/2003 | Rhoads | |
| 6,556,689 B1 * | 4/2003 | Xia et al. | 382/100 |
| 6,560,349 B1 | 5/2003 | Rhoads | |
| 6,560,350 B2 | 5/2003 | Rhoads | |
| 6,567,780 B2 | 5/2003 | Rhoads | |
| 6,574,594 B2 | 6/2003 | Pitman et al. | |
| 6,597,405 B1 | 7/2003 | Iggulden | |
| 6,604,072 B2 | 8/2003 | Pitman et al. | |
| 6,614,915 B2 | 9/2003 | Powell et al. | |
| 6,633,651 B1 | 10/2003 | Hirzalla et al. | |
| 6,647,129 B2 | 11/2003 | Rhoads | |
| 6,647,130 B2 | 11/2003 | Rhoads | |
| 6,675,383 B1 | 1/2004 | Wheeler et al. | |
| 6,678,392 B2 | 1/2004 | Powell et al. | |
| 6,714,683 B1 | 3/2004 | Tian et al. | |
| 6,757,407 B2 | 6/2004 | Bruckstein et al. | |
| 6,799,274 B1 | 9/2004 | Hamlin | |
| 6,839,673 B1 | 1/2005 | Choi et al. | |
| 6,879,652 B1 * | 4/2005 | Srinivasan | 375/377 |
| 6,959,386 B2 | 10/2005 | Rhoads | |
| 6,968,337 B2 | 11/2005 | Wold | |
| 6,971,010 B1 * | 11/2005 | Abdel-Mottaleb | 713/176 |
| 7,006,555 B1 * | 2/2006 | Srinivasan | 375/133 |
| 7,073,065 B2 | 7/2006 | Stone | |
| 7,120,562 B1 | 10/2006 | Wilson | |
| 7,221,902 B2 * | 5/2007 | Kopra et al. | 455/3.05 |
| 7,269,338 B2 | 9/2007 | Janevski | |
| 7,284,128 B2 | 10/2007 | Sako | |
| 7,512,801 B1 | 3/2009 | Akiyama et al. | |
| 7,562,012 B1 | 7/2009 | Wold et al. | |
| 7,711,123 B2 * | 5/2010 | Crockett | 381/56 |
| 7,783,889 B2 * | 8/2010 | Srinivasan | 713/179 |
| 2001/0005823 A1 | 6/2001 | Fischer et al. | |
| 2001/0029580 A1 | 10/2001 | Moskowitz | |
| 2002/0010917 A1 * | 1/2002 | Srikantan et al. | 725/1 |
| 2002/0178410 A1 | 11/2002 | Haitsma et al. | |
| 2002/0186768 A1 | 12/2002 | Dimitrova et al. | |
| 2003/0005430 A1 | 1/2003 | Kolessar | |
| 2003/0036910 A1 | 2/2003 | Van Der Veen et al. | |
| 2003/0086341 A1 | 5/2003 | Wells et al. | |
| 2003/0123743 A1 * | 7/2003 | Zandi et al. | 382/240 |
| 2003/0131350 A1 | 7/2003 | Peiffer et al. | |
| 2003/0156827 A1 * | 8/2003 | Janevski | 386/96 |
| 2003/0202660 A1 * | 10/2003 | Zhou et al. | 380/210 |
| 2003/0223584 A1 * | 12/2003 | Bradley et al. | 380/229 |
| 2004/0212679 A1 | 6/2004 | Neuhauser et al. | |
| 2004/0210922 A1 | 10/2004 | Peiffer et al. | |
| 2005/0257064 A1 * | 11/2005 | Boutant et al. | 713/180 |
| 2005/0257099 A1 * | 11/2005 | Bounkong et al. | 714/48 |
| 2005/0262350 A1 * | 11/2005 | Boutant et al. | 713/176 |
| 2006/0088194 A1 * | 4/2006 | Lee et al. | 382/119 |
| 2006/0107057 A1 | 5/2006 | Lewis et al. | |
| 2006/0184961 A1 | 8/2006 | Lee et al. | |
| 2006/0195861 A1 * | 8/2006 | Lee | 725/19 |
| 2006/0257028 A1 * | 11/2006 | Laurent et al. | 382/191 |
| 2007/0033409 A1 * | 2/2007 | Brunk et al. | 713/176 |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| EP | 0887958 | 12/1998 |
| EP | 0987855 | 3/2000 |
| JP | 3173291 | 7/1991 |
| WO | 0079709 | 12/2000 |
| WO | 02065782 | 8/2002 |
| WO | 2005/006768 | 1/2005 |

OTHER PUBLICATIONS

Amara Graps, An introduction to Wavelets, pp. 1-18, IEEE 1995.*
Schneider et al., "A Robust Content Based Digital Signature for Image Authentication," Columbia University, 1996, 4 pages.
Jeffrey D. Taft, PhD., "DSP Design Performance—Breaking barriers in Digital Signal Processing . . . with new design 1 tools," 2001, [retrieved from http://www.nauticom.neUwww.jdtaftIDFT_increm. htm, accessed on Jan. 19, 2004], 1 page.
Mexican Institute of Industrial Property issued on Jul. 16, 2009, The result of Substantive Examination (including English Translation) in Mexican patent application No. MX/a/2007/002071, 3 pages with 3 pages English Translation.
International Preliminary Examining Authority, "PCT International Preliminary Examination Report," issued on May 6, 2008, in connection with International application No. PCT/US2005/029623 (9 pages).
International Searching Authority, "International Search Report," on Feb. 6, 2008, in connection with International application No. PCT/US2005/029623 (3 pages).
Graps, Amara, "An Introduction to Wavelets," Institute of Electrical and Electronics Engineers, Inc., Summer 1995, Los Alamitos, USA (18 pages).
Haitsma et al., "Robust Audio Hashing for Content Identification," Philips Research, Eindhoven, NL, http://cite.seer.ist.psu.edu/haitsma01 robust.html, 2001 (8 pages).
Conner, Margery, "Advantages of the Sliding-Mode DFT," www.edn.com, Jan. 9, 2002 (1 page).
International Searching Authority, "Written Opinion," on Feb. 6, 2008, in connection with a International application No. PCT/US2005/029623 (4 pages).

* cited by examiner



FIG. 1A



FIG. 1B



FIG. 2



FIG. 3



FIG. 4



FIG. 5



FIG. 6



FIG. 7



FIG. 8



FIG. 9



FIG. 10



FIG. 11



FIG. 12

US 8,489,884 B2

1

# METHODS AND APPARATUS FOR GENERATING SIGNATURES

## RELATED APPLICATIONS

This patent is a continuation of U.S. patent application Ser. No. 11/676,452, filed Feb. 19, 2007, which is a continuation of International Patent Application Serial No. PCT/US2005/029623, filed Aug. 18, 2005, which claims the benefit of U.S. Provisional Application Ser. No. 60/603,024, filed on Aug. 18, 2004, all of which are hereby incorporated herein by reference in their entireties.

## FIELD OF THE DISCLOSURE

The present disclosure relates generally to media monitoring and, more particularly, to methods and apparatus for generating signatures for use in identifying media information.

## BACKGROUND

Identifying media information and more specifically audio streams (e.g., audio information) using signature-matching techniques is well known. Known signature-matching techniques are often used in television and radio audience metering applications and are implemented using several known methods for generating and matching signatures. For example, in television audience metering applications, signatures are generated at monitoring sites (e.g., monitored households) and reference sites. Monitoring sites typically include locations such as, for example, households where the media consumption of audience members is monitored. For example, at a monitoring site, monitored signatures may be generated based on audio streams associated with a selected channel, radio station, etc. The monitored signatures may then be sent to a central data collection facility for analysis. At a reference site, signatures, typically referred to as reference signatures, are generated based on known programs that are provided within a broadcast region. The reference signatures may be stored at the reference site and/or a central data collection facility and compared with monitored signatures generated at monitoring sites. A monitored signature may be found to match with a reference signature and the known program corresponding to the matching reference signature may be identified as the program that was presented at the monitoring site.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIGS. 1A and 1B illustrate example audio stream identification systems for generating digital spectral signatures and identifying audio streams.

FIG. 2 is a time-domain representation of an example monitored audio stream and a plurality of audio sample frames acquired from the monitored audio stream.

FIG. 3 is a time-domain representation of an example reference audio stream and a plurality of audio sample frames acquired from the example reference audio stream.

FIG. 4 is a flow diagram of an example method for generating digital spectral signatures based on spectral decompositions.

FIG. 5 is a flow diagram of an example method for generating descriptors associated with the example method of FIG. 4.

2

FIG. 6 is a flow diagram of another example method for generating digital spectral signatures based on spectral decompositions.

FIG. 7 is a flow diagram of an example method for generating descriptors associated with the example method of FIG. 6.

FIG. 8 is a flow diagram of an example method for comparing the digital spectral signatures generated using the example methods of FIGS. 4-7.

FIG. 9 is a block diagram of an example signature generation system for generating digital spectral signatures based on audio streams.

FIG. 10 is a block diagram of another example signature generation system for generating digital spectral signatures based on audio streams.

FIG. 11 is a block diagram of an example signature comparison system for comparing digital spectral signatures.

FIG. 12 is a block diagram of an example processor system that may be used to implement the methods and apparatus described herein.

## DETAILED DESCRIPTION

Although the following discloses example systems including, among other components, software executed on hardware, it should be noted that such systems are merely illustrative and should not be considered as limiting. For example, it is contemplated that any or all of these hardware and software components could be embodied exclusively in hardware, exclusively in software, or in any combination of hardware and software. Accordingly, while the following describes example systems, persons of ordinary skill in the art will readily appreciate that the examples provided are not the only way to implement such systems.

The methods and apparatus described herein generally relate to generating digital spectral signatures, which may be used to identify media information. In particular, the disclosed methods and apparatus are described with respect to generating digital spectral signatures based on audio streams (e.g., audio information). However, the methods and apparatus described herein may also be used to generate digital spectral signatures based on any other type of media information such as, for example, video information, web pages, still images, computer data, etc. Further, the media information may be associated with broadcast information (e.g., television information, radio information, etc.), information reproduced from any storage medium (e.g., compact discs (CD), digital versatile discs (DVD), etc.), or any other information that is associated with an audio stream, a video stream, or any other media information for which the digital spectral signatures are generated. In one particular example, the audio streams are identified based on digital spectral signatures that include monitored digital signatures generated at a monitoring site (e.g., a monitored household) and reference digital signatures generated and/or stored at a reference site and/or a central data collection facility.

As described in detail below, the methods and apparatus described herein identify media information including audio streams based on digital spectral signatures. The digital spectral signatures may be formed using digital descriptors that are generated based on the spectral components of an audio stream and that may be analyzed using frequency transforms and/or wavelet transforms.

Unlike known methods in the prior art that use interframe operations (i.e., operations based on sample data within different data sample frames) to generate digital spectral signatures, the methods and apparatus described herein may be

US 8,489,884 B2

**3**

implemented using intraframe operations (e.g., operations based on sample data within a single frame). Intraframe operations may include, for example, comparison operations, determining percentage differences between values, etc. that are performed on two or more values (e.g., spectral power values) that are uniquely associated with or derived from a single frame. For example, using the methods and apparatus described herein, a digital spectral signature may be generated by obtaining a frame of media samples, determining spectral power values by performing a spectral transform (e.g., a FFT, a wavelet transform, etc.) on the frame of media samples, and performing an intraframe operation (e.g., a comparison) based on two or more spectral power values that are uniquely associated with the frame of media samples.

Frequency components of an audio signal are typically generated by transforming the audio signal data (e.g., an audio stream) from the time domain to the frequency domain using, for example, a Fourier Transform. The Fourier Transform can be used to analyze the frequency components in an audio stream and identify the spectral power of each frequency component. The spectral powers may then be used to generate digital spectral signatures.

Digital spectral signatures may also be generated based on wavelet transforms which transform audio data from the time domain to the wavelet domain. In general, wavelet transforms may be used to decompose blocks or frames of data (e.g., time domain audio samples) into multiple sub-bands, thereby allowing data sets to be analyzed at various scales and/or resolutions. By separating data into multiple sub-bands, a wavelet transform may be used to analyze each time interval of data at a desired scale or resolution.

Monitored signatures may be generated at a monitoring site based on audio streams associated with media information (e.g., a monitored audio stream) that is consumed by an audience. For example, a monitored signature may be generated based on the audio track of a television program presented at a monitoring site. The monitored signature may then be communicated to a central data collection facility for comparison to one or more reference signatures.

Reference signatures are generated at a reference site and/or a central data collection facility based on audio streams associated with known media information. The known media information may include media that is broadcast within a region, media that is reproduced within a household, media that is received via the internet, etc. Each reference signature is stored in a memory with media identification information such as, for example, a song title, a movie title, etc. When a monitored signature is received at the central data collection facility, the monitored signature is compared with one or more reference signatures until a match is found. This match information may then be used to identify the media information (e.g., monitored audio stream) from which the monitored signature was generated. For example, a look-up table or a database may be referenced to retrieve a media title, a program identity, an episode number, etc. that corresponds to the media information from which the monitored signature was generated.

As described below in connection with FIGS. 2 and 3, more reference signatures are generated at a reference site and/or a central data collection facility for a given audio stream than monitored signatures generated for a given audio stream at a monitoring site. In particular, the reference signatures generated for an audio stream (i.e., a reference audio stream) overlap in time. More specifically, the starting reference time or timestamp of each reference signature is shifted by a relatively small amount of time from the starting reference time or timestamp of a previous reference signature. In this man-

**4**

ner, a monitored signature generated at a monitoring site and having a substantially arbitrary reference time may be aligned and/or matched with at least one of the reference signatures generated for a reference audio stream. As a result of the relatively fewer number of monitored signatures generated at the monitoring site, monitored signatures may be generated by processor systems and/or hardware devices having relatively less computing power and/or memory than processor systems and/or hardware devices used to generate reference signatures.

FIGS. 1A and 1B illustrate example audio stream identification systems 100 and 150 for generating digital spectral signatures and identifying audio streams. The example audio stream identification systems 100 and 150 may be implemented as a television broadcast information identification system and a radio broadcast information identification system, respectively. The example audio stream identification system 100 includes a monitoring site 102 (e.g., a monitored household), a reference site 104, and a central data collection facility 106.

Monitoring television broadcast information involves generating monitored signatures at the monitoring site 102 based on the audio data of television broadcast information and communicating the monitored signatures to the central data collection facility 106 via a network 108. Reference signatures may be generated at the reference site 104 and may also be communicated to the central data collection facility 106 via the network 108. The audio content represented by a monitored signature that is generated at the monitoring site 102 may be identified at the central data collection facility 106 by comparing the monitored signature to one or more reference signatures until a match is found. Alternatively, monitored signatures may be communicated from the monitoring site 102 to the reference site 104 and compared one or more reference signatures at the reference site 104. In another example, the reference signatures may be communicated to the monitoring site 102 and compared with the monitored signatures at the monitoring site 102.

The monitoring site 102 may be, for example, a household for which the media consumption of an audience is monitored. In general, the monitoring site 102 may include a plurality of media delivery devices 110, a plurality of media presentation devices 112, and a signature generator 114 that is used to generate monitored signatures associated with media presented at the monitoring site 102.

The plurality of media delivery devices 110 may include, for example, set top box tuners (e.g., cable tuners, satellite tuners, etc.), DVD players, CD players, radios, etc. Some or all of the media delivery devices 110 such as, for example, set top box tuners may be communicatively coupled to one or more broadcast information reception devices 116, which may include a cable, a satellite dish, an antenna, and/or any other suitable device for receiving broadcast information. The media delivery devices 110 may be configured to reproduce media information (e.g., audio information, video information, web pages, still images, etc.) based on, for example, broadcast information and/or stored information. Broadcast information may be obtained from the broadcast information reception devices 116 and stored information may be obtained from any information storage medium (e.g., a DVD, a CD, a tape, etc.). The media delivery devices 110 are communicatively coupled to the media presentation devices 112 and configurable to communicate media information to the media presentation devices 112 for presentation. The media presentation devices 112 may include televisions having a

US 8,489,884 B2

5

display device and/or a set of speakers by which audience members consume, for example, broadcast television information, music, movies, etc.

The signature generator 114 may be used to generate monitored digital signatures based on audio information as described in greater detail below. In particular, at the monitoring site 102, the signature generator 114 may be configured to generate monitored signatures based on monitored audio streams that are reproduced by the media delivery devices 110 and/or presented by the media presentation devices 112. The signature generator 114 may be communicatively coupled to the media delivery devices 110 and/or the media presentation devices 112 via an audio monitoring interface 118. In this manner, the signature generator 114 may obtain audio streams associated with media information that is reproduced by the media delivery devices 110 and/or presented by the media presentation devices 112. Additionally or alternatively, the signature generator 114 may be communicatively coupled to microphones (not shown) that are placed in proximity to the media presentation devices 112 to detect audio streams. The signature generator 114 may also be communicatively coupled to the central data collection facility 106 via the network 108.

The network 108 may be used to communicate signatures (e.g., digital spectral signatures), control information, and/or configuration information between the monitoring site 102, the reference site 104, and the central data collection facility 106. Any wired or wireless communication system such as, for example, a broadband cable network, a DSL network, a cellular telephone network, a satellite network, and/or any other communication network may be used to implement the network 108.

As shown in FIG. 1A, the reference site 104 may include a plurality of broadcast information tuners 120, a reference signature generator 122, a transmitter 124, a database or memory 126, and broadcast information reception devices 128. The reference signature generator 122 and the transmitter 124 may be communicatively coupled to the memory 126 to store reference signatures therein and/or to retrieve stored reference signatures therefrom.

The broadcast information tuners 120 may be communicatively coupled to the broadcast information reception devices 128, which may include a cable, an antenna, a satellite dish, and/or any other suitable device for receiving broadcast information. Each of the broadcast information tuners 120 may be configured to tune to a particular broadcast channel. In general, the number of tuners at the reference site 104 is equal to the number of channels available in a particular broadcast region. In this manner, reference signatures may be generated for all of the media information transmitted over all of the channels in a broadcast region. The audio portion of the tuned media information may be communicated from the broadcast information tuners 120 to the reference signature generator 122.

The reference signature generator 122 may be configured to obtain the audio portion of all of the media information that is available in a particular broadcast region. The reference signature generator 122 may then generate a plurality of reference signatures (as described in greater detail below) based on the audio information and store the reference signatures in the memory 126. Although one reference signature generator is shown in FIG. 1, a plurality of reference signature generators may be used in the reference site 104. For example, each of the plurality of signature generators may be communicatively coupled to a respective one of the broadcast information tuners 120.

6

The transmitter 124 may be communicatively coupled to the memory 126 and configured to retrieve signatures therefrom and communicate the reference signatures to the central data collection facility 106 via the network 108.

The central data collection facility 106 may be configured to compare monitored signatures received from the monitoring site 102 to reference signatures received from the reference site 104. In addition, the central data collection facility 106 may be configured to identify monitored audio streams by matching monitored signatures to reference signatures and using the matching information to retrieve television program identification information (e.g., program title, broadcast time, broadcast channel, etc.) from a database. The central data collection facility 106 includes a receiver 130, a signature analyzer 132, and a memory 134, all of which are communicatively coupled as shown.

The receiver 130 may be configured to receive monitored signatures and reference signatures via the network 108. The receiver 130 is communicatively coupled to the memory 134 and configured to store the monitored signatures and the reference signatures therein.

The signature analyzer 132 may be used to compare reference signatures to monitored signatures. The signature analyzer 132 is communicatively coupled to the memory 134 and configured to retrieve the monitored signatures and the reference signatures from the same. The signature analyzer 132 may be configured to retrieve reference signatures and monitored signatures from the memory 134 and compare the monitored signatures to the reference signatures until a match is found. The memory 134 may be implemented using any machine accessible information storage medium such as, for example, one or more hard drives, one or more optical storage devices, etc.

Although the signature analyzer 132 is located at the central data collection facility 106 in FIG. 1A, the signature analyzer 132 may instead be located at the reference site 104. In such a configuration, the monitored signatures may be communicated from the monitoring site 102 to the reference site 104 via the network 108. Alternatively, the memory 134 may be located at the monitoring site 102 and reference signatures may be added periodically to the memory 134 via the network 108 by transmitter 124. Additionally, although the signature analyzer 132 is shown as a separate device from the signature generators 114 and 122, the signature analyzer 132 may be integral with the reference signature generator 122 and/or the signature generator 114. Still further, although FIG. 1 depicts a single monitoring site (i.e., the monitoring site 102) and a single reference site (i.e., the reference site 104), multiple such sites may be coupled via the network 108 to the central data collection facility 106.

The audio stream identification system 150 of FIG. 1B may be configured to monitor and identify audio streams associated with radio broadcast information. In general, the audio stream identification system 150 is used to monitor the content that is broadcast by a plurality of radio stations in a particular broadcast region. Unlike the audio stream identification system 100 used to monitor television content consumed by an audience, the audio stream identification system 150 may be used to monitor music, songs, etc. that are broadcast within a broadcast region and the number of times that they are broadcast. This type of media tracking may be used to determine royalty payments, proper use of copyrights, etc. associated with each audio composition. The audio stream identification system 150 includes a monitoring site 152, a central data collection facility 154, and the network 108.

The monitoring site 152 is configured to receive all radio broadcast information that is available in a particular broad-

7

cast region and generate monitored signatures based on the radio broadcast information. The monitoring site **152** includes the plurality of broadcast information tuners **120**, the transmitter **124**, the memory **126**, and the broadcast information reception devices **128**, all of which are described above in connection with FIG. 1A. In addition, the monitoring site **152** includes a signature generator **156**. When used in the audio stream identification system **150**, the broadcast information reception devices **128** are configured to receive radio broadcast information and the broadcast information tuners **120** are configured to tune to the radio broadcast stations. The number of broadcast information tuners **120** at the monitoring site **152** may be equal to the number of radio broadcasting stations in a particular broadcast region.

The signature generator **156** is configured to receive the tuned audio information from each of the broadcast information tuners **120** and generate monitored signatures for the same. Although one signature generator is shown (i.e., the signature generator **156**), the monitoring site **152** may include multiple signature generators, each of which may be communicatively coupled to one of the broadcast information tuners **120**. The signature generator **156** may store the monitored signatures in the memory **126**. The transmitter **124** may retrieve the monitored signatures from the memory **126** and communicate them to the central data collection facility **154** via the network **108**.

The central data collection facility **154** is configured to receive monitored signatures from the monitoring site **152**, generate reference signatures based on reference audio streams, and compare the monitored signatures to the reference signatures. The central data collection facility **154** includes the receiver **130**, the signature analyzer **132**, and the memory **134**, all of which are described in greater detail above in connection with FIG. 1A. In addition, the central data collection facility **154** includes a reference signature generator **158**.

The reference signature generator **158** is configured to generate reference signatures based on reference audio streams. The reference audio streams may be stored on any type of machine accessible medium such as, for example, a CD, a DVD, a digital audio tape (DAT), etc. In general, artists and/or record producing companies send their audio works (i.e., music, songs, etc.) to the central data collection facility **154** to be added to a reference library. The reference signature generator **158** may read the audio data from the machine accessible medium and generate a plurality of reference signatures based on each audio work (e.g., the reference audio stream **302** of FIG. 3). The reference signature generator **158** may then store the reference signatures in the memory **134** for subsequent retrieval by the signature analyzer **132**. Identification information (e.g., song title, artist name, track number, etc.) associated with each reference audio stream may be stored in a database and may be indexed based on the reference signatures. In this manner, the central data collection facility **154** includes a database of reference signatures and identification information corresponding to all known and available song titles.

The receiver **130** is configured to receive monitored signatures from the network **108** and store the monitored signatures in the memory **134**. The monitored signatures and the reference signatures are retrieved from the memory **134** by the signature analyzer **132** for use in identifying the monitored audio streams broadcast within a broadcast region. The signature analyzer **132** may identify the monitored audio streams by first matching a monitored signature to a reference signature. The match information and/or the matching reference signature is then used to retrieve identification informa-

8

tion (e.g., a song title, a song track, an artist, etc.) from a database stored in the memory **134**.

Although one monitoring site (e.g., the monitoring site **152**) is shown in FIG. 1B, multiple monitoring sites may be communicatively coupled to the network **108** and configured to generate monitored signatures. In particular, each monitoring site may be located in a respective broadcast region and configured to monitor the content of the broadcast stations within a respective broadcast region.

FIG. **2** is a time-domain representation **200** of an example monitored audio stream **202** and a plurality of audio sample frames **204**, **206**, **208**, and **210** acquired from the monitored audio stream **202**. A monitored digital spectral signature is generated at a monitoring site (e.g., the monitoring site **102** of FIG. 1A or the monitoring site **152** of FIG. 1B) based on audio samples acquired from the example monitored audio stream **202**. The time-domain representation **200** illustrates the time relationship between the example monitored audio stream **202** and the audio sample frames **204**, **206**, **208**, and **210**, which are used to generate monitored signatures.

In one example, an N-bit monitored signature $S_x(t)$ is formed using one or more M-bit descriptors $B_x(t_0)$, $B_x(t_0+1)$, $B_x(t_0+2)$, $B_x(t_0+3)$. For example, a 32-bit monitored signature $S_x(t)$ includes four 8-bit descriptors $B_x(t_0)$, $B_x(t_0+1)$, $B_x(t_0+2)$, $B_x(t_0+3)$, each of which is generated based on a corresponding one of the audio sample frames **204**, **206**, **208**, and **210**. More specifically, each of the descriptors is generated using one or more intraframe operations (e.g., comparison operations) based on two or more spectral components that are uniquely associated with a single audio sample frame.

The four descriptors may be generated based on spectral decompositions (e.g., frequency decompositions or wavelet decompositions) of the audio sample frames **204**, **206**, **208**, and **210** as described in detail below in connection with FIGS. **4-7**. The spectral decompositions are used to extract features that are uniquely characteristic of the example monitored audio stream **202**. In this manner, a reference signature and a monitored signature that are generated based on the same audio stream using the same signature generation method (e.g., the same spectral decomposition-based method) will include similar features, and, thus can be used to reliably identify the monitored audio stream **202** using a matching algorithm. A monitored signature may be generated by sampling the example monitored audio stream **202** to generate the audio sample frames **204**, **206**, **208**, and **210**, generating the descriptors $B_x(t_0)$, $B_x(t_0+1)$, $B_x(t_0+2)$, $B_x(t_0+3)$ based on spectral decompositions of the audio sample frames **204**, **206**, **208**, and **210**, and concatenating the descriptors.

The audio sample frames **204**, **206**, **208**, and **210** are generated by sampling the example monitored audio stream **202** during four time intervals at a sampling frequency $f_s$. For example, a sampling frequency $f_s$ of 6000 Hz will generate 6000 samples of audio data for each of the audio sample frames **204**, **206**, **208**, and **210** (assuming the sample frames are collected over one second intervals). However, any other suitable sampling frequency $f_s$ may instead be selected. As shown in FIG. **2**, the duration of each of the audio sample frames **204**, **206**, **208**, and **210** is one second (e.g., 0 to $t_0$, $t_0$ to $t_0+1$, $t_0+1$ to $t_0+2$, and $t_0+2$ to $t_0+3$). However, the duration may instead be set to any other length of time. The times within the monitored audio stream **202** during which monitored signatures are generated are substantially similar or identical to the times within a reference audio stream during which corresponding reference signatures are generated. By acquiring audio sample frames for monitored signatures and reference signatures at substantially the same times, the features extracted from a monitored audio stream (e.g., the

US 8,489,884 B2

9

example monitored audio stream **202**) and a corresponding reference audio stream (e.g., the example reference audio stream **302** of FIG. **3**) are substantially similar or identical. Although, the audio sample frames **204**, **206**, **208**, and **210** are shown in FIG. **2** as occurring consecutively in time, the audio sample frames **204**, **206**, **208**, and **210** may occur at any time and in any sequence within the example monitored audio stream **202**.

To ensure that the monitored signature is compared with a reference signature that is generated at substantially the same time within respective audio streams, the monitored signatures may be generated relative to a reference time that is used during the signature comparison process to align a monitored signature with a reference signature. More specifically, during the generation of a monitored signature, the example monitored audio stream **202** is sampled starting at a time indicated by a reference time $t_0$, which may be selected relative to a time stamp embedded within the example audio stream **202**, a system startup time, a daily recurring time (e.g., midnight), and/or any other reference time that may be indicative of the time at which a signature is generated. A signature matching system (e.g., the signature analyzer **132** of FIGS. **1**A and **1**B) uses the reference time $t_0$ to retrieve one or more reference signatures that correspond to substantially the same time within reference audio streams as indicated by the reference time $t_0$.

Additionally, one or more monitored signatures may be generated using the example monitored audio stream **202** so that multiple signatures are matched to identify the example monitored audio stream **202**. For example, it is possible that one or more monitored signatures generated using the example monitored audio stream **202** are substantially similar or identical to one or more reference signatures of a reference audio stream (e.g., the example reference audio stream **302** of FIG. **3**) that does not correspond to the example monitored audio stream **202**. In this case, to decrease the possibility of erroneously identifying the wrong reference audio stream, more than one monitored signature is generated for the monitored audio stream **202**. More specifically, the signatures may be generated at multiple times throughout the example monitored audio stream **202**. In addition, a comparison algorithm may be configured to match two or more monitored signatures with corresponding reference signatures to accurately identify the example monitored audio stream **202**.

FIG. **3** is a time-domain representation **300** of an example reference audio stream **302** and a plurality of audio sample frames **304**, **306**, **308**, and **310** that may be acquired from the example reference audio stream **302**. The time-domain representation **300** shows two one second time intervals (e.g., 0 to $t_0$ and $t_0$ to $t_0$+1) and the plurality of audio sample frames **304**, **306**, **308**, and **310** that are collected during the time intervals and that are subsequently used to generate a plurality of reference signatures that are staggered in time (i.e., time shifted relative to one another). The example reference audio stream **302** is sampled at a sampling frequency $f_s$ to collect the audio sample frames **304**, **306**, **308**, and **310**, which are used to generate M-bit descriptors $B_{Rn}(t)$. One or more of the descriptors $B_{Rn}(t)$ may then be concatenated to form an N-bit reference signature $S_{Rn}(t)$. Typically, the number of descriptors in a reference signature is equal to the number of descriptors in a monitored signature. Additionally, each of the M-bit descriptors $B_{Rn}(t)$ includes the same number of bits as a corresponding M-bit descriptor $B_x(t)$ associated with the example monitored audio stream **202** (FIG. **2**) and, thus, each N-bit reference signature $S_{Rn}(t)$ includes the same number of bits as a corresponding N-bit monitored signature $S_x(t)$.

Multiple reference signatures are generated for the example reference audio stream **302** in a manner that causes the reference signatures to be time-shifted relative to each other and to overlap in time with one another. More specifi-

10

cally, the start time at which a first audio sample frame (e.g., the audio sample frame **304**) of a first reference signature is collected is offset, or shifted, by an amount of time

$$\frac{1}{T_S}$$

from the start time at which a first audio sample frame (e.g., the audio sample frame **308**) of a second reference signature is collected. The value $T_S$ is associated with a number of equal segments ("sample segments") into which each time interval (e.g., $t_0$ to $t_0$+1) is divided. For example, if the number of sample segments $T_S$ in a time interval of one second is set equal to thirty, the collection of a new data set will begin every $\frac{1}{30}$-th of a second. In addition, if the sampling frequency $f_s$ is set equal to 6000 Hz, each sample segment will include 200 samples.

Each audio sample frame is used to generate a single signature. More specifically, an audio sample frame is collected using a predetermined number of sample segments (e.g., the sample segments **312a–312e**), which are concatenated to form the audio sample frame (e.g., the audio sample frame **304**). To achieve overlap among consecutively generated signatures, each signature is formed using an audio sample frame that partially overlaps with an audio sample frame used to form the previously generated signature. More specifically, two audio sample frames that overlap include a common set of sample segments. For example, the audio sample frames **304** and **308** include a common set of sample segments comprising the sample segments **312b–312e**. The audio sample frame **308** may be formed by extracting a common plurality of media samples or the common set of sample segments **312b–312e** from the audio sample frame **304** and appending a recently acquired sample segment (e.g., the sample segment **312f**) to the common set of sample segments **312b–312e**. In addition, two audio sample frames that overlap also contain sample segments that are exclusive to one or the other of the audio sample frames (i.e., audio sample frames that overlap also contain sample segments that occur in one or the other of the audio sample frames but do not occur in both frames).

To further illustrate the generation of reference signatures that are time shifted and overlapped, each reference signature is formed by four reference descriptors

$$B_{Rn}\left(t_0 + \frac{k}{T_S}\right), B_{Rn}\left(t_0 + \frac{k}{T_S} + 1\right), B_{Rn}\left(t_0 + \frac{k}{T_S} + 2\right), B_{Rn}\left(t_0 + \frac{k}{T_S} + 3\right).$$

The four reference descriptors are separated by one-second time intervals and are shifted by

$$\frac{k}{T_S} \text{ seconds}$$

with respect to the reference time $t_0$, where $0 \leqq k < T_S$. For example, the audio sample frames **304** and **306**

$$\left(\text{generated at } t_0 + \frac{0}{T_S} \text{ and } t_0 + \frac{0}{T_S} + 1\right).$$

respectively, in combination with two other audio sample frames generated at

$$t_0 + \frac{0}{T_S} + 2 \text{ and } t_0 + \frac{0}{T_S} + 3 \text{(not shown)},$$

US 8,489,884 B2

11

are used to generate four descriptors that form a first reference signature. Additionally, the audio sample frames **308** and **310**

$$\left( \text{generated at } \left( t_0 + \frac{1}{T_S} \right) \text{ and } \left( t_0 + \frac{1}{T_S} + 1 \right) \right),$$

respectively, are used with two other audio sample frames generated at

$$\left( t_0 + \frac{1}{T_S} + 2 \right) \text{ and } \left( t_0 + \frac{1}{T_S} + 3 \right) \text{(not shown)}$$

to generate four descriptors that form a second reference signature that is time shifted relative to the first reference signature by

$$\frac{1}{T_S} \text{ seconds.}$$

As described below in connection with FIG. **5**, each of the reference descriptors is generated using one or more operations (e.g., comparison operations) based on two or more spectral components that are both associated with the same audio sample frame. These operations are referred to as intraframe operations because they are performed using data exclusive to a single audio frame and are not dependent on sample data collected over other audio frames.

During an example sample acquisition process, the sample segments **312a-312e** are collected and are used to form the first audio sample frame **304**, which is subsequently used to determine a descriptor. This descriptor is then used to form part of a first reference signature. Then, a new sample segment **312f** is collected and a second audio sample frame **308** is formed using sample segments **312b-312f**. The second audio sample frame **308** is then used to determine a reference descriptor which is used to form part of a second reference signature. Thus, the first and second audio sample frames **304** and **308** include a common set of sample segments **312b-312e** and each of the first and second audio sample frames additionally include a sample segment not included in the other (i.e., the first audio sample frame **304** includes sample segment **312a** and the second audio sample frame **308** includes sample segment **312f**). In this manner, the first and second reference signatures are generated using data collected at points in the audio stream that are staggered or shifted in time by

$$\frac{1}{T_S} \text{ seconds}$$

and are generated using data that overlaps. In addition, the amount by which the first and second signatures are shifted can be adjusted by changing the value of $T_S$ thereby permitting the resolution of the signatures to vary as desired. Specifically, if a set of signatures that represents an audio stream with a greater resolution is desired, $T_S$ can be increased accordingly. Likewise, if less resolution is desired, $T_S$ can be decreased. As will be appreciated by one having ordinary skill in the art, the value of $T_S$ may affect the quantity of signatures that can be generated for a given audio stream. For example, if the number of sample segments used to form a signature

12

remains constant, a larger value of $T_S$ will result in forming more audio sample frames than a smaller value of $T_S$. Therefore, the amount of memory available to store the signature data may be a factor in determining the desired value of $T_S$.

As described above, in order to identify the title of a song or the title of a program associated with a particular audio stream, a set of monitored signatures generated for a monitored audio stream are compared to a database of reference signatures associated with a plurality of reference audio streams. In one example system, a signature generator (e.g., the signature generator **114** of FIG. **1A**) may be configured to monitor the audio emitted by a specific television (e.g., one of the presentation devices **112** of FIG. **1A**) located in the home of a specific panelist. Signatures are generated for the audio emitted by the television in the manner described above. In addition, the time at which the audio corresponding to each signature was emitted is recorded and stored as a reference time $t_0$ with the corresponding monitored signature in a memory device. A timing device (e.g., the timing device **903** of FIGS. **9** and **10**) located at the monitoring site may be used to trigger the collection of the audio data for the subsequent generation of monitored signatures and to provide the corresponding data collection times (e.g., reference times $t_0$, timestamps, etc.) to the memory for storage with the corresponding signature. To enable the subsequent identification of the emitted audio, a reference site (e.g., the reference site **104** of FIG. **1A**) located within the same broadcast region as a monitoring site (e.g., the monitoring site **102** of FIG. **1A**) is configured to generate reference signatures corresponding to the audio broadcast on all television broadcast channels at all times of the day. A timing device (e.g., the timing device **903** of FIGS. **9** and **10**) located at the reference site may be used to trigger the collection of the audio data at a set of equally spaced intervals corresponding to the time period

$$\frac{1}{T_S}$$

for the subsequent generation of the reference signatures and to provide a corresponding set of data collection times to a reference memory (e.g., the memory **126** of FIG. **1A**) for storage. Thus, each reference signature is stored in a reference device located at the reference site along with timestamp data indicating the time at which the underlying audio data was collected. In one example, the timing devices (e.g., the timing device **903** of FIG. **9**) located at the monitoring site and the reference site are synchronized such that the timestamps can be used to align the reference signatures with the monitored signatures to facilitate the signature matching process. Likewise, because a plurality of monitoring sites are likely to be located in the same broadcast region as a single reference site, in the same example, each of the timing devices **903** located in each such monitoring site may be synchronized with the timing device **903** located in the single reference site. However, due to the staggered arrangement of the reference signatures described above in connection with FIG. **3**, the timing devices **903** at the monitoring site and the reference site do not have to be synchronized.

To compensate for offsets between the timing devices located at the monitoring sites and the reference site, the value of $T_S$ may be adjusted. The value of $T_S$ is generally selected to incrementally time shift a reference signature from a previous reference signature so that a monitored signature generated at an arbitrary reference time is highly likely to align with one of the staggered or time-shifted reference signatures. More spe-

US 8,489,884 B2

13

14

cifically, increasing the value of $T_s$ causes the number of sample segments (e.g., the sample segments 312a-312f) to increase and the offset or time shift from one reference signature to the next reference signature to decrease. This, in turn, increases the likelihood that the times at which reference signatures are generated for a given audio stream correspond to substantially similar or identical reference times at which monitored signatures are generated for the same audio stream. Signatures generated at the same times for the same program are expected to be identical or at least similar enough to cause a match to be detected. Thus, increasing the value of $T_s$ increases the likelihood of a match between a set of reference signatures and a set of monitored signatures corresponding to the same audio program. Additionally, assuming the timing devices located at the reference site and the monitoring site are synchronized with sufficient precision, a monitored signature generated for data collected at a time T need only be compared to each reference signature associated with the same timestamp T instead of all reference signatures generated during the same twenty-four hour period. This reduction in comparisons reduces the processing time required to find a match. Similarly, assuming there is a known error, E, between the timing devices located at a monitoring site and a reference site, each monitored signature generated at the monitoring site at a time T need only be compared to all reference signatures generated from data collected within a window of the time spanning from T−E to T+E.

In another example system (e.g., the example audio identification system 150 of FIG. 1B), a set of monitored signatures are generated for a monitored audio stream and then compared to a database of reference signatures associated with a set of reference audio streams that, ideally, represent the universe of currently available audio streams. For example, as described above, in connection with FIG. 1B, reference signatures corresponding to reference audio streams may be stored in a database that is stored in, for example, the memory 134. For each reference signature that is matched to a monitored signature, the matching information and/or the reference signature may be used to retrieve identification information (e.g., song title, song track, artist, etc.) from the database. The identification information is then used to identify the monitored audio stream. In one example, reference times $t_0$ or timestamps associated with each monitored signature may be used to identify the time (of day) at which the monitored audio streams were broadcast.

FIG. 4 is a flow diagram of an example method for generating digital spectral signatures based on spectral decompositions. In particular, the example method of FIG. 4 may be used to generate digital spectral signatures (e.g., reference signatures and/or monitored signatures) based on frequency decomposition methods using a sliding Fast Fourier transform (FFT). As is known by one having ordinary skill in the art, an FFT may be used to convert a time domain signal (e.g., the example audio streams 202 and 302 of FIGS. 2 and 3) into a frequency domain representation of the same signal which may then be used to analyze the frequency components of the converted signal.

As will be appreciated by one having ordinary skill in the art, a sliding FFT provides advantages over a conventional non-sliding FFT for generating the digital spectral signatures. Unlike a conventional non-sliding FFT, a sliding FFT can be used to incrementally compute an FFT. For example, one example approach to processing the audio streams 202 and 302 involves generating FFT data for each audio sample frame independent of any data associated with previous audio sample frames. In contrast, a sliding FFT involves generating FFT data for an audio sample frame by updating the FFT data

generated in connection with a previous audio sample frame. Updating the previous frame's FFT data is less computationally expensive than generating FFT data anew for each frame causing the sliding FFT technique to be more efficient than the non-sliding conventional FFT approach. Additionally, the number of samples forming each audio sample frame (e.g., the audio sample frames 204, 206, 208, and 210 of FIG. 2 or 304, 306, 308, and 310 of FIG. 3) need not be a power of two, as is required of the non-sliding FFT approach. Thus, when using a sliding FFT, the digital spectral signatures can be generated using audio sample frames of any arbitrary size (i.e., any number of samples) that are acquired using any sampling frequency $f_s$.

Now turning in detail to the example method of FIG. 4, initially the example method involves obtaining an audio stream (block 402) (e.g., the example monitored audio stream 202 of FIG. 2 or the example reference audio stream 302 of FIG. 3). A reference time $t_0$ described above in connection with FIGS. 2 and 3 is determined (block 404) to indicate the time within an audio stream at which a signature is generated. An initial audio sample set is then obtained (block 406). The audio samples may be obtained by sampling an analog audio stream at a sampling frequency $f_s$ and performing an analog-to-digital conversion. Alternatively, the audio samples may be obtained by extracting or acquiring samples from a digital audio stream at a sampling frequency $f_s$. The initial audio sample set may be a complete audio sample frame (e.g., one of the audio sample frames 204, 206, 208, and 210 of FIG. 2 or 304, 306, 308, and 310 of FIG. 3) or a portion thereof. An initial FFT operation is performed on the initial audio sample set to establish an initial frequency spectrum (block 408). The method of performing a FFT is well known in the art and, thus, is not discussed in detail herein.

After the initial frequency spectrum is determined (block 408), a next set of audio samples is obtained (block 410). The sliding FFT may then be used to update the initial frequency spectrum (generated at block 408) based on two most recently collected samples $v_{N_s-2}$ and $v_{N_s-1}$ according to Equation 1 below.

$$a_1[J] \times \exp(\varphi_1[J]) = a_0[J] \times \exp(\varphi_0[J]) \times \exp\left(-\frac{i2\pi J(2)}{N_S}\right) + \left(v_{N_s-2} \times \exp\left(\frac{i2\pi J(N_S-2)}{N_S}\right)\right) + \left(v_{N_s-1} \times \exp\left(\frac{i2\pi J(N_S-1)}{6000}\right)\right) - \left(v_0 \times \exp\left(-\frac{i2\pi J(2)}{N_S}\right)\right) - \left(v_1 \times \exp\left(-\frac{i2\pi J}{N_S}\right)\right)$$

Equation 1

Equation 1 may be used to update the frequency spectrum of an audio sample frame having a sample quantity $N_s$. The spectral amplitude $a_0[J]$ and phase value $\phi_0[J]$ form the existing frequency spectrum $a_0[J] \times \exp(\phi_0[J])$, which includes the frequencies indexed by the frequency index J. When the two most recently collected audio samples $v_{N_s-2}$ and $v_{N_s-1}$ are obtained, the existing frequency spectrum $a_0[J] \times \exp(\phi_0[J])$ may be updated to determine a new frequency spectrum $a_1[J] \times \exp(\phi_1[J])$. The two most recently collected audio samples $v_{N_s-2}$ and $v_{N_s-1}$ are inserted into the audio sample frame to replace the two earliest collected samples $v_0$ and $v_1$.

As shown in Equation 1, the updated frequency spectrum $a_1[J] \times \exp(\phi_1[J])$ is determined using one or more multiplication operations, addition operations, and subtraction operations based on complex exponents, the two earliest collected samples $v_0$ and $v_1$, and the two most recently collected

US 8,489,884 B2

15

samples $v_{N_S-2}$ and $v_{N_S-1}$. Initially, the existing frequency spectrum $a_0[J] \times \exp(\phi_0[J])$ is multiplied by a first complex exponential value

$$\exp\left(-\frac{i2\pi J(2)}{N_S}\right).$$

The product of the multiplication is added to a product determined by multiplying the first most recently collected audio sample $v_{N_S-2}$ by a second complex exponential value

$$\exp\left(\frac{i2\pi J(N_S-2)}{N_S}\right).$$

The result is then added to a product determined by multiplying the second most recently collected audio sample $v_{N_S-1}$ by a third complex exponential value

$$\exp\left(\frac{i2\pi J(N_S-1)}{N_S}\right).$$

The first earliest collected audio sample $v_0$ is then multiplied by the first complex exponential value

$$\exp\left(-\frac{i2\pi J(2)}{N_S}\right)$$

and subtracted from the previous addition result. The second earliest collected audio sample $v_1$ is then multiplied by a fourth complex exponential value

$$\exp\left(-\frac{i2\pi J}{N_S}\right)$$

and subtracted from the previous subtraction result.

It is well known in the art that instabilities such as, for example, oscillation or data overflow can be substantially minimized when implementing a sliding FFT by multiplying most recently collected audio samples (e.g., the most recently collected audio samples $v_{N_S-2}$ and $v_{N_S-1}$) by a first stability factor $sf_1$ and earliest collected audio samples (e.g., the earliest collected audio samples $v_0$ and $v_1$) by a second stability factor $sf_2$. The first stability factor $sf_1$ may be set equal to a value as close as possible to one. In the case of an audio sample frame having 6000 samples, the first stability factor $sf_1$ may be set equal to 0.99995. The second stability factor $sf_2$ may be set equal to $(sf_1)^{p-1}$, where the value p is equal to the number of sample shifts required to process an audio sample frame using the sliding FFT. For example, a two-sample shift is required to update an audio sample frame based on the two most recently collected audio samples $v_{N_S-2}$ and $v_{N_S-1}$. In the case of the audio sample frame having 6000 samples, the value p may be set equal to 3000.

After the sliding FFT is determined or calculated at block 412, it is determined if a complete audio sample frame (e.g., one of the audio sample frames 204, 206, 208, and 210 of FIG. 2 or one of the audio sample frames 304, 306, 308, and 310 of FIG. 3) has been obtained (block 414). At the monitoring sites 102 (FIG. 1A) and 152 (FIG. 1B), a complete audio sample frame is obtained when a plurality of most recently collected

16

$N_S$ samples is obtained. For example, if an audio sample frame includes 6000 samples, a complete audio sample frame is obtained after 6000 new samples are obtained. At the reference site 104 (FIG. 1A) or the central data collection facility 154 (FIG. 1B), a complete audio sample frame is obtained when a most recently collected sample segment (e.g., one of the sample segments 312a-312f of FIG. 3) is obtained and a current audio sample frame is formed as described in greater detail above in connection with FIG. 3. If it is determined at block 414 that a complete audio sample frame has not been obtained, control is passed back to block 410. However, if it is determined at block 414 that a complete audio sample frame has been obtained, a descriptor is generated (block 416). An example method for generating descriptors based on frequency components is described in greater detail below in connection with FIG. 5.

It is then determined if a complete descriptor set has been obtained (block 418). A descriptor set includes a predetermined number of descriptors that are used to form a signature. For example, if a 32-bit signature is formed by 8-bit descriptors, then a descriptor set includes four descriptors. If it is determined at block 418 that a complete descriptor set has not been obtained, control is passed back to block 410. However, if it is determined at block 418, that a complete descriptor set has been obtained, a digital spectral signature is generated by concatenating the descriptors of the descriptor set (block 420). After the digital spectral signature is generated (block 420), it is determined if another signature is to be generated (block 422). If another signature is to be generated, control is passed back to block 404.

FIG. 5 is a flow diagram of an example method for generating descriptors associated with the example method of FIG. 4. In particular, the example method of FIG. 5 may be used to implement block 416 of FIG. 4. An M-bit descriptor is generated by selecting M pairs of frequency components $f_{lb}$ that are uniquely associated with an audio sample frame and determining each bit of the descriptor based on intraframe comparisons of the spectral powers $P_{lb}$ of the frequency components $f_{lb}$. The frequency components $f_{lb}$ and the spectral powers $P_{lb}$ are indexed by a frequency component index l and a bit index b, where $0 \leq l < f\ index_{max}$ and $0 \leq b < M$.

The example method initially selects a first pair of frequency components $f_{00}$ and $f_{10}$ (block 502). Although consecutive frequency components are selected (i.e., $f_{0b}$ and $f_{1b}$, $f_{2b}$ and $f_{3b}$, etc.) in the example method, the frequency components may be selected from any location in the frequency spectrum of an audio sample frame (e.g., one of the audio sample frames 204, 206, 208, and 210 of FIG. 2 or one of the audio sample frames 304, 306, 308, and 310 of FIG. 3). However, the frequency component indexes l used to select pairs of frequency components for generating a monitored signature are the same frequency component indexes l used to select pairs of frequency components for generating a corresponding reference signature.

After the first pair of frequency components $f_{00}$ and $f_{10}$ is selected, the spectral powers $P_{00}$ and $P_{10}$ corresponding to the selected frequency components are determined (block 504). One of ordinary skill in the art will readily appreciate that the spectral power for each frequency component can be obtained based on the results of the sliding FFT performed at block 412 of FIG. 4.

A descriptor bit is determined based on the frequency components $f_{00}$ and $f_{10}$ by comparing the first spectral power $P_{00}$ with the second spectral power $P_{10}$ (block 506). If the first spectral power is greater than the second spectral power (i.e., $P_{00} > F_{10}$), the descriptor bit is set equal to one. If, instead, the

US 8,489,884 B2

**17**

first spectral power is less than or equal to the second spectral power (i.e., $P_{00} \leq P_{10}$) the descriptor bit is set equal to zero.

It is then determined if another descriptor bit is to be determined (block **508**). If another descriptor bit is to be determined, another pair of frequency components is selected (e.g., $f_{21}$ and $f_{31}$) (block **510**) and control is passed back to block **504**. If, instead, another descriptor bit is not to be determined, the example method of FIG. **5** may be stopped.

FIG. **6** is a flow diagram of another example method for generating digital spectral signatures based on spectral decompositions. In particular, the example method of FIG. **6** may be used to generate digital spectral signatures (e.g., reference signatures and monitored signatures) based on wavelet decompositions of audio sample frames (e.g., the audio sample frames **204**, **206**, **208**, and **210** of FIG. **2** or **304**, **306**, **308**, and **310** of FIG. **3**) using wavelet transforms. As described above, wavelet transforms may be employed to analyze data using different scales and/or resolutions by separating blocks or frames of data (e.g., the audio sample frames **204**, **206**, **208**, **210**, **304**, **306**, **308**, and **310**) into multiple sub-bands.

Initially, the example method obtains an audio stream (block **602**) (e.g., the example monitored audio stream **202** of FIG. **2** or the example reference audio stream **302** of FIG. **3**). A reference time $t_0$ described above in connection with FIGS. **2** and **3** is determined (block **604**) to indicate the time within an audio stream at which a signature is generated. An audio sample frame is then obtained (block **606**). The audio sample frame may be obtained by sampling an analog audio stream at a sampling frequency $f_s$ and performing an analog-to-digital conversion. Alternatively, the audio sample frame may be obtained by extracting or acquiring samples from a digital audio stream at a sampling frequency $f_s$. Based on the Nyquist Theorem, aliasing is avoided by sampling the audio samples at frequencies ranging from zero to

$$\frac{f_s}{2}.$$

A descriptor is then determined (block **608**) based on wavelet decomposition performed using a wavelet transform. An example method for generating descriptors based on one or more wavelet decompositions is described in greater detail below in connection with FIG. **7**.

After the descriptor is generated, it is determined if a complete descriptor set has been obtained (block **610**). If a complete descriptor set has not been obtained, a next audio sample frame is obtained (block **612**) and control is passed back to block **608**. However, if a complete descriptor set has been obtained, a digital spectral signature is generated (block **614**) by concatenating the descriptors of the descriptor set. After the digital spectral signature is generated, it is determined if another signature is to be generated (block **616**). If another signature is to be generated, control is passed back to block **604**. Otherwise, the example method is stopped.

FIG. **7** is a flow diagram of an example method for generating descriptors associated with the example method of FIG. **6**. In particular, the example method of FIG. **7** may be used to implement block **608** of FIG. **6**. An M-bit descriptor is generated by performing an M-level wavelet decomposition on an audio sample frame (e.g., one of the audio sample frames **204**, **206**, **208**, and **210** of FIG. **2** or one of the audio sample frames **304**, **306**, **308**, and **310** of FIG. **3**). For each level wavelet decomposition, the energy of the audio signal for each sub-band is determined and descriptors are generated

**18**

based on comparisons of the sub-band energies. For each descriptor, the M-level wavelet decomposition is implemented as an intraframe operation that is performed on spectral energies that are uniquely associated with an audio sample frame. Additionally, the M-level wavelet decomposition may be implemented using any wavelet transform. For purposes of clarity, the example method of FIG. **7** is described in terms of the well-known Daubechies wavelet transform.

Initially, the example method performs a first-level wavelet decomposition (block **702**) by applying the Daubechies wavelet transform to an audio sample frame. The first application of the Daubechies wavelet transform results in a low-frequency sub-band block of filtered values $L_0$ and a high-frequency sub-band block of filtered values $H_0$, each of which includes

$$\frac{N_S}{2}$$

filtered values.

Turning in greater detail to the Daubechies wavelet transform implementation, the Daubechies coefficients $c_0$, $c_1$, $c_2$, and $c_3$ are used to generate an $N_S \times N_S$ transformation matrix in which the coefficients are arranged as shown below.

$$\begin{bmatrix} c_0 & c_1 & c_2 & c_3 & & & & \\ c_3 & -c_2 & c_1 & -c_0 & & & & \\ & & c_0 & c_1 & c_2 & c_3 & & \\ & & c_3 & -c_2 & c_1 & -c_0 & & \\ & & & & & & & \\ & & & & c_0 & c_1 & c_2 & c_3 \\ & & & & c_3 & -c_2 & c_1 & -c_0 \\ c_2 & c_3 & & & & & c_0 & c_1 \end{bmatrix}$$

The coefficients are ordered in the transformation matrix, as shown above, using two dominant patterns. The odd rows include the first pattern, which is an ordering of the coefficients that functions as a smoothing filter (e.g., similar to a moving filter). The even rows include the second pattern, which is an ordering of the coefficients that functions to bring out the details of data (e.g., the audio sample frame). The transformation matrix is first applied to the entire audio sample frame (e.g., all of the $N_S$ samples) to generate filtered values that include low-frequency sub-band filtered values alternated with high-frequency sub-band filtered values. The values are de-interleaved to generate the two sub-band blocks $L_0$ and $H_0$, each of which includes

$$\frac{N_S}{2}$$

samples. The low-frequency sub-band block $L_0$ includes filtered values that are associated with sub-band frequencies ranging from zero to

$$\frac{f_s}{4}.$$

US 8,489,884 B2

**19**

The high-frequency sub-band block $H_0$ includes filtered values that are associated with sub-band frequencies ranging from

$$\frac{f_s}{4} \text{ to } \frac{f_s}{2}.$$

An

$$\frac{N_s}{2} \times \frac{N_s}{2}$$

transformation matrix of the Daubechies coefficients is then applied to the low-frequency sub-band block $L_0$ to generate two additional sub-band blocks $L_1$ and $H_1$. For each transformation, the number of filtered values in each sub-band block is halved. Additionally, for each transformation, a descriptor is generated based on a high-frequency sub-band block (e.g., $H_0, H_1, H_2$, etc.). Further details related to the implementation of wavelet transforms are well known in the art and are not described herein.

After the first-level wavelet transform is applied, the high-frequency sub-band block $H_0$ is parsed by separating the filtered values into a first half and a second half (block 704). Next, at a block 706, a first energy value $E_0$ is determined by squaring and summing the filtered values of the first half of the high-frequency sub-band block $H_0$ and a second energy value $E_1$ is also determined (block 706) by squaring and summing the filtered values of the second half of the high-frequency sub-band block $H_0$.

A descriptor bit is determined by comparing the first energy value $E_0$ with the second energy value $E_1$ (block 708). For example, if the first energy value $E_0$ is greater than the second energy value $E_1$ (i.e., $E_0 > E_1$), the first descriptor bit is set equal to one. If the first energy value $E_0$ is less than or equal to the second energy value $E_1$ (i.e., $E_0 \leq E_1$), the first descriptor bit is set equal to zero. It is then determined if another descriptor bit is to be determined (block 710). If another descriptor bit is to be determined, a next-level wavelet decomposition is performed (block 712). For example, as described above, if a second-level wavelet decomposition is performed, an

$$\frac{N_s}{2} \times \frac{N_s}{2}$$

transformation matrix is applied to the filtered values of the low-frequency sub-band block $L_0$ to determine filtered sub-band blocks $L_1$ and $H_1$. If it is determined at block 710 that another descriptor bit is not to be determined, the example method of FIG. 7 may be stopped.

FIG. 8 is a flow diagram of an example method for comparing the digital spectral signatures (e.g., monitored signatures and reference signatures) generated using the example methods of FIGS. 4-7. In particular, the example method may be used to compare a monitored signature with a reference signature, both of which are generated based on a sliding FFT or a wavelet transform. In general, the example method of FIG. 8 may be used to match a monitored signature with a reference signature by comparing the monitored signature with a plurality of reference signatures. Identification information (e.g., channel, program title, episode number, etc.) associated with a matching reference signature may then be

**20**

retrieved from, for example, a database and used to generate media ratings information. The comparisons may be performed by comparing any number of bits from a monitored signature with the same number of bits from a reference signature such as, for example, a bit-by-bit comparison, a byte-by-byte comparison, a word-by-word comparison, etc. Due to the large number of reference signatures available for comparison, a Hamming distance may be used for the comparisons to eliminate mismatches rapidly, thereby significantly decreasing the time required to compare a monitored signature with the reference signatures.

As is known to one of ordinary skill in the art, a Hamming distance between two values may be identified by determining how many bits, numbers, characters, etc. need to be changed to make the two values equal. For example, a first binary value of 0110 and a second binary value of 0101 have a Hamming distance of two because bit location zero and bit location one need to be changed to make the first binary value equal to the second binary value.

Now turning in detail to the example method of FIG. 8, the example method involves first obtaining a monitored signature (block 802). A reference time $t_0$ for the monitored signature is then obtained (block 804). A first reference signature corresponding to a time within a reference audio stream indicated by the reference time $t_0$ is obtained from, for example, the memory 134 of FIGS. 1A and 1B (block 806). The first descriptor of the monitored signature and the first descriptor of the reference signature are then obtained (block 808).

The first descriptor of the monitored signature is compared to the first descriptor of the reference signature to determine if the descriptors match (block 810). If a match is detected, it is determined if all of the descriptors of the monitored signature and the reference signature have been compared (block 812). If it is determined at block 812 that all of the descriptors have not been compared, the next descriptors are obtained from the monitored signature and the reference signature (block 816) and control is passed back to block 810. If it is determined at block 812 that all of the descriptors have been compared, the monitored audio stream is identified based on the matching reference signature (block 814). Alternatively, the example method may be implemented so that multiple monitored signatures of a single audio stream need to be matched to multiple signatures of a reference audio stream prior to identifying the monitored audio stream.

If it is determined at block 810 that the descriptors do not match, then it is determined if all of the reference signatures has been compared (block 818). If all of the reference signatures have not been compared, the next reference signature is obtained (block 820) and control is passed to block 808. However, if it is determined at block 818 that all of the reference signatures have been compared, the media, channel, radio station, etc. associated with the monitored audio stream may be unidentifiable and the example method is stopped. A flag may be set to indicate that the monitored audio stream is unidentifiable.

Although, the example method of FIG. 8 is described as comparing one reference signature at a time, the example method can be adapted to compare multiple reference signatures with one monitored signature in parallel (i.e., at the same time). For example, the operation of block 806 may be configured to obtain a plurality of reference signatures at one time, each of which corresponds to a different reference audio stream. The operation of block 808 may be configured to obtain the first descriptor of each of the plurality of reference signatures retrieved at block 806. The descriptors of each of the reference signatures may be compared with the each descriptor of the monitored signature until a match is found or

US 8,489,884 B2

21                                                    22

until the plurality of reference signatures obtained at block **806** is eliminated, after which time another plurality of reference signatures may be obtained at block **820**.

One of ordinary skill in the art can readily appreciate that applying the Hamming distance to the comparison process may significantly reduce the time required to match all of the available reference signatures. For example, after the first descriptor of each of a plurality of reference signatures are compared to the first descriptor of a monitored signature, the first descriptor of each of the reference signatures is associated with a Hamming distance. Only reference signatures having first descriptors associated with a Hamming distance less than a predetermined Hamming distance threshold are further compared with the monitored signature based on the next descriptor of each of the reference signatures and the monitored signature. Reference signatures having descriptors associated with a Hamming distance greater than a predetermined threshold are discarded. The number of reference signatures to be compared based on the next descriptors is reduced from the number of reference signatures compared to the monitored signature based on the first descriptor. In this manner, with each iteration of the comparison process, the number of reference signatures that remain to be compared in subsequent iterations of the signature comparison process quickly diminishes until it is determined that all of the descriptors of a single reference signature are associated with a Hamming distance below the predetermined Hamming distance threshold.

In instances where all of the descriptors of more than one reference signature are associated with a Hamming distance below the predetermined Hamming distance threshold, more than one monitored signature may need to be matched with respective reference signatures of the possible matching reference audio streams. It will be relatively unlikely that all of the monitored signatures generated based on the monitored audio stream will match all of the reference signatures of more than one reference audio stream, and, thus erroneously matching more than one reference audio stream to the monitored audio stream can be prevented.

The example methods described above in connection with FIGS. **4**-**8** may be implemented by hardware, software, and/or any combination thereof. More specifically, the example methods may be executed in hardware defined by the block diagrams of FIGS. **9**-**11**. The example methods may also be implemented by software executed on a processor system such as, for example, the processor system **1210** of FIG. **12**.

FIG. **9** is a block diagram of an example signature generation system **900** for generating digital spectral signatures. In particular, the example signature generation system **900** may be used to generate monitored signatures and/or reference signatures based on a sliding FFT as described above in connection with the example methods of FIGS. **4** and **5**. For example, the example signature generation system **900** may be used to implement the signature generators **114** and **122** of FIG. **1A** or the signature generators **156** and **158** of FIG. **1B**. Additionally, the example signature generation system **900** may be used to implement the example methods of FIGS. **4** and **5**.

As shown in FIG. **9**, the example signature generation system **900** includes a sample generator **902**, a timing device **903**, a reference time generator **904**, a sliding FFT module **906**, a frequency identifier **908**, a spectral power value identifier **910**, a comparator **912**, a descriptor generator **914**, a concatenator **916**, and a data communication interface **918**, all of which may be communicatively coupled as shown. The example signature generation system **900** may be configured to obtain an example audio stream **920**, acquire a plurality of

audio samples from the example audio stream **920**, and generate digital spectral signatures based on the audio samples.

The sample generator **902** may be configured to obtain the example audio stream **920**, which may be any analog or digital audio stream. If the example audio stream **920** is an analog audio stream, the sample generator **902** may be implemented using an analog-to-digital converter. If the example audio stream **920** is a digital audio stream, the sample generator **902** may be implemented using a digital signal processor. Additionally, the sample generator **902** may be configured to acquire and/or extract audio samples at any desired sampling frequency $f_s$ and notify the reference time generator **904** when an audio sample acquisition process begins. The sample generator **902** communicates samples to the sliding FFT module **906**. The sample generator **902** may also be configured to notify the frequency identifier **908** when an audio sample frame (e.g., one of the audio sample frames **204**, **206**, **208**, and **210** of FIG. **2** or **304**, **306**, **308**, and **310** of FIG. **3**) or a sample segment (e.g., one of the sample segments **312**$a$-$f$ of FIG. **3**) has been generated.

The timing device **903** may be configured to generate time data and/or timestamp information and may be implemented by a clock, a timer, a counter, and/or any other suitable device. The timing device **903** may be communicatively coupled to the reference time generator **904** and may be configured to communicate time data and/or timestamps to the reference time generator **904**. The timing device **903** may also be communicatively coupled to the sample generator **902** and may assert a start signal or interrupt to instruct the sample generator **902** to begin collecting or acquiring audio sample data. In one example, the timing device **903** may be implemented by a real-time clock having a 24-hour period that tracks time at a resolution of milliseconds. In this case, the timing device **903** may be configured to reset to zero at midnight and track time in milliseconds with respect to midnight.

The reference time generator **904** may initialize a reference time $t_0$ when a notification is received from the sample generator **902**. As described above in connection with FIGS. **2** and **3**, the reference time $t_0$ may be used to indicate the time within an audio stream at which a signature is generated. In particular, the reference time generator **904** may be configured to read time data and/or a timestamp value from the timing device **903** when notified of the beginning of a sample acquisition process by the sample generator **902**. The reference time generator **904** may then store the timestamp value as the reference time $t_0$.

The sliding FFT module **906** may be configured to perform a sliding FFT using the audio samples obtained from the sample generator **902**. As described above in connection with FIG. **4**, a sliding FFT may update frequency spectrum data each time two samples (e.g., the two most recently acquired samples $v_{N_x-2}$ and $v_{N_x-1}$) are obtained from the sample generator **902**.

The frequency identifier **908** may be configured to identify one or more frequency pairs from frequency spectrum data in response to a notification from the sample generator **902** that a new audio sample frame or a new sample segment has been generated. For example, if the example signature generation system **900** is configured to generate monitored signatures, the frequency identifier **908** identifies frequency pairs from the frequency spectrum data in response to a new audio sample frame notification. Alternatively, if the example signature generation system **900** is configured to generate reference signatures, an audio sample frame of data is formed with each new sample segment as described above in connection with FIG. **3**. Therefore, the frequency identifier **908** identifies frequency pairs from the frequency spectrum data in response

US 8,489,884 B2

23

to a new sample segment notification. The frequency identifier 908 may then be configured to communicate indexes identifying the frequency components of the frequency pairs to the spectral power value identifier 910.

The spectral power value identifier 910 may be configured to obtain the indexes associated with the frequency components of the frequency pairs from the frequency identifier 908. The spectral power value identifier 910 may then determine or identify the spectral power of each frequency component of the frequency pairs by retrieving the spectral power value for each frequency component from the frequency spectrum data generated by the sliding FFT module 906. The spectral power values may then be communicated to the comparator 912.

As described above in connection with FIG. 5, the comparator 912 and the descriptor generator 914 may work cooperatively to generate M-bit descriptors. The comparator 912 may obtain the spectral power values and compare the spectral power values for each frequency pair. The descriptor generator 914 may be configured to obtain comparison results from the comparator 912 and generate the descriptor bits of an M-bit descriptor based on the comparison results.

The concatenater 916 may obtain descriptor values from the descriptor generator 914. When a complete set of descriptors is obtained, the concatenater 916 may concatenate the descriptors 916 to form a digital spectral signature. The data communication interface 918 may obtain the digital spectral signatures from the concatenater 916 and the reference time $t_0$ corresponding to the digital spectral signature and communicate the same to a memory and/or a reference site. For example, if the example signature generation system 900 is configured to generate monitored signatures at the monitoring site 102 (FIG. 1A), the monitored signatures may be communicated to the central data collection facility (FIG. 1A) via the network 108 (FIG. 1A). Alternatively, if the example signature generation system 900 is configured to generate reference signatures, the reference signatures may be communicated to the central data collection facility 154 (FIG. 1B) and/or stored in the memory 134 (FIG. 1B).

FIG. 10 is a block diagram of another example signature generation system 1000 for generating digital signatures based on audio streams. In particular, the example signature generation system 1000 may be used to generate monitored signatures and/or reference signatures based on wavelet transforms as described above in connection with the example methods of FIGS. 6 and 7. For example, the example signature generation system 1000 may be used to implement the signature generators 114 and 122 of FIG. 1A and generate monitored signatures. Additionally or alternatively, the example signature generation system 1000 may be used to implement the signature generators 156 and 158 of FIG. 1B. In addition, the example signature generation system 1000 may be used to implement the example methods of FIGS. 6 and 7.

The example signature generation system 1000 includes the sample generator 902, the timing device 903, the reference time generator 904, the comparator 912, the descriptor generator 914, the concatenater 916, and the data communication interface 918 of the example signature generation system 900 described above in connection with FIG. 9. Additionally, the example signature generation system 1000 includes a wavelet transform module 1002, a sub-band block identifier 1004, and an energy value generator 1006, all of which may be communicatively coupled as shown.

The wavelet transform module 1002 may be configured to apply wavelet transforms to audio samples obtained from the sample generator 902. For example, the wavelet transform

24

module 1002 may obtain an audio sample frame (e.g., one of the audio sample frames 204, 206, 208, and 210 of FIG. 2 or 304, 306, 308, and 310 of FIG. 3) from the sample generator 902 and perform an M-level wavelet decomposition on the audio samples to generate filtered data values using, for example, the Daubechies wavelet transform as described in connection with FIGS. 6 and 7. The filtered data values may then be communicated to the sub-band block identifier 1004.

The sub-band block identifier 1004 may be configured to obtain the filtered data values from the wavelet transform module 1002 and generate a low-frequency sub-band block $L_x$ and a high-frequency sub-band block $H_x$. As described in greater detail above in connection with FIG. 7, the sub-band blocks $L_x$ and $H_x$ may be identified by de-interleaving the filtered data values. The low-frequency sub-band block may then be communicated to the wavelet transform module 1002 to perform another wavelet decomposition and the high-frequency sub-band filtered block may be communicated to the energy value generator 1006.

The energy value generator 1006 may be configured to generate energy values $E_x$ based on the high-frequency sub-band block. The energy value generator 1006 may be configured to parse or separate the high-frequency sub-band block into a first half of filtered data values and a second half of filtered data values as described in greater detail above in connection with FIG. 7. The energy value generator 1006 may then generate a first energy value $E_0$ by squaring and summing the first half of filtered data values. A second energy value $E_1$ may be generated by squaring and summing the second half of filtered data values.

The comparator 912 and the descriptor generator 914 may be configured to generate descriptors based on energy values. For example, the comparator 912 may obtain energy values from the energy value generator 1006 and compare a first energy to a second energy value. The descriptor generator 914 may obtain comparison results from the comparator 912 and generate the bits of an M-bit descriptor based on the comparison results.

The concatenater 916 may obtain descriptors from the descriptor generator 914 and generate digital spectral signatures by concatenating a plurality of descriptors as described above in connection with FIG. 9. The data communication interface 918 may then store or transmit signatures obtained from the concatenater 916 with corresponding reference times obtained from the reference time generator 904.

FIG. 11 is a block diagram of an example signature comparison system 1100 for comparing digital spectral signatures. In particular, the example signature comparison system 1100 may be used to compare monitored signatures with reference signatures. For example, the example signature comparison system 1100 may be used to implement the signature analyzer 132 of FIG. 1 to compare monitored signatures with reference signatures. Additionally, the example signature comparison system 1100 may be used to implement the example method of FIG. 8.

The example signature comparison system 1100 includes a monitored signature receiver 1102, a reference signature receiver 1104, a comparator 1106, a Hamming distance filter 1108, a media identifier 1110, and a media identification look-up table interface 1112, all of which may be communicatively coupled as shown.

The monitored signature receiver 1102 may be configured to obtain monitored signatures via the network 106 (FIG. 1) and communicate the monitored signatures to the comparator 1106. The reference signature receiver 1104 may be config-

US 8,489,884 B2

25

ured to obtain reference signatures from the memory **134** (FIGS. **1**A and **1**B) and communicate the reference signatures to the comparator **1106**.

The comparator **1106** and the Hamming distance filter **1108** may be configured to compare reference signatures to monitored signatures using Hamming distances. In particular, the comparator **1106** may be configured to compare descriptors of monitored signatures with descriptors from a plurality of reference signatures and to generate Hamming distance values for each comparison. The Hamming distance filter **1108** may then obtain the Hamming distance values from the comparator **1106** and filter out non-matching reference signatures based on the Hamming distance values as described above in connection with FIG. **8**.

After a matching reference signature is found, the media identifier **1110** may obtain the matching reference signature and in cooperation with the media identification look-up table interface **1112** may identify the media information associated with an unidentified audio stream (e.g., the example monitored audio stream **202** of FIG. **2**). For example, the media identification look-up table interface **1112** may be communicatively coupled to a media identification look-up table or a database that is used to cross-reference media identification information (e.g., movie title, show title, song title, artist name, episode number, etc.) based on reference signatures. In this manner, the media identifier **1110** may retrieve media identification information from the media identification database based on the matching reference signatures.

FIG. **12** is a block diagram of an example processor system **1210** that may be used to implement the apparatus and methods described herein. As shown in FIG. **12**, the processor system **1210** includes a processor **1212** that is coupled to an interconnection bus or network **1214**. The processor **1212** includes a register set or register space **1216**, which is depicted in FIG. **12** as being entirely on-chip, but which could alternatively be located entirely or partially off-chip and directly coupled to the processor **1212** via dedicated electrical connections and/or via the interconnection network or bus **1214**. The processor **1212** may be any suitable processor, processing unit or microprocessor. Although not shown in FIG. **12**, the system **1210** may be a multi-processor system and, thus, may include one or more additional processors that are identical or similar to the processor **1212** and that are communicatively coupled to the interconnection bus or network **1214**.

The processor **1212** of FIG. **12** is coupled to a chipset **1218**, which includes a memory controller **1220** and an input/output (I/O) controller **1222**. As is well known, a chipset typically provides I/O and memory management functions as well as a plurality of general purpose and/or special purpose registers, timers, etc. that are accessible or used by one or more processors coupled to the chipset. The memory controller **1220** performs functions that enable the processor **1212** (or processors if there are multiple processors) to access a system memory **1224** and a mass storage memory **1225**.

The system memory **1224** may include any desired type of volatile and/or non-volatile memory such as, for example, static random access memory (SRAM), dynamic random access memory (DRAM), flash memory, read-only memory (ROM), etc. The mass storage memory **1225** may include any desired type of mass storage device including hard disk drives, optical drives, tape storage devices, etc.

The I/O controller **1222** performs functions that enable the processor **1212** to communicate with peripheral input/output (I/O) devices **1226** and **1228** via an I/O bus **1230**. The I/O devices **1226** and **1228** may be any desired type of I/O device such as, for example, a keyboard, a video display or monitor,

26

a mouse, etc. While the memory controller **1220** and the I/O controller **1222** are depicted in FIG. **12** as separate functional blocks within the chipset **1218**, the functions performed by these blocks may be integrated within a single semiconductor circuit or may be implemented using two or more separate integrated circuits.

The methods described herein may be implemented using instructions stored on a computer readable medium that are executed by the processor **1212**. The computer readable medium may include any desired combination of solid state, magnetic and/or optical media implemented using any desired combination of mass storage devices (e.g., disk drive), removable storage devices (e.g., floppy disks, memory cards or sticks, etc.) and/or integrated memory devices (e.g., random access memory, flash memory, etc.).

Although certain methods, apparatus, and articles of manufacture have been described herein, the scope of coverage of this patent is not limited thereto. To the contrary, this patent covers all methods, apparatus, and articles of manufacture fairly falling within the scope of the appended claims either literally or under the doctrine of equivalents.

What is claimed is:

**1**. A method for generating signatures, comprising:
identifying a first plurality of filtered values by performing a wavelet transform on a first frame of media samples;
determining a first energy value based on a first portion of the first plurality of filtered values;
determining a second energy value based on a second portion of the first plurality of filtered values;
determining a first descriptor of the first frame of media samples based on a comparison of the first energy value and the second energy value;
generating, via a processor, a first signature based on the first descriptor;
determining a second descriptor of a second frame of media samples; and
generating a second signature based on the second descriptor.

**2**. A method as defined in claim **1**, wherein the first plurality of filtered values is associated with a high-frequency sub-band of the first frame of media samples.

**3**. A method as defined in claim **1**, wherein the first descriptor is associated with only the first frame of media samples.

**4**. A method as defined in claim **1**, further comprising:
identifying the second frame of media samples by extracting a common plurality of media samples from the first frame of media samples and appending a first plurality of media samples to the common plurality of media samples.

**5**. A method as defined in claim **4**, further comprising:
identifying a second plurality of filtered values by performing the wavelet transform on the second frame of media samples;
determining a third energy value based on a first portion of the second plurality of filtered values;
determining a fourth energy value based on a second portion of the second plurality of filtered values; and
determining the second descriptor based on a comparison of the third energy value and the fourth energy value.

**6**. A method as defined in claim **1**, further comprising identifying media information based on the first signature.

**7**. A method as defined in claim **6**, wherein the media information is associated with at least one of audio information or video information.

US 8,489,884 B2

27

**8**. An apparatus for generating signatures, comprising:
a processor system including a memory; and
instructions stored in the memory that enable the processor system to:

identify a first plurality of filtered values by performing a wavelet transform on a first frame of media samples;

determine a first energy value based on a first portion of the first plurality of filtered values;

determine a second energy value based on a second portion of the first plurality of filtered values;

determine a first descriptor of the first frame of media samples based on a comparison of the first energy value and the second energy value;

generate a first signature based on the first descriptor;

determine a second descriptor of a second frame of media samples; and

generate a second signature based on the second descriptor.

**9**. An apparatus as defined in claim **8**, wherein the first plurality of filtered values is associated with a high-frequency sub-band of the first frame of media samples.

**10**. An apparatus as defined in claim **8**, wherein the first descriptor is associated with only the first frame of media samples.

**11**. An apparatus as defined in claim **8**, wherein the instructions stored in the memory enable the processor system to:

identify the second frame of media samples by extracting a common plurality of media samples from the first frame of media samples and appending a first plurality of media samples to the common plurality of media samples.

**12**. An apparatus as defined in claim **11**, wherein the instructions stored in the memory enable the processor system to:

identify a second plurality of filtered values by performing the wavelet transform on the second frame of media samples;

determine a third energy value based on a first portion of the second plurality of filtered values;

determine a fourth energy value based on a second portion of the second plurality of filtered values; and

determine the second descriptor based on a comparison of the third energy value and the fourth energy value.

**13**. An apparatus as defined in claim **8**, wherein the instructions stored in the memory enable the processor system to identify media information based on the first signature.

28

**14**. An apparatus as defined in claim **13**, wherein the media information is associated with at least one of audio information or video information.

**15**. A tangible machine accessible storage medium, excluding a signal, comprising instructions that, when executed, cause a machine to at least:

identify a first plurality of filtered values by performing a wavelet transform on a first frame of media samples;

determine a first energy value based on a first portion of the first plurality of filtered values;

determine a second energy value based on a second portion of the first plurality of filtered values;

determine a first descriptor of the first frame of media samples based on a comparison of the first energy value and the second energy value;

generate a first signature based on the first descriptor;

determine a second descriptor of a second frame of media samples; and

generate a second signature based on the second descriptor.

**16**. A machine accessible medium as defined in claim **15**, wherein the first plurality of filtered values is associated with a high-frequency sub-band of the first frame of media samples.

**17**. A machine accessible medium as defined in claim **15**, wherein the first descriptor is associated with only the first frame of media samples.

**18**. A machine accessible medium as defined in claim **15**, having instructions stored thereon that, when executed, cause the machine to:

identify the second frame of media samples by extracting a common plurality of media samples from the first flame of media samples and appending a first plurality of media samples to the common plurality of media samples.

**19**. A machine accessible medium as defined in claim **18**, having instructions stored thereon that, when executed, cause the machine to:

identify a second plurality of filtered values by performing the wavelet transform on the second frame of media samples;

determine a third energy value based on a first portion of the second plurality of filtered values;

determine a fourth energy value based on a second portion of the second plurality of filtered values; and

determine the second descriptor based on a comparison of the third energy value and the fourth energy value.

\* \* \* \* \*